No. 26-1878

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————————

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

JARED DEMARINIS, in his Official Capacity as State Administrator of
Elections for the State of Maryland,

Defendant-Appellee

MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS; COMMON
CAUSE; OUT FOR JUSTICE, INC.; CARL SNOWDEN; MYRIAM PAUL;
LUIS SIMS,

Intervenors/Defendants

—————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

—————————————

BRIEF FOR THE UNITED STATES AS APPELLANT

—————————————

*(See inside cover for continuation of counsel)*

*(Continuation of cover)*

HARMEET K. DHILLON
  Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
AUDREY A. WEAVER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 890-0949

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ...................................................................................1

STATEMENT OF JURISDICTION........................................................2

STATEMENT OF THE ISSUES..............................................................2

STATEMENT OF THE CASE .................................................................3

SUMMARY OF ARGUMENT................................................................12

STANDARD OF REVIEW.....................................................................14

ARGUMENT

     I.     The DOJ's demand for an electronic, unredacted copy of Maryland's SVRL satisfied Title III's requirements. ...................................................................15

          A.     Maryland's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA. ..............................................16

               1.     The SVRL falls within the scope of the plain language of Section 301. ............................18

               2.     The district court erred in finding the SVRL falls outside Title III when the SVRL would still "come into" Administrator DeMarinis' possession the moment another person in his office gave it to him. ......................31

               3.     The district court's interpretation of Section 301 as excluding internally generated documents would lead to absurd results. ...........32

**TABLE OF CONTENTS (continued):**            **PAGE**

4.    The SVRL is a record "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" within the scope of Title III ................. 35

B.    The DOJ satisfied Title III's requirement of providing a written statement of the basis and the purpose for the demand. ...................................... 36

II.   Maryland must produce the SVRL without redactions. ...... 56

III.   Privacy laws do not provide any alternative basis to affirm ............................................................. 58

A.    Federal law preempts any contrary Maryland privacy law. ................................................ 58

B.    The DOJ is complying with the Privacy Act. ............ 60

CONCLUSION ............................................................. 63

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

ADDENDUM

## TABLE OF AUTHORITIES

**CASES:**                                               **PAGE**

*Alabama ex rel. Gallion v. Rogers*,
187 F. Supp. 848 (M.D. Ala. 1960)
*aff'd sub nom. Dinkens v. Attorney Gen.*,
285 F.2d 430 (5th Cir. 1961) ..................................................20, 39

*Alphin v. United States*, 809 F.2d 236 (4th Cir. 1987)...........................56

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) ........................................................62

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) ............59

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .....................................................14

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) ..............53, 63

*Bryan v. United States*, 524 U.S. 184 (1998)...........................................31

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) ..............59

*Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052 (2026) ........22

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963)
(per curiam) ......................................................................40-41, 52

*Department of Commerce v. New York*, 588 U.S. 752 (2019).................55

*Dinkens v. Attorney Gen.*, 285 F.2d 430 (5th Cir. 1961) ...................20, 39

*Doe v. Chao*, 540 U.S. 614 (2004)...........................................................61

*Donaldson v. United States*, 400 U.S. 517 (1971),
*superseded by statute on other grounds*,
Tax Reform Act of 1976, Pub. L. No. 94-455,

**CASES (continued):**                                                    **PAGE**

90 Stat. 1520 ..................................................................45-46

*EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*,
    116 F.3d 110 (4th Cir. 1997) ....................................... 47, 50

*EEOC v. Maryland Cup Corp.*, 785 F.2d 471 (4th Cir. 1986)........... 46, 49

*EEOC v. South Carolina Nat'l Bank*,
    562 F.2d 329 (4th Cir. 1977) .....................................45-47

*Endicott Johnson Corp. v. Perkins*, 317 U.S. 501 (1943) ...................... 47

*Equity Inv. Assocs., LLC v. United States*,
    40 F.4th 156 (4th Cir. 2022)....................................43-44

*Ex Parte Siebold*, 100 U.S. 371 (1879) ...................................... 60

*Fischer v. United States*, 603 U.S. 480 (2024) ...........................30

*Foster v. Love*, 522 U.S. 67 (1997).........................................59-60

*Garcia-Bengochea v. Carnival Corp.*,
    57 F.4th 916 (11th Cir. 2023)................................... 19, 30

*Glacier Nw., Inc. v. International Bhd. of Teamsters Loc.
    Union No. 174*, 598 U.S. 771 (2023) ..............................60

*Gray v. Main*, 309 F. Supp. 207 (M.D. Ala. 1968) ..................................57

*Hannah P. v. Coats*, 916 F.3d 327 (4th Cir. 2019) ................................50

*Heckler v. Chaney*, 470 U.S. 821 (1985)...................................40

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ..............................41

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000) ..................44

**CASES (continued):** **PAGE**

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962)....................................39-40

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962)..............................*passim*

*Lamie v. United States Tr.*, 540 U.S. 526 (2004)....................................27

*Link v. NLRB*, 330 F.2d 437 (4th Cir. 1964) ...........................................47

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ...................17, 21

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374 (1992) ...................22

*Murphy v. Smith*, 583 U.S. 220 (2018) ...................................................35

*Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130 (4th Cir. 1993) .........14

*Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186 (1946).....................44

*Project Vote/Voting for Am., Inc. v. Long*,
  682 F.3d 331 (4th Cir. 2012) .........................................................57

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam) ..............................53

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ......................................................................31

*Reynolds v. Sims*, 377 U.S. 533 (1964) ...................................................53

*Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997) .......................................17

*Ronnow v. City of Las Vegas*, 65 P.2d 133 (Nev. 1937)...........................19

*Russello v. United States*, 464 U.S. 16 (1983) .............................26, 34, 51

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966)..............................3-5

**CASES (continued):** **PAGE**

*Stone v. Instrumentation Lab'y Co.*,
591 F.3d 239 (4th Cir. 2009) ..................................................14, 17

*United States v. American Target Advert., Inc.*,
257 F.3d 348 (4th Cir. 2001) ...............................................46-47, 56

*United States v. Benson*, 819 F. Supp. 3d 753
(W.D. Mich. 2026)..................................................................25, 27,

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026),
*petition for reh'g en banc pending*..........................................*passim*

*United States v. LaSalle Nat'l Bank*, 437 U.S. 298 (1978) ....................54

*United States v. Lynd*, 301 F.2d 818 (5th Cir. 1962) .............................40

*United States v. Maine*, No. 1:06-CV-0086-JAW,
2007 WL 1059565 (D. Me. Apr. 4, 2007) ........................................21

*United States v. McAnlis*, 721 F.2d 334 (11th Cir. 1983) ......................58

*United States v. Mississippi*, 380 U.S. 128 (1965) ...........................16, 21

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950)....................41, 46

*United States v. Powell*, 379 U.S. 48 (1964) ..................................*passim*

*United States v. Rosinsky*, 547 F.2d 249 (4th Cir. 1977) ......................43

*United States v. Stuart*, 489 U.S. 353 (1989) .......................................54

*United States v. Sturm, Ruger & Co.*, 84 F.3d 1 (1st Cir. 1996) ............46

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ............................................................21, 33

**CASES (continued):** **PAGE**

*Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068
 (10th Cir. 2025)................................................................30

*Webster v. Doe*, 486 U.S. 592 (1988).......................................40

**CONSTITUTION:**

U.S. Const. Art. I, § 4, Cl. 1.................................................59

U.S. Const. Art. VI, Cl. 2.....................................................59

**STATUTES:**

Civil Rights Cold Case Records Collection Act of 2018
 44 U.S.C. 2107 (note) .................................................20
 Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) ..................20

Civil Rights Act of 1960(CRA)
 52 U.S.C. 20701 *et seq.* ...............................................4
 52 U.S.C. 20701 ...............................................*passim*
 52 U.S.C. 20702 ...............................................*passim*
 52 U.S.C. 20703 ...............................................*passim*
 52 U.S.C. 20704 ............................................4, 10, 57, 60
 52 U.S.C. 20705 ..................................................5, 15, 38
 Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960)..............................51

Help America Vote Act of 2002 (HAVA)
 52 U.S.C. 20901 *et seq.* .................................................1
 52 U.S.C. 20901 ...........................................................1
 52 U.S.C. 21083(a)(1)(A) ..................................................6
 52 U.S.C. 21083(a)(1)(A)(viii)..............................................6
 52 U.S.C. 21083(a)(2)(A) ................................................6, 29
 52 U.S.C. 21083(a)(2)(A)(i)-(iii).............................................6
 52 U.S.C. 21083(a)(5)(A)(i)-(ii)............................................6-7
 52 U.S.C. 21083(a)(5)(A)(iii)................................................7
 Pub. L. No. 107-252, 116 Stat. 1666 (2002)................................52

**STATUTES (continued):**                                    **PAGE**

National Voter Registration Act of 1993 (NVRA)
    52 U.S.C. 20501 *et seq.* ...................................................... 1
    52 U.S.C. 20501 .............................................................. 1, 9, 48
    52 U.S.C. 20501(a)(3) ........................................................ 52
    52 U.S.C. 20501(b)(3) ......................................................... 5
    52 U.S.C. 20507 ................................................................ 26
    52 U.S.C. 20507(a)(4) ...................................................... 6, 29
    52 U.S.C. 20507(i)(1) ....................................................... 5, 57

President John F. Kennedy Assassination Records Collection
    Act of 1992
    44 U.S.C. 2107 (note) ........................................................ 21
    Pub. L. No. 102-526, § 3(2), 106 Stat. 3444................................. 21

Privacy Act of 1974
    5 U.S.C. 552a(e)(4) ...................................................... 60, 61
    5 U.S.C. 552a(e)(4)(B) ....................................................... 62
    Pub. L. No. 93-579, 88 Stat. 1896........................................... 58

8 U.S.C. 1445(f)................................................................... 26

8 U.S.C. 1454(a) .............................................................. 25, 26

10 U.S.C. 130c(d)(2)(C) ........................................................ 24

13 U.S.C. 214 ..................................................................... 24

26 U.S.C. 7602(a) ............................................................... 43

26 U.S.C. 7605(a) ............................................................... 43

26 U.S.C. 7605(b) ............................................................... 43

28 U.S.C. 1291 .................................................................... 2

28 U.S.C. 1331 .................................................................... 2

**STATUTES (continued):**                                                    **PAGE**

28 U.S.C. 1343(a)(4)................................................................2

30 U.S.C. 1732(b) ................................................................24

42 U.S.C. 2000e-2 ................................................................51

42 U.S.C. 3604-3606 ................................................................51

42 U.S.C. 2617 ................................................................51

44 U.S.C. 3572(f)................................................................24

52 U.S.C. 10101 ................................................................51

52 U.S.C. 10301-10306 ................................................................51

52 U.S.C. 10309 ................................................................51

**REGULATIONS:**

28 C.F.R. 0.50(a) ................................................................62

68 Fed. Reg. 47,610 (Aug. 11, 2003) ................................................................61

70 Fed. Reg. 43,904 (July 29, 2005) ................................................................61

82 Fed. Reg. 24,147 (May 25, 2017)................................................................61

**LEGISLATIVE HISTORY:**

*Civil Rights—1959: Hearings Before the Subcomm. on
     Constitutional Rights of the S. Comm. on the Judiciary,*
     86th Cong., 1 Sess. (1959) ................................................................45

106 Cong. Rec. 7767 (1960) ................................................................52

**RULES (continued):** **PAGE**

Fed. R. App. P. 2 ..................................................................................64

Fed. R. App. P. 40(d)(1) ....................................................................64

Fed. R. App. P. 41(b)..........................................................................64

Fed. R. Evid. 201(b) ..........................................................................56

**MISCELLANEOUS:**

1 New Shorter Oxford English Dictionary (4th ed. 1993) ......................19

Authority to Obtain and Share Statewide Voter Roll Data,
    50 Op. O.L.C. (2026),
    https://www.justice.gov/olc/media/1440346/dl .............................20

*Black's Law Dictionary* (4th ed. 1968)...................................................19

EAC, Election Administration and Voting Survey
    2024 Comprehensive Report (June 2025),
    https://tinyurl.com/38xb38tx.........................................................7

U.S. Comm'n on Civ. Rights (1959),
    https://www.usccr.gov/files/historical/1959/
    59-001-U.pdf ................................................................ 27-28, 33-34

U.S. Election Assistance Comm'n,
    Celebrating 20 Years of HAVA,
    https://www.eac.gov/sites/default/files/HelpAmerica
    VoteDay/HAVA_1-Pager_10-27-22_508.pdf.............................52-53

U.S. Dep't of Just., Civil Rights Division, Voting Section,
    https://www.justice.gov/crt/voting-section
    (last visited Aug. 7, 2026) ...........................................................62

**MISCELLANEOUS (continued):**          **PAGE**

U.S. Dep't of Just., Justice Manual § 9-11.151 (2020),
https://www.justice.gov/jm/jm-9-11000-grand-jury# ......................62

*Webster's Third New International Dictionary*
(1966 ed. unabridg. Vol. I)..............................................................18

*Webster's New World Dictionary of the American
Language* (8th coll. ed. 1960) ........................................................18

## INTRODUCTION

Title III of the Civil Rights Act of 1960 (CRA) gives the Attorney General sweeping authority to inspect election records. 52 U.S.C. 20703. The United States Department of Justice (DOJ or Department) under that authority to compel Maryland to produce its statewide voter registration list (SVRL), which would enable the United States to investigate compliance with the National Voter Registration Act of 1993 (NVRA), 52 U.S.C. 20501 *et seq.*, and the Help America Vote Act of 2002 (HAVA), 52 U.S.C. 20901 *et seq.*

In dismissing the United States' Complaint and denying its Motion to Compel, the district court rewrote the phrase "come[s] into . . . possession" to exclude internally generated documents like Maryland's SVRL from the scope of Title III. By reading an external-source limitation into the language of Title III, the district court defied the fundamental task of statutory interpretation. The district court erred in adopting an unreasonable interpretation that cannot be reconciled with the plain and ordinary meaning of the words chosen by Congress. The other arguments raised below that (1) the United States failed to provide a sufficient basis and purpose for its Title III demand, (2) Title III does not allow the

United States to obtain unredacted SVRLs, and (3) state or federal privacy laws excuse compliance with Title III, provide no alternative basis to affirm.

This Court should reverse the district court's judgment and remand with instructions for the district court to order Maryland to produce the demanded SVRL.

## STATEMENT OF JURISDICTION

This appeal stems from a final judgment in a civil case. The district court had jurisdiction under 28 U.S.C. 1331 and 1343(a)(4). That court entered a final Order granting defendants' and interventors' Motions to Dismiss on June 18, 2026. JA1-11.[1] The United States filed a timely Notice of Appeal. JA196-198. This Court has jurisdiction under 28 U.S.C. 1291.

## STATEMENT OF THE ISSUES

1.    Whether the district court erred in concluding Maryland's statewide voter registration list (SVRL) is not a record that "come[s] into"

---

[1] "JA__" refers to the page numbers of the Joint Appendix filed with this Brief.

an election officer's "possession" within the meaning of Title III of the CRA, 52 U.S.C. 20701.

2.     Whether Title III of the CRA permits a court to scrutinize the sufficiency of the Attorney General's written statement of the basis and the purpose for the demand, and if so, whether the Attorney General's statement was sufficient here.

3.     Whether Title III of the CRA requires Maryland to produce the full SVRL without redactions to the United States.

4.     Whether federal or state privacy laws prevent the United States from demanding and obtaining the full, unredacted copy of Maryland's SVRL pursuant to Title III of the CRA.

## STATEMENT OF THE CASE

1.a. The CRA was passed by Congress to strengthen the Civil Rights Act of 1957, which had "authorized the Attorney General to seek injunctions against public and private interference with the right to vote on racial grounds." *South Carolina v. Katzenbach*, 383 U.S. 301, 313 (1966). The CRA "permitted the joinder of States as parties defendant" in such suits and "authorized courts to register voters in areas of systematic discrimination." *Ibid.* In addition, Title III of the CRA "gave

- 3 -

the Attorney General access to local voting records." *Ibid.*; *see* 52 U.S.C. 20701 *et seq.*

Under Title III, "[e]very officer of election shall retain and preserve, for a period of twenty-two months from the date of any [federal] general, special, or primary election . . . all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. In the key provision here, Title III further provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

52 U.S.C. 20703.

The Attorney General and his representatives are prohibited from disclosing such records or papers except to Congress and its committees, governmental agencies, and in the presentation of a court proceeding. 52 U.S.C. 20704. And, should it be necessary, the Attorney General may seek the aid of a district court: "The United States district court for the district in which a demand is made . . . or in which a record or paper so

- 4 -

demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

b. Although Congress enacted the CRA, including Title III, with its eyes on "tr[ying] to cope with the problem" of racial discrimination in voting, *Katzenbach*, 383 U.S. at 313, Congress has since enacted additional laws that affect what "records and papers which come into [election officers'] possession," 52 U.S.C. 20701.

Relevant here are the NVRA and the HAVA, which help the federal government ensure that States are overseeing federal elections in a fair and honest manner and "to protect the integrity of the electoral process." 52 U.S.C. 20501(b)(3). The NVRA requires each State, with exceptions, "for at least 2 years . . . [to] make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. 20507(i)(1). The NVRA further requires each State to conduct "a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of . . . the death of the registrant; or . . . change in the

- 5 -

residence of the registrant." 52 U.S.C. 20507(a)(4). Similarly, HAVA mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(2)(A).

Of highest importance to this litigation, HAVA requires States to implement a single centralized computerized SVRL which "serve[s] as the official voter registration list for the conduct of all elections for Federal office in the State," 52 U.S.C. 21083(a)(1)(A)(viii). HAVA mandates that the "appropriate State or local election official shall perform list maintenance with respect to the computerized list on a regular basis." 52 U.S.C. 21083(a)(1)(A) and (a)(2)(A). This process includes removing "individual[s]," "registrant[s]," and "ineligible voters," who should not appear on the lists. 52 U.S.C. 21083(a)(2)(A)(i)-(iii). HAVA also mandates that States may not "accept[] or process[]" an application for voter registration "unless the application includes" particular identifiers—namely, an applicant's "driver's license number" if he or she has one; "the last 4 digits of the applicant's social security number"; or, if the applicant has neither a driver's license nor a social security number, a state-assigned "unique identifying number." 52

- 6 -

U.S.C. 21083(a)(5)(A)(i)-(ii). "The State shall determine whether the information provided by an individual is sufficient to meet the[se] requirements . . . in accordance with State law." 52 U.S.C. 21083(a)(5)(A)(iii).

2. The United States Election Assistance Commission (EAC) is "an independent bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process." EAC, About the EAC, http://eac.gov/about. EAC conducts a biennial Election Administration and Voting Survey (EAVS) of States. For the 2024 EAVS, States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." EAC, *Election Administration and Voting Survey 2024 Comprehensive Report* (June 2025) at iv, https://tinyurl.com/38xb38tx.

Based on its review of the 2024 EAVS report, the Attorney General, acting through representatives at the DOJ, sent a July 14, 2025, letter to Administrator DeMarinis, Chief Election Officer of Maryland, regarding Maryland's compliance with Federal list maintenance requirements. JA35-38. The July 14 letter listed several anomalies in Maryland's voter

- 7 -

registration data identified from Maryland's EAVS responses. JA36-37. For example, the letter described that Maryland reported nearly as many active registered voters as the citizen voting age population in Maryland, with a registration rate in 2024 of 95.9% of the citizen voting age population and a similar unusually high ratio of registered voters to citizens for several prior years. JA36. As another example, the letter highlighted that Maryland reported only 430 registered voters were removed for duplicate registrations during the relevant period, well below the national average. JA37. In addition, the letter described that an October 2023 audit identified potentially thousands of deceased individuals with active voter registrations, found local boards of election were not removing deceased voters promptly, and found duplicate voter registrations were not being removed from voter rolls. JA37.

The letter requested a list of the election officials responsible for implementing Maryland's general program of voter registration list maintenance for a specified time and a description of the list maintenance steps taken and when those steps were taken to assess compliance with the NVRA. JA35. The letter also requested a current electronic copy of Maryland's computerized SVRL, as required by Section

- 8 -

303(a) of HAVA. JA35-36. The letter emphasized that the request "regard[ed] the state's procedures for complying with the statewide voter registration list maintenance provisions of the [NVRA], 52 U.S.C. § 20501 *et seq*." JA35.

On July 30, 2025, Administrator DeMarinis responded by directing the DOJ to a website where it could obtain "copies of publicly available data in the statewide voter registration list." JA39-43. On August 13, 2025, Administrator DeMarinis sent the Department another letter in which he asked the purpose of the Attorney General's request for Maryland's SVRL citing Maryland election laws and raised various privacy concerns under the Privacy Act. JA44-45.

The DOJ then responded on August 18, 2025, invoking the CRA to again demand Maryland's complete, unredacted SVRL. JA46-48. The letter invoked the Attorney General's authority under Title III of the CRA and made clear that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." JA47. The DOJ requested Administrator DeMarinis' compliance by August 25, 2025. JA48.

- 9 -

To alleviate the privacy concerns previously raised by Administrator DeMarinis in prior letters, the August 18 letter assured that the DOJ would comply with federal privacy laws applicable to the demanded federal election records. JA47-48. The letter also emphasized that the CRA prohibits the Attorney General or DOJ from "disclos[ing] any record or paper produced pursuant to this chapter" except for limited exceptions. JA47 (quoting 52 U.S.C. 20704).

On August 25, 2025, Administrator DeMarinis responded by asserting that none of the authorities cited in the DOJ's correspondence "expressly grant to DOJ the right to access to the State's voter registration list." JA49-51. According to Administrator DeMarinis: "absent particularized and detailed concerns, a demand for the entire Maryland voter list, including sensitive personally identifying information that is not publicly available, without evidence or support, is an overreach and unreasonable under the circumstances." JA50. Administrator DeMarinis suggested he "remain[ed] open to any opportunity to discuss this matter further" but "would be better able to participate in any legitimate investigation" if the DOJ provided "specific cases or specific individuals suspected of involvement in electoral

- 10 -

illegalities." JA51-50. To date, Administrator DeMarinis has refused to produce for inspection the complete, unredacted SVRL.

3. The United States brought this suit on December 1, 2025, alleging that Administrator DeMarinis' refusal to produce Maryland's complete, unredacted SVRL violated Section 303 of the CRA, 52 U.S.C. 20703, and seeking declaratory judgment in its favor. *See generally* JA26-34. The United States simultaneously moved to compel production of the SVRL. JA18 (docket entry 2). Shortly thereafter, two sets of non-parties sought to intervene as defendants. *See* JA18 (docket entries 4, 8). The district court granted those two motions on February 2, 2026. JA21 (docket entries 37-38). By early February, Administrator DeMarinis and the two sets of intervenors each filed Motions to Dismiss. *See* JA20-22 (docket entries 34, 43, 50).

On June 18, 2026, the district court entered an Order dismissing the United States' Complaint (JA1-11), concluding that Maryland's SVRL is not a "record" within the meaning of Title III, 52 U.S.C. 20701 (JA9). At the threshold, the district court rejected the United States' contention that the special statutory proceeding described in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) governed the CRA claim. JA6. As to

- 11 -

the merits, the district court held that the SVRL is not a record whose retention is required by Title III of the CRA, 52 U.S.C. 20701. JA9. The court provided two reasons. First, it concluded the SVRL does not "come into [the] possession" of election officers within the meaning of Title III because it "is created by state officials." JA7. Second, the court concluded that if Title III encompassed "constantly updated and, thus, altered" documents such as Maryland's SVRL, then Title III would "conflict with an adjacent provision, 52 U.S.C. § 20702, which criminalizes the alteration of any record or paper covered by § 20701." JA8.

The United States now appeals from the Order granting Administrator DeMarinis' and the intervenors' Motions to Dismiss and dismissing the United States' Complaint with prejudice.

## SUMMARY OF ARGUMENT

The district court erred in dismissing the United States' claim against Administrator DeMarinis and intervenors (collectively defendants) under Title III of the Civil Rights Act of 1960. Under the plain language of Section 301 (52 U.S.C. 20701), Maryland's SVRL is an election record that "come[s] into [an election officer's] possession" and

- 12 -

must be preserved and produced to the Attorney General for inspection upon written demand. *See* 52 U.S.C. 20703. The district court erred in adopting a strained interpretation of "come[s] into . . . possession" that arbitrarily excludes internally generated records like the SVRL from the scope of Title III. This Court should reverse.

While the district court declined to reach the other arguments advanced below, none of those provide an alternative ground to affirm the district court. First, the Attorney General satisfied Section 303 (52 U.S.C. 20703) by issuing a written demand to Administrator DeMarinis that contained a statement of the basis and purpose of the demand. Nothing in the language of Title III authorizes a court to scrutinize the sufficiency of that demand, nor cabins the Attorney General's authority to demand records to certain types of investigations. Even if it did, the statement of the basis and purpose of the demand was sufficient. The SVRL is a record "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" within the scope of Section 301. Second, nothing in the text of Title III or elsewhere permits Maryland to withhold the full, unredacted SVRL from the Attorney General. Third, no state or federal privacy laws excuse

- 13 -

Maryland's non-compliance with the Title III demand. This Court should remand this case with instructions to order Maryland to produce the full, unredacted SVRL for inspection consistent with the United States' Title III demand.

## STANDARD OF REVIEW

This Court "review[s] a district court's dismissal under [Federal] Rule [of Civil Procedure] 12(b)(6) *de novo.*" *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a motion to dismiss under Rule 12(b)(6), courts must "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Ibid.* A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Facial plausibility is achieved "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* In addition, statutory interpretation is a question of law reviewed *de novo. Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 242-243 (4th Cir. 2009).

- 14 -

## ARGUMENT

### I. The DOJ's demand for an electronic, unredacted copy of Maryland's SVRL satisfied Title III's requirements.

Section 301 of Title III of the CRA imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962) (*Lynd II*), to "retain and preserve, for a period of twenty-two months from the date of [a federal election] *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701 (emphasis added).

Section 303 provides the Attorney General with a correspondingly comprehensive power to demand in writing that "the person having custody, possession, or control of such record[s] or paper[s]" make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. After that written demand has been made, and the state election officer has rejected it, the Attorney General may seek an order from the federal court with "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705.

Notwithstanding the plain language of these provisions, the district court dismissed the DOJ's Title III claim on the grounds that Maryland's "SVRL is not a record or paper that a state must produce to the United States under the CRA." JA9. The court reasoned that "the SVRL, which is created by state officials, does not 'come into [their] possession[,]'" and that to interpret Section 301 as "cover[ing] an SVRL would bring it into conflict with an adjacent provision, 52 U.S.C. § 20702, which criminalizes the alteration of any record or paper covered by § 20701." JA7-8. This was error.

### A. Maryland's SVRL qualifies as a "record[]" or "paper[]" subject to the Attorney General's demand under the CRA.

Under the plain language of Title III, Maryland's SVRL is a record required to be preserved—and thus produced for inspection upon demand. That statute imposes on officers of election a duty to "retain and preserve . . . all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701. This "sweeping" provision encompasses Maryland's SVRL. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III. . .

- 16 -

requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records").

Any exercise of statutory interpretation "start[s] with the plain language." *Stone v. Instrumentation Lab'y Co.*, 591 F.3d 239, 243 (4th Cir. 2009) (citation omitted). After all, "courts must presume that a legislature says in a statute what it means and means in a statute what it says." *Ibid.* (citation omitted). As a result, unless a statute is ambiguous, "this first canon is also the last: judicial inquiry is complete." *Ibid.* (internal quotation marks and citation omitted); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (citation omitted) ("Our inquiry must cease if the statutory language is unambiguous and the statutory scheme is coherent and consistent.").

Here, the plain language used in Title III—"all records and papers which come into [an election officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. 20701—encompasses Maryland's SVRL. The district court below erred by reading an external-source limitation into the phrase "come[s] into . . . possession" and thus holding

- 17 -

that internally generated documents like the SVRL are excluded from Section 301's scope.

### 1. The SVRL falls within the scope of the plain language of Section 301.

a. The district court erred in refusing to adopt the ordinary meaning of the phrase "come[s] into . . . possession" offered by the United States. Consistent with dictionary definitions contemporaneous with the CRA's passage, an officer "come[s] into . . . possession" of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World Dictionary of the American Language* 291 (8th coll. ed. 1960); *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). None of these definitions limit the author, source, or origin of the thing acquired or possessed.

In fact, the definition of "acquire" conveys the opposite: "to come into possession of often by some *uncertain or unspecified means.*" *Webster's Seventh New Collegiate Dictionary* 8 (1967 ed.) (emphasis added); *see also Webster's Third New International Dictionary* 18 (1966 ed. unabridg. Vol. I) ("to come into possession, control, or power of

- 18 -

disposal of often by some uncertain or unspecified means"); *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring) (discussing that "acquire" has two definitions, one of which is "[c]ome into possession of," which "broadly encompasses possession *by any means*" (alteration in original; emphasis added) (quoting 1 *New Shorter Oxford English Dictionary* 20 (4th ed. 1993))). As the contemporaneous Black's Law Dictionary described, to acquire was to "receive or gain *in whatever manner*[,]" broadly "being the act of getting or obtaining something which may be already in existence, *or may be brought into existence* through means employed to acquire it." *Black's Law Dictionary* 41 (4th ed. 1968) (emphases added) (citing *Ronnow v. City of Las Vegas*, 65 P.2d 133, 139 (Nev. 1937) (explaining that "[a] bridge may be acquired *by construction* as well as by purchase")).

The defining feature of the phrase "come into possession" then, is the resulting possession—not the particular means by which that possession is secured. By limiting the phrase's meaning to one particular method of possession, *i.e.*, receipt of externally created records, the district court's interpretation does *exactly the opposite* of what the plain language of the phrase commands.

- 19 -

Congress's choice of the phrase "come[s] into . . . possession" appears deliberate, being selected precisely because it is broad enough to cover any document obtained by any means—both self-generated and from an outside source—during the officer's tenure. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C., at 8-9 (2026), https://www.justice.gov/olc/media/1440346/dl (discussing that the phrase "come into possession" "does not carry a requirement that the thing is received from a third party" and that "it is not unusual to say that one comes into possession of a thing that one created oneself"); *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 855 (M.D. Ala. 1960) (referring to "all records and papers which are in the possession of an election official . . . if those records and papers relate to the acts requisite to voting"), *aff'd sub nom.*, *Dinkens v. Attorney Gen.*, 285 F.2d 430 (5th Cir. 1961).[2] Indeed, courts have recognized that Section 301 encompasses

---

[2] This would not be the only time Congress has used the phrase in a manner meant to encompass both self-generation and receipt from an outside source. *See* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) ("was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

"records of voting registration[,]" *Mississippi*, 380 U.S. at 134, including voter registration lists, *see, e.g.*, *United States v. Maine*, No. 1:06-CV-0086-JAW, 2007 WL 1059565, at *5 (D. Me. Apr. 4, 2007); *McIntyre*, 624 F. Supp. at 664.

The Supreme Court has likewise understood that the scope of the phrase "come into . . . possession" is broad enough to cover internally generated documents, albeit in the context of the Freedom of Information Act (FOIA). In *United States Dep't of Just. v. Tax Analysts*, 492 U.S. 136 (1989), the Court was tasked with discerning the meaning of the phrase "agency records[,]" which FOIA left undefined. *Id.* at 142 (citation omitted). It held that the phrase encompassed two requirements: "First, an agency must either *create* or obtain the requested materials," and second, "the materials [must] have *come into the agency's possessio*n in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *Id.* at 144-145 (emphasis added). Thus, the Supreme Court specifically recognized that records that "come into the agency's possession" can be created by the agency— not just obtained from external sources.

- 21 -

The surrounding context of Section 301 confirms the United States' interpretation. The phrases "all records and papers" and "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" clearly encompass election documents like an SVRL. 52 U.S.C. 20701; *cf. United States v. Benson*, 179 F.4th 470, 478 (6th Cir. 2026) (*Benson II*) (citation omitted) (observing it was undisputed that the "qualified voter file is a 'record'" and "that the term 'relating to' has a broad meaning"), *petition for reh'g en banc pending* (filed July 8, 2026). The phrase "relating to' sweeps broadly[,]" and "means 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1060 (2026) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992), quoting Black's Law Dictionary 1158 (5th ed. 1979)). Thus, the types of records encompassed under Section 301 extend beyond simply applications, registrations, or receipts for payments, including any record relating to one of those activities—or even relating to the catchall "other act requisite to voting." 52 U.S.C. 20701. The SVRL fits comfortably within that scope.

- 22 -

When Administrator DeMarinis or his agents, employees, or officers, aggregate individual voter records into an SVRL, they get or acquire a new document (the SVRL) and retain it within their control— thus coming into possession of the SVRL.

b. The district court viewed the United States' reading as creating "surplusage" for the words "come into," and concluded the choice of the phrase "come into possession" instead of "in the possession" supported the district court's carve-out for self-generated documents. *See* JA7-8. That is incorrect.

Congress used the phrase "*come* into his possession" rather than "*in* his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance. 52 U.S.C. 20701; *see Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance"). Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time. See, e.g.*, 13 U.S.C. 214 (prohibiting an

- 23 -

employee from publishing or communicating information "which comes into his possession by reason of his being employed"); 10 U.S.C. 130c(d)(2)(C) (prescribing disclosure timing rules for sensitive information that "came into possession or under the control of the United States more than 10 years before the date on which the request is received"). Thus, when elsewhere in federal law a legal obligation is created when one "comes into possession of such information by reason of his or her being an officer[,]" 44 U.S.C. 3572(f), or within a certain time after "information comes into the possession of the Secretary[,]" 30 U.S.C. 1732(b), no source, origin, or author of said information is required.

Following this focus on the *how* and *when* an individual gains possession of a record or paper, Section 301 places a duty of retention and preservation only on those officers who acquire a record or paper in the course of administering one of the elections mentioned in that provision—and then only "for a period of twenty-two months from the date" of that same election. 52 U.S.C. 20701. Thus the phrase "come into his possession" "cabins an election official's liability to documents she received during her tenure." *Benson II*, 179 F.4th at 487 n.8 (Nalbandian, J., dissenting).

- 24 -

The distinction between records "com[ing] into [one's] possession" and being "in[] [one's] possession," then, is a "temporal" one, *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting)—not a distinction between obtaining records from an outside source and through the fruits of state officer's labor. One of the statutes cited by *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026) (*Benson I*), which the district court below heavily relied on, as "draw[ing] an explicit distinction between possessing something and having something come into one's possession," 819 F. Supp. 3d at 768 (citing 8 U.S.C. 1454), illustrates the point. JA7. Section 1454(a) of Title 8 imposes dual obligations: If a certificate of naturalization or declaration of intention is lost, "the applicant or any other person who shall have" the certificate or declaration at that time "is required to surrender it to the Attorney General," but so too "the applicant or any other person who . . . may come into possession of it" at a later time must likewise surrender the document. 8 U.S.C. 1454(a). Thus, the phrase "come into possession" implies a temporal change in circumstances. Reading that distinction as one between documents that a person obtains from an outside source and documents that a person generates for himself, in contrast, would make

little sense because no applicant or private person can create a certificate of naturalization nor can any "other person," 8 U.S.C. 1454(a), create a declaration of intention for a separate declarant. *See* 8 U.S.C. 1445(f), 1449.

The district court contrasted the "come into . . . possession" formulation of Title III with the NVRA's public-inspection provision, which requires States to make available "all records concerning the implementation of [certain] programs and activities." JA7-8 (quoting 52 U.S.C. 20507). But unlike the CRA, the NVRA's public-inspection provision imposes no *personal* liability—only a state government's obligation—so there is less reason to cabin when and how the duty to retain and preserve attaches. In any event, "[l]anguage in one statute usually sheds little light upon the meaning of different language in another statute." *Russello v. United States*, 464 U.S. 16, 25 (1983). By the district court's own cross-statute surplusage analysis, it would appear that States are obligated under the NVRA to make available even those "records" *not* in their possession—a result that makes little sense— because the NVRA does not use the word "possession" whereas the CRA does. JA7-8. Even assuming the district court's preferred formulation

- 26 -

would have been clearer than what Congress chose, however, that would not necessarily render the meaning of the statute any less plain. *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004).

c. The district court also supported its construction by pointing to the example records and papers listed in Section 301 as ones "that election officials *receive*, rather than *create*." JA8 (quoting *Benson I*, 819 F. Supp. 3d at 768). However, Section 301 is explicitly not limited to those example records; it covers "all records and papers . . . *relating to*" those example records. 52 U.S.C. 20701 (emphasis added). So this context illuminates little.

And as Judge Nalbandian has explained, the historical context in which the CRA was passed makes clear that the CRA was aimed at covering "at least some government-generated records." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting).

> One practice in the Jim Crow South was the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them. *See* Rep. of the U.S. Comm'n on Civ. Rights 93 (1959) [(1959 CCR Report), https://www.usccr.gov/files/historical/1959/59-001-U.pdf]. And county boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant.

- 27 -

*Ibid.*; *see* 1959 CCR Report 75, 82, 87-89 (noting that the Commission had reviewed lists of registered voters); pp. 33-34, *infra*.

Judge Nalbandian also pointed out another contextual clue. Under the reading adopted by the district court in this case that Title III does not cover "any internally or self-generated record," the Attorney General would have no authority to demand records created by a county clerk tracking voters by race. *Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting). At the time of the CRA's passage, such internally generated and inculpatory documents would have been among the most pertinent records the Attorney General could have sought to investigate rampant discriminatory practices.

d. The district court erred in rejecting the United States' interpretation of Title III because it "would bring it into conflict with an adjacent provision, 52 U.S.C. § 20702, which . . . criminalize[s] the same conduct that the NVRA and HAVA require." JA8.

Section 302 of Title III prohibits "[a]ny person" from "willfully steal[ing], destroy[ing], conceal[ing], mutilat[ing], or alter[ing] any record or paper" covered by Section 301. 52 U.S.C. 20702. The NVRA requires States to "make[] a reasonable effort to remove the names of

- 28 -

ineligible voters from the official lists of eligible voters[,]" 52 U.S.C. 20507(a)(4), and HAVA requires States to "perform list maintenance with respect to the [SVRL] on a regular basis[,]" including ensuring individuals "who are not eligible to vote are removed from the [SVRL][.]" 52 U.S.C. 21083(a)(2)(A) and (B)(ii). According to the district court, "the NVRA and HAVA *require* an SVRL's constant alteration[,]" making the SVRL "a dynamic list that is constantly updated and, thus, altered." JA8. But these provisions can easily be harmonized without resorting to an "implied repeal" of Section 301 as applied to SVRLs. *Benson II*, 179 F.4th at 485-486 (Nalbandian, J., dissenting).

Nothing in the text of Section 302's criminal penalties suggests a dynamic record requiring continuous maintenance or updates—whether the SVRL or something else[3]—cannot properly come within the scope of Section 301. And nothing in the text of Section 301 suggests that it does not cover dynamic documents. Indeed, the broad scope of "all records and papers" in Section 301 indicates the opposite.

---

[3] Accepting the district court's conclusion would place *all* dynamic documents, not just the SVRL, beyond the reach of Title III.

Nor does the word "alter" in Section 302 encompass list maintenance under the NVRA or HAVA. The Supreme Court recently interpreted a similarly worded criminal statute in *Fischer v. United States* and explained that, under the canon of *noscitur a sociis*, each of these words must be understood as "actions that, by their nature, impair the integrity or availability of records, documents, or objects." 603 U.S. 480, 481 (2024). Performing list maintenance under the NVRA and HAVA is thus not "alter[ing]" the SVRL at all, 52 U.S.C. 20702; it is, rather, "retain[ing] and preserv[ing]" the SVRL, 52 U.S.C. 20701; *see Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1084-1085 (10th Cir. 2025) (explaining how States can "maintain" documents under the NVRA even when those documents are "dynamic" and "constantly changing").[4] And to the extent the two statutes were actually in conflict,

---

[4] *See The American College Dictionary* 1035 (1959) (defining "retain" as, *e.g.*, "to keep possession of"; "to continue to use, practice, etc."); *id.* at 958 (defining "preserve" as, *e.g.*, "to keep alive or in existence; make lasting"; "to keep safe from harm or injury; save"; and "to keep up; maintain"); *Webster's Third New International Dictionary* 1938 (1966 unabridg.) (defining "retain" as, *e.g.*, "to hold or continue to hold in possession or use"); *id.* at 1794 (defining "preserve" as, *e.g.*, "to keep safe from injury, harm, or destruction"; to "maintain" (capitalization omitted)).

the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in 52 U.S.C. 20702. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Moreover, Section 302's willful *mens rea*—overlooked by the district court—places the type of ordinary list maintenance and updates required under the NVRA and HAVA well beyond the scope of criminal penalties. 52 U.S.C. 20702; *see Bryan v. United States*, 524 U.S. 184, 191-192 (1998) (citation omitted) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'").

> **2.** **The district court erred in finding the SVRL falls outside Title III when the SVRL would still "come into" Administrator DeMarinis' possession the moment another person in his office gave it to him.**

Even accepting the district court's arbitrary external-source limitation, the SVRL would still fall within the scope of Title III the moment it came into Administrator DeMarinis' possession from someone else in the office. Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into his or her possession.

- 31 -

The fines and penalties follow the individual state official having possession of those records. *See* 52 U.S.C. 20701. Under Section 301, "[a]s long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 486-487 (Nalbandian, J., dissenting) (second ellipsis in original) (quoting 52 U.S.C. 20701). Thus, even if Administrator DeMarinis' "employees generated the voter file—and therefore didn't 'come into . . . possession' of the list themselves—[DeMarinis] nonetheless 'c[a]me into . . . possession' of the file when [his] employees sent it to [him]." *Ibid.* (second brackets original; ellipsis in original) (quoting 52 U.S.C. 20701).

### 3. The district court's interpretation of Section 301 as excluding internally generated documents would lead to absurd results.

Excluding government-generated documents from Title III's coverage would lead to absurd results. One of these results is that the SVRL is, since the passage of HAVA, an archetypal record of acts requisite to voting in an election kept by election officials. After all, the SVRL is not just any "record" of an "act requisite to voting," 52 U.S.C. 20701; it is a federally mandated record that "serve[s] as the official voter registration list for the conduct of *all* elections for Federal office in the

State." 52 U.S.C. 21083(a)(1)(A)(viii) (emphasis added). Federal elections cannot occur in any state without the SVRL, and it would seem absurd if the state election officials could hide behind pedantic distinctions to avoid revealing this list to federal officials under the CRA.

Historical context—alluded to above (pp. 27-28, *supra)*—further demonstrates that Congress would not have created such a distinction between documents received from voters and those generated by state officers. To repeat, Title III was enacted in light of "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing 1959 CCR Report at 93); *see also id.* at 479 (majority opinion) (relying on the same report). These voucher indices were critical to the Commission because the state legislatures had passed bills which allowed for the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138.

The Commission itself reviewed self-generated records including overall voting registration records for specific counties, noting that at the

- 33 -

time, in Macon County, Alabama, "the 1958 voter registration list" showed only 1218 of the 25,784 nonwhite citizens were registered to vote. 1959 CCR Report at 75; *see also id.* at 82 (noting evidence of "a list of qualified voters which is brought up to date every 2 years"). The Commission reviewed the "5-year-old official voting list of Bullock County" which showed only five registered black voters in the county. *Id.* at 89. And the Commission gathered evidence of self-generated actions by County registrars, like error corrections on white voter registration applications. *Id.* at 87-88. Now these county tally sheets and county voter registration lists have been replaced by the self-generated electronic state voter registration list as required by HAVA.

The district court's interpretation would also exclude from Title III all of the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting) (highlighting that under that interpretation, "if a county clerk were to keep track of anyone, by race, who paid a poll tax or was given a literacy test or otherwise tried to register to vote, that record could not be obtained by the DOJ"). Surely that was not Congress's

- 34 -

intent, and the text of Title III does not support such a strained limitation.

> ### 4. The SVRL is a record "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" within the scope of Title III.

Administrator DeMarinis below argued Title III's scope was limited to records that relate "to the act of voting in *a particular* election." *See* JA102 (emphasis added). According to them, "Congress could not have intended the 22-month retention of specific 'election records' (ECF 1 ¶¶ 25, 28) to include continuous computer systems that operate in every election." JA102-103. But that, like the district court's errant interpretation of "come[s] into . . . possession," requires the Court to read words that do not appear into the plain text of Title III. The words Congress actually chose are not constrained to one election, but encompass "*any* general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for." 52 U.S.C. 20701; *see also Murphy v. Smith*, 583 U.S. 220, 224 (2018) ("respect for Congress's prerogatives as policymaker means carefully

- 35 -

attending to the words it chose rather than replacing them with others of our own").

In any event, while Administrator DeMarinis posits that the SVRL "is not a record of any particular election" (JA102), he simultaneously acknowledges that the SVRL serves as "the official voter registration list for the conduct of all elections for Federal office in the State" (JA102) (quoting 52 U.S.C. 21083(a)(1)(A)(viii)). Thus, *no election* can be conducted without the SVRL, and the SVRL is a relevant election record for *every election*. At most, then, this interpretation would limit Title III's reach to *the version* of the SVRL in existence within the retention period—not place the SVRL beyond Title III's reach.

### B.    The DOJ satisfied Title III's requirement of providing a written statement of the basis and the purpose for the demand.

In the district court, the defendants challenged the sufficiency of the Attorney General's statement of the basis and the purpose for the Title III demand. *See, e.g.*, JA104-113 (DeMarinis), JA133-136 (Common Cause, *et al.*), JA174-180 (Maryland/DC Alliance). DeMarinis argued that both the stated basis and purpose were inadequate, whether because the statement "used boilerplate language[,]" failed to "articulate[] any

factual basis[,]" or was "not 'limited in scope to reasonably relate to and further its purpose.'" JA109, JA111 (citation and internal quotation marks omitted). And DeMarinis and Common Cause, *et al.*, argued to some extent the demand statement was pretextual. JA112, JA136. While the district court declined to reach these arguments, they nonetheless fail to provide an alternative basis to affirm the district court.

Section 303 of Title III provides the Attorney General with a comprehensive power to demand in writing that "the person having custody, possession, or control of" records or papers falling within the scope of Section 301 make them "available for inspection, reproduction, and copying" so long as the demand "contain[s] a statement of the basis and the purpose therefor." 52 U.S.C. 20703. Nothing in that text authorizes *post hoc* scrutiny into the sufficiency of the Attorney General's statement. The United States easily satisfied the plain text of Section 303 by providing a written statement of the basis and purpose for its records demand. Nothing in the language of Title III restricts the Attorney General's purpose to investigating racially discriminatory practices affecting the right to vote. And defendants' speculation about an ulterior motive does not provide a legal basis to resist the Title III demand.

- 37 -

1. Defendants below repeatedly criticized the United States for "not stat[ing] a proper 'basis' for its demand" (JA134), not "provid[ing] any basis to believe that Maryland has infringed the voting rights of its citizens" (JA177), "fail[ing] to articulate a proper purpose" (JA179), "fail[ing] to explain any connection between its purported 'purpose' and the vast scope of its records request" (JA135), or "not provid[ing] any justification for why the full unredacted voter file is necessary to carry out this purported purpose" (JA136). As an initial matter, accepting defendants' invitation to scrutinize the Attorney General's demand statement requires overlooking the limited role that courts play in evaluating a demand under 52 U.S.C. 20703. Title III does not allow scrutiny into the sufficiency of the Attorney General's demand statement.

After the Attorney General's written demand has been made, and the state election officer has rejected it, Title III authorizes the Attorney General to seek an order from the federal court with "jurisdiction by appropriate process to compel the production of such record or paper." 52 U.S.C. 20705. This proceeding to compel production of federal election records under Title III "is not the commencement of an ordinary, traditional civil action with all of its trappings," but rather "comparable

- 38 -

to the form of a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Lynd II*, 306 F.2d at 225. The Attorney General's authority under Title III is a "purely investigative" one, *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 854 (M.D. Ala. 1960), *aff'd sub nom. Dinkens v. Attorney General of the United States*, 285 F.2d 430 (5th Cir. 1961), and the "investigative process could be completely disrupted if investigative hearings were transformed into trial-like proceedings," *Kennedy v. Bruce*, 298 F.2d 860, 863 (5th Cir. 1962) (citation omitted).

By seeking records required to be maintained under Section 301, the United States initiated "a special statutory proceeding in which the courts play a limited, albeit vital, role." *Lynd II*, 306 F.2d at 225. The special statutory proceeding contemplated in Title III's text limits how the Attorney General's demand for federal election records may be challenged and reviewed. Under the statute's plain language, "[t]here is no place for any . . . procedural device or maneuver—either before or during any hearing of the application—to ascertain the factual support for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose therefor' as set forth in the written demand." *Id.* at 226

- 39 -

(quoting 52 U.S.C. 20703). Nor is "the factual foundation for, or the sufficiency of" the statement of basis and purpose "open to judicial review or ascertainment." *Ibid.*; *see United States v. Lynd*, 301 F.2d 818, 822 (5th Cir. 1962) (*Lynd I*).

Nothing in the language of Title III provides a meaningful standard against which courts could ascertain the sufficiency of the Attorney General's stated basis and purpose. *Cf. Webster v. Doe*, 486 U.S. 592, 599-600 (1988); *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The statute identifies only the scope of the "records and papers" that he may demand, 52 U.S.C. 20701, and a requirement that he communicate in writing "the basis and the purpose" for his request, 52 U.S.C. 20703—not any standard against which to measure his statement of basis and purpose.

Instead, the Attorney General need only "identify in a general way the reasons for his demand" for federal election records. *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)). "Clearly a sufficient statement would be the assertion that the demand was made for the purpose of investigating *possible* violations of a Federal statute." *Ibid.* (emphasis added); *see, e.g.*, *Bruce*, 298 F.2d at 861 (citation omitted) ("The

- 40 -

purpose of this demand is to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred."); *In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962) (verbatim)*, aff'd sub. nom. Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963); *cf. United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950) (concluding the government "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not").

Accordingly, the only "matters open for determination" by the court when a recipient of the Attorney General's demand challenges that demand are "whether the written demand has been made" and "whether the custodians against whom orders are sought have been given reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226.

Defendants attempt to evade the special statutory proceeding contemplated in Title III by analogizing this proceeding to an administrative subpoena enforcement. *See, e.g.*, JA133-134, JA174-175. Defendants claim that "the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is 'conducted

- 41 -

pursuant to a legitimate purpose,'" whether they serve "unnecessary examination or investigations," and even whether "the information sought is relevant to the inquiry and not unduly burdensome." JA133-134 (citations omitted); *see also* JA107, JA174-175. But the distinctions between a Title III demand and an administrative subpoena are pervasive and dispositive.

To start, the text of Title III is markedly different from the text of statutes relating to administrative subpoenas. The Attorney General's Authority to demand records and papers under Title III extends only to a specific, though broad, set of documents: those "relating to any application, registration, payment of poll tax, or other act requisite to voting in [a federal] election." 52 U.S.C. 20701.

The authorization for administrative subpoenas is quite the opposite: the government may demand a wide variety of records and testimony from any person but, because there is no other limit on the person affected or the type of information, the information must be relevant or material to one of the agency's authorized purposes. *See United States v. Powell*, 379 U.S. 48, 53 n.12 (1964) (noting that information can be obtained if it "may be relevant or material" (quoting

- 42 -

26 U.S.C. 7602 (1954 ed.))); *see also Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 162 (4th Cir. 2022); *United States v. Rosinsky*, 547 F.2d 249, 252 (4th Cir. 1977).

Consider the statute at issue in *Powell*. That statute authorizes the Internal Revenue Service (IRS) to issue an administrative summons to a taxpayer to appear and provide testimony and records that "may be relevant or material" to its inquiry into the taxpayer's liability due to a possibly fraudulent return. *Powell*, 379 U.S. at 53 n.12 (quoting 26 U.S.C. 7602). The statute limited the IRS's authority to summon for:

> the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability.

26 U.S.C. 7602(a). The statute also required the time and place of examination to be "reasonable under the circumstances." 26 U.S.C. 7605(a). Importantly, it also provided that "[n]o taxpayer shall be subjected to unnecessary examination or investigations." 26 U.S.C. 7605(b). So under that statute, courts have held that the issuer "must show that the investigation will be conducted pursuant to a legitimate purpose, that the inquiry may be relevant to the purpose, that the

- 43 -

information sought is not already within the Commissioner's possession, and that the administrative steps required by the Code have been followed." *Powell*, 379 U.S. at 57-58; *Equity Inv. Assocs., LLC*, 40 F.4th at 161-162 (same).

The requirements that courts have imposed on enforcement of administrative subpoenas also have roots in the Fourth Amendment. *See, e.g.*, *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000) (explaining four factors must be met for "an investigative subpoena[] to be reasonable under the Fourth Amendment"); *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208-209 (1946) (discussing how the requirements of relevance, a congressionally-authorized purpose within Congress's power, and adequate specification of the documents satisfy the Fourth Amendment). But those Fourth Amendment concerns are not implicated in Title III, involving official documents from state officials—not an individual's private papers.

Title III already imposes the constraints that Congress deemed necessary by limiting the set of records and papers which he can demand. *See* 52 U.S.C. 20701, 20703. Title III also prescribes what method of production is reasonable under the circumstances. 52 U.S.C. 20703. And

- 44 -

unlike administrative-subpoena statutes, Section 303 does not limit the purpose of any demand; a statement of purpose must simply be provided in the demand. 52 U.S.C. 20703. There is thus no need and no statutory authorization for a relevance inquiry. Indeed, the CRA was enacted after Congress saw that the mere power of subpoena had not proven sufficiently effective in investigating discriminatory voting practices. *See Civil Rights—1959: Hearings Before the Subcomm. on Constitutional Rights of the S. Comm. on the Judiciary*, 86th Cong., 1st Sess. 191-192 (1959) (statement of Attorney General William P. Rogers) (explaining the need for the power of "production and inspection . . . rather than for the issuance of a subp[o]ena").

Even under more generally applicable standards for enforcing administrative subpoenas, *see Benson I*, 819 F. Supp. 3d at 765 ("constru[ing] a request for records under the CRA as a form of administrative subpoena"), judicial review "is sharply limited." *EEOC v. South Carolina Nat'l Bank*, 562 F.2d 329, 332 (4th Cir. 1977); *see also Donaldson v. United States*, 400 U.S. 517, 529 (1971) (explaining that "*Powell* was not intended to impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an

- 45 -

adversary hearing, if requested, is made available"), *superseded by statute on other grounds*, Tax Reform Act of 1976, Pub. L. No. 94-455, 90 Stat. 1520. Ordinarily, the government "need not show that the exercise of its jurisdiction is supported by reasonable cause unless the person to whom the subpoena is directed raises a substantial question that the court's process will be abused by enforcement." *South Carolina Nat'l Bank*, 562 F.2d at 332; *Morton Salt Co.*, 338 U.S. at 652 ("[I]t is sufficient if the inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant.").

At most, the court may satisfy itself that "the subpoena is within the agency's authority" and "that the information sought is relevant and material to the investigation." *EEOC v. Maryland Cup Corp.*, 785 F.2d 471, 475 (4th Cir. 1986).[5] The first factor is met "[s]o long as the agency's assertion of authority is not 'obviously apocryphal[.]'" *United States v. American Target Advert., Inc.*, 257 F.3d 348, 354 (4th Cir. 2001) (quoting

---

[5] In the subpoena context, the Court may also require a threshold showing that "the agency has satisfied statutory requirements of due process" and allow a recipient to "demonstrate[] that the subpoena is unduly burdensome." *Maryland Cup Corp.*, 785 F.2d at 475-476. Defendants have raised neither issue here.

- 46 -

*United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 5 (1st Cir. 1996)). The next factor is "not especially constraining," "generously construed to afford access to virtually any material that might cast light on the allegations," and satisfied by "defering to an agency's own appraisal of what is relevant so long as it is not obviously wrong." *EEOC v. Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d 110, 113 (4th Cir. 1997) (citation modified).

Importantly, a dispute as to whether the records sought by the agency will ultimately prove a legal violation is not a basis for resisting the subpoena. *See Endicott Johnson Corp. v. Perkins*, 317 U.S. 501, 509 (1943); *see also South Carolina Nat'l Bank*, 562 F.2d at 332 ("The administrative agency, not the court, is responsible for determining in the first instance through its preliminary investigations the coverage of the statutes the agency must administer."). Put differently, "[i]t is unreasonable to the extreme to insist that the result shall be in hand before an investigation may begin." *Link v. NLRB*, 330 F.2d 437, 440 (4th Cir. 1964). The possibility that "the investigation ultimately uncovers no wrongdoing" cannot override the "public interest in ensuring 'the

expeditious investigation of possible unlawful activity.'" *American Target Advert., Inc.*, 257 F.3d at 353-354 (citation omitted).

In sum, nothing in the text of Title III, nor the subpoena enforcement cases, allows election officials like Administrator DeMarinis to resist compliance with the Attorney General's Title III demand because the demand did not provide the official's desired "basis for suspecting any shortcoming or failure in Maryland's HAVA compliance" or "particularized and detailed concerns" with "the legitimacy of Maryland's voter registration process." JA50.

2. Regardless of the level of scrutiny that may apply, the statement provided by the Attorney General here was sufficient.

The two letters sent by the DOJ both individually and together provided ample "basis" for the demand. The July 14 letter disclosed concern over the sufficiency of Maryland's efforts "to remove those ineligible voters from the registration list[,]" citing several examples of irregularities from "[a] review of the most recent EAVS report." JA36-37; *see also* pp. 7-8, *supra*.

The August 18 letter, for its part, referenced the July 14 letter and reiterated that the DOJ sought to "assess the State's compliance with the

- 48 -

statewide VRL maintenance provisions of the NVRA, 52 U.S.C. § 20501, *et seq.*" JA47. The August 18 letter also expanded upon the *legal* basis for the request, reciting in detail the relevant provisions of the CRA and clarifying the SVRL demand was made pursuant to Section 303 of the CRA in service of the Attorney General's responsibility to enforce the NVRA and HAVA. JA47.

The two letters also both individually and together provided ample "purpose" for the demand. The July 14 letter disclosed the DOJ sought "to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA." JA35. The August 18 Letter also stated that "the purpose of [the Department's] request [for the unredacted SVRL] is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." JA47.

Under any reasonable reading, the basis and purpose for the DOJ's demand was clear and put Administrator DeMarinis on "reasonable notice of the pendency of the proceeding." *Lynd II*, 306 F.2d at 226. That was all that Administrator DeMarinis was owed. The demand provided sufficient notice of the basis for the demand, including the Attorney General's authority and reasons for desiring to inspect the SVRL, as well

- 49 -

as the purpose. Defendants do not claim that producing the SVRL would be "unduly burdensome," *Maryland Cup Corp.*, 785 F.2d at 476, and the record sought, the SVRL, is directly relevant to and "might cast light on" the DOJ's investigation into Maryland's compliance with the NVRA and HAVA. *Lockheed Martin Corp., Aero & Naval Sys.*, 116 F.3d at 113.

Finally, Title III does not require the United States to ritualistically use the word "basis," "based upon," or any other magic words or phrases when communicating its demand to a State. *Compare Hannah P. v. Coats*, 916 F.3d 327, 345 (4th Cir. 2019) ("Proper notice does not require 'any magic words.'") (citation omitted), *with* JA108 (criticizing the DOJ because "[t]he word 'basis' does not even appear in either letter").

3. According to defendants, investigating Maryland's compliance with the NVRA and HAVA "is beyond the scope of the CRA" because "Title III was not passed as a tool for NVRA compliance." JA179 (citation omitted); *see also* JA107, JA133. Defendants envision that the demand "must be sufficiently related to Title III and its subject matter—disenfranchisement through discriminatory practices—otherwise the statutory requirement would become meaningless." JA107. But no such

limitation on the scope of the basis or purpose for the demand appears in the text of Title III. *See* 52 U.S.C. 20701-20706.

By contrast, Congress limits the application of rights and remedies when it wants to, including elsewhere in the CRA where it constrained the Attorney General's authority to address racially discriminatory practices. *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101); 42 U.S.C. 2000e-2 (prohibiting employment practices "because of such individual's race, color, . . . or national origin" in Title VII of the Civil Rights Act of 1964); 52 U.S.C. 10301-10306, 10309 (prohibiting discrimination "on account of race, color," or language in the Voting Rights Act of 1965); 42 U.S.C. 3604-3606, 3617 (prohibiting discrimination in renting "because of race, color, . . . or national origin" in the Fair Housing Act of 1968). The lack of a similar limitation in Title III is significant, because "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello*, 464 U.S. at 23 (brackets in original; citation omitted).

- 51 -

- 52 -

Honoring the plain text of Title III, it is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman*, 313 F.2d at 868 (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating). The Title III demand here plainly relates to investigating possible violations of federal statutes—and statutes that share Title III's purpose of protecting the constitutional right to vote. *See* pp. 5-7, *supra*; *Benson I*, 819 F. Supp. 3d at 767. Congress passed the NVRA after finding that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation . . . and disproportionately harm voter participation by various groups, including racial minorities." 52 U.S.C. 20501(a)(3).

HAVA, for its part, is a federal statute aimed at protecting voting rights. The statute "establish[es] minimum election administration standards for States and units of local government with responsibility for the administration of Federal elections." Pub. L. No. 107-252, 116 Stat. 1666 (2002) (preamble). Those minimum standards, including accurate voter lists, were created to "address[] a variety of improvements to voting

- 52 -

systems and voter access that were identified following the 2000 election."[6]

By mandating list maintenance, the NVRA and HAVA also protect against fraudulent voting, which "dilute[s] the right of citizens to cast ballots that carry appropriate weight." *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021). Indeed, "[t]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)). The CRA, at the very least, empowers the Attorney General to investigate and assess compliance with other elections statutes, like the NVRA and HAVA.

4. DeMarinis and Common Cause also argued to varying degrees that the DOJ's demand was improper because it was "pretextual." JA136; *see also* JA109.[7] They conclude that "the United States has not disclosed

---

[6] U.S. Election Assistance Comm'n, Celebrating 20 Years of HAVA 1, https://www.eac.gov/sites/default/files/HelpAmericaVoteDay/HAVA_1 -Pager_10-27-22_508.pdf.

[7] Administrator DeMarinis never seriously contends the demand was in bad faith or a pretext for some nefarious purpose like harassment.

the actual purpose for its requests, and this Court 'is not obliged to accept a contrived statement and purpose' in place of an accurate one." JA136 (citation omitted). As already explained (pp. 37-48, *supra*), this Court's review of the DOJ's demand is limited to assessing whether the Attorney General in fact stated a "basis and purpose," 52 U.S.C. 20703, not whether that basis and purpose is subjectively sufficient.

Setting that aside, even under precedents involving administrative subpoenas, the burden on a party resisting a subpoena based on claims the government is abusing the court's process and acting in "bad faith" "is a heavy one." *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978). The United States generally "need only demonstrate good faith in issuing the summons." *United States v. Stuart*, 489 U.S. 353, 359 (1989). The types of improper purposes that justify court intervention are narrow "such as to harass the [recipient] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *Powell*, 379 U.S. at 58.

---

Instead, he posits that "[t]he Department's alleged purpose . . . is also *possibly* not the Department's actual purpose[.]" JA112 (emphasis added). His pretext argument also largely collapses into the same disagreement over the scope of Title III. *See, e.g.*, JA109, JA111.

Defendants here cannot overcome their heavy burden of disproving the good faith basis of the demand and proving the demand was issued out of malice, intent to harass, to pressure to settle a collateral dispute, or the like. *Compare* JA136-137 (suggesting "the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file"), *with* JA190 (declaring the United States intends to "perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA[,]" not "create 'a centralized federal database' for broader immigration enforcement purposes'") (citation omitted). First, it is doubtful that the mere existence of a secondary motive related to "identify[ing] ostensibly ineligible voters" could constitute bad faith or improper motive. JA137; *see also Powell*, 379 U.S. at 58.[8] Second, because "[m]ere allegations of bad faith

---

[8] Administrator DeMarinis cites *Department of Commerce v. New York*, 588 U.S. 752, 784 (2019), to suggest courts can reject "contrived" agency rationale (JA112), but that case involved an inapposite Administrative Procedure Act challenge and "a rare" extensive administrative record that presented "unusual circumstances[.]" *New York*, 588 U.S. at 785. In any event, it supports the United States' position, including by confirming that a "strong showing of bad faith or improper behavior" is required to venture beyond the record and "inquir[e] into 'the mental process[] of administrative decisionmakers'" and "a court may not reject an agency's stated reasons for acting simply

will not suffice[,]" defendants' speculation based on "public reporting" falls well short of "specific facts in its responsive pleadings, supported by affidavits, from which the court can infer a possibility of some wrongful conduct." *Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987) (citation omitted); *see also* JA126-130.[9] Inquiring into the "actual purpose" of the DOJ's request would improperly intrude upon the investigative functions of the DOJ. *See, e.g., American Target Advert., Inc.*, 257 F.3d at 354 ("Congress has duly weighed the competing policy interests, and it has chosen in favor of the effective administration and enforcement of its laws. It is not the role of the courts to second-guess that choice.").

## II.    Maryland must produce the SVRL without redactions.

Intervenors argued below that the United States' demand for the SVRL is invalid because "any sensitive personal voter information would still be subject to redaction." JA139. Nothing in the text of Title III

---

because the agency might also have had other unstated reasons." *Id.* at 780-781 (citation omitted).

[9] Intervenors' cited news articles, which rely on speculation and inadmissible hearsay, do not satisfy the requirements for judicial notice. Fed. R. Evid. 201(b).

supports this conclusion. Indeed, even in the 1960s, voter-registration applications—unquestionably records covered by the CRA, *see* 52 U.S.C. 20701—sometimes contained significant personal information that the intervenors seek to shield here, such as birthdates. *See, e.g., Gray v. Main*, 309 F. Supp. 207, 219 (M.D. Ala. 1968) (birthdate).

Intervenors rely predominantly on cases interpreting provisions of the NVRA to support their belief redactions are required here. But the NVRA requires *public* inspection, allowing inspection by *any* party. *See* 52 U.S.C. 20507(i)(1). Because the CRA requires disclosure to the Attorney General, not the public, these authorities are inapposite. *See, e.g., Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (citation omitted; emphasis added) (allowing redactions in the NVRA context to cure "an intolerable burden on [the constitutional right to vote]" for a "statute that conditions voting on *public release*").

Precisely because such privacy concerns might be implicated with public disclosure, Title III prohibits the Attorney General from "disclos[ing] any record or paper produced pursuant to [Title III], or any reproduction or copy, except to Congress and any committee thereof, governmental agencies," and in judicial proceedings, "[u]nless otherwise

- 57 -

ordered by a [federal] court." 52 U.S.C. 20704. None of the public disclosure concerns justifying redactions in the context of the NVRA justify redactions of the SVRL to the DOJ here. Maryland must produce the unredacted SVRL.

## III. Privacy laws do not provide any alternative basis to affirm.

The district court also did not reach one intervenor's (Maryland/DC Alliance for Retired Americans') arguments regarding state and federal privacy laws, but these arguments are likewise meritless. *See, e.g.*, JA180-187. State privacy or anti-disclosure laws do not permit Maryland to defy Title III, and Maryland's duty to comply with Title III is independent of any duty the United States has to comply with the Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896; *see United States v. McAnlis*, 721 F.2d 334, 337 (11th Cir. 1983) (holding that compliance with a provision of the Privacy Act was "not a prerequisite to enforcement of an IRS summons"). Regardless, though, the United States is complying with federal privacy laws.

### A. Federal law preempts any contrary Maryland privacy law.

Maryland/DC Alliance below argued that "[n]umerous Maryland laws and regulations prohibit the State from sharing sensitive personal

information that is withheld from the publicly available voter list." JA180. Put simply, state law does not allow Maryland to defy federal law. To the extent that state law purports to prohibit Maryland from complying with the United States' demands, state law must yield. *See* U.S. Const. Art. VI, Cl. 2; *see also Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 15 (2013) ("States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it 'terminates according to federal law.'") (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).

Notwithstanding a State's broad constitutional authority over the conduct of federal elections, including voters' privacy rights, Congress can override those state choices. U.S. Const. Art. I, § 4, Cl. 1. The Supreme Court has explained that the Elections Clause "is a default provision; it invests the States with responsibility for the mechanics of congressional elections . . . but only so far as Congress declines to preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997) (citations omitted). "[T]he regulations made by Congress are paramount to those made by the State legislature; and if they conflict therewith, the latter,

so far as the conflict extends, ceases to be operative." *Ibid.* (brackets in original) (quoting *Ex Parte Siebold,* 100 U.S. 371, 384 (1879)).

Congress enacted broad regulations over the conduct of federal elections. Title III imposes a "sweeping" obligation on election officials to preserve and, on request, to produce registration records pertaining to federal elections. *Kennedy v. Lynd,* 306 F.2d 222, 226 (5th Cir. 1962). Title III authorizes the Attorney General to compel records under Title III but imposes its own privacy protections for records and papers demanded under Section 303. *See* 52 U.S.C. 20704. If Maryland's laws impose even greater privacy protections, they conflict with and thwart the enforcement of federal law and therefore are preempted. *See, e.g., Glacier Nw., Inc. v. International Bhd. of Teamsters Loc. Union No. 174,* 598 U.S. 771, 776 (2023) ("It is a bedrock rule, of course, that federal law preempts state law when the two conflict.").

## B.    The DOJ is complying with the Privacy Act.

Maryland/DC Alliance also argued below that the DOJ failed to identify a System of Records Notice (SORN) required by the Privacy Act, *see* 5 U.S.C. 552a(e)(4), that covers an unredacted SVRL. JA185-186. That is incorrect.

The Privacy Act was designed to "protect the privacy of individuals" through regulation of the "collection, maintenance, use, and dissemination of information" by federal agencies. *Doe v. Chao*, 540 U.S. 614, 618 (2004) (quoting the Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896). It requires federal agencies to "publish in the Federal Register upon establishment or revision a notice of the existence and character of the system of records." 5 U.S.C. 552a(e)(4).

The DOJ did so here. It has published a full list of routine uses for its collection of voter information, which can be found in the SORN titled JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47,610 (Aug. 11, 2003); 70 Fed. Reg. 43,904 (July 29, 2005); and 82 Fed. Reg. 24,147 (May 25, 2017). The SORN states that "[t]he records in the system of records are kept. . . in the ordinary course of fulfilling the responsibility assigned to [the Civil Rights Division] under the provisions of 28 CFR 0.50, 0.51." 68 Fed. Reg. at 47,611. And the cited regulation, in turn, makes clear that the Civil Rights Division is responsible for "[e]nforcement of all Federal statutes affecting civil rights, including those pertaining to

- 61 -

elections and voting." 28 C.F.R. 0.50(a). Accordingly, the SORN covers the NVRA, HAVA, and the CRA as statutes for routine use.[10]

No more persuasive is the argument that this SORN's identification of "the categories of individuals on whom records are maintained in the system," 5 U.S.C. 552a(e)(4)(B), cannot be read to include all registered voters in Maryland and other States. *See* JA186. The SORN covers a variety of people, including "[s]ubjects of investigations, [and] victims." 68 Fed. Reg. at 47,611. The term "subject[]" is a "term[] of art in the context of DOJ investigations," *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022) (citation omitted), which includes anyone whose "conduct is within the scope of the . . . investigation," U.S. Dep't of Just., Justice Manual § 9-11.151 (2020), https://www.justice.gov/jm/jm-9-11000-grand-jury#. Persons who appear in a statewide voter registration list are "[s]ubjects of investigations," 68 Fed. Reg. at

---

[10] The SORN further identifies the "Civil Rights Division Web page" as a source for "[t]he delegated legal duties and responsibilities of each section" of the Division. 68 Fed. Reg. at 47,611. And the Voting Section's webpage identifies all three statutes prominently and by name. U.S. Dep't of Just., Civil Rights Division, Voting Section, https://www.justice.gov/crt/voting-section (last visited Aug. 7, 2026).

47,611, as their voter registrations are within the scope of the Division's investigation into list maintenance and voter fraud. Moreover, because votes case by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. at 47,611. The Privacy Act therefore provides no alternative basis to affirm the district court.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's Order dismissing the DOJ's Title III claim and denying the Motion to Compel Production, and remand with instructions to order Administrator DeMarinis to immediately produce the requested unredacted SVRL. This Court should make clear that Title III of the CRA authorizes the United States to demand from a State an electronic, unredacted copy of its SVRL to determine the State's compliance with the NVRA, as set forth above.

Further, because the district court's application of an erroneous framework has deprived the DOJ of the "prompt and expeditious inspection" that is required under Title III, the "mandate of this Court

[should] issue forthwith." *Kennedy v. Lynd*, 306 F.2d 222, 231 (5th Cir. 1962); *see* Fed. R. App. P. 2, 41(b). A decision in September would still allow the United States to work with Maryland to take real steps to clean up its SVRL, if necessary, prior to the upcoming November 3, 2026, general election. The United States is confident that States will not ignore out-of-hand alerts from the United States that their SVRLs contain ineligible voters.

In the alternative, and for the same reason, the United States requests that the Court shorten the time for filing a petition for rehearing and rehearing en banc. *See* Fed. R. App. 2, 40(d)(1).

- 64 -

## STATEMENT REGARDING ORAL ARGUMENT

The United States believes that it is in all parties' interest to obtain a decision from this Court quickly given the upcoming November 3, 2026, general election. Accordingly, the United States is willing to waive oral argument, despite the great importance of the issues here, to allow faster resolution of this case. Of course, the United States will participate in oral argument, if the Court believes that the benefit of oral argument would outweigh the time concerns and would request that argument take place in September 2026.

Respectfully submitted,

HARMEET K. DHILLON
 Assistant Attorney General

s/ Audrey A. Weaver
ANDREW G. BRANIFF
DAVID N. GOLDMAN
AUDREY A. WEAVER
 Attorneys
 Department of Justice
 Civil Rights Division
 Appellate Section
 Ben Franklin Station
 P.O. Box 14403
 Washington, D.C.  20044-4403
 (202) 890-0949

Date: August 10, 2026

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,770 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Audrey A. Weaver
AUDREY A. WEAVER
 Attorney

Date: August 10, 2026

**ADDENDUM**

## TABLE OF CONTENTS

**PAGE**

52 U.S.C. 20701 ........................................................................1

52 U.S.C. 20703 ........................................................................1

52 U.S.C. 20704 ........................................................................2

52 U.S.C. 20705 ........................................................................2

**52 U.S.C. 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation.**

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

**52 U.S.C. 20703.  Demand for records or papers by Attorney General or representative; statement of basis and purpose.**

Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

A-1

**52 U.S.C. 20704. Disclosure of records or papers.**

Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

**52 U.S.C. 20705. Jurisdiction to compel production of records or papers.**

The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper.