No. 26-1878

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

JARED DEMARINIS, in his Official Capacity as State Administrator of
Elections for the State of Maryland,

Defendant-Appellee

MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS; COMMON
CAUSE; OUT FOR JUSTICE, INC.; CARL SNOWDEN; MYRIAM
PAUL; LUIS SIMS,

Intervenors/Defendants

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

JOINT APPENDIX
(VOLUME 1 OF 1)

*(See inside cover for continuation of counsel)*

(*Continuation of cover*)

HARMEET K. DHILLON
  Assistant Attorney General

ANDREW G. BRANIFF
DAVID N. GOLDMAN
AUDREY A. WEAVER
  Attorneys
  Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 890-0949

# TABLE OF CONTENTS

**PAGE**

Memorandum Opinion,
    filed June 18, 2026
    (Doc. 91) ........................................................................................... 1

Order Appealed,
    filed June 18, 2026
    (Doc. 92) ......................................................................................... 11

District Court Docket .......................................................................... 12

Complaint,
    filed December 1, 2025
    (Doc. 1) ........................................................................................... 26

Letter from the DOJ to State Administrator DeMarinis,
    dated July 14, 2025
    (Doc. 2-2, at 2-5) ........................................................................... 35

Letter from State Administrator DeMarinis to the DOJ,
    dated July 30, 2025
    (Doc. 2-2, at 7-11) ......................................................................... 39

Letter from State Administrator DeMarinis to the DOJ,
    dated August 13, 2025
    (Doc. 2-2, at 13-14) ....................................................................... 44

Letter from the DOJ to State Administrator DeMarinis,
    dated August 18, 2025
    (Doc. 2-2, at 16-18) ....................................................................... 46

Letter from State Administrator DeMarinis to the DOJ,
    dated August 25, 2025
    (Doc. 2-2, at 20-22) ....................................................................... 49

**TABLE OF CONTENTS (continued):** **PAGE**

Declaration of Joanne Antoine,
      filed December 12, 2025
      (Doc. 8-2, Exh. B)..............................................................................52

Declaration of Trina Selden,
      filed December 12, 2025
      (Doc. 8-3, Exh. C)..............................................................................60

Declaration of Carl O. Snowden,
      filed December 12, 2025
      (Doc. 8-4, Exh. D) .............................................................................65

Declaration of Myriam Paul,
      filed December 12, 2025
      (Doc. 8-5, Exh. E)..............................................................................71

Declaration of Luis Sims,
      filed December 12, 2025
      (Doc. 8-6, Exh. F)..............................................................................74

State Administrator DeMarinis's Motion to Dismiss,
      filed January 30, 2026
      (Doc. 34) ............................................................................................78

State Administrator DeMarinis's Memorandum
      Supporting Motion to Dismiss,
      filed January 30, 2026
      (Doc. 34-1)..........................................................................................81

Common Cause's Motion to Dismiss,
      filed February 5, 2026
      (Doc. 43) ..........................................................................................114

Memorandum of Understanding between the DOJ and Colorado,
      filed February 5, 2026
      (Doc. 43-1, Exh. 1) ..........................................................................149

## TABLE OF CONTENTS (continued): PAGE

Maryland/DC Alliance for Retired Americans' Motion to Dismiss,
    filed February 9, 2026
    (Doc. 50) ...................................................................................... 159

Declaration of Eric Neff,
    filed February 13, 2026
    (Doc. 56-1) .................................................................................. 189

United States' Response to Notice of Supplemental Authority,
    filed April 13, 2026
    (Doc. 66) ...................................................................................... 194

Notice of Appeal,
    filed July 6, 2026
    (Doc. 94) ...................................................................................... 196

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civil Case No.: SAG-25-3934** |
| **v.** | * | |
| | * | |
| **JARED DEMARINIS** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION

The United States brings this action, one of thirty similar lawsuits that it has brought throughout the country, seeking Maryland's statewide voter registration list ("SVRL"). ECF 1. The United States has sued Jared DeMarinis in his official capacity as State Administrator of Elections for the State of Maryland, and several additional individuals and organizations have intervened as defendants (collectively, "Defendants"). The United States has filed a Motion to Compel Production of Documents, ECF 2, and various groupings of Defendants have filed motions to dismiss the United States's complaint, ECF 34 (DeMarinis), 43 (Common Cause; Out for Justice, Inc.; Myriam Paul; Luis Sims; Carl Snowden), 50 (Maryland/DC Alliance for Retired Americans).[1] This Court has reviewed the filings and finds that no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons explained below, the United States's motion to compel will be denied, and Defendants' motions to dismiss will be granted.

---

[1] Also pending is the United States's Motion for Leave to File Combined Response to Supplemental Authorities, ECF 73, which will be granted as unopposed.

JA1

## I.    BACKGROUND

On July 14, 2025, the Deputy Assistant Attorney General for the Civil Rights Division sent DeMarinis, in his capacity as the chief election official for Maryland, a letter concerning Maryland's compliance with federal election laws. ECF 2-2 at 2–5. The letter requested several types of information, including, as pertinent here, a copy of Maryland's computerized SVRL. *Id.* at 2. Specifically, the letter requested, "The current electronic copy of Maryland's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list." *Id.* On July 30, DeMarinis responded to the letter, directing the United States to obtain publicly available portions of the SVRL online. *Id.* at 9. DeMarinis sent a follow-up letter on August 13 that inquired into the purpose of the SVRL request. *Id.* at 13–14.

The Assistant Attorney General for the Civil Rights Division then sent DeMarinis another letter on August 18. *Id.* at 16–18. That letter (1) reiterated the United States's demand for a copy of the computerized SVRL; (2) specified that the request was made pursuant to the National Voter Registration Act ("NVRA"), the Help America Vote Act ("HAVA"), and Title III of the Civil Rights Act of 1960 ("CRA"); and (3) stated that the purpose of the request was to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA. *Id.* The letter specified that the United States sought a copy of the SVRL that "contains all fields, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number." *Id.* at 16. One week later, DeMarinis responded that none of the provisions cited in the previous letter granted the United States access to Maryland's SVRL. *Id.* at 20–22.

2

JA2

Several months later, the United States commenced this action, bringing a single claim for violation of the CRA. ECF 1. Immediately thereafter, it filed the motion to compel production of the SVRL. ECF 2. As noted above, the United States has filed similar lawsuits in other courts seeking the SVRLs of other states. *See Justice Department Sues Five Additional States for Failure to Produce Voter Rolls*, U.S. Dep't of Justice Office of Public Affairs (Feb. 26, 2026), https://www.justice.gov/opa/pr/justice-department-sues-five-additional-states-failure-produce-voter-rolls (last visited June 18, 2026). Thus far, courts have dismissed eight of these lawsuits on motions similar to the ones pending before this Court. *See United States v. Wis. Elections Comm'n*, ——— F. Supp. 3d ———, 2026 WL 1430354 (W.D. Wis. May 21, 2026); *United States v. Bellows*, –— F. Supp. 3d ———, 2026 WL 1430481 (D. Me. May 21, 2026); *United States v. Fontes*, ——— F. Supp. 3d ———, 2026 WL 1177244 (D. Ariz. Apr. 28, 2026); *United States v. Amore*, ——— F. Supp. 3d ———, 2026 WL 1040637 (D.R.I. Apr. 17, 2026); *United States v. Galvin*, ——— F. Supp. 3d ———–, 2026 WL 972129 (D. Mass. Apr. 9, 2026); *United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich. 2026); *United States v. Oregon*, ——— F. Supp. 3d ———, 2026 WL 318402 (D. Or. Feb. 5, 2026); *United States v. Weber*, 816 F. Supp. 3d 1168 (C.D. Cal. 2026). No court has ruled in favor of the United States to date.

## II.    LEGAL STANDARD

A defendant is permitted to test the legal sufficiency of a complaint by way of a motion to dismiss. *See, e.g.*, *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165–66 (4th Cir. 2016). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Rule

8(a)(2), which provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." The purpose of the rule is to provide the defendant with "fair notice" of the claims and the "grounds" for entitlement to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015). But if a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555.

## III.  DISCUSSION

### A.  Statutory Background

Title III of the CRA contains several provisions governing this dispute. First, 52 U.S.C. § 20701 provides, in pertinent part:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election . . . .

52 U.S.C. § 20703, in turn, provides:

> Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative. This demand shall contain a statement of the basis and the purpose therefor.

Finally, 52 U.S.C. § 20705 provides, "The United States district court for the district in which a demand is made pursuant to section 20703 of this title, or in which a record or paper so demanded is located, shall have jurisdiction by appropriate process to compel the production of such record or paper."

Although the United States did not bring claims under the NVRA and HAVA, those provisions are also relevant to this dispute. As pertinent here, the NVRA requires each state to maintain its SVRL by making a reasonable effort to remove the names of voters who are no longer eligible to vote in that jurisdiction. 52 U.S.C. § 20507(a)(4). The HAVA, in turn, requires states to maintain and administer an interactive computerized SVRL and prescribes how to maintain such a list in accordance with the NVRA. 52 U.S.C. § 21083.

**B. Applicability of the Federal Rules of Civil Procedure**

This Court must first determine the proper procedures to employ in adjudicating the pending motions. The United States argues that the Federal Rules of Civil Procedure do not apply in a proceeding to compel documents requested under Title III. Accordingly, it contends that it is entitled to an order compelling the production of the requested documents before discovery or summary judgment and that Defendants may not file motions to dismiss.

Rule 81 of the Federal Rules of Civil Procedure provides that those rules apply to "proceedings to compel . . . the production of documents through a subpoena issued by a United States officer or agency under a federal statute, except as otherwise provided by statute, by local rule, or by court order in the proceedings." Fed. R. Civ. P. 81(a)(5). Nothing in the CRA or this Court' Local Rules provides that the Federal Rules of Civil Procedure do not apply to these proceedings, and this Court has entered no such order.

5

JA5

The United States, however, contends that *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962), supports its position. In that case, the Fifth Circuit concluded that in adjudicating a motion to compel pursuant to the CRA, the court must conduct "a special statutory proceeding" divorced from the Federal Rules of Civil Procedure. *Id.* at 225–26. Only two years later, however, the Supreme Court decided *United States v. Powell*, 379 U.S. 48 (1964). That case involved two different statutes concerning administrative summonses that each include, as pertinent here, identical language to § 20705. *Powell*, 379 U.S. at 52. Namely, the statutes at issue provided that a district court "shall have jurisdiction by appropriate process to compel [testimony or production of evidence]." *Id.* at 52 n.10 (quoting 26 U.S.C. § 7402(b) and 26 U.S.C. § 7604(a)). The Supreme Court determined that because the statutes contained no provision specifying a procedure, the Federal Rules of Civil Procedure applied to adjudications under the statutes. *Id.* at 58 n.18.

The CRA similarly contains no provision specifying a procedure to invoke the district court's jurisdiction. Rather, it contains the same language at issue in *Powell* conferring jurisdiction "by appropriate process." Consistent with *Powell*, and every other court to have addressed this question in the recent litigation in other states, this Court concludes that the Federal Rules of Civil Procedure apply. *See Fontes*, 2026 WL 1177244, at *1; *Amore*, 2026 WL 1040637, at *4; *Benson*, 819 F. Supp. 3d at 766; *Oregon*, 2026 WL 318402, at *8; *Weber*, 816 F. Supp. 3d at 1182. Accordingly, this Court will now turn to the merits of the pending motions.

## C. CRA Claim

Defendants make several arguments supporting dismissal of the United States's claim, but this Court need address only one: whether the SVRL constitutes a record or paper that the United

States may request, and that DeMarinis must produce, pursuant to § 20703.[2] As described above, that provision requires the production of only those records and papers whose retention is required by § 20701, which, in turn, covers "all records and papers which come into [an election officer's] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election" for federal office within the preceding twenty-two months.

The SVRL is not such a record or paper. First, the SVRL, which is created by state officials, does not "come into [their] possession." As another court recently analyzing this question reasoned:

> The phrase "come into [their] possession" naturally refers to a process by which someone acquires an item from an external source. *See, e.g.*, *Honeycutt v. United States*, 581 U.S. 443, 449, 137 S.Ct. 1626, 198 L.Ed.2d 73 (2017) (defining "obtain" as "to come into possession of" (quoting Random House Dictionary of the English Language 995 (1966))); *Receive*, *Black's Law Dictionary* (11th ed. 2019) (defining "receive" as "to come into possession of or get from some outside source"); 16 U.S.C. § 620e (defining "acquire" as "to come into possession of"). As Intervenors observe, Congress frequently uses the phrase "come into possession" to refer to items that a person obtains rather than creates. *See, e.g.*, 18 U.S.C. § 1703(a) (prohibiting postal employees from destroying letters that "come into [their] possession"); 50 U.S.C. § 217 (requiring soldiers to report when abandoned property "comes into [their] possession"); 13 U.S.C. § 214 (prohibiting census takers from disclosing information that "comes into [their] possession"); 18 U.S.C. § 654 (prohibiting embezzlement of property that "comes into [one's] possession"); 46 U.S.C. § 10705 (describing process to follow "[w]hen money, property, or wages of a deceased seaman comes into possession of a consular officer"); 44 U.S.C. § 3572 (imposing limits on federal employees' use of confidential information that they "come[ ] into possession of"). Indeed, at least one federal statute draws an explicit distinction between possessing something and having something come into one's possession. *See* 8 U.S.C. § 1454 ("If the certificate or declaration has been lost, the applicant or any other person who *shall have, or may come into possession of it* is required to surrender it ...." (emphasis added)). Here, Congress could have referred simply to "records in the possession

---

[2] Even were this Court to follow *Lynd* and conclude that the Federal Rules of Civil Procedure do not apply to this proceeding, *Lynd* itself acknowledged that the court may determine whether a particular record falls within the scope of the CRA. *See Lynd*, 306 F.2d at 226; *see also Wis. Elections Comm'n*, 2026 WL 1430354, at *2 (noting that even under the summary proceeding used in *Lynd*, the court must decide as a matter of law whether the records at issue fall under the statute).

of" election officials, or even just "records" without any qualifier, which is the language used in the NVRA, *see* 52 U.S.C. § 20507(i)(1). In order to give effect to the phrase "come into [their] possession" and prevent it from being surplusage, the Court interprets the phrase as referring to only those documents that state election officials receive from prospective voters.

This interpretation of "come into [their] possession" is bolstered by the next words in the sentence: "relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." Each of these terms refers to something that the voter submits or does as part of the registration process. Here, the meaning of "come into possession" is clarified by the rest of the sentence, which indicates the sorts of records covered by the statute: namely, records that election officials *receive*, rather than *create*. This fact supports the conclusion that the provision requires officials to preserve voters' submissions to the State so that the federal government can determine whether the State is improperly rejecting voter registration applications. Such an interpretation makes sense given that when the CRA was passed, the federal government's attempts to protect the voting rights of Black citizens had been frustrated by state officials' destruction of voter registration applications. *See Report of the United States Commission on Civil Rights* 93 (1959), https://perma.cc/2PDF-GZHB ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."). The CRA responded to that problem by requiring states to preserve records that voters submit to them—not records that states create.

*Benson*, 819 F. Supp. 3d at 768–69 (footnote omitted).

Second, interpreting § 20701 to cover an SVRL would bring it into conflict with an adjacent provision, 52 U.S.C. § 20702, which criminalizes the alteration of any record or paper covered by § 20701. An SVRL, unlike a voter registration application that an applicant submits once, is a dynamic list that is constantly updated and, thus, altered. Indeed, the NVRA and HAVA *require* an SVRL's constant alteration. The United States's proposed interpretation of the CRA would therefore criminalize the same conduct that the NVRA and HAVA require. This Court will not read § 20701 to produce such an absurd result. *See Fontes*, 2026 WL 1177244, at *4 (noting this potential conflict and instead reading § 20701 in harmony with the rest of the statutory scheme).

This Court is not persuaded otherwise by the authorities on which the United States relies. First, the United States cites several cases that do not concern the reach of § 20701. Rather,

8

JA8

*Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848 (M.D. Ala. 1960), concerned the constitutionality of the CRA, and *Judicial Watch v. Lamone*, 399 F. Supp. 3d 425 (D. Md. 2019), and *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331 (4th Cir. 2012), concerned the authority to request voter registration materials pursuant to the NVRA. Specifically, the latter two decisions interpreted the records disclosure provision of the NVRA, which, unlike § 20701, does not include the qualifying language "come into his possession." *See* 52 U.S.C. § 20507 (requiring maintenance and disclosure of "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters"). Those decisions therefore have no bearing on whether the CRA's provisions authorize requests for SVRLs. Finally, the United States cites a recent opinion published by the Department of Justice Office of Legal Counsel, which determined that the CRA authorizes the United States to compel production of SVRLs. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. ___ (May 12, 2026). This Court will not interpret the CRA contrary to its text simply because an office of the party advancing that interpretation has adopted it.

Accordingly, this Court joins every court to have addressed this issue in concluding that an SVRL is not a record or paper that a state must produce to the United States under the CRA. *See Wis. Elections Comm'n*, 2026 WL 1430354, at *5; *Bellows*, 2026 WL 1430481, at *7; *Fontes*, 2026 WL 1177244, at *5; *Benson*, 819 F. Supp. 3d at 770. Thus, the motion to compel will be denied, and the motions to dismiss will be granted. Given this Court's ruling that the CRA does not require production of the SVRL, "no amendment in the complaint could cure the defects in the plaintiff's case." *Domino Sugar Corp. Sugar Workers Loc. Union 392*, 10 F.3d 1064, 1067 (4th Cir. 1993) (quoting *Coniston Corp. v. Vill. of Hoffman Ests.*, 844 F.2d 461, 463 (7th Cir. 1988)). The dismissal of the CRA claim will therefore be with prejudice.

JA9

**IV.    CONCLUSION**

For the reasons stated above, the United States's motion for leave to file combined response, ECF 73, will be granted, its motion to compel, ECF 2, will be denied, and Defendants' motions to dismiss, ECF 34, 43, 50, will be granted. The United States's complaint, ECF 1, will be dismissed with prejudice, and this case will be closed. A separate Order follows.


Dated: June 18, 2026                                          /s/
                                                    Stephanie A. Gallagher
                                                    United States District Judge

JA10

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | **Civil Case No.: SAG-25-3934** |
| **v.** | * | |
| | * | |
| **JARED DEMARINIS** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \*

## <u>ORDER</u>

For the reasons stated in the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. The United States's Motion to Compel Production of Documents, ECF 2, is DENIED;
2. Defendants' Motions to Dismiss, ECF 34, 43, 50, are GRANTED;
3. The United States's Motion for Leave to File Combined Response to Supplemental Authorities, ECF 73, is GRANTED;
4. The United States's Complaint, ECF 1, is DISMISSED WITH PREJUDICE; and
5. The Clerk is directed to CLOSE this case.

Date: June 18, 2026

_____/s/_____
Stephanie A. Gallagher
United States District Judge

JA11

# *1:25cv3934, The United States Of America V. Demarinis*

US District Court Docket

United States District Court, Maryland

(Baltimore)

**This case was retrieved on 08/04/2026**

## Header

**Case Number:** 1:25cv3934
**Date Filed:** 12/01/2025
**Assigned To:** Judge Stephanie A. Gallagher
**Nature of Suit:** Voting (441)
**Cause:** Declaratory Judgement
**Lead Docket:** None
**Other Docket:** Fourth Circuit Court of Appeals, 26-01878
**Jurisdiction:** U.S. Government Plaintiff

**Class Code:** Closed
**Closed:** 06/18/2026
**Statute:** 28:2201
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Voting

## Participants

### Litigants

The United States of America
**Plaintiff**

### Attorneys

Brittany E. Bennett
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Crt
150 M Street Ne
Washington Dc, DC  20002
USA
202-704-5430 Email:Brittany.Bennett@usdoj.Gov

Joseph W. Voiland
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Crt
Civil Rights Division 4 Constitution Square 150 M Street Ne
Washington, DC  20002
USA
202-353-5318 Email:Joseph.Voiland@usdoj.Gov

William Francis Mohrman
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
DOJ-Crt
Civil Rights Division 950 Pennsylvania Avenue, Nw Room 5533
Washington, DC  20530
USA
202-368-6597 Email:William.Mohrman@usdoj.Gov

David D. Vandenberg

[Terminated: 02/09/2026]
U.S. Department of Justice
Civil Rights Division, Voting Section 150 M. Street Ne Room 8.923

JA12

1:25cv3934, The United States Of America V. Demarinis

| Litigants | Attorneys |
|---|---|
| | Washington, DC  20002<br>USA<br>202-307-2767 Email:David.Vandenberg@usdoj.Gov |
| | Jake T. Bachand<br>ATTORNEY TO BE NOTICED<br>DOJ-Crt<br>Civil Rights Division 150 M St Ne<br>Washington, DC  20002<br>USA<br>202-304-8146 Email:Jake.Bachand@usdoj.Gov |
| | Jonathon Hauenschild<br>ATTORNEY TO BE NOTICED<br><br>150 M St. Ne Ste 8th Floor<br>Washington, DC  20002<br>USA<br>202-215-2110 Email:Jonathon.Hauenschild@usdoj.Gov |
| | Megan Frederick<br><br>[Terminated: 03/19/2026]<br>DOJ-Crt<br>Crt 150 M Street Ne<br>Washington, DC  20002<br>USA<br>202-304-2927 Email:Megan.Frederick@usdoj.Gov |
| | Raymond Yang<br>ATTORNEY TO BE NOTICED<br>DOJ-Crt<br>150 M Street Ne<br>Washington, DC  20002<br>USA<br>202-316-3962 Email:Raymond.Yang@usdoj.Gov |
| Jared DeMarinis<br>in his Official Capacity as State Administrator of Elections for the State of Maryland \|<br>**Defendant** | Daniel Michael Kobrin<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Office of the Attorney General<br>Civil Litigation Division 200 Saint Paul Place 20th Floor<br>Baltimore, MD  21202<br>USA<br>410-576-6472 Email:Dkobrin@oag.Maryland.Gov |
| Maryland/DC Alliance for Retired Americans<br>**Intervenor Defendant** | Jacob D Shelly<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4496 Email:Jshelly@elias.Law |
| | Marcos Mocine-McQueen<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4492 Email:Mmcqueen@elias.Law |

JA13

1:25cv3934, The United States Of America V. Demarinis

| Litigants | Attorneys |
|-----------|-----------|
| | Tina Meng Morrison<br>ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>Litigation 250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4592 Email:Tmengmorrison@elias.Law |
| | Uzoma Nkem Nkwonta<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Elias Law Group LLP<br>250 Massachusetts Ave Nw Suite 400<br>Washington, DC  20001<br>USA<br>202-968-4517 Email:Unkwonta@elias.Law |
| Common Cause<br>**Intervenor Defendant** | Deborah A Jeon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland Foundation<br>3600 Clipper Mill Rd Ste 350<br>Baltimore, MD  21211<br>USA<br>14108898555 Fax: 14103667838 Email:Jeon@aclu-Md.Org |
| | Dara Johnson<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland<br>3600 Clipper Mill Road Suite 200<br>Baltimore, MD  21211<br>USA<br>410-889-8555 Email:Djohnson@aclu-Md.Org |
| | Jonathan Topaz<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street 18th Floor<br>New York, NY  10004<br>USA<br>212-549-2640 Email:Jtopaz@aclu.Org |
| | Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street Ste 18th Floor<br>New York, NY  10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St. 18th Fl.<br>New York, NY  10004<br>USA<br>6469058881 Fax: 2125492654 Email:Tlee@aclu.Org |
| Out for Justice, Inc.<br>**Intervenor Defendant** | Deborah A Jeon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland Foundation |

JA14

1:25cv3934, The United States Of America V. Demarinis

| Litigants | Attorneys |
|---|---|
| | 3600 Clipper Mill Rd Ste 350<br>Baltimore, MD  21211<br>USA<br>14108898555 Fax: 14103667838 Email:Jeon@aclu-Md.Org<br><br>Dara Johnson<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland<br>3600 Clipper Mill Road Suite 200<br>Baltimore, MD  21211<br>USA<br>410-889-8555 Email:Djohnson@aclu-Md.Org<br><br>Jonathan Topaz<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street 18th Floor<br>New York, NY  10004<br>USA<br>212-549-2640 Email:Jtopaz@aclu.Org<br><br>Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street Ste 18th Floor<br>New York, NY  10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa J. Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St. 18th Fl.<br>New York, NY  10004<br>USA<br>6469058881 Fax: 2125492654 Email:Tlee@aclu.Org |
| Carl Snowden<br>**Intervenor Defendant** | Deborah A Jeon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland Foundation<br>3600 Clipper Mill Rd Ste 350<br>Baltimore, MD  21211<br>USA<br>14108898555 Fax: 14103667838 Email:Jeon@aclu-Md.Org<br><br>Dara Johnson<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland<br>3600 Clipper Mill Road Suite 200<br>Baltimore, MD  21211<br>USA<br>410-889-8555 Email:Djohnson@aclu-Md.Org<br><br>Jonathan Topaz<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street 18th Floor<br>New York, NY  10004<br>USA<br>212-549-2640 Email:Jtopaz@aclu.Org |

JA15

1:25cv3934, The United States Of America V. Demarinis

| Litigants | Attorneys |
|---|---|
| | Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St. 18th Fl.<br>New York, NY 10004<br>USA<br>6469058881 Fax: 2125492654 Email:Tlee@aclu.Org |
| Myriam Paul<br>**Intervenor Defendant** | Deborah A Jeon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland Foundation<br>3600 Clipper Mill Rd Ste 350<br>Baltimore, MD 21211<br>USA<br>14108898555 Fax: 14103667838 Email:Jeon@aclu-Md.Org |
| | Dara Johnson<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland<br>3600 Clipper Mill Road Suite 200<br>Baltimore, MD 21211<br>USA<br>410-889-8555 Email:Djohnson@aclu-Md.Org |
| | Jonathan Topaz<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street 18th Floor<br>New York, NY 10004<br>USA<br>212-549-2640 Email:Jtopaz@aclu.Org |
| | Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street Ste 18th Floor<br>New York, NY 10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org |
| | Theresa J. Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St. 18th Fl.<br>New York, NY 10004<br>USA<br>6469058881 Fax: 2125492654 Email:Tlee@aclu.Org |
| Luis Sims<br>**Intervenor Defendant** | Deborah A Jeon<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland Foundation |

JA16

1:25cv3934, The United States Of America V. Demarinis

| Litigants | Attorneys |
|-----------|-----------|
| | 3600 Clipper Mill Rd Ste 350<br>Baltimore, MD  21211<br>USA<br>14108898555 Fax: 14103667838 Email:Jeon@aclu-Md.Org<br><br>Dara Johnson<br>ATTORNEY TO BE NOTICED<br>American Civil Liberties Union of Maryland<br>3600 Clipper Mill Road Suite 200<br>Baltimore, MD  21211<br>USA<br>410-889-8555 Email:Djohnson@aclu-Md.Org<br><br>Jonathan Topaz<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>AMERICAN CIVIL LIBERTIES UNION FOUNDATION<br>125 Broad Street 18th Floor<br>New York, NY  10004<br>USA<br>212-549-2640 Email:Jtopaz@aclu.Org<br><br>Sophia Lin Lakin<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>Voting Rights Project 125 Broad Street Ste 18th Floor<br>New York, NY  10004<br>USA<br>212-519-7836 Email:Slakin@aclu.Org<br><br>Theresa J. Lee<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>American Civil Liberties Union Foundation<br>125 Broad St. 18th Fl.<br>New York, NY  10004<br>USA<br>6469058881 Fax: 2125492654 Email:Tlee@aclu.Org |
| Democratic National Committee<br>**Amicus** | Andrew D Levy<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Brown Goldstein and Levy, LLP<br>120 E Baltimore St., Ste. 2500<br>Baltimore, MD  21202<br>USA<br>4109621030 Fax: 4103850869 Email:Adl@browngold.Com<br><br>Daniel J. Freeman<br>PRO HAC VICE;ATTORNEY TO BE NOTICED<br>Democratic National Committee<br>430 South Capitol St Se #3 20003<br>Washington, DC  20003<br>USA<br>202-923-6429 Email:Freemand@dnc.Org<br><br>Monica Rae Basche<br>ATTORNEY TO BE NOTICED<br>Brown, Goldstein & Levy, LLP<br>120 E Baltimore St Suite 1700<br>Baltimore, MD  21202<br>USA<br>410-962-1030 Email:Mbasche@browngold.Com |

JA17

1:25cv3934, The United States Of America V. Demarinis

## Litigants

Former Employees of the U.S. Department of Justice
**Amicus**

Maryland Election Integrity LLC
**Amicus**

## Attorneys

Anne T Marchitello
LEAD ATTORNEY;ATTORNEY TO BE NOTICED
O'Melveny & Myers LLP
1625 Eye Street, Nw
Washington, WA  20006
USA
202-383-5329 Email:Amarchitello@omm.Com

C Edward Hartman , III
ATTORNEY TO BE NOTICED
Hartman, Attorneys at Law
116 Defense Highway Suite 300
Annapolis, MD  21401
USA
410-266-3232 Fax: 410-266-5561 Email:Ed@hartman.Law

## Proceedings

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 1 | 12/01/2025 | COMPLAINT  against Jared DeMarinis, filed by UNITED STATES OF AMERICA. (Attachments: # 1 Civil Cover Sheet, # 2 Attachment to Civil Cover Sheet, # 3 Summons)(Bennett, Brittany) (Entered: 12/01/2025) | |
| 2 | 12/01/2025 | MOTION to Compel Production of Documents by UNITED STATES OF AMERICA (Attachments: # 1 Memorandum in Support of Motion to Compel Production of Documents, # 2 Exhibit, # 3 Attachment Declaration of Maureen Riordan, # 4 Text of Proposed Order)(Bennett, Brittany) (Entered: 12/01/2025) | |
| | 12/02/2025 | Case Reassigned to Judge Stephanie A. Gallagher. Magistrate Judge Erin Aslan no longer assigned to the case. (jf3s, Deputy Clerk) (Entered: 12/02/2025) | |
| 3 | 12/02/2025 | Summons Issued 21 days as to Jared DeMarinis.(bw5s, Deputy Clerk) (Entered: 12/02/2025) | |
| 4 | 12/11/2025 | MOTION to Intervene  by Maryland/DC Alliance for Retired Americans (Attachments: # 1 Memorandum in Support, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Text of Proposed Order)(Meng Morrison, Tina) (Entered: 12/11/2025) | |
| 5 | 12/11/2025 | Local Rule 103.3 Disclosure Statement by Maryland/DC Alliance for Retired Americans (Meng Morrison, Tina) (Entered: 12/11/2025) | |
| 6 | 12/12/2025 | Correspondence Correcting Earlier Submission: 4 Motion to Intervene, Corrected Memorandum in Support (Meng Morrison, Tina) Modified on 12/12/2025 (bw5s). (Entered: 12/12/2025) | |
| 7 | 12/12/2025 | NOTICE by The United States of America re 4 MOTION to Intervene , 6 Correcting earlier submission  (Bennett, Brittany) (Entered: 12/12/2025) | |
| 8 | 12/12/2025 | MOTION to Intervene  by Common Cause, Out for Justice, Inc., Carl Snowden, Myriam Paul, Luis Sims (Attachments: # 1 Exhibit A - Proposed Motion to Dismiss, # 2 Exhibit B - Antoine Declaration, # 3 Exhibit C - Selden Declaration, # 4 Exhibit D - Snowden Declaration, # 5 Exhibit E - Paul Declaration, # 6 Exhibit F - Sims Declaration, # 7 Text of Proposed Order)(Jeon, Deborah) (Entered: 12/12/2025) | |
| 9 | 12/18/2025 | NOTICE of Appearance by Daniel Michael Kobrin on behalf of Jared DeMarinis (Kobrin, Daniel) (Entered: 12/18/2025) | |
| 10 | 12/18/2025 | MOTION to Appear Pro Hac Vice for Jonathan Topaz  (Filing fee | |

JA18

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | $100, receipt number AMDDC-12427674.) by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden(Jeon, Deborah) (Entered: 12/18/2025) | |
| 11 | 12/18/2025 | MOTION to Appear Pro Hac Vice for Theresa J. Lee  (Filing fee $100, receipt number AMDDC-12427762.) by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden(Jeon, Deborah) (Entered: 12/18/2025) | |
| 12 | 12/18/2025 | MOTION to Appear Pro Hac Vice for Sophia Lin Lakin  (Filing fee $100, receipt number AMDDC-12427797.) by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden(Jeon, Deborah) (Entered: 12/18/2025) | |
| 13 | 12/19/2025 | Consent MOTION for Extension of Time to File Response/Reply to Complaint and Pending Motion by Jared DeMarinis. (Attachments: # 1 Text of Proposed Order)(Kobrin, Daniel) (Entered: 12/19/2025) | |
| 14 | 12/19/2025 | MOTION to Appear Pro Hac Vice for Uzoma Nkwonta  (Filing fee $100, receipt number AMDDC-12429618.) by Maryland/DC Alliance for Retired Americans(Meng Morrison, Tina) (Entered: 12/19/2025) | |
| 15 | 12/19/2025 | MOTION to Appear Pro Hac Vice for Marcos Mocine-McQueen (Filing fee $100, receipt number AMDDC-12429652.) by Maryland/DC Alliance for Retired Americans(Meng Morrison, Tina) (Main Document 15 replaced on 12/19/2025) (jf3s). (Entered: 12/19/2025) | |
| 16 | 12/19/2025 | ORDER granting 13 Consent MOTION for Extension of Time to File Response/Reply to Complaint and Pending Motion. Signed by Judge Stephanie A. Gallagher on 12/19/2025. (bw5s, Deputy Clerk) (Entered: 12/19/2025) | |
| 17 | 12/22/2025 | PAPERLESS ORDER granting 10 Motion to Appear Pro Hac Vice on behalf of Jonathan Topaz. Directing attorney Jonathan Topaz to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 12/22/2025. (mh4s, Deputy Clerk) (Entered: 12/22/2025) | |
| 18 | 12/22/2025 | PAPERLESS ORDER granting 11 Motion to Appear Pro Hac Vice on behalf of Theresa J. Lee. Directing attorney Theresa J. Lee to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 12/22/2025. (mh4s, Deputy Clerk) (Entered: 12/22/2025) | |
| 19 | 12/22/2025 | QC NOTICE: 12 Motion to Appear Pro Hac Vice filed by Luis Sims, Carl Snowden, Myriam Paul, Out for Justice, Inc., Common Cause needs to be modified. See attachment for details and corrective actions needed regarding missing or incomplete information. (mh4s, Deputy Clerk) (Entered: 12/22/2025) | |
| 20 | 12/22/2025 | CORRECTED MOTION to Appear Pro Hac Vice for Sophia Lin Lakin  by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden. The fee has already been paid.(Jeon, Deborah) (Entered: 12/22/2025) | |
| 21 | 12/23/2025 | QC NOTICE: 14 Motion to Appear Pro Hac Vice filed by Maryland/DC Alliance for Retired Americans needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 12/23/2025) | |
| 22 | 12/23/2025 | QC NOTICE: 15 Exparte, Motion to Appear Pro Hac Vice filed by Maryland/DC Alliance for Retired Americans needs to be modified. See attachment for details and corrective actions needed | |

JA19

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | regarding the signature(s) on the motion. (mh4s, Deputy Clerk) (Entered: 12/23/2025) | |
| 23 | 12/23/2025 | PAPERLESS ORDER granting 20 Corrected Motion to Appear Pro Hac Vice on behalf of Sophia Lin Lakin. Directing attorney Sophia Lin Lakin to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 12/23/2025. (mh4s, Deputy Clerk) (Entered: 12/23/2025) | |
| 24 | 12/24/2025 | CORRECTED MOTION to Appear Pro Hac Vice for Marcos Mocine-McQueen  by Maryland/DC Alliance for Retired Americans. The fee has already been paid.(Meng Morrison, Tina) (Entered: 12/24/2025) | |
| 25 | 12/24/2025 | CORRECTED MOTION to Appear Pro Hac Vice for Uzoma Nkwonta  by Maryland/DC Alliance for Retired Americans. The fee has already been paid.(Meng Morrison, Tina) (Entered: 12/24/2025) | |
| 26 | 12/30/2025 | PAPERLESS ORDER granting 24 Corrected Motion to Appear Pro Hac Vice on behalf of Marcos Mocine-McQueen. Directing attorney Marcos Mocine-McQueen to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 12/30/2025. (mh4s, Deputy Clerk) (Entered: 12/30/2025) | |
| 27 | 12/30/2025 | PAPERLESS ORDER granting 25 Corrected Motion to Appear Pro Hac Vice on behalf of Uzoma Nkwonta. Directing attorney Uzoma Nkwonta to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 12/30/2025. (mh4s, Deputy Clerk) (Entered: 12/30/2025) | |
| 28 | 01/05/2026 | SUMMONS Returned Executed by The United States of America. All Defendants.(Bennett, Brittany) (Entered: 01/05/2026) | |
| 29 | 01/06/2026 | NOTICE by Maryland/DC Alliance for Retired Americans re 4 MOTION to Intervene   (Attachments: # 1 Exhibit 1 - Scanlan Order, # 2 Exhibit 2 - Nago Order, # 3 Exhibit 3 - Simon Order)(Meng Morrison, Tina) (Entered: 01/06/2026) | |
| 30 | 01/07/2026 | NOTICE by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden re 8 MOTION to Intervene Supplemental Authority (Attachments: # 1 Exhibit Simon Order (Minnesota), # 2 Exhibit Amore Order (Rhode Island), # 3 Exhibit Galvin Order (Massachusetts))(Jeon, Deborah) (Entered: 01/07/2026) | |
| 31 | 01/20/2026 | CERTIFICATE OF SERVICE by The United States of America re 2 MOTION to Compel Production of Documents, 1 Complaint (Vandenberg, David) (Entered: 01/20/2026) | |
| 32 | 01/21/2026 | NOTICE of Appearance by David D. Vandenberg on behalf of The United States of America (Vandenberg, David) (Entered: 01/21/2026) | |
| 33 | 01/28/2026 | NOTICE of Appearance by Megan Frederick on behalf of The United States of America (Frederick, Megan) (Entered: 01/28/2026) | |
| 34 | 01/30/2026 | MOTION to Dismiss for Failure to State a Claim by Jared DeMarinis (Attachments: # 1 Memorandum in Support, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Text of Proposed Order)(Kobrin, Daniel) (Entered: 01/30/2026) | |
| 35 | 01/30/2026 | RESPONSE in Opposition re 2 MOTION to Compel Production of Documents  filed by Jared DeMarinis.(Kobrin, Daniel) (Entered: | |

JA20

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | 01/30/2026) | |
| 36 | 01/30/2026 | MOTION for Leave to File Responses to the Complaint and the Motion for Order to Compel Records by Maryland/DC Alliance for Retired Americans (Attachments: # 1 Exhibit 1 - Proposed Motion to Dismiss, # 2 Exhibit 2 - Proposed Opposition to Motion for Order to Compel Records, # 3 Text of Proposed Order)(Nkwonta, Uzoma) (Entered: 01/30/2026) | |
| 37 | 02/02/2026 | ORDER granting 4 Motion to Intervene. Signed by Judge Stephanie A. Gallagher on 2/2/2026. (bw5s, Deputy Clerk) (Entered: 02/02/2026) | |
| 38 | 02/02/2026 | ORDER granting 8 Motion to Intervene. Signed by Judge Stephanie A. Gallagher on 2/2/2026. (bw5s, Deputy Clerk) (Entered: 02/02/2026) | |
| 39 | 02/02/2026 | MOTION for Leave to File an Amicus Brief by Democratic National Committee (Attachments: # 1 Memorandum in Support of Democratic National Committee's Motion for Leave to File an Amicus Brief, # 2 Text of Proposed Order - Democratic National Committee's Motion for Leave to File an Amicus Brief, # 3 Attachment Democratic National Committee's Brief as Amicus Curiae)(Basche, Monica) (Entered: 02/02/2026) | |
| 40 | 02/02/2026 | MOTION to Appear Pro Hac Vice for Daniel J. Freeman (Filing fee $100, receipt number AMDDC-12510132.) by Democratic National Committee(Basche, Monica) (Entered: 02/02/2026) | |
| 41 | 02/02/2026 | Local Rule 103.3 Disclosure Statement by Democratic National Committee (Basche, Monica) (Entered: 02/02/2026) | |
| 42 | 02/02/2026 | PAPERLESS ORDER granting 40 Motion to Appear Pro Hac Vice on behalf of Daniel J. Freeman. Directing attorney Daniel J. Freeman to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The Pro Hac Vice option must be selected when registering. Signed by Clerk on 2/2/2026. (sj4s, Deputy Clerk) (Entered: 02/02/2026) | |
| 43 | 02/05/2026 | MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden (Attachments: # 1 Exhibit 1 - DOJ Memorandum of Understanding)(Topaz, Jonathan) (Entered: 02/05/2026) | |
| 44 | 02/06/2026 | QC NOTICE: 43 Motion to Dismiss filed by Luis Sims, Carl Snowden, Myriam Paul, Out for Justice, Inc., Common Cause was filed incompletely. **The following attachments or exhibits are missing - Text of Proposed Order. To correct this problem, file Text of Proposed Order using the event Notice (Other) and link Text of Proposed Order to 43 . (bw5s, Deputy Clerk) (Entered: 02/06/2026) | |
| 45 | 02/06/2026 | NOTICE by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden re 43 MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel - Text of Proposed Order (Topaz, Jonathan) (Entered: 02/06/2026) | |
| 46 | 02/06/2026 | MOTION for Leave to File Brief of Amici Curiae Former Employees of the U.S. Department of Justice (Unopposed) by Former Employees of the U.S. Department of Justice (Attachments: # 1 Memorandum in Support, # 2 Attachment / Proposed Brief of Amici Curiae, # 3 Text of Proposed Order)(Marchitello, Anne) (Entered: 02/06/2026) | |
| 47 | 02/09/2026 | ORDER granting 46 Former Employees of the U.S. Department of Justice's Motion for Leave to File Brief Amici Curiae. Signed by Judge Stephanie A. Gallagher on 2/9/2026. (ols, Deputy Clerk) (Entered: 02/09/2026) | |

JA21

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| 48 | 02/09/2026 | BRIEF of Amici Curiae re 43 MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel, 34 MOTION to Dismiss for Failure to State a Claim filed by Former Employees of the U.S. Department of Justice. (ols, Deputy Clerk) (Entered: 02/09/2026) | |
| 49 | 02/09/2026 | ORDER granting 36 Maryland/DC Alliance for Retired Americans' Motion for Leave to File Responses to the Complaint and the Motion for Order to Compel Records. Signed by Judge Stephanie A. Gallagher on 2/9/2026. (ols, Deputy Clerk) (Entered: 02/09/2026) | |
| 50 | 02/09/2026 | MOTION to Dismiss by Maryland/DC Alliance for Retired Americans (Attachments: # 1 Text of Proposed Order) (ols, Deputy Clerk) (Entered: 02/09/2026) | |
| 51 | 02/09/2026 | RESPONSE in Opposition re 2 MOTION to Compel Production of Documents filed by Maryland/DC Alliance for Retired Americans. (ols, Deputy Clerk) (Entered: 02/09/2026) | |
| 52 | 02/09/2026 | MOTION to Withdraw as Attorney David D. Vandenberg (UNOPPOSED) by The United States of America(Vandenberg, David) (Entered: 02/09/2026) | |
| 53 | 02/09/2026 | PAPERLESS ORDER granting 52 Motion to Withdraw as Attorney. Attorney David D. Vandenberg terminated. Signed by Judge Stephanie A. Gallagher on 2/9/2026. (jmhs, Chambers) (Entered: 02/09/2026) | |
| 54 | 02/11/2026 | ORDER granting 39 MOTION for Leave to File an Amicus Brief; directing the Clerk to docket the proposed amicus brief. Signed by Judge Stephanie A. Gallagher on 2/11/2026. (bw5s, Deputy Clerk) (Entered: 02/11/2026) | |
| 55 | 02/11/2026 | Amicus Curiae Brief filed by Democratic National Committee(bw5s, Deputy Clerk) (Entered: 02/11/2026) | |
| 56 | 02/13/2026 | RESPONSE in Opposition to 43 MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel, 34 MOTION to Dismiss for Failure to State a Claim, 50 MOTION to Dismiss in Opposition to Motions to Dismiss filed by The United States of America. (Attachments: # 1 Attachment Neff Declaration, # 2 Exhibit MOU, # 3 Exhibit GA 2006 Complnt., # 4 Exhibit GA 2006 Order, # 5 Exhibit NCSBE Order, # 6 Exhibit NCSBE Status Rpt., # 7 Exhibit Oregon Order, # 8 Exhibit Michigan Order, # 9 Exhibit Commission FER Report, # 10 Exhibit CA Weber Order, # 11 Exhibit GA 2026 Order)(Frederick, Megan) Modified on 2/18/2026 (kk5s). (Entered: 02/13/2026) | |
| 57 | 02/18/2026 | NOTICE of Appearance by C Edward Hartman, III on behalf of Maryland Election Integrity LLC (Hartman, C) (Entered: 02/18/2026) | |
| 58 | 02/27/2026 | REPLY to Response to Motion re 50 MOTION to Dismiss filed by Maryland/DC Alliance for Retired Americans.(Nkwonta, Uzoma) (Entered: 02/27/2026) | |
| 59 | 02/27/2026 | REPLY to Response to Motion re 34 MOTION to Dismiss for Failure to State a Claim filed by Jared DeMarinis.(Kobrin, Daniel) (Entered: 02/27/2026) | |
| 60 | 02/27/2026 | REPLY to Response to Motion re 43 MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel filed by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden.(Lee, Theresa) (Entered: 02/27/2026) | |
| 61 | 03/09/2026 | NOTICE of Appearance by Dara Johnson on behalf of Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden (Johnson, Dara) (Entered: 03/09/2026) | |
| 62 | 03/18/2026 | NOTICE of Appearance by Joseph W. Voiland on behalf of The United States of America (Voiland, Joseph) (Entered: 03/18/2026) | |
| 63 | 03/19/2026 | MOTION to Withdraw as Attorney by The United States of | |

JA22

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|------|-----------------|--------|
| | | America (Attachments: # 1 Proposed Order for Megan Frederick to Withdraw as Counsel for the United States)(Frederick, Megan) (Entered: 03/19/2026) | |
| 64 | 03/19/2026 | ORDER granting 63 Motion to Withdraw as Attorney. Attorney Megan Frederick terminated. Signed by Judge Stephanie A. Gallagher on 3/19/2026. (bw5s, Deputy Clerk) (Entered: 03/19/2026) | |
| 65 | 04/09/2026 | NOTICE by Maryland/DC Alliance for Retired Americans re 50 MOTION to Dismiss  (Attachments: # 1 Exhibit A)(Nkwonta, Uzoma) (Entered: 04/09/2026) | |
| 66 | 04/13/2026 | RESPONSE re 65 Notice (Other) of Supplemental Authority filed by The United States of America. (Attachments: # 1 Ex. 1 Transcript Excerpt D. Conn.)(Voiland, Joseph) (Entered: 04/13/2026) | |
| 67 | 04/17/2026 | NOTICE by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden Supplemental Authority (Attachments: # 1 Exhibit)(Topaz, Jonathan) (Entered: 04/17/2026) | |
| 68 | 04/17/2026 | NOTICE of Appearance by Raymond Yang on behalf of The United States of America (Yang, Raymond) (Entered: 04/17/2026) | |
| 69 | 04/22/2026 | RESPONSE re 67 Notice (Other) of Supplemental Authority by Intervenor-Defendant Common Cause filed by The United States of America.(Voiland, Joseph) (Entered: 04/22/2026) | |
| 70 | 04/23/2026 | RESPONSE re 69 Response  filed by Jared DeMarinis.(Kobrin, Daniel) (Entered: 04/23/2026) | |
| 71 | 04/29/2026 | Supplement to 34 MOTION to Dismiss for Failure to State a Claim, 35 Response in Opposition to Motion filed by Jared DeMarinis  (Attachments: # 1 Exhibit Opinion and Order in U.S. v. Fontes)(Kobrin, Daniel) (Entered: 04/29/2026) | |
| 72 | 04/29/2026 | NOTICE by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden re 43 MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel, 60 Reply to Response to Motion  (Attachments: # 1 Exhibit United States v. Fontes, April 28, 2026, Amended Order)(Topaz, Jonathan) (Entered: 04/29/2026) | |
| 73 | 05/05/2026 | MOTION for Leave to File Combined Response to Supplemental Authorities (Dkts. 70 - 72) by The United States of America (Attachments: # 1 Proposed Combined Response to Supplemental Authorities (Dkts. 70 - 72))(Voiland, Joseph) (Entered: 05/05/2026) | |
| 74 | 05/06/2026 | QC NOTICE: 73 Motion for Leave to File filed by The United States of America was filed incorrectly. **The following attachments or exhibits are missing - Text of Proposed Order. To correct this problem, file proposed order using the event Notice (Other) and link to 73 .  (bw5s, Deputy Clerk) (Entered: 05/06/2026) | |
| 75 | 05/06/2026 | NOTICE by The United States of America re 73 MOTION for Leave to File Combined Response to Supplemental Authorities (Dkts. 70 - 72) attaching Text of Proposed Order (Voiland, Joseph) (Entered: 05/06/2026) | |
| 76 | 05/11/2026 | MOTION for Leave to File an Amicus Brief by Maryland Election Integrity LLC (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order, # 3 Attachment Maryland Election Integrity, LLC's Brief as Amicus Curiae)(Hartman, C) (Entered: 05/11/2026) | |
| 77 | 05/11/2026 | ORDER granting 76 MOTION for Leave to File an Amicus Brief. Signed by Judge Stephanie A. Gallagher on 5/11/2026. (bw5s, Deputy Clerk) (Entered: 05/11/2026) | |
| 78 | 05/11/2026 | Amicus Curiae Brief by Maryland Election Integrity LLC(bw5s, Deputy Clerk) (Entered: 05/11/2026) | |

JA23

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|------|----------------|--------|
| | 05/11/2026 | Deficiency Notice -Common Cause and Out for Justice, Inc.- Your Local Rule 103.3 disclosure statement has not been filed. The Statement must be filed by 5/18/2026 (bw5s, Deputy Clerk) (Entered: 05/11/2026) | |
| | 05/11/2026 | Deficiency Notice -Maryland Election Integrity LLC- Your Local Rule 103.3 disclosure statement has not been filed. The Statement must be filed by 5/18/2026 (bw5s, Deputy Clerk) (Entered: 05/11/2026) | |
| 79 | 05/11/2026 | Local Rule 103.3 Disclosure Statement by Maryland Election Integrity LLC (Hartman, C) (Entered: 05/11/2026) | |
| 80 | 05/12/2026 | Local Rule 103.3 Disclosure Statement by Common Cause (Jeon, Deborah) (Entered: 05/12/2026) | |
| 81 | 05/12/2026 | Local Rule 103.3 Disclosure Statement by Out for Justice, Inc. (Jeon, Deborah) (Entered: 05/12/2026) | |
| 82 | 05/15/2026 | NOTICE by The United States of America re 2 MOTION to Compel Production of Documents to include Supplemental Authority (Attachments: # 1 Ex. 1 OLC Opinion 05.12.2026)(Voiland, Joseph) (Entered: 05/15/2026) | |
| 83 | 05/17/2026 | RESPONSE re 82 Notice (Other) , Supplemental Authority filed by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden.(Topaz, Jonathan) (Entered: 05/17/2026) | |
| 84 | 05/18/2026 | RESPONSE re 82 Notice (Other) of Supplemental Authority filed by Maryland/DC Alliance for Retired Americans.(Nkwonta, Uzoma) (Entered: 05/18/2026) | |
| 85 | 05/22/2026 | NOTICE by Common Cause, Out for Justice, Inc., Myriam Paul, Luis Sims, Carl Snowden , Supplemental Authority (Attachments: # 1 Exhibit United States v. Bellows, # 2 Exhibit United States v. WEC)(Topaz, Jonathan) (Entered: 05/22/2026) | |
| 86 | 06/04/2026 | PAPERLESS NOTICE OF SCHEDULING OF HEARING advising counsel/parties of record that a hearing will be held before Judge Stephanie A. Gallagher on Wednesday, June 10, 2026, at 10:00 a.m. (Courtroom 1A - 101 W. Lombard Street, Baltimore, MD 21201). (jmhs, Chambers) (Entered: 06/04/2026) | |
| 87 | 06/09/2026 | NOTICE of Appearance by William Francis Mohrman on behalf of The United States of America (Mohrman, William) (Entered: 06/09/2026) | |
| 88 | 06/10/2026 | Motion Hearing held on 6/10/2026 re 43 MOTION to Dismiss and Brief in Opposition to Plaintiff's Motion to Compel filed by Luis Sims, Carl Snowden, Myriam Paul, Out for Justice, Inc., Common Cause, 34 MOTION to Dismiss for Failure to State a Claim filed by Jared DeMarinis, 50 MOTION to Dismiss filed by Maryland/DC Alliance for Retired Americans before Judge Stephanie A. Gallagher.(Court Reporter: Trish Mitchell) (dg4s, Deputy Clerk) (Entered: 06/10/2026) | |
| 89 | 06/12/2026 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings, Motions Hearing held on 6/10/2026, before Judge Stephanie A. Gallagher. Court Reporter Patricia G. Mitchell, trish_mitchell@mdd.uscourts.gov. Total number of pages filed: 60. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 7/6/2026. Redacted Transcript Deadline set for 7/13/2026. Release of Transcript Restriction set for 9/10/2026. (Entered: 06/12/2026) | |
| 90 | 06/16/2026 | NOTICE of Appearance by Jake T. Bachand on behalf of The United States of America (Bachand, Jake) (Entered: 06/16/2026) | |
| 91 | 06/18/2026 | MEMORANDUM OPINION. Signed by Judge Stephanie A. | |

JA24

1:25cv3934, The United States Of America V. Demarinis

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Gallagher on 6/18/2026. (bw5s, Deputy Clerk) (Entered: 06/22/2026) | |
| 92 | 06/18/2026 | ORDER denying 2 MOTION to Compel Production of Documents; granting 34 Motion to Dismiss for Failure to State a Claim; granting 43 Motion to Dismiss; granting 50 Motion to Dismiss; granting 73 MOTION for Leave to File Combined Response to Supplemental Authorities (Dkts. 70 - 72); dismissing with prejudice 1 COMPLAINT; directing the Clerk to close this case. Signed by Judge Stephanie A. Gallagher on 6/18/2026. (bw5s, Deputy Clerk) (Entered: 06/22/2026) | |
| 93 | 07/06/2026 | NOTICE of Appearance by Jonathon Hauenschild on behalf of The United States of America (Hauenschild, Jonathon) (Entered: 07/06/2026) | |
| 94 | 07/06/2026 | NOTICE OF APPEAL as to 91 Memorandum Opinion, 92 Order on Motion to Dismiss for Failure to State a Claim, Order on Motion for Leave to File, Order on Motion to Compel, by The United States of America. (Hauenschild, Jonathon) (Entered: 07/06/2026) | |
| 95 | 07/08/2026 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 94 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(slss, Deputy Clerk) (Entered: 07/08/2026) | |
| 96 | 07/13/2026 | USCA Case Number 26-1878 for 94 Notice of Appeal filed by The United States of America - Case Manager - M. Powers. (slss, Deputy Clerk) (Entered: 07/13/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

**End of Document**

JA25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State of Maryland, <br><br> Defendant. | **COMPLAINT** |

## <u>COMPLAINT</u>

### INTRODUCTION

1.      Title III of the Civil Rights Act of 1960 ("CRA") imposes a "sweeping" obligation on election officials, *Kennedy v. Lynd*, 306 F.2d 222, 226 (5th Cir. 1962), to "retain and preserve … *all* records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," 52 U.S.C. § 20701 (emphasis added).

2.      Title III likewise grants the Attorney General the sweeping power to obtain these records: "Any record or paper required by [section 301] to be retained and preserved shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative…." 52 U.S.C. § 20703. The written demand "shall contain a statement of the basis and the purpose therefor." *Id.*

1

JA26

3. If the custodian to whom the written demand is made refuses to comply, the CRA requires "a special statutory proceeding in which the courts play a limited, albeit vital, role" in assisting the Attorney General's investigative powers. *Lynd*, 306 F.2d at 225. The Attorney General or her representative may request a Federal court to issue an order directing the officer of election to produce the demanded records, akin to "a traditional order to show cause, or to produce in aid of an order of an administrative agency." *Id.*

4. In this "summary" proceeding, *In re Gordon*, 218 F. Supp. 826, 826-27 (S.D. Miss. 1963), the Attorney General need only show that she made a "written demand" for records covered by Section 301 of the CRA and that "the person against whom an order for production is sought … has failed or refused to make such papers 'available for inspection, reproduction, and copying,'" *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703). The court does not adjudicate "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand" or "the scope of the order to produce." *Lynd*, 306 F.2d at 226 (quoting 52 U.S.C. § 20703).

## I. JURISDICTION AND VENUE

5. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1345, and 2201(a); and 52 U.S.C. § 20705.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred in this District, and the Defendant is located in and conducts election administration activities in this District.

JA27

## II.    PARTIES

7. Plaintiff is the Attorney General of the United States.  The Attorney General has authority to enforce various federal election statutes, including the CRA, *see* 52 U.S.C. § 20703; the National Voter Registration Act ("NVRA"), *id.* § 20510(a); and Title III of the Help America Vote Act ("HAVA"), *id.* § 21111.

8. Defendant State Administrator of Maryland, Jared DeMarinis, is sued in his official capacity as chief state election official responsible for coordinating Maryland's responsibilities under the NVRA. *See* 52 U.S.C. § 20509; Md. Code Ann., Elec. Law § 2-103 DeMarinis is sued in his official capacity only.

## BACKGROUND

9. This proceeding arises from the Attorney General's investigation into Maryland's compliance with federal election law, particularly the NVRA and HAVA.

10. Both the NVRA and HAVA require States to maintain and preserve certain records and papers that fall within the scope of Section 301 of Title III of the CRA.

### The National Voter Registration Act

11. The NVRA requires each state to "designate a State officer or employee as the chief State election official to be responsible for coordination of State responsibilities" under the NVRA. 52 U.S.C. § 20509. Defendant DeMarinis is the chief election official of the State of Maryland.

12. The NVRA requires States to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the death of the registrant, or "a change in the residence of the registrant, in accordance with subsections (b), (c), and (d)[.]" 52 U.S.C. § 20507(a)(4)

3

JA28

13. The NVRA also requires States to maintain, with exceptions not relevant here, "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters…." 52 U.S.C. § 20507(i)(1).

### The Help America Vote Act

14. HAVA requires all States to maintain and administer "a single, uniform, official, centralized, interactive computerized statewide voter registration list" that contains "the name and registration information of every legally registered voter in the State and assigns a unique identifier to each legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A).

15. HAVA further establishes "[m]inimum standard[s] for accuracy of State voter registration records," 52 U.S.C. § 21083(a)(4), and prohibits States from processing voter-registration applications without obtaining and verifying certain identifying information from the applicants, namely, a Driver's License number for those who possess a valid one, the last four digits of a social security number for those who do not possess a valid Drivers' license, and for those who have neither a unique identifier. *id.* § 21083(a)(5)(A).

### The Civil Rights Act

16. Congress empowered the Attorney General to request records pursuant to Title III of the CRA, codified at 52 U.S.C. § 20701, *et seq.*

17. Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of twenty-two months after any federal general, special or primary election. *See* 52 U.S.C. § 20701, *et seq.*

18. Section 303 of the CRA provides, in pertinent part, "[a]ny record or paper required by Section 20701 of this title to be retained and preserved shall, upon demand in writing by the

4

JA29

Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…." 52 U.S.C. § 20703.

**FACTUAL ALLEGATIONS**

19.    The United States Election Assistance Commission ("EAC")— "an independent, bipartisan commission whose mission is to help election officials improve the administration of elections and help Americans participate in the election process"—conducts a biennial Election Administration and Voting Survey ("EAVS"). EAC, *About the EAC*, http://eac.gov/about (last visited Nov. 14, 2025).

20.    For the EAC's most recent report, "Election Administration and Voting Survey 2024 Comprehensive Report: A Report from the U.S. Election Assistance Commission to the 119th Congress" ("2024 EAVS Report"), States "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." EAC, 2024 EAVS Report at 7.[1]

21.    Based on a review of the 2024 EAVS Report, the Attorney General sent a letter to State Administrator DeMarinis on July 14, 2025, seeking information regarding Maryland's compliance with federal election law. See Letter from Attorney General to Secretary Administrator DeMarinis ("July 14 Letter").

22.    The Letter requested, among other information and documents, a list of the election officials who are responsible for implementing Maryland's general program of voter registration list maintenance from November 2022 through receipt of the letter and a description of the steps

---

[1] https://www.eac.gov/sites/default/files/2025-07/2024_EAVS_Report_508.pdf (last visited Nov. 24, 2025).

JA30

that Maryland has taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. The July 14 Letter also requested—pursuant to Section 8(i) of the NVRA—that Maryland provide a current electronic copy of its computerized statewide voter registration list, containing "all fields" ("SVRL"), required under Section 303 of HAVA.

23.    The Attorney General's July 14 letter asked Administrator DeMarinis to produce the requested information and records by encrypted email or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

24.    In response, on July 30, 2025, Administrator DeMarinis sent a letter refusing to provide Maryland's SVRL and directing the Department to a website where "copies of publicly available data in the statewide voter registration list[.]" are available. Administrator DeMarinis also sent a letter on August 13, 2025, inquiring into the purpose of the Department's requests for the SVRL and citing Maryland election laws and Federal privacy law.

25.    On August 18, 2025, the Attorney General responded to Administrator DeMarinis August 13 Letter, advising the federal basis for her request, including the NVRA and HAVA, and informed the Administrator that the CRA empowers the Attorney General to request election records to enforce federal law. The Letter then demanded pursuant to the CRA "an electronic copy of Maryland's complete and current VRL." The Attorney General further stated that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." ("August 18 Letter") The letter directed that the SVRL should contain "all fields, which includes the registrant's full name, date of birth, residential address, his or her state driver's license number, or the last four digits of the registrant's social security number as required

JA31

under the Help America Vote Act ("HAVA") to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i)." (footnote omitted).

26.    The August 18 Letter explained to Administrator DeMarinis that "HAVA specifies that the 'last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974.'" *See* 5 U.S.C. § 552a note; 52 U.S.C. § 21083(c). In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Department is now doing.

27.    On August 25, 2025, Administrator DeMarinis responded to the Attorney General's letter, again refusing to provide an unredacted computerized SVRL.

## COUNT ONE
## VIOLATION OF THE CIVIL RIGHTS ACT OF 1960, 52 U.S.C. § 20703

28.    On August 18, 2025, the Attorney General sent a written demand to Administrator DeMarinis for the production of specific election records pursuant to 52 U.S.C. § 20703.

29.    The written demand "contain[ed] a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

30.    On August 25, 2025, Administrator DeMarinis refused to provide the records requested.

Wherefore, the United States respectfully requests this Court:

A.   Declare that Defendant's refusal to provide the election records upon a demand by the Attorney General violates Title III of the Civil Rights Act as required by 52 U.S.C. § 20703;

7

JA32

B.  Order Administrator DeMarinis to provide to the Attorney General the current electronic copy of Maryland's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number, or HAVA unique identifier as required by 52 U.S.C. § 21083 within 5 days of a Court order.

DATED: December 1, 2025

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

/s/ *Brittany E. Bennett*
MAUREEN RIORDAN
Senior Counsel, Voting Section
BRITTANY E. BENNETT
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

8

JA33

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2025, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsel of record.

/s/ *Brittany E. Bennett*
Brittany E. Bennett
Trial Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.141
Washington, D.C. 20002
Telephone: (202) 704-5430
Email: brittany.bennett@usdoj.gov

JA34

Case 1:25-cv-03934-SAG    Document 2-2    Filed 12/01/25    Page 2 of 36



**U.S. Department of Justice**

Civil Rights Division

*Voting Section*
*950 Pennsylvania Ave, NW – 4CON*
*Washington, DC  20530*

July 14, 2025

Via Mail and Email

The Honorable Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486
jared.demarinis@maryland.gov

Dear State Administrator DeMarinis:

We write to you as the chief election official for the State of Maryland to request information regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq*.

Please provide a list of the election officials who are responsible for implementing Maryland's general program of voter registration list maintenance from November 2022 through receipt of this letter, including those responsible officials not employed by your office (such as local election officials) who are also involved in that effort. Please also provide a description of the steps that you have taken, and when those steps were taken, to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA. Please include both the actions taken by Maryland officials as well as county officials.

The NVRA requires each state and the District of Columbia to make available for inspection "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Section 11 of the NVRA authorizes the Attorney General to bring NVRA enforcement actions. *See* 52 U.S.C. § 20510.

Pursuant to Section 20507(i) of the NVRA, the Attorney General requests that you produce for inspection the following records:

1. The current electronic copy of Maryland's computerized statewide voter registration list ("statewide voter registration list") as required by Section 303(a) of the Help America Vote Act. Please include all fields contained within the list. Please produce each list in a .xls, .csv, or delimited-text file format.  Please specify what delimiter is used, if applicable, or provide a file layout along with a database user manual, coding list, or other materials that define or explain how a voter record is coded into the statewide voter

JA35

registration list and reported in the electronic copy of the statewide voter registration list.

Additionally, please provide the following information in electronic form. The time period for these requests is close of registration for the November 2022 general election through the close of registration for the November 2024 general election, the same time period as the most recent report from the Election Assistance Commission's Election Administration and Voting Survey ("EAVS"). If you are unable to provide the data, please explain why the data is not available.

1.  A review of the most recent EAVS report indicates that in response to Question A1b, there are nearly as many registered voters listed as active as the citizen voting age population in Maryland, with a registration rate in 2024 of 95.9 percent of the citizen voting age population.  Furthermore, the EAVS report indicates that the ratio of registered voters to citizen voting age population has been unusually high for several years, with Maryland reporting a registration rate of 93.9 percent of citizen voting age population in 2022 and 96 percent in 2020. Please explain what actions Maryland is taking to ensure that voters who should not be on the voter roll are being removed.

2.  In the EAVS data for Question A3a, Maryland had 6,491,862 registration transactions processed, which is significantly more than Maryland's 4,231,112 active registered voters.  Please explain why the number of registration transactions was significantly higher than the number of active registered voters.  In Question A3b, there are 524,189 new valid registrations, which is less than the 613,352 new registrations listed on your website in the year end activity reports for 2023 and 2024 combined: Voter Registration Statistics. Please explain why there is a difference in those registration statistics.

3.  In the EAVS data for Question A10a, Maryland sent 1,559,430 confirmation notices, which is 36.9 percent of all active registered voters and well above the national average of 19.5 percent.  Based on the responses to Question A11b, it appears that most of these notices were sent because voters may have moved.  Please explain why Maryland sent confirmation notices to so many registered voters.

4.  In the EAVS data for Questions A10e and A10f, Maryland combined the responses and stated that 1,520,490 confirmation notices were unreturned, which is 97.5 percent of all notices sent. According to the most recent EAVS report, only 320,634 voters are inactive. Please explain the process for determining how a voter becomes an inactive voter.  Please explain why the number of inactive voters is so low relative to the number of confirmation notices not being returned.

5.  In the EAVS data for Question A12b, 44,869 voters were removed because they had moved outside of the jurisdiction.  In the EAVS data for Question A12e, 123,312 voters were removed because they failed to respond to a sent confirmation notice and had not voted in the two most recent federal elections.  Together that means a maximum of 168,181 voters might have been removed for reasons related to confirmation notices. Please explain why the number of voters removed is so low relative to the number of unreturned confirmation notices.

2

6. In October 2023, the Office of Legislative Audits published a report regarding the State Board of Elections (SBE). State Board of Elections - 10-31-23  The Audit found that "SBE's match of voter records to State death records were not as comprehensive as necessary to identify certain potentially deceased voters." Audit at 11.  Because SBE only followed up on exact matches and information received by SBE from the Maryland Department of Health was not complete, the Audit identified potentially thousands of deceased individuals with active voter registration.  *Id*.  Please explain if the process to remove deceased voters has changed since the issuance of that Audit, and if so, please describe the process.

7. The Audit also found that Local Boards of Elections (LBE) were not removing deceased voters promptly.  "For example, as of May 2022, one LBE had not removed a voter for 332 days after receiving notification of the voter's death." Audit at 12.  The Audit's finding was that the SBE failed to ensure that LBEs were correcting voter data.  Audit at 10.  The Audit also noted a similar finding and recommended corrective action in 2019 that was not implemented. Audit at 12.  Please explain if the process that the State Board uses to ensure that LBEs are promptly updating voter rolls has changed since the issuance of the most recent Audit, and if so, please describe the updated process and when the changes were implemented.

8. The Audit also found that the duplicate voter registrations were not being removed from the voter rolls.  The Audit identified potential duplicate voter registrations.  *See* Audit at 11.  In the EAVS data for Question A3d, Maryland said that there were no duplicate registrations.  In the EAVS data for Question A12h, Maryland said it removed only 430 duplicate registrations, well below the national average.  Please explain the process for removing duplicate registrations and whether the State Board or the LBEs are responsible for removing those voters.  If the records were merged, please provide that information and explain that process. Please provide the number of registrations if they were merged.

Please provide a description of the steps that Maryland has taken, and when those steps were taken, to identify registered voters who are ineligible to vote as well as the procedures Maryland used to remove those ineligible voters from the registration list. Please identify the number of registered voters identified as ineligible to vote for the time period of the close of registration for the November 2022 general election through present for each of the following reasons:

1. Non-citizen

2. Adjudicated incompetent

3. Felony conviction

For each of those voters identified in categories 1-3 above, provide their registration information on the statewide voter registration list, including their vote history.

Please provide this information within 14 days of the date of this letter. The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing (JEFS).

3

JA37

Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov. We look forward to your assistance in advance.

Sincerely,

Michael E. Gates
Deputy Assistant Attorney General
Civil Rights Division


Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division

4



**Jared DeMarinis**
State Administrator

**Katherine Berry**
Deputy Administrator

**Michael Summers**, Chairman
**Jim Shalleck**, Vice Chairman
**Yaakov "Jake" Weissmann**
**Diane Butler**
**Victoria Jackson-Stanley**

July 30, 2025

Maureen Riordan
Acting Chief, Voting Section
Michael Gates
Deputy Assistant Attorney General, Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Ave. NW - 4CON
Washington, DC 20530
Sent by email to voting.section@usdoj.gov

Dear Chief Riordan and Deputy Assistant Attorney General Gates,

I write in response to your letter dated July 14, 2025. Pursuant to applicable state law governing access to public records, please find the State Board of Elections' (SBE) response.

Preliminarily, the letter requests information regarding list maintenance carried out by state and county election officials. Under Maryland law, the State Administrator, local boards, and election directors each perform voter registration list maintenance duties. Under Maryland Code, Election Law Article § 3-501, election directors in Maryland's counties and in Baltimore City have authority to remove voters from the registration list upon their request and upon learning of their loss of eligibility. Election Law § 3-502(b)-(c) charges the appropriate election official with sending a confirmation notice upon learning that a voter may have moved, while § 3-502(d)-(e) give election directors responsibility for updating or removing records in accordance with the NVRA and State laws. Section § 3-504 describes the following roles:

- The State Administrator secures records of deaths, convictions, and name changes from State and federal agencies;
- The local boards receive jurisdiction-specific cuts of this information, as well as obituaries and reports of destruction of residences within their jurisdictions; and
- Election directors send confirmation notices and remove voters from the registration list when statutorily-required conditions are met.

Additionally, Chapters 6 and 7 of Title 33, Subtitle 5 of the Code of Maryland Regulations (COMAR) elaborate on responsibilities of the State Board and State Administrator, and local boards and election directors, in the voter registration list maintenance program. Provisions include, for example, that under COMAR § 33.05.06.06, the State Board receives reports from the jury commissioner; the State Administrator delivers county-specific information to local boards; and election directors communicate with voters and update or cancel their registration records. Under COMAR § 33.05.07.01(B), election directors mail nonforwardable specimen ballots to all registered voters in their jurisdictions as part of the State's process to identify individuals who may have become ineligible by reason of a change of address. COMAR § 33.05.07.04 requires election directors to act as soon as reasonably possible to update records

FAX (410) 974- 2019
MD Relay Service (800) 735-2258

Toll Free Phone Number (800) 222-8683
https://elections.maryland.gov

151 West Street Suite 200
Annapolis, Maryland 21401

JA39

USCA4 Appeal: 26-1878    Doc: 30    Filed: 08/10/2026    Pg: 45 of 203

in the statewide voter registration list.

Maryland voter registration list maintenance procedures are dictated by state law, which derive from NVRA requirements. In general, the NVRA requires that:
- State programs make a reasonable effort to remove the names of ineligible voters by reason of death or change of residence, 52 USC § 20507(a)(4);
- State programs be uniform, nondiscriminatory, and not result in removal of registered voters solely by reason of failure to vote, 52 USC § 20507(b);
- States not remove a registrant on grounds of change of address unless they confirm, or fail to respond to a confirmation notice and do not vote in two general elections for Federal office after receiving a confirmation notice, 52 USC § 20507(d)(1); and
- State programs must be completed not later than 90 days before a primary or general election for Federal office, 52 USC § 20507(c)(2)(A).

Maryland procedures for voter registration list maintenance are set forth in the Election Law Article, Title 3, Subtitle 5, and COMAR Title 33, Subtitle 5, Chapters 6 and 7. Maryland's list maintenance processes are generally explained on the State Board of Elections Website: https://elections.maryland.gov/voter_registration/list_maintenance.html.

Furthermore, Maryland is a member of the Electronic Registration Information Center (ERIC) and follows the coalition's bylaws and the procedures set forth in its Membership Agreement, both of which may be reviewed and downloaded at the following URL: https://ericstates.org/wp-content/uploads/documents/ERIC-Bylaw-MA-FINAL.pdf. As summarized on the Voter Registration List Maintenance section of our website, "Each ERIC member shares their voter registration data along with data provided by each Department of Motor Vehicles. This allows the data to be matched with member states and against the Social Security Administration's death records and the National Change of Address (NCOA) program through the U.S. Postal Service. Maryland receives 5 reports from ERIC: in-state duplicate records, death notifications, in-state address changes, cross-state address changes and a report from NCOA regarding address updates." The State Administrator sends county-specific cuts of ERIC data to local boards and election directors to take appropriate action, in accordance with standard procedures.

Without exhaustion, we highlight here key provisions that guarantee compliance with NVRA requirements for voter registration list maintenance:
- Election Law Article § 3-502(c) requires election directors who receive notice of a move outside their jurisdiction to send a confirmation notice, and § 3-502(d) prohibits removal of a voter who receives this notice unless the voter confirms their move, or fails to respond and to vote in the two general elections following issuance of the confirmation notice.
- COMAR § 33.05.07.01(C) requires that confirmation mailings and subsequent actions to remove voters or place them in inactive status must be completed at least 90 days before an election.
- Election Law Article § 3-504(a)(1) requires the State Department of Health to report deaths to the State Administrator. Under § 3-504(a)(2) the State Administrator also must seek arrangements that provide access to Social Security Administration death

notices, while local boards are empowered to make arrangements to receive change of address information from approved sources under § 3-504(b)(4). When an election director receives a report of death from one of these sources or an obituary or other reliable report, the election director requests confirmation if appropriate, and cancels registration for deceased voters in accordance with provisions in § 3-504(c).

- COMAR § 33.05.06.05(A) further specifies that election directors cancel registration immediately upon receiving a report of a voter's death from a state vital statistics agency, and § 33.05.06.05(B) requires them to send a confirmation letter when a death report comes from another credible source.
- Election Law Article § 1-201 provides that the purposes of the State's election laws include fair and equitable treatment of all voters and assurance that all qualified persons may register.

With regard to the request to inspect the current voter registration list, this process is currently prescribed by Maryland law. Pursuant to Election Law § 3-506 and COMAR Title 33, Subtitle 3, Chapter 2, copies of publicly-available data in the statewide voter registration list are available upon completion of the process described at https://elections.maryland.gov/voter_registration/data.html. Please follow these instructions to obtain a copy of the portions of the statewide voter registration list that are subject to disclosure.

Insofar as the letter sent to SBE requests information regarding EAVS data, please see the EAC's publication Instructions for Completing the 2024 Election Administration and Voting Survey, OMB Control Number 3265-0006 (Expiration April 30, 2027), at page 6 for instructions that govern Maryland's reporting of transactions. In particular the instructions provide that the response should "[i]nclude any transactions that were processed, such as changes to name, political party, or address; duplicates; or pre-registrations…divide the total number of transactions received (A3a) into the categories listed in A3b through A3f…If a registration transaction involves a registered voter moving out of your jurisdiction to another jurisdiction (either within your state or to a different state), that is considered an update to an existing valid registration that is reported in A3e. If a voter who was previously registered in another jurisdiction in your state moves into your jurisdiction, that is considered a new valid registration that is reported in A3b." As indicated in the quoted language, EAVS data measures transactions, not registered voters.

We are currently reviewing the mailing figures you highlighted and our responses to the EAVS to determine if a reporting discrepancy occurred; that review is not complete in the timeframe you requested a response to the letter.

Designation of a registered voter as inactive is controlled by Election Law § 3-503. A person who fails to respond to a notice sent under § 3-502(c) becomes an inactive voter, and an inactive voter who submits a new registration application, absentee ballot application, certificate of candidacy, or affirmation of residence, or who signs a petition, is moved from inactive to active status.

Finally, the NVRA provides that, "A State shall not remove the name of a registrant from the official list of registered voters in elections for Federal office on the ground that the registrant has changed residence unless the registrant…(B)(i) has failed to respond to a notice described in paragraph (2); and (ii) has not voted or appeared to vote…in an election during the period beginning on the date of the notice and ending

USCA4 Appeal: 26-1878    Doc: 30    Filed: 08/10/2026    Pg: 46 of 203

USCA4 Appeal: 26-1878    Doc: 30    Filed: 08/10/2026    Pg: 47 of 203

on the day after the date of the second general election for Federal office that occurs after the date of the notice." 52 USC § 20507(d)(1). Our compliance with this provision means that failure to respond to a confirmation notice does not automatically correspond with or lead to cancellation of that individual's voter registration.

The requested information regarding the Office of Legislative Audits (OLA) and corrective measures, can generally be found in SBE's response to the audit findings. Please see Appendix B to the October 2023 audit cited, in which SBE responds to OLA's findings and describes procedures it will undertake in the future, stating in pertinent part: "SBE will make the following changes to its processing of MDH death records. SBE will implement changes to the matching process to include non-exact matches on first or last name due to hyphens or apostrophes. These will be sent to the LBEs for processing as normal. In addition, SBE will create a monthly list of all deceased residents who are not forwarded to LBEs for processing, because they do not match a voter in MDVOTERS." Outside of these changes, SBE concluded, based on the detailed explanation at pages 1-3 of Appendix B, that "current procedures are sufficient to identify deceased voters and cancel them."

As described in Appendix B to the October 2023 audit cited, in which SBE responds to OLA's findings and describes procedures it has undertaken and will undertake in the future, stating in pertinent part: "Each month, the LBEs perform peer reviews of changes made to critical data in MDVOTERS. Each LBE is assigned another LBE and using procedures and requirements set out by SBE, reviews certain transactions performed by that LBE. SBE randomly selects four of the peer reviews to audit monthly in a quality assurance review. If an LBE fails to follow the proper procedure in making changes to critical data in MDVOTERS, an exception is noted by SBE. SBE notifies the LBEs of exceptions discovered during the SBE quality assurance review and requires the LBE to submit a corrective action plan, with an estimated completion date. During the audit period, the LBEs reviewed 618,977 transactions using the peer review process. SBE audited 10,748 of these transactions and identified 738 exceptions. Of the 738 exceptions, 712 were corrected by the LBE using the process described above. There were 26 errors that were not corrected, which accounts for .0042% of all transactions, 0.24% of audited transactions, and 3.52% of all exceptions identified during the review process. That said, the process will be updated to ensure that 100% of identified exceptions are corrected. The data audit summary report will continue to be forwarded to the LBE Election Director and Deputy Director when complete. SBE will make corrections during the review and note the same in the summary report."

Neither Maryland nor federal law prescribes procedures for handling suspected duplicate registrations. Maryland receives information about potential duplicate records from ERIC, and pursuant to ERIC's Membership Agreement, the State Administrator ensures that election directors initiate contact with individuals whose registration records may be inaccurate or outdated within 90 days of receiving notice. Election directors are responsible for updating or removing voter registration records in accordance with the list maintenance laws we have described above. SBE's response to the OLA audit at pages 3-4 of Appendix B to the document also describes procedures for handling suspected duplicate registrations and concludes that with reasonable adjustments, OLA's review found at most a potential 0.00645% rate of duplicates among all active Maryland voter registration records. The duplicate registrations will be identified and merged using existing list maintenance practices at regular intervals.

The right to vote is a sacred right that has been expanded through sacrifices of many before us. It is a privilege and honor to work in this field empowering individuals to make their voices heard. The State Board works diligently to ensure that every eligible Marylander can register to vote in accordance with federal and State laws. And as referenced above, election officials in Maryland continue that diligent

Response Letter
July 30, 2025
Page 5 of 5

work to maintain up to date voter rolls.

Improper cancellation leads to disenfranchisement of an eligible voter. That is why it is a detailed process. It must be certain. Maryland's process errs on the side of removing any doubt in the cancellation before potentially disenfranchising a voter. As the Maryland Declaration of Rights states "the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; . . . and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage."

Sincerely,

Jared DeMarinis
State Administrator of Elections



**Jared DeMarinis**
State Administrator

**Katherine Berry**
Deputy Administrator

**Michael Summers**, Chairman
**Jim Shalleck**, Vice Chairman
**Yaakov "Jake" Weissmann**
**Diane Butler**
**Victoria Jackson-Stanley**

August 13, 2025

Michael E. Gates
Deputy Assistant Attorney General

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530

Sent via email: voting.section@doj.gov

RE: Voter Registration List Request

Thank you for your request for Maryland's voter registration list.

Maryland law requires that the voter registration list not be used for "commercial solicitation" and, more importantly, may not be used for "any other purpose not related to the electoral process."  Md. Code Ann., Elec. Law § 3-506(a)(1). Based upon the current request and similar requests made to other states, it is not clear what you intend to do with Maryland's voter registration list.

From your request, we understand the Department of Justice (Department) to be creating a system of records of Maryland voters, subject to the Federal Privacy Act (5 USC § 552a). Accordingly, the Department must share the Department's purpose in creating that system of records, including the notice published in the Federal Register required by 5 USC § 552A(e)(4) and how the public voter registration list requested is necessary and relevant to that purpose.

Because the request seeks past records, could you also share how the system of records you seek to establish of Maryland's voters will be maintained with "such accuracy, relevance, timeliness, and completeness as is reasonably necessary to assure fairness to the individual in the determination." *Id*. at § 552A(e)(5). Moreover, since the voter registration list the Department requested includes party affiliation and voting history information, could you please provide your analysis for how the system of records the Department is establishing avoids maintaining a record "describing how any individual exercises rights guaranteed by the First Amendment." *Id*. at § 552A(e)(6).

Finally, I request that the Department state whether the voter registration list will be

FAX (410) 974- 2019
MD Relay Service (800) 735-2258

Toll Free Phone Number (800) 222-8683
https://elections.maryland.gov

151 West Street Suite 200
Annapolis, Maryland 21401

JA44

DOJ_08_13_2025
Page 2 of 2

used in any investigative actions for potential violations of federal law. Specifically, whether the voter registration list will be used for enforcement of immigration laws against Maryland residents.

The voter registration list may not be used in a manner that intimidates a voter from going to the polls, results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote or causes a qualified voter to be stricken from voter registration list.

Maryland voters have the right to know what the Department intends to do with the state's voter registration list. That is why use is restricted to purposes related to the electoral process in Maryland.

Sincerely,

Jared DeMarinis
State Administrator of Elections



**U.S. Department of Justice**

Civil Rights Division

---

*Office of the Assistant Attorney General*                    *Washington, D.C. 20530*

August 18, 2025

Via Mail and Email

The Honorable Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections
P.O. Box 6486
Annapolis, MD 21401-0486
Jared.DeMarinis@maryland.gov

Re:     **Complete Maryland Voter Registration List with All Fields**

Dear State Administrator DeMarinis:

In our letter dated July 14, 2025, we made a request to you regarding the state's procedures for complying with the statewide voter registration list maintenance provisions of the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501, *et seq*. The deadline for the requested information was July 28, 2025. In a letter dated July 30, 2025, you directed us to a website where we could obtain "copies of publicly-available data in the statewide voter registration list[.]" You also sent a letter dated August 13, 2025, regarding our request for Maryland's voter registration list.

This letter from the Justice Department responds to your letter of August 13, 2025. This communication is limited to our request for the State of Maryland's voter registration list ("VRL") and associated voter registration records and does not include the Justice Department's response to your partial answers to the inquiries about Maryland's VRL maintenance processes.

When providing the electronic copy of the statewide VRL, Maryland must ensure that it contains *all fields*, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number as required under the Help America Vote Act ("HAVA")[1] to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A)(i).

---

[1] In charging the Attorney General with enforcement of the voter registration list requirements in HAVA and in the NVRA, Congress plainly intended that DOJ be able to conduct an independent review of each state's list. Any statewide prohibitions are clearly preempted by federal law.

JA46

Our July 14, 2025 letter requested Maryland's VRL to assess the State's compliance with the statewide VRL maintenance provisions of the NVRA, 52 U.S.C. § 20501, *et seq*. Our request is pursuant to the Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. *See* 52 U.S.C. § 20510(a).

HAVA also provides authority for the Justice Department to seek the State's VRL via Section 401, which makes the Attorney General solely responsible for actions to enforce HAVA's computerized statewide voter registration list requirements. *See* 52 U.S.C. § 21111; *see also Brunner v. Ohio Republican Party*, 555 U.S. 5, 6 (2008) (*per curiam*) (finding there is no private right of action to enforce those requirements in HAVA).

In addition to those authorities, the Attorney General is also empowered by Congress to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.  Section 301 of the CRA requires state and local officials to retain and preserve records related to voter registration and other acts requisite to voting for any federal office for a period of 22 months after any federal general, special or primary election. *See* 52 U.S.C. § 20701.

Section 303 of the CRA provides, in pertinent part, "Any record or paper required by section 20701 of this title to be retained and preserved shall, upon demand in writing by the Attorney General or his representative directed to the person having custody, possession, or control of such record or paper, be made available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or his representative…" 52 U.S.C. § 20703.

Pursuant to the foregoing authorities, including the CRA, the Attorney General is demanding an electronic copy of Maryland's complete and current VRL. The purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA.

Maryland has raised privacy concerns, and the voter registration list is subject to federal privacy protections. Section 304 of the CRA provides:

> Unless otherwise ordered by a court of the United States, neither the Attorney General nor any employee of the Department of Justice, nor any other representative of the Attorney General, shall disclose any record or paper produced pursuant to this chapter, or any reproduction or copy, except to Congress and any committee thereof, governmental agencies, and in the presentation of any case or proceeding before any court or grand jury.

52 U.S.C. § 20704.

HAVA specifies that the "last 4 digits of a social security number . . . shall not be considered a social security number for purposes of section 7 of the Privacy Act of 1974" (5 U.S.C. § 552a note); 52 U.S.C. § 21083(c).  In addition, any prohibition of disclosure of a motor vehicle record contained in the Driver's License Protection Act, codified at 18 U.S.C. § 2721(b)(1), is exempted when the disclosure is for use by a government agency in carrying out the government agency's function to accomplish its enforcement authority as the Justice Department is now doing. That said, all data

JA47

received from you will be kept securely and treated consistently with the Privacy Act. The use of Maryland's statewide VRL will be limited to the enforcement of statutes regarding voting.

To that end, please provide the requested electronic Voter Registration List[2] to the Justice Department by August 25, 2025.

The information and materials may be sent by encrypted email to voting.section@usdoj.gov or via the Department's secure file-sharing system, Justice Enterprise File Sharing ("JEFS"). Should further clarification be required, please contact Maureen Riordan at maureen.riordan2@usdoj.gov.

Regards,

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

---

[2] Containing *all fields*, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number as required by HAVA.

JA48



**Jared DeMarinis**
State Administrator

**Katherine Berry**
Deputy Administrator

**Michael Summers**, Chairman
**Jim Shalleck**, Vice Chairman
**Yaakov "Jake" Weissmann**
**Diane Butler**
**Victoria Jackson-Stanley**

August 25, 2025

Harmeet K. Dhillon
Assistant Attorney General
Civil Rights Division

Maureen Riordan
Acting Chief, Voting Section
Civil Rights Division
Department of Justice
950 Pennsylvania Avenue, NW – 4CON
Washington, DC 20530
Email: maureen.riordan2@usdoj.gov

Sent via email : voting.section@usdoj.gov

Re : **Complete Maryland Voting Registration List with All Fields**

Dear Assistant Attorney General Dhillon:

I write in response to your letter dated August 18, 2025. Pursuant to applicable state law governing access to public records, please find the State Board of Elections' (SBE) response.

Preliminarily, here is a summary of the relevant correspondence. On July 14, 2025, the Department of Justice Civil Rights Division (DOJ) sent a letter to SBE making requests for information and voter records. On July 30, 2025, SBE responded to the requests and provided information about obtaining publicly available voter registration lists. On August 5, 2025, the DOJ submitted an electronic application for a voter list. In response, on August 13, 2025, SBE requested additional information about your request for a voter list to ensure compliance with State law and regulations on its release. Specifically, SBE requested several pieces of information to determine whether (1) the list complies with the Federal Privacy Act, 5 USC § 552a, (2) the information would be used for immigration enforcement, and (3) your request related to an electoral process in Maryland.

Your August 18, 2025 letter did not answer the questions posed in SBE's August 13, 2025 letter. Additionally, your letter expanded the information requested in the request for a voter list to information that is not publicly available. **SBE renews that request for information in this letter to ascertain the use of the voter registration relating to an electoral process in Maryland.** By evading SBE's questions and failing to provide answers, DOJ is undermining its own requests to SBE.

FAX (410) 974- 2019
MD Relay Service (800) 735-2258

Toll Free Phone Number (800) 222-8683
https://elections.maryland.gov

151 West Street Suite 200
Annapolis, Maryland 21401

JA49

August 25, 2025
Page 2 of 3

In its letter dated July 14, 2025, DOJ asserted the National Voter Registration Act (NVRA), 52 U.S.C. § 20201(i), to assess compliance with voter list maintenance provisions as the basis for its request for a voter registration list.  In its response dated July 30, 2025, SBE detailed its compliance with the NVRA and how SBE conducts its maintenance to keep the voter registration list up to date.

In the letter dated August 18, 2025, DOJ asserted the Help America Vote Act (HAVA) as a basis for the request for a voter registration list to enforce the computerized statewide voter registration list requirements. SBE has complied with requirements of 52 U.S.C. § 21083. Moreover, Maryland carefully complies with every HAVA requirement and stands ready to demonstrate this compliance through its documented policies and practices.  Notably, your letter gives no basis for suspecting any shortcoming or failure in Maryland's HAVA compliance, nor suggests that DOJ is actually investigating any alleged HAVA violation in Maryland. The actual voter list is not required to assess compliance with those provisions.

Despite this, DOJ now asserts that Sections 11 and 401 of the NVRA are the basis for the request. Again, those sections do not support such a request. Recently, DOJ added Section 303 of the Civil Rights Act of 1960, 52 U.S.C. § 20701 as a legal justification for the voter list request.  In continuation of its review of the legality of all the DOJ requests, SBE maintains that none of these provisions expressly grant to DOJ the right to access to the State's voter registration list.

Furthermore, Maryland voters have a right to know of the enforcement actions referenced in your latest letter. If you have specific cases or specific individuals suspected of involvement in electoral illegalities, please provide me with a list of names.  With that information, SBE, in coordination with Maryland's Office of State Prosecutor, would be better able to participate in any legitimate investigation. However, absent particularized and detailed concerns, a demand for the entire Maryland voter list, including sensitive personally identifying information that is not publicly available, without evidence or support, is an overreach and unreasonable under the circumstances. It cast aspersions on every Maryland voter and attempts to sow doubt on the legitimacy of Maryland's voter registration process. Improper voter registration cancellation not only leads to disenfranchisement of eligible Maryland voters, but it is unlawful. *See* Md. Code, Election Law § 16-201(a)(5).

As SBE stated in previous correspondence, the voter registration list cannot be used to threaten or intimidate a voter from going to the polls.  And the voter registration list cannot be used for a purpose that results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote or causes a qualified voter to be stricken from voter registration list. The Maryland Declaration of Rights states "the right of the People to participate in the Legislature is the best security of liberty and the foundation of all free Government; . . . and every citizen having the qualifications prescribed by the Constitution, ought to have the right of suffrage." SBE ensures Marylanders can exercise this constitutional right in a **v**erified, **o**pen, **t**ransparent and **e**mpowering manner that is safe and secure.

JA50

August 25, 2025
Page 3 of 3

Thank you for your request. Please respond to my inquiries so that we can assess how your request for Maryland's publicly available voter registration list conforms with all relevant laws. SBE remains open to any opportunity to discuss this matter further with DOJ. I look forward to hearing from you.


Sincerely,

*Jared DeMarinis*

Jared DeMarinis
State Administrator of Elections
Maryland State Board of Elections

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF MARYLAND**

**(Northern Division)**

| | |
|---|---|
| United States of America,<br><br>　　　　　　*Plaintiff,*<br><br>v.<br><br>Jared DeMarinis,<br><br>　　　　　　*Defendant.* | Civil Action No. 25-SAG-3934 |

**<u>DECLARATION OF JOANNE ANTOINE</u>**

Pursuant to 28 U.S.C. § 1746, I, Joanne Antoine, declare as follows:

1. I am over 18 years old and am otherwise competent to testify. I have personal knowledge of the matters in this declaration, and I would testify thereto if I were called as a witness in Court.

2. I live in Maryland, and I am an eligible registered voter. Voting is the most fundamental form of democratic participation, and I am proud to be a Maryland voter. I am the Maryland State Director of Common Cause. I am also a member of Common Cause. I serve as the primary spokesperson and lobbyist for Common Cause in Maryland, working to protect voting rights, promote ethical government, and to hold power accountable. In my role as State Director, I also lead the Everyone Votes Maryland coalition –group of more than twenty-five organizations that serves as the state's primary voting rights coalition. I work with the coalition to advance pro-voter reforms and increase

JA53

civic engagement through events like legislative days of action and outreach to eligible voters on holidays such as National Voter Registration Day.

3. Common Cause is a nonprofit, nonpartisan membership organization incorporated under the laws of the District of Columbia and registered to do business in Maryland. Pursuant to its bylaws, Common Cause is organized and operated as a membership organization and brings this action in a representative capacity on behalf of its members.

4. Pursuant to its bylaws, Common Cause has defined who qualifies as a member. Under its definition, a "member" of Common Cause is any individual who, within the past two years, (a) made a financial contribution to the organization; or (b) has taken meaningful action in support of Common Cause's advocacy work. Such meaningful action includes, but is not limited to, signing petitions directed to government officials; participating in letter-writing or phone-banking campaigns; attending town halls, workshops, or rallies organized by Common Cause; or otherwise engaging in activities designed to advance the organization's mission. There are more than 18,087 Common Cause Maryland members, including voters with felony convictions; voters who have moved within Maryland or left the state and then returned to Maryland (but might be deemed "duplicate" voters or "out-of-state" voters due to a shoddy matching system); voters who are naturalized citizens (who may have indicated they were not a citizen on a government form prior to naturalization); and voters who vote by mail. They also may include voters whose identifying information is particularly important to keep private, due to their particular status as crime victims, public officials, or due to some other heightened need for privacy.

5. Common Cause's mission is to uphold the core values of American democracy by creating an open, honest, and accountable government that serves the public interest, promotes equal rights, opportunity, and representation for all, and empowers people to make their voices heard in the political process.

6. In Maryland, Common Cause ensures that Marylanders' voices are heard in the political process. Common Cause's Maryland members live throughout the state and include registered voters whose personal information is maintained in the statewide voter registration database held by the Maryland State Board of Elections. If the State Administrator of Elections discloses the unredacted voter registration file to DOJ, these members' sensitive personal information—including driver's license numbers, and portions of social security numbers—would be unlawfully released, causing an invasion of privacy, chilling participation in the electoral process, and undermining confidence in the integrity of Maryland elections.

7. Common Cause believes the right to vote is the cornerstone of a functioning democracy. We are committed to ensuring that every eligible Marylander can register and cast their ballot. Through our advocacy, in the last two decades Maryland has adopted a number of pro-voter reforms, including enhanced mail-in voting, same-day registration, and automatic voter registration. Our advocacy has also resulted in a number of reforms, including post-election audits, that seek to ensure the security and accuracy of our elections. These efforts are not just about increasing participation—they are about ensuring that every voice is heard, and every vote is protected.

JA55

8. Common Cause has a history of fighting to protect voter privacy in Maryland. In 2019 Common Cause worked to ensure the State Board of Elections would promulgate regulations for the secure storage of voter data and reporting of breaches of that data.

9. As a nonpartisan democracy reform organization, Common Cause, our volunteers, and coalition allies, regularly assist eligible Marylanders in registering to vote through community education and outreach. The voters we help are now part of the state's official voter file, and we consider it our duty to safeguard the trust they place in us and in the democratic process.

10. At public engagement events, we invite Marylanders not only to register but also to verify and update their voter information. As a result, many voters we assist become part of the official statewide voter file. We have a vested interest in protecting the integrity and privacy of that data. Any threat to the security of the voter file, especially one that could result in the misuse of personal information, directly undermines our work, damages public trust, and risks chilling voter participation. For one, our voter registration activities will be harmed because voters will be chilled from registering and participating if they believe their sensitive personal data will be provided to the federal government. We also run targeted communications campaigns, including through social media, to keep Marylanders informed about key election deadlines and updates. These efforts amplify official messages from the State Board of Elections and other election officials, helping ensure voters have accurate, timely information to participate confidently in our democracy.

11. Disclosure of the entire, unredacted Maryland voter file would undermine Common Cause's work and risk harm to our members. We rely on public confidence in the security

JA56

and integrity of voter data to encourage participation. If voters fear their personal information, like a partial Social Security number or driver's license number, could be misused or exposed, some will likely avoid registering to vote, decline to update their current voter registration record, or withdraw from civic engagement activities altogether. Such results undermine Common Cause's mission to expand access and participation, especially among historically marginalized communities. They also likely include voters whose identifying information is particularly important to keep private, due to their particular status as crime victims, public officials, or due to some other heightened need for privacy. Knowing that their personal data could be weaponized to question their eligibility to vote would chill engagement with the democratic process. This is especially true for voters in marginalized communities who already face systemic barriers and distrust government surveillance. Common Cause expends significant resources conducting on-the-ground voter engagement and assistance efforts seeking to register voters and engage voters in the democratic process.

12. Disclosure of the full Maryland voter file would facilitate unsubstantiated voter challenges, a concern especially for vulnerable communities. Improper and flawed mass challenge programs disproportionately target voters without stable housing or traditional addresses. Common Cause actively works to register and protect these very same disenfranchised Marylanders. Mass challenges, often filed in bulk by activists, can overwhelm local election officials, divert resources from voter outreach and education, delay or obstruct legitimate registrations and ballot processing. This undermines the infrastructure that Common Cause and our partners rely upon to ensure smooth, inclusive elections. Diverting resources to address these improper activities weakens our capacity

JA57

to run voter registration drives, educate voters, and mobilize communities. These sorts of challenges also work to revive historical tactics of voter suppression. Private voter challenges have roots in post-Reconstruction laws used to disenfranchise Black voters. Today, they are increasingly used to target voters of color, Indigenous Peoples, young voters, and those who are unhoused or in transient living situations; all of whom Common Cause prioritizes in our voter registration work and lobbying/advocacy supporting the inclusion of their voting rights. If voters' sensitive data is turned over to the federal government and used to promote mass disenfranchisement, Common Cause will be forced to redirect resources to mitigating the disenfranchisement of existing voters and away from its core activities of registering voters and engaging new voters in the democratic process.

13. Common Cause also runs a nonpartisan Election Protection program in Maryland, which provides critical information and assistance to voters around primary and general elections. These include helping voters navigate the vote-by-mail process, encouraging voters to participate, and assisting voters when they experience problems in trying to vote. It is the largest nonpartisan voter protection effort in the state. The success of this program and our ability to effectively identify and respond to issues that hinder voters depend on voters' trust in the election system. When voters fear their personal information could be misused for partisan or punitive reasons, especially under a federal administration known for voter suppression rhetoric and tactics, they may hesitate to accept help from volunteers, avoid reporting issues at the polls, and disengage from the voting process altogether.

JA58

14. If Maryland discloses the unredacted voter file, this will work to normalize federal overreach into state-run elections, weakening local control and opening the door to future demands for even more intrusive data. It poses a grave threat to voter privacy and public confidence. This threatens the decentralized structure of U.S. elections, which Common Cause defends as a safeguard against authoritarianism.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 12, 2025

Joanne Antoine

JA59

# Exhibit C

Docusign Envelope ID: 4519A29E-8DF6-4A04-8667-5D99C4471D73

## **DECLARATION OF TRINA SELDEN**

Pursuant to 28 U.S.C. § 1746, I, Trina Selden, declare as follows:

1. I am over 18 years old and am otherwise competent to testify. I have personal knowledge of the matters in this declaration, and I would testify thereto if I were called as a witness in Court.

2. I live in Maryland, and I am an eligible registered voter. Voting is the most fundamental democratic tool for civic engagement, and I am proud to be a Maryland voter. Our vote is our power. It's how we protect our freedoms and civil liberties, shape our communities, and hold elected leaders accountable. Every election is a chance to stand up for fairness, equity, and a democracy that works for all of us.

3. I am the Founder and Executive Director of Out for Justice, Inc. ("OFJ"). I am also a member of Out for Justice. In my role as Executive Director, I lead the organization to engage, educate, and empower individuals impacted by the legal system to build collective power for dismantling systemic oppression and harmful policies. We strive to humanize marginalized communities, prevent criminalization, reduce recidivism and promote second chances and successful reintegration through advocacy, education and supportive programming.

4. I represent Out for Justice in coalitions, testimony at the local and state level, and in the community.

5. Out for Justice, Inc, is a nonprofit, nonpartisan membership organization incorporated under the laws of the Maryland.

6. Out for Justice, Inc. is a grassroots advocacy organization that received our official nonprofit status in 2012 in Maryland. The organization was founded by a group of formerly incarcerated individuals who were ready and willing to work but repeatedly denied employment due to their criminal record. With the support of justice-impacted individuals, their friends, and their family members, OFJ strives to bring about policy reform that ends employment barriers and perpetual punishment that adversely affects citizens impacted by the criminal legal system.

7. Out for Justice believes that individuals impacted by the criminal legal system should be at the forefront of policy reform efforts that directly affect us, our families, and communities. Targeting unjust, counterproductive policies reduces the collateral consequences associated with a criminal record, provides a fiscally responsible method for reducing recidivism, and increases the health and safety of our communities.

8. Out for Justice is a membership organization. We believe those closest to the problem are closest to the solution. We are a member-led organization made up of individuals who have been directly impacted by the criminal legal system, and those who stand beside us in the fight for change. We have three levels of membership: Advocate Member (individuals who have experienced incarceration or they are a family member of someone who has been

JA61

Docusign Envelope ID: 4519A29E-8DF6-4A04-8667-5D99C4471D73

incarcerated), Supporting Member (individuals who support the mission of Out for Justice), and Organizational Member (an organization or business that supports the mission of Out for Justice.) Membership obligations include paying yearly dues (Individual - $60/year, Organizational - $120/year) and attending monthly membership meetings. No one is turned away for inability to pay. If they can't contribute, we ask that they engage through volunteer work. We have over 400 members.

9. Out for Justice is a member of the Everyone Votes Maryland coalition as well as the Voting Rights for All coalition (formerly called the Expand the Vote coalition) and we have been a leader in the efforts to return voting rights to currently and formerly incarcerated Marylanders and to engage eligible currently and formerly incarcerated Marylanders in the process of registering to vote and voting.

10. If the Maryland Board of Elections discloses the unredacted voter registration file to the U.S. Department of Justice ("DOJ"), these members' sensitive personal information—including full residential addresses, voter signatures, dates of birth, driver's license numbers, and portions of social security number—would be unlawfully released. This would constitute an invasion of privacy, create a significant chilling effect on participation in the electoral process particularly for system-impacted voters, and undermine confidence in the integrity of Maryland elections.

11. One of our strategic priorities is our voter registration and engagement campaign. After playing an integral role in passing legislation in 2015 that restored voting rights to 40,000 formerly incarcerated Marylanders, OFJ continues to work to implement this legislation by providing voter education, voter registration, and bringing returning citizens to the polls during major elections by: registering returning citizens at various probation and parole sites statewide; registering individuals with misdemeanor convictions and those on pre-trial; creating public awareness campaigns like our #ValueMyVote campaign; providing rides to the polls and bringing people to poll parties; and creating and staffing a hotline for folks behind the walls to discuss any issues with exercising their right to vote.

12. We register individuals to vote at parole and probation offices, during door-to-door voter outreach, and community resource events statewide and in the OFJ office. We speak to and submit PIA requests to the Maryland Board of Elections and Maryland Department of Corrections to ensure they are providing voter registration and voting access to eligible voters to include all county jails. In addition, we phone bank to encourage voting and offer voting access, transportation and assistance as needed. We host civic engagement events to encourage attention to elections and voter participation. Our 2020 "Value My Vote" campaign led to the Maryland State Board of Elections (for the first time) affirmatively providing detainees in local jails materials to register to vote and cast their ballots. We assisted with mailing over 5,000 packets to 21 detention centers.

Docusign Envelope ID: 4519A29E-8DF6-4A04-8667-5D99C4471D73

13. In addition to our voter registration and engagement work, we do outreach and education to reach eligible voters, their families and communities. We distribute voter education materials in-person and by mail to eligible voters who are currently or formerly incarcerated. We create and distribute voting-related PSAs through various media sources. And we led a statewide coalition of over 26 organizations that advocate for voting rights for individuals convicted of felonies.

14. Our work to register voters and use voting as a way to increase civic engagement among our membership and community has been featured in documentaries, including the award-winning film Out to Vote, local and national news sources, and has been supported by numerous foundations, including the Oprah Foundation.

15. For more than two decades, Maryland's laws have shifted from severe disenfranchisement for people with past felony convictions to today's more expansive system, where people on probation and parole can vote. People in jails and prisons for a misdemeanor conviction or pre-trial can also vote in Maryland.

16. For several decades, the rules for when someone regained their voting rights were complicated and ever-changing. This long history of tying criminal convictions to voting, combined with unclear laws, created real fear and risk for anyone with a past arrest who tried to register. We have devoted significant resources to educating the public, including impacted individuals, staff at boards of elections, corrections administrators, and elected officials, because there has been so much confusion and misinformation. While confusion about eligibility still exists, our work and that of our coalition partners has led to growing clarity and confidence among voters who are currently or formerly incarcerated.

17. Our staff and membership take the right to vote and voting laws very seriously. Knowing the law, following the law, and being able to promise to our members, government partners, and impacted communities that formerly incarcerated people (with only few exceptions) are legally allowed and completely safe to register to vote and vote is central to our voter engagement work. We are only as successful as we are trusted. We know firsthand that people will almost always say no to registering to vote if they are worried about whether they're legally allowed, whether they can trust to people asking them to register, and whether there are risks to their privacy or safety.

18. We have worked so hard to increase public knowledge of the law, trust in government and democratic process, and voter engagement. We have earned the trust of our members and communities because we are led by people who also experienced the justice system and know first-hand the concerns and the rewards related to voting after incarceration.

19. Disclosure of the Maryland voter file would do serious damage to our work and create real risks to our members.

20. Unsubstantiated voter challenges and voter list purges are a real risk and have happened before in Maryland. In fact, one of our staff members received a letter

JA63

Docusign Envelope ID: 4519A29E-8DF6-4A04-8667-5D99C4471D73

Case 1:25-cv-03934-SAG    Document 8-3    Filed 12/12/25    Page 5 of 5

from the Baltimore City Board of Elections in 2020 with the words "NOTIFICATION OF CANCELLATION OF VOTER REGISTRATION" in all capital letters at the top and stating that they "received notice from the Maryland court system that you have been convicted of a crime that requires cancellation of your voter registration. You are permanently disqualified from registration and voting in Maryland if you have been convicted of buying or selling votes, unless you obtain a pardon from the Governor." Because she worked at Out for Justice, she immediately knew this was wrong, but didn't know if it was a glitch or an administrative error or an intentional and improper removal based on a past conviction. When one person with a former conviction is in the news for a voting related accusation, the chilling effect is significant. Vulnerable populations - such as individuals with former felony convictions, people experiencing housing instability, and people with disabilities - as well as Black voters, who face the added weight of a long and violent history of disenfranchisement in this country, are more likely to feel the impact of these voter challenges. They may feel they have more to lose, face a higher risk of collateral consequences, and may experience these efforts as a revival of historical voter-suppression tactics.

21.  Any threat to the security of Maryland's voter file, especially one that could result in the misuse of personal information or targeting of people with past convictions, directly undermines our work, damages public trust in our democratic systems, and risks chilling voter participation.

I declare under penalty of perjury that the foregoing is true and correct.

Signed:  *Signed by:*
*Trina Selden*
18636DB782DB461...

Executed on: December 12, 2025

JA64

# Exhibit D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

| | |
|---|---|
| United States of America., | |
| *Plaintiff,* | |
| v. | Civil Action No. 25-SAG-3934 |
| Jared DeMarinis, | |
| *Defendant.* | |

## DECLARATION OF CARL O. SNOWDEN

Pursuant to 28 U.S.C. § 1746, I, Carl O. Snowden, declare as follows:

1. I, Carl O. Snowden, am over 18 years of age and am competent to testify. I provide this declaration in support of Plaintiffs' Motion to Intervene in this case.

2. Born and raised in Annapolis, where I reside today, I am a registered Maryland voter who considers my right to vote precious. I am also a community activist, writer, and former elected and appointed government official. I am a founder and current Convener of the Caucus of African American Leaders.

3. I have been a civil rights activist and leader in Maryland throughout my life, beginning in childhood. As a young teenager in 1970, I was expelled from Annapolis High School along with 14 other students, after we organized a boycott of classes to protest the school's lack of African American teachers and African American studies courses. (Fortunately, local benefactors raised funds for me to complete my high school education at the private Key School in Annapolis.) Also while a young adult, I organized a group called VOTE (an acronymfor Voters Organized To Educate), in the aftermath of the acclaimed Alex Haley work *Roots*, that successfully

JA66

advocated for Annapolis officials to create a memorial celebrating the triumph of the human spirit personified in the character Kunta Kinte, and acknowledging the City's role in the African slave trade.

4.    My youthful civil rights activism brought me unwelcome and unlawful attention from the Federal Bureau of Investigation (FBI), which placed me under surveillance from the time I was aged 16 through 24, as part of its COINTELPRO program, through which the FBI illegally spied on civil rights proponents.  As a result, I pursued legal action against the FBI, winning a $10,000 settlement and forcing the FBI to expunge the files the government had illegally compiled about me.

5.    Beginning in 1985, I served for three terms as an elected Annapolis City Alderman, after successfully resolving a legal challenge to the City's abuse of the electoral districting process to limit the influence of Black voters.  Thereafter, I served under Governor Parris Glendening as an administrator in the Maryland Department of Juvenile Services, and as President of the Anne Arundel County Economic Opportunity Committee.  Additionally, from 1998 to 2006, I served as Legislative Liaison and Special Assistant to Anne Arundel County Executive Janet Owens, working on intergovernmental relations for the County.

6.    In 2007, I was appointed by Attorney General Douglas Gansler as the State of Maryland's first-ever Director of Civil Rights, where I served until 2012, conducting advocacy, investigation and mediation in civil rights matters statewide.  While my work as Civil Rights Director spanned a wide range of issues, I was vigilant in that role about doing all I could to protect Marylanders' fundamental voting rights, which I view as preservative of all of our constitutional freedoms.  For example, from 2007-2008, I helped Mr. Gansler organize and served as convener for the Attorney General's Task Force on Voting Irregularities, which conducted hearings

2

statewide and reported its recommendations to help ensure that election issues that occurred in connection with Maryland's 2006 elections were addressed and remedied in advance of the important 2008 Presidential Elections.[1]

7.      In 2011, I founded and convened the Caucus of African American Leaders (CAAL), a membership-based consortium of organizations and individuals, including the NAACP, elected officials, and faith and community leaders, among others.  We seek to raise awareness about current civil rights issues impacting the African-American community, particularly with respect to democracy and voting rights issues, by engaging in legal advocacy and encouraging the public to participate in local, state, and national elections to effect positive change. I have served as CAAL's Convener in Annapolis throughout the life of the organization.

8.      Before and after CAAL's founding, over the course of four decades, I have worked extensively with civil rights lawyers to advance voting rights for Black and BIPOC Marylanders through enforcement of the landmark Voting Rights Act of 1965.  This work included a 1984 Voting Rights Act lawsuit I participated in as a plaintiff successfully challenging the racially discriminatory election system in the City of Annapolis, as well as numerous challenges to racially discriminatory election systems up and down Maryland's Eastern Shore, including most recently successful challenges in the Town of Federalsburg (2024) and Wicomico County (2025).

9.      My background as a voting rights activist, my work with the Caucus of African American Leaders and my past targeting for unlawful surveillance by the FBI as a result of my activism make me extremely concerned about the current administration's efforts to suppress votes and undermine democracy.  When I learned that the U.S. Department of Justice has made an

---

[1] *See*
https://msa.maryland.gov/megafile/msa/speccol/sc5300/sc5339/000113/005000/005368/unrestricted/20071452e.pdf.

unprecedented demand for unredacted voter records from Maryland, including sensitive data, I immediately became concerned about how the government might try to use or manipulate this information. As a Maryland voter who has previously had my freedoms and privacy rights violated by the federal government through its unlawful COINTELPRO program, the DOJ effort to secure my private voting information for use in ways it refuses to justify or explain concerns me deeply. When this occurred in my youth I had no advance notice, and could only challenge the violations by seeking compensation in retrospect; this time I see an opportunity to prevent the violation before it occurs, and so I am seeking to intervene at the outset of this litigation in the hopes of securing court relief to protect my rights and those of all other Maryland voters.

10. Among the many other Maryland voters who could be impacted by this lawsuit, CAAL's members and constituents include many people – both high profile people like me with a record of challenging authority and vulnerable newcomers to the Maryland electorate. CAAL's membership includes people who have moved to Maryland recently, naturalized citizens, and citizens returning from incarceration who are newly engaged in the election process. As someone who has experienced abuse of power by federal officials personally and sees daily efforts by the current administration to undermine democracy and the rule of law, I justifiably fear the Justice Department will use the sensitive information it is demanding about Maryland voters inappropriately, to levy false accusations about illegal voting and suppress the votes of people like me and others CAAL represents.

11. I believe we should make the electoral process more welcoming to every eligible voter and not try to intimidate voters or expunge eligible voters from election lists.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

4

JA69

Executed on December 11, 2025

Carl O. Snowden

5

# Exhibit E

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

United States of America,

       *Plaintiff,*

v.

Jared DeMarinis,

       *Defendant.*

Civil Action No. 25-SAG-3934

**<u>DECLARATION OF MYRIAM PAUL</u>**

Pursuant to 28 U.S.C. § 1746, I, Myriam Paul, declare as follows:

1. I am over 18 years of age and am competent to testify. I submit this declaration in support of a Motion to Intervene in this case.

2. I was born in Haiti and immigrated to the United States at age 13. I lived in New York before moving to Boston, where I graduated from high school and earned an undergraduate degree in finance and accounting, as well as a master's degree in leadership and project management from Northeastern University.

3. I became a naturalized U.S. citizen 20 years ago and have consistently exercised my right to vote since then. Voting is fundamental to ensuring that my voice is heard, and I actively encourage others in my community to participate, particularly in local elections.

4. I have lived in Maryland for nine years and am a registered voter in the state. I currently serve as Assistant Director of Sponsored Projects at the College of Information at the University of Maryland, College Park, and recently completed my first semester as a Doctor of Business Administration candidate.

JA72

5.      I am deeply concerned about the potential disclosure of my sensitive personal information from Maryland's voter rolls to the U.S. Department of Justice. I take significant precautions to protect my personal data and do not share details such as my Social Security number over the phone. The lack of clarity regarding how this information will be used and safeguarded raises serious privacy and security concerns.

6.      Voting is a private and fundamental right, and individuals must feel secure and free from fear when exercising it. The Department of Justice's request for voter data threatens not only my privacy and personal freedoms but also those of other Maryland voters.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

Executed on December 12, 2025

Myriam Paul

2

JA73

# Exhibit F

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)**

| | |
|---|---|
| United States of America, | |
| *Plaintiff,* | |
| v. | Civil Action No. 25-SAG-3934 |
| Jared DeMarinis, | |
| *Defendant.* | |

**<u>DECLARATION OF LUIS SIMS</u>**

Pursuant to 28 U.S.C. § 1746, I, Luis Sims, declare as follows:

1. I, Luis Sims, am over 18 years of age and am competent to testify. I provide this declaration in support of our Motion to Intervene in this case.

2. As an Army veteran, I grew up and currently reside in Baltimore City, Maryland. Since returning home to Baltimore last year after serving more than 30 years for a felony conviction, I have registered to vote and am eager to do so after being disenfranchised for almost half of my life.

3. Before my incarceration in 1990, I regularly voted because I experienced the direct impact of decisions made by elected officials on my life, my family, and my community. This included redlining during the 1960's that denied us and other Black families the freedom to choose where we wanted to live, and rent control that later allowed my father to access affordable housing.

4. During my childhood in Baltimore, I experienced a lot of racism that made me fearful of being wrongfully targeted, such as being chased out of a public pool because of my race. Following my service as a communications officer in the United States Army during the late

JA75

1970's, I grew more wary that such targeting could include covert government misconduct, especially with the harmful government secrecy during the Vietnam War that was exposed during the years leading up to my enlistment.

5. My fear of government mistreatment was realized during my incarceration, where I often endured poor conditions and undue surveillance, and was denied parole despite the Parole Commission unanimously recommending my release in 2020.

6. Since finally returning home on parole in 2024, I have remained deeply concerned with how governmental decisions affect my life. In hearing that the U.S. Department of Justice is seeking sensitive information from Maryland's voter rolls about me as a registered voter, I worry that I will be unduly scrutinized due to my race and felony conviction. I also worry this could undermine my right to vote, particularly as I registered to vote while living in transitional housing in Baltimore, but recently moved to a new residence.

7. After being stripped of my right to vote while serving my sentence, I am fiercely protective against anything that could impact my freedom again. Statements made by the current administration vilifying people with felony convictions make me genuinely concerned about being targeted by the Department of Justice.

8. Protecting the ability to vote without fear is particularly important for people like me who have been hampered by our justice system. It is essential for us to be able to exercise this fundamental right without worrying about political repercussions that already burden so much of our lives.

I declare under penalty of perjury that the foregoing is true and correct according to the best of my knowledge, information, and belief.

2

JA76

Executed on December 12, 2025

Luis Sims

3

JA77

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | * |
| *Plaintiff*, | * |
| v. | * |
| | No. 1:25-cv-03934-SAG |
| JARED DEMARINIS, in his official capacity as state administrator of elections for the state of Maryland, | * |
| *Defendant*. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MOTION TO DISMISS BY MARYLAND STATE ADMINISTRATOR OF ELECTIONS

Defendant State Administrator of Elections, Jared DeMarinis, through counsel, moves to dismiss the complaint (ECF 1) under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.

The grounds for the motion are fully stated in the accompanying memorandum and incorporated by reference herein.

WHEREFORE, for the reasons stated, the State Administrator hereby requests that the Court enter an order dismissing plaintiffs' complaint (ECF 1) and any further relief as may be appropriate.

JA78

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland


/s/ Daniel M. Kobrin

_____

DANIEL M. KOBRIN
Federal Bar No. 30392
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.state.md.us
(410) 576-6472
(410) 576-6955 (facsimile)

January 30, 2026                              Attorneys for Defendant

2

## CERTIFICATE OF SERVICE

I certify that, on this 30th day of January, 2026 the foregoing was served by CM/ECF on all registered CMF users.

/s/ Daniel M. Kobrin

_____

Daniel M. Kobrin

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

THE UNITED STATES OF AMERICA,　　　*

　　　　*Plaintiff*,　　　　　　　　　　*

　　　　　v.　　　　　　　　　　　　*

　　　　　　　　　　　　　　　　　No. 1:25-cv-03934-SAG

JARED DEMARINIS, in his official　　*
capacity as state administrator of
elections for the state of Maryland,　*

　　　　*Defendant*.


\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

## MEMORANDUM IN SUPPORT OF MARYLAND STATE ADMINISTRATOR'S MOTION TO DISMISS

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

---

DANIEL M. KOBRIN
Federal Bar No. 30392
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.state.md.us
(410) 576-6472
(410) 576-6955 (facsimile)

January 30, 2026　　　　　　　Attorneys for Defendant


JA81

**TABLE OF CONTENTS**

Page

STATEMENT OF FACTS ........................................................................... 2

    Federal Law Governing Elections ........................................................ 2

    The Federal Government's Efforts to Collect Personal Information ...................... 4

    The Federal Government's Voter Registration Demand in Maryland .................... 9

    Allegations in the Complaint ................................................................ 12

ARGUMENT ........................................................................................ 14

I.     STANDARD OF REVIEW ................................................................. 14

II.    TITLE III DOES NOT AUTHORIZE THE ATTORNEY GENERAL TO DEMAND AN ENTIRE, COMPUTERIZED, VOTER REGISTRATION DATABASE. .............................. 14

III.   THE ATTORNEY GENERAL DID NOT PROVIDE A SUFFICIENT PURPOSE OR ANY BASIS FOR ITS DEMAND. ................................................................. 18

    A.    Congress enacted Title III to protect against racially discriminatory voting practices ................................................................. 18

    B.    The basis and purpose of a Title III demand must relate to Title III. ......... 21

    C.    The Attorney General did not provide a basis for the voter registration database demand. ................................................. 22

    D.    The Attorney General provided an inadequate, and possibly pretextual, purpose for the demand. ........................................... 23

CONCLUSION ..................................................................................... 27

JA82

## Cases

*A Society Without A Name v. Virginia,* 655 F.3d 342 (4th Cir. 2011) ............................... 14

*Alvarez Ronquillo v. Bondi*, 151 F.4th 522 (4th Cir. 2025) ................................. 15

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007) .................................................... 14

*Bey v. Shapiro Brown & Alt, LLP*, 997 F.Supp.2d 310 (D. Md. 2014) ............................. 10

*Chambers v. King Buick GMC*, LLC, 43 F.Supp.3d 575 (D. Md. 2014) .......................... 27

*Department of Commerce v. New York*, 588 U.S. 752 (2019) .......................................... 26

*Hillman v. Amazon.com Services*, 785 F.Supp.3d 59 (D. Md. 2025) ................................. 14

*In re 2025 Subpoena to Children's National Hospital*, No. 1:25-CV-03780, 2026 WL 160792 (D. Md., Jan. 21, 2026) ................................................................. 21, 25

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ............................................. 22

*In re Subpoena Duces Tecum*, 228 F.3d 341 (4th Cir. 2000) ............................................. 25

*Judicial Watch v. Lamone*, 399 F.Supp.3d 425 (D. Md. 2019) ......................................... 24

*Just Puppies, Inc. v. Frosh*, 565 F.Supp.3d 665 (D. Md. 2021) ......................................... 15

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ................................................. 25

*Kennedy v. Lynd*, 306 F.2d 322 (5th Cir. 1962) ..................................... 21, 24, 25

*Minnesota, et al. v. Kristi Noem, et al.,* No. 1:26-CV-190, (D. Minn. Jan. 25, 2026) ........ 9

*Prewett v. Weems*, 749 F.3d 454 (6th Cir. 2014) ................................................. 16

*Redeemed Christian Church of God (Victory Temple) Bowie, MD v. Prince George's County*, 17 F.4th 497 (4th Cir. 2021) ................................................................. 15

*Tankersley v. Almand*, 837 F.3d 390 (4th Cir. 2016) ................................................. 15

*United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev.) ................................................. 7

*United States v. Albence*, No. 1:25-cv-01453 (D. Del.) ................................................. 6

*United States v. Amore*, No. 1:25-cv-00639 (D.R.I.) ................................................. 7

*United States v. Beals*, No. 3:26-CV-00042 (E.D. Va.) ................................................. 7

JA83

*United States v. Bellows*, No. 1:25- cv-00468 (D. Me.).......................................7

*United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich.)...............................7

*United States v. Board of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y.)..7

*United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md.)...................................7

*United States v. Evans*, No. 1:25-cv-04403 (D.D.C) .........................................7

*United States v. Fontes*, No. 2:26-cv-00066 (D. Az.) .........................................7

*United States v. Griswold*, No. 1:25-cv-03967 (D. Colo.) ..................................6

*United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash.) ................................7

*United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill.) ..................................7

*United States v. Nago*, No. 1:25-cv-00522 (D. Haw.)........................................7

*United States v. Oliver*, No. 1:25-cv-01193 (D.N.M.) ........................................7

*United States v. Oregon, et al.*, No. 6:25-CV-01666, (D. Or. Jan 26, 2026) ..................2, 7

*United States v. Pennsylvania, et al.*, No. 2:25-CV-01481 (W.D. Penn)...........................7

*United States v. Raffensperger*, No. 1:25-cv-00548 (M.D. Ga.).........................7

*United States v. Read*, No. 6:25-CV-01666 (D. Or.)...........................................7

*United States v. Scanlan*, No. 1:25-CV-00371 (D.N.H.) .....................................7

*United States v. Simon*, 0:25-cv-03761 (D. Minn.) ............................................7

*United States v. Thomas*, No. 3:26 cv 00021 (D. Conn.) .....................................6

*United States v. Weber*, ___ F.Supp.3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ............................................................................................passim

*United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal.) .........................6, 12, 23

*United States v. Wisc. Elections Comm'n*, 3:25-cv-01036 (W.D. Wis.).............7

*United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193 (1979) ...........25

**Statutes**

52 U.S.C. § 20507 ................................................................3, 8, 17, 26

52 U.S.C. § 20510 ..............................................................................4

52 U.S.C. § 20701 ......................................................................passim

52 U.S.C. § 20702 ..............................................................................3

52 U.S.C. § 20703 ......................................................................passim

52 U.S.C. § 20705 ..............................................................................3

52 U.S.C. § 21083 ...........................................................4, 14, 16, 24

52 U.S.C. § 21111 ..............................................................................4

6 U.S.C. § 1502 ...............................................................................16

Ariz. Rev. Stat. Ann. § 16-152 ........................................................8

Ga. Code Ann. §§ 21-2-220(c) ........................................................8

La. Stat. Ann. § 18:104....................................................................8

Mass. Gen. Laws ch. 51, § 47C ......................................................8

Md. Code Ann., Cts. & Jud. Proc., § 3-2303................................9, 24

Md. Code Ann., Elec. Law § 3-101................................................25

Md. Code Ann., State Gov't. § 7-303...........................................9, 24

Mo. Rev. Stat. § 115.157.................................................................8

Mont. Code Ann. § 13-2-110 ..........................................................8

N.H. Rev. Stat. Ann. § 659:13-b .....................................................8

N.J. Stat. Ann. § 19:31-6.4 .............................................................9

N.Y. Elec. Law § 8-303...................................................................9

Tenn. Code Ann. § 2-2-116.............................................................9

Wis. Stat. § 6.34...............................................................................9

JA85

## Regulations

COMAR 33.01.01.01 ................................................................................ 8, 24

COMAR 33.05.02.02 ..................................................................................... 24

COMAR 33.05.04.05 ................................................................................ 8, 24

## Other Authorities

Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, 90 Fed. Reg. 13681 (Mar. 20, 2025) ................................................ 5

Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025) ............................................................. 5

U.S. Election Assistance Comm'n, *Election Administration and Voting Survey: 2024 Comprehensive Report* (June 2025) ................................................................... 8

v

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

THE UNITED STATES OF AMERICA,     *

        *Plaintiff,*            *

      v.                    *

                        No. 1:25-cv-03934-SAG

JARED DEMARINIS, in his official    *
capacity as state administrator of
elections for the state of Maryland,    *

        *Defendant*.

       *     *     *     *     *     *     *     *     *     *     *     *

**MEMORANDUM IN SUPPORT OF STATE ADMINISTRATOR'S MOTION TO DISMISS**

The United States has filed a complaint against the Maryland State Administrator of Elections to compel the disclosure of an unredacted, electronic copy of Maryland's voter registration database. The United States alleges that Title III of the Civil Rights Act of 1960, codified at 52 U.S.C. §§ 20701–20706 ("Title III"), grants the Attorney General authority to obtain the unredacted database because it is an "election record" within the meaning of 52 U.S.C. § 20701. (ECF 1 ¶¶ 17, 25.) It must thus be made available to the Attorney General for inspection upon written demand setting forth "the basis and the purpose therefor." 52 U.S.C. § 20703. The United States further alleges that it transmitted two letters to the State Administrator demanding the unredacted database, with the second letter providing the requisite basis and purpose. (ECF 1 ¶¶ 25.) And it has filed this suit in response to the State Administrator's failure to comply with that demand.

JA87

The complaint fails to state a claim because it is legally insufficient. Title III is a civil rights statute enacted 40 years ago to combat racial discrimination in voting administration. It's mandate to retain records of an election received during an election cannot reasonably be read to apply to a persistent and computerized voter registration database created and maintained by the State. *See* 52 U.S.C. § 20701. And even if it did, the Department of Justice failed to meet the law's conditions for the exercise of the Attorney General's record inspection authority. *See* 52 U.S.C. § 20703. The Department provided no "basis" for its demand, neglecting to articulate why it believed a federal election law had been violated. And it provided an inadequate "purpose," failing to connect its demand to concerns about disenfranchisement through racial discrimination. This Court should dismiss the complaint for its failure to state a claim upon which the government could obtain relief. *See United States v. Weber*, ___ F.Supp.3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also United States v. Oregon, et al.*, No. 6:25-CV-01666, Dkt. No. 68 (D. Or. Jan 26, 2026).

## STATEMENT OF FACTS

### Federal Law Governing Elections

Pertinent to this case, Congress enacted three laws that govern the administration of elections and voter registration: Title III of the Civil Rights Act of 1960, 52 U.S.C. §§ 20701—20706 ("Title III"); the National Voter Registration Act of 1993, 52 U.S.C. §§ 20501—20511 ("NVRA"); and the Help America Vote Act of 2002, 52 U.S.C. §§

20901—21145 ("HAVA"). Title III governs the retention of records related to an election. It requires an "officer of election" to "retain and preserve" all "records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. § 20701. The records must be retained "for a period of twenty-two months from the date" of the federal election to which the records relate. *Id.* And the premature destruction, mutilation, or alteration of such records is a crime punishable by up to a $1,000 fine, one year in prison, or both. *Id*. at § 20702.

The Attorney General of the United States may make a "demand in writing" for records retained under Title III. 52 U.S.C. § 20703. The demand "shall" provide both a "basis" and a "purpose" for the demand. *Id.* Upon a sufficient demand, the records must be available at the "principal office" of the records' custodian for "inspection, reproduction, and copying." *Id.* If a dispute over the demand arises, a United States district court for the district in which the records are held possesses jurisdiction "to compel production" of the records "by appropriate process." *Id.* at § 20705.

The NVRA provides minimum standards for the administration of voter registration. One such standard, pertinent to this case, is the requirement that a state "conduct a general program that makes a reasonable effort" to remove registered voters from a voter registration list when the voter dies or moves out of the registrar's jurisdiction. 52 U.S.C. § 20507(a)(4). A state "may" meet this requirement by using change-of-address information provided by the United States' Postal Service to identify voters who may have moved from the jurisdiction; but, it may only remove such voters

3

JA89

by sending them written notice and having them reply to the notice with written confirmation of their move. *Id.* at § 20507(c)(1). If the voter does not respond to the state's notice, they can only be removed from the voter roll if they subsequently fail to vote, or appear to vote, in the jurisdiction for two consecutive general elections for federal office. *Id.* at § 20507(c)(1), (d)(1).

HAVA, among other measures, governs the operational requirements for the administration of voter registration. The law requires a state to maintain its voter registration data in "a single, uniform, official, centralized, interactive computerized statewide voter registration" database that is administered at the state level. 52 U.S.C. § 21083(a)(1)(A). The state must conduct "list maintenance" on its computerized database, removing ineligible voters on a consistent and timely basis. *Id.* at § 21083(a)(2)(A). But HAVA does not impose any substantive requirements to remove ineligible voters or conduct systemized removal programs; it only requires that states remove voters from a computerized system in accordance with the standards set by the NVRA. *Id.*

For a violation of the NVRA, both the Attorney General of the United States and an aggrieved member of the public may sue for declaratory and injunctive relief. 52 U.S.C. § 20510(a), (b). For a violation of the voter registration requirements in HAVA, only the Attorney General is authorized to file an enforcement suit. 52 U.S.C. § 21111.

**The Federal Government's Efforts to Collect Personal Information**

In March 2025, the President issued two executive orders directing federal officials to undertake novel efforts to aggregate federal and state records containing

4

JA90

millions of individuals' personal information. The first executive order, issued on March 20, 2025, commanded federal officials across agencies to synthesize "agency records, data, software systems, and information technology systems" to pursue "Administration priorities" related to "waste, fraud, and abuse." Executive Order No. 14243, *Stopping Waste, Fraud, and Abuse by Eliminating Information Silos*, § 3(a), 90 Fed. Reg. 13681 (Mar. 20, 2025). The order further directed federal officials to establish "unfettered access to comprehensive data *from all State programs* that receive federal funding." *Id.* § 3(b) (emphasis added).

A second executive order, issued on March 25, 2025, sought to impose new requirements on the conduct of federal elections. Executive Order No. 14248, *Preserving and Protecting the Integrity of American Elections*, 90 Fed. Reg. 14005 (Mar. 25, 2025). The President directed the Secretary of the Department of Homeland Security and the Administrator of the Department of Government Efficiency to "review each State's *publicly available* voter registration list and available records concerning voter list maintenance activities," and to compare the publicly available data to "Federal immigration databases and State records requested" to ensure "consistency with Federal requirements." *Id.* § 2(b)(iii) (emphasis added).

Subsequent to these orders, the federal government began taking unprecedented steps to collect and pool Americans' personal data and to pressure States into assisting with this effort. The federal government enlisted technology company Palantir to build a massive repository of data pulled from federal agencies, including the Internal Revenue Service, the Social Security Administration, and the Department of Health and Human

5

JA91

Services ("HHS"), to facilitate immigration enforcement and deportations.[1] At the same time, federal agencies have pressed States to turn over sensitive, personal data collected in administering vital programs like Medicaid[2] and the Supplemental Nutrition Assistance Program.[3]

Apparently undeterred by federal court orders enjoining the improper collection and sharing of sensitive data,[4] the federal government has now demanded unredacted voter registration databases from 44 states and the District of Columbia. Brennan Center for Justice, *Tracker of Justice Department Requests for Voter Information*, https://tinyurl.com/532npb34 (last accessed Jan. 30, 2026). Eleven states have obliged the demand. *Id.* Of the remaining 33 states who have sought clarification or declined, the Department of Justice has initiated litigation against 24 states and the District of Columbia. *See United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal.); *United States v. Griswold*, No. 1:25-cv-03967 (D. Colo.); *United States v. Thomas*, No. 3:26 cv 00021 (D. Conn.); *United States v. Albence*, No. 1:25-cv-01453 (D. Del.); *United States v. Evans*,

---

[1] Priscilla Alvarez et al., *DOGE Is Building a Master Database for Immigration Enforcement, Sources Say*, CNN (Apr. 25, 2025), https://tinyurl.com/4bcurxw4.

[2] *See* Kimberly Kindy & Amanda Seitz, *Trump Administration Hands Over Medicaid Recipients' Personal Data, Including Addresses, to ICE*, Associated Press (July 17, 2025), https://tinyurl.com/32xwt9ws.

[3] Press Release, *Secretary Rollins Requires States to Provide Records on SNAP Benefits, Ensure Lawful Use of Federal Funds* (May 6, 2025), https://tinyurl.com/5yvbdwxt.

[4] *California, et al. v. U.S. Dep't of Health & Hum. Servs. et al.*, No. 3:25-cv-05536-VC, Dkt. No. 148 (N.D. Cal. Dec. 29, 2025) (enjoining sharing plaintiff states' Medicaid data regarding citizens and lawful residents); *California, et al. v. v. U.S. Dep't of Agric., et al.*, No. 3:25-cv-06310, Dkt. 106 (N.D. Cal., Oct. 15, 2025) (granting a preliminary injunction against the demand for SNAP data).

JA92

No. 1:25-cv-04403 (D.D.C); *United States v. Raffensperger*, No. 1:25-cv-00548 (M.D. Ga.); *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill.); *United States v. Nago*, No. 1:25-cv-00522 (D. Haw.); *United States v. Bellows*, No. 1:25- cv-00468 (D. Me.); *United States v. DeMarinis*, No. 1:25-cv-03934 (D. Md.); *United States v. Galvin*, No. 1:25-cv13816 (D. Mass.); *United States v. Simon*, 0:25-cv-03761 (D. Minn.); *United States v. Aguilar*, No. 3:25-cv-00728 (D. Nev.); *United States v. Oliver*, No. 1:25-cv-01193 (D.N.M.); *United States v. Board of Elections of the State of N.Y.*, No. 1:25-cv-01338 (N.D.N.Y.); *United States v. Amore*, No. 1:25-cv-00639 (D.R.I.); *United States v. Hanzas*, No. 2:25-cv-00903 (D. Vt.); *United States v. Hobbs*, No. 3:25-cv-06078 (W.D. Wash.); *United States v. Wisc. Elections Comm'n*, 3:25-cv-01036 (W.D. Wis.); *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich.); *United States v. Fontes*, No. 2:26-cv-00066 (D. Az.); *United States v. Read*, No. 6:25-CV-01666 (D. Or.); *United States v. Beals*, No. 3:26-CV-00042 (E.D. Va.); *United States v. Pennsylvania, et al.*, No. 2:25-CV-01481 (W.D. Penn); *United States v. Scanlan*, No. 1:25-CV-00371 (D.N.H.).

As of today's date, only two courts have issued a ruling on the viability of the Department's demands. Both granted the state's motion to dismiss for failure to state a claim. *See Weber*, ___ F.Supp.3d ___, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also Oregon*, No. 6:25-CV-01666 at Dkt. No. 68 (D. Or. Jan 26, 2026) (docketing court's oral grant of defendants' motion to dismiss with a formal, written opinion to follow).

By its very nature, a voter registration database is a unique repository of information. As of the 2024 general election, 86.6% of the estimated national citizen voting-age population was registered to vote. U.S. Election Assistance Comm'n,

*Election Administration and Voting Survey: 2024 Comprehensive Report* 132, 156-60 (June 2025). Most States reported rates greater than 80%, with sixteen reporting more than 90%. *See id.* at 156-60. Moreover, 32 States and the District of Columbia permit pre-registration, i.e., registration by an underage applicant, which becomes active when the applicant turns 18. *Id.* at 173-74. Those jurisdictions reported recording 1.18 million pre-registrations between 2022 and 2024. *Id.* at 174.

In addition to the personal information that election officials must collect to verify voter identity and eligibility, voter registration databases may contain information about a voter's electoral participation necessary to administering the State's elections. In all States, this includes information on whether a voter actually participated in an election, because federal law requires States to remove non-participatory voters who moved out of a jurisdiction. *See* 52 U.S.C. § 20507(d)(1)(ii). And in 30 States and the District of Columbia, the voter registration database includes information about party affiliation. Ballotpedia, *Partisan Affiliations of Registered Voters* (Aug. 31, 2025), https://tinyurl.com/yx2aec8b. Additionally, voter registration databases may contain information on a variety of sensitive topics (used to assist with voting or verify residency), such as disability, religious beliefs, occupation, parents' names, and criminal history, along with documents that include sensitive information, such as paychecks and bank statements.[5] Finally, the Department's request in this case would unmask specific

---

[5] *See, e.g.*, COMAR 33.05.04.05 & 33.01.01.01B(26)(a)(ii); Ariz. Rev. Stat. Ann. § 16-152(A)(9), (11); Ga. Code Ann. §§ 21-2-220(c), -417(c); La. Stat. Ann. § 18:104(B)(5), (8); Mass. Gen. Laws ch. 51, § 47C; Mo. Rev. Stat. § 115.157(1); Mont. Code Ann. § 13-2-110(5)(b)(ii); N.H. Rev. Stat. Ann. § 659:13-b; N.J. Stat. Ann. §

voters enrolled in programs that protect the home addresses of victims of domestic and sexual violence, law enforcement officers, and judicial officials. *See* Md. Code Ann., State Gov't. § 7-303 (LexisNexis 2021) (establishing an address confidentiality program for survivors of "domestic violence, sexual assault, stalking, harassment, or human trafficking"); *see also* Md. Code Ann., Cts. & Jud. Proc., §§ 3-2303, 3-2406 (LexisNexis 2020) (establishing an address confidentiality program and the means for removing for state and federal judicial officers).

The government has not publicly provided a consistent reason for its demands. Public statements and news reports indicate that the effort to collect voter registration databases from every state is actually an effort to create "a centralized federal database" for broader immigration enforcement purposes. *See Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *11 (aggregating reports and statements in analyzing the government's purpose for collecting voter registration data). And the Attorney General implied in a recent letter to the Governor of Minnesota that the efforts to aggregate voter registration data is part-and-parcel of a larger effort to "bring back law and order" and "improve the lives of Americans." *See Minnesota, et al. v. Kristi Noem, et al.,* No. 1:26-CV-190, Dkt. No. 114-1 (D. Minn. Jan. 25, 2026).

**The Federal Government's Voter Registration Demand in Maryland**

On July 14, 2025, the Deputy Assistant Attorney General for the Civil Rights Division of the Department of Justice transmitted a letter to State Administrator

---

19:31-6.4; N.Y. Elec. Law § 8-303(3)(a)(2); Tenn. Code Ann. § 2-2-116; Wis. Stat. § 6.34(3)(a)(8)-(9).

9

DeMarinis (attached to this motion and hereafter referred to as "Exhibit A.")[6]  The letter sought to "request information" about Maryland's compliance with the "list maintenance" provisions of the NVRA.  (Exhibit A at 1.)  In response to the request, the State Administrator was directed to provide "a list of the election officials who are responsible for implementing Maryland's general program of voter registration list maintenance from November 2022 through receipt of this letter."  (*Id.*)  The State Administrator was further directed to provide "information in electronic form," or an explanation in the absence of information, to clarify certain statistics and findings in the Election Assistance Commission's recent Election Administration and Voting Survey Report and in the State's recent Office of Legislative Audit's review of the statewide voter registration database.  (*Id.* at 2-3.)

Most pertinent to this case, though, the letter demanded a "current electronic copy" of the computerized, statewide voter registration database. (*Id.* at 1.)  The database was to contain "all fields," without redactions.  (*Id.*)  And alongside the list, the State Administrator was to provide materials that explained "how a voter record is coded into the statewide voter registration list and reported in the electronic copy," such as a "database user manual" or "coding list."  (*Id.* at 1-2.)

In a responsive letter dated July 30, 2025 (attached to this motion and hereafter referred to as "Exhibit B"), the State Administrator provided portions of the requested

---

[6] This Court may consider the letters sent to the State Administrator in the motion to dismiss because the government expressly references them in its complaint (ECF 1 ¶¶ 21-27) and rely on them in bringing their action.  *Bey v. Shapiro Brown & Alt, LLP*, 997 F.Supp.2d 310, 314 (D. Md. 2014).

10

information.  The letter clarified Maryland's "list maintenance" processes (Exhibit B at 1-3) and directed the recipient to pertinent sources of information explaining the statistics and findings that had been questioned (*id*. at 3-4).  In response to the voter registration database request, the State Administrator directed the Department to Maryland's public-facing portal for requesting copies of the state's voter registration list.  (*Id* at 3.)  The Department could obtain "publicly-available data in the statewide voter registration list" by submitting a standard request through that portal.  (*Id.*)

The Assistant Attorney General for the Civil Rights Division responded by letter dated August 18, 2025 (attached to this motion and hereafter referred to as "Exhibit C").  It declined the offer of publicly available data and twice specified that the government sought production of Maryland's voter registration database containing "*all fields*, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number."  (Exhibit C at 1, 3 n. 2.)  The letter continued by offering that its demand for a full, unredacted voter registration database was made pursuant to three grants of statutory authority:  the NVRA's grant to the Attorney General "to bring enforcement actions," HAVA's grant to the Attorney general "for actions to enforce," and the Title III authority to request records of elections.  (*Id*. at 2.)  For the Title III authority, the letter further offered that the "purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." (*Id.*)

By responsive letter one week later, the State Administrator declined to provide the unredacted voter registration database (attached to this motion and hereafter referred to as "Exhibit D.")

Maryland's experience in this context was not unique. The Department of Justice transmitted substantively identical letters to a majority of states during the summer of 2025. *See United States v. Weber*, No. 2:25-CV-09149, Dkt. No. 37-2 at 148 (Filed Nov. 7, 2025) (collecting demand letters sent by the Department to 30 States).

**Allegations in the Complaint**

The complaint makes nine factual allegations. (ECF 1 ¶¶ 19-27.) Those allegations summarize the correspondence between the government and the State Administrator from July and August 2025. (*Id.*) They also provide a brief background into the Election Assistance Commission and its publication of a biennial Election Administration and Voting Survey Report. (ECF 1 ¶ 19-20.). None of the allegations provide the Department's basis or purpose for making its demand; instead, the allegations only provide that prior statements about the basis and purpose were made in the correspondence.

According to the complaint, the letters sent to Administrator DeMarinis followed "a review of the 2024 EAVS Report." (ECF 1 at ¶ 21.) The July 14 letter allegedly sought "information regarding Maryland's compliance with federal election law." (*Id.*) The complaint does not allege what in the EAVS Report caused DOJ's interest in Maryland's compliance with federal law, nor how the requested information—including an unredacted voter registration database—would shed light on the State's compliance.

The August 18th letter was allegedly sent after Administrator DeMarinis "refus[ed] to provide Maryland's" unredacted database. (ECF 1 ¶ 24.) The complaint alleges that the August 18th letter "advis[ed] the federal basis for [the Attorney General's] request, including the NVRA and HAVA." (ECF 1 ¶ 25.) It also "demanded" the unredacted voter registration database "pursuant to [Title III]" and stated that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." (*Id.*) Administrator DeMarinis "again refus[ed]" to provide "an unredacted computerized [voter registration database." (ECF 1 ¶ 27.)

The complaint therefore claims that the Attorney General sent a sufficient written demand to the State Administrator, containing a "statement of basis and purpose therefor," for the production of "specific election records pursuant to 52 U.S.C. § 20703 [Title III]." (ECF 1 ¶¶ 28-29.) It asks this Court to declare that the State Administrator's refusal to provide "election records" is a violation of Title III; and, to order the State Administrator to provide the Attorney General "the current electronic copy of Maryland's computerized statewide voter registration list, with all fields, including each registrant's full name, date of birth, residential address, and either their state driver's license number, the last four digits of their Social Security number" within five days of the Court's order. (ECF 1 at 30-31.)

13
JA99

## ARGUMENT

### I.    STANDARD OF REVIEW

Under Rule 12(b)(6), a motion to dismiss tests the legal sufficiency of the complaint placed before the court.  *Hillman v. Amazon.com Services*, 785 F.Supp.3d 59, 64 (D. Md. 2025).  "A court decides whether [the 12(b)(6)] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the remedy requested.  *A Society Without A Name v. Virginia,* 655 F.3d 342, 346 (4th Cir. 2011).  When the complaint provides no more than "labels and conclusions" for its entitlement to relief, it is insufficient.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).

### II.    TITLE III DOES NOT AUTHORIZE THE ATTORNEY GENERAL TO DEMAND AN ENTIRE, COMPUTERIZED, VOTER REGISTRATION DATABASE.

The live, computerized voter registration database that a state must maintain under HAVA is not an "election record[]" (ECF 1 ¶ 28), i.e., a record of a specific election. The voter registration database required by HAVA is dynamic and continual, *see* 52 U.S.C. § 21083(a)(1)(A)(vi), (viii), it is not tied to a singular election, *see id.* at § 20701 (requiring retention of records of any act "requisite to voting in such election").  When the government thus claims entitlement to an unredacted version of Maryland's electronic voter registration database under the Title III authorization to demand election records, it misreads the law.  The plain language of Title III cannot reasonably be read to require the

14

JA100

maintenance of a persistent voter registration database, so the government cannot use Title III to compel its production.

The task of statutory interpretation begins with "the language of the statute itself." *Redeemed Christian Church of God (Victory Temple) Bowie, MD v. Prince George's County*, 17 F.4th 497, 508 (4th Cir. 2021) (quotation omitted). The language in a statute cannot be interpreted in a vacuum and must instead be read in the context of the overall statutory scheme. *Just Puppies, Inc. v. Frosh*, 565 F.Supp.3d 665, 706 (D. Md. 2021) *aff'd* 123 F.4th 652 (4th Cir. 2024) (quotation omitted). Undefined language in a statute is given its "ordinary meaning unless the context suggests otherwise." *Tankersley v. Almand*, 837 F.3d 390, 395 (4th Cir. 2016) (quotation omitted). And when the plain language produces an unambiguous result, this Court "need look no further." *Alvarez Ronquillo v. Bondi*, 151 F.4th 522, 526 (4th Cir. 2025) (quotation omitted).

Title III at § 20701 provides in pertinent part:

> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election.

52 U.S.C. § 20701. The statute's description of what must be retained, and how, does not describe the computerized system required by HAVA.

First, the records that must be retained and preserved are those that "come into" the possession of the officer of an election—the materials an officer receives (primarily

15

from registrants and voters) that are predicate to the act of voting.  *Id*.  A HAVA voter registration database does not "come into" the possession of an election official.  *See* Black's Law Dictionary, *Entry for "Receive"* (12th ed. 2024) ("to come into possession or get from some outside source").  Just the opposite, HAVA requires that the database originate with state's chief election official; it is built by the state.  *See* 52 U.S.C. § 21083(a)(1)(A) (providing that "each State, acting through the chief State election official, shall implement" a computerized voter registration database).  Congress could have used broader language to include any record "in the possession" of the officer of election. *See e.g.* 6 U.S.C. § 1502(a).  It did not, indicating that it did not intend to require the retention of systems *created* by election officials.  *See Prewett v. Weems*, 749 F.3d 454, 461 (6th Cir. 2014) ("Omitting a phrase from one statute that Congress has used in another statute with a similar purpose 'virtually commands the ... inference' that the two have different meanings.")

Moreover, the records at issue are those that relate to the act of voting in a particular election.  The twenty-two month retention period begins on the "date of any general, special or primary election," and the records to be retained are those that relate to voting "in such election."  *Id.*  But under HAVA a voter registration database is persistent, serving as "the official voter registration list for the conduct of all elections for Federal office in the State."  52 U.S.C. § 21083(a)(1)(A)(viii).  It is not a record of any particular election.  And disposing of a voter database 22 months after an election would conflict directly with HAVA, which does not permit the expiration of a voter registration database.  *See* 52 U.S.C. § 21083(a).  Congress could not have intended the 22-month

16
JA102

retention of specific "election records" (ECF 1 ¶¶ 25, 28) to include continuous computer systems that operate in every election.

Finally, Title III criminalizes conduct that HAVA requires for voter registration databases. Section 20702 prohibits "[a]ny person" from willfully "destroy[ing]" or "alter[ing]" any record required by § 20701 for retention and preservation. Under the government's reading, then, § 20702 criminalizes destroying or altering any part of a voter registration database. But HAVA requires constant alteration to a voter registration database in the form of list maintenance. Election officials must systematically remove ineligible voters, 52 U.S.C. § 21083(a)(1)(A)(2), and duplicate entries, *id.* at § 21083(a)(1)(B)(iii), from a voter registration database. And under the NVRA, officials must promptly update registration records with new address information. 52 U.S.C. § 20507(c)(1)(B)(i). Congress could not have intended to compel and criminalize the same conduct with two different statutes. It's choice *not* to amend Title III's criminal prohibition when it enacted HAVA and the NVRA evidence its understanding, and intent, that Title III does not apply to computerized voter registration databases.

Ultimately, the government alleges that it sufficiently provided a "written demand" for the production of "specific election records pursuant to 52 U.S.C. § 20703." (ECF 1 ¶ 28.) But it missed the predicate to § 20703—that the object it seeks to compel production of is "a record or paper required by section 20701 . . . to be retained and preserved." A plain reading of § 20701 within its statutory framework reveals that its description of what is to be retained and how it is to be preserved does not apply to a computerized system that is constantly updated and meant for use in multiple elections.

17

JA103

The government cannot compel the disclosure of an unredacted voter registration database under Title III.

### III.    THE ATTORNEY GENERAL DID NOT PROVIDE A SUFFICIENT PURPOSE OR ANY BASIS FOR HER DEMAND.

If this Court determines that Title III applies to require the retention of a computerized voter registration database, that does not end the inquiry. To compel the production of a record, the Attorney General must issue a written demand setting forth "the basis and the purpose therefor." 52 U.S.C. § 20703. The Attorney General did not do so in this instance. The Department's letters to the State Administrator did not provide any basis for its voter registration database demand and set forth a purpose unrelated to Title III and its subject matter. The stated purpose was also called into question by contemporaneous statements from Department officials and news reports. The government therefore fails to state a claim for a violation of Title III, given the insufficiency of its written demand. *See Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *8-*10 (ruling that the Department, using substantively identical letters, failed to provide an adequate basis and purpose in its written demand to California).

### A.    Congress enacted Title III to protect against racially discriminatory voting practices.

"Title III of the Civil Rights Act of 1960 was passed during the Jim Crow era, when persistent voter suppression was preventing Black Americans from voting. States were utilizing literacy tests, arbitrary registration tactics, voter ID laws, and poll taxes to keep minorities away from the ballot." *Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *1. The impetus behind Title III, however, arrived earlier. In 1957, Congress created

the bipartisan Commission on Civil Rights. Civil Rights Act of 1957, § 101(a), Pub. L. No. 85-315, 71 Stat. 634 (Sept 9, 1957). It charged the Commission with investigating and studying how voters were disenfranchised and denied equal protection on the basis of their "color, race, religion, or national original." *Id.* at § 104(a)(1). But recalcitrant election officials stymied the Commission in its mission. "To hide their complicity in voter suppression, state officials destroyed the records of Black Americans who had registered to vote, as well as those denied the opportunity to register." *Weber*, ___ F.Supp.3d at ___, 2026 WL 11807 at *1; *see also* United States' Comm'n on Civ. Rights, *Report of the United States Commission on Civil Rights* at 93 (Sept. 9, 1959), accessible at https://tinyurl.com/y253324x ("Rejected applications were destroyed approximately 30 days after being rejected, which fact made accurate statistical review of the records impossible."); *id* at 137 (explaining that midway through the Commission's review of Alabama counties' records, the state legislature authorized counties to destroy denied registrants' application forms even though the forms were "essential to any investigation of denials of the right to vote").

The Commission thus recommended that Congress enact retention and preservation requirements for "all State registration and voting records" and make such records subject to "public inspection." *Id*. at 138. President Eisenhower echoed the recommendation, urging Congress to adopt provisions granting the Attorney General authority to "inspect Federal election records, and to require that such records be preserved for a reasonable period of time so as to permit such inspection." *Selected*

19

JA105

*Speeches of Dwight D. Eisenhower: Special Message to the Congress on Civil Rights,* 91 Cong. Rec 2d, Vol. 2-3 at 145 (Feb. 5, 1959) accessible at https://perma.cc/5KCX-3JT4.

"Title III was enacted directly in response to these concerns, requiring states to retain and preserve all records pertaining to voter registration, voting applications, and payments of poll taxes." *Weber*, ___ F.Supp.3d at ___, 2026 WL 118807 at *1; *see also* Dwight D. Eisenhower, *Statement by the President Upon Signing the Civil Rights Act of 1960* (May 6, 1960) (explaining how Title III, including the requirement to retain voting records, "deals significantly with that key constitutional right of every American, the right to vote without discrimination on account of race or color"); Sen. R. No. 86-1205 at 2 (1960) (stating that the congressional assumption regarding the effectiveness of the Civil Rights Act of 1957 has proven "wrong," requiring the Civil Rights Act of 1960); H.R. Rep. No. 86-956 at 26 (1959) (providing how Title III was a "necessary supplement" to the enforcement of the Civil Rights Act of 1957 prohibition against threats or intimidation designed to disenfranchise).

And after its enactment the Commission and Department of Justice used Title III for its intended purpose: gathering evidence to investigate complaints of racially discriminatory practices in election administration and evaluating whether there were patterns or practices disenfranchising Black voters. *See generally* United States Comm'n on Civ. Rights, *Civil Rights: Report of United States Commission on Civil Rights in 1963* at 13-26 (Sept. 30, 1963) accessible at https://tinyurl.com/58v3a84u (detailing investigations, negotiations, and lawsuits initiated by the Department of Justice based on the 1957 and 1960 Civil Rights Acts.)

**B.    The basis and purpose of a Title III demand must relate to Title III.**

The sufficiency of the Attorney General's demand for election records depends on the provided "statement of the basis and purpose."  52 U.S.C. § 20703.  That statement must be sufficiently related to Title III and its subject matter—disenfranchisement through discriminatory practices—otherwise the statutory requirement would become meaningless.  *See American Petroleum Institute v. Cooper*, 718 F.3d 347, 356 (4th Cir. 2013) (counseling avoidance of interpreting a statute that "may render statutory terms meaningless or superfluous").  Congress sets such requirements to ensure that the government exercise its authority pursuant to statutorily set purposes rather than engaging in harmful fishing expeditions.  *See In re 2025 Subpoena to Children's National Hospital*, No. 1:25-CV-03780, 2026 WL 160792. *6-*7 (D. Md., Jan. 21, 2026) (quashing an administrative subpoena issued by the Department of Justice because it was "not issued for a legitimate governmental purpose, is not limited in scope to any legitimate purpose, and is oppressive in its breadth").

Under their ordinary meanings, a basis is "something on which something else is established or based"; a purpose is "the reason something is done or used."  *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9, n. 17 & n. 18 (citing the Merriam-Webster Dictionary).  In the context of Title III, a basis is the articulation of the particular, factual violation that the Attorney General suspects; a purpose is the rationale for the demand, or what the demand seeks to determine.  *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9; *see also Kennedy v. Lynd*, 306 F.2d 322, 229 n.6 (5th Cir. 1962).  This interpretation

21
JA107

of the statutory terms is reflected in the Department's investigative demands immediately after the enactment of Title III. *See Lynd*, 306 F.2d at 229 n. 6; *see also In re Coleman*, 208 F. Supp. 199, 199-200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

Accordingly, the statutory requirement in § 20703 for a statement of the basis and purpose of a demand is not "merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9. Interpreting the statute otherwise grants the Attorney General a warrantless search through a compilation of sensitive data without suspicion or justification.

## C. The Attorney General did not provide a basis for the voter registration database demand.

The Department did not provide a basis for its database demand in either letter it sent to the State Administrator of Elections. (*See* Exhibits A, C.) The word "basis" does not even appear in either letter. In its second letter, the Department quotes the statutory language of 52 U.S.C. § 20703 but leaves out the mandate that a demand "contain a statement of the basis and purpose therefor." (Exhibit C at 2.)[7] The second letter then cites to Title III and purports to provide a "purpose of the request," but no basis. (*Id.*)

Nonetheless, the government alleges now that its database demand in the first letter was sent "[b]ased on a review of the 2024 EAVS Report" and the desire to seek information about "Maryland's compliance with federal election law." (ECF 1 ¶¶ 21-22.)

---

[7] The government likewise leaves this out of its quotation of the statutory text in its complaint. (ECF 1 ¶ 18.)

22

It further alleges that the second letter "advise[ed] the federal basis for [the Attorney General's] request, including the NVRA and HAVA." (ECF 1 ¶ 25.) But the letters themselves refute those allegations. The first letter only mentions the EAVS Report in the context of its statistics inquiry, not its database demand. (Exhibit A at 2.) And the second letter only mentions the NVRA and HAVA in citing the Attorney General's authority under those statutes to bring enforcement actions.

In any event, it would not have been enough to cite a federal statute as a basis for the database demand. Especially when the Department used boilerplate language to cite the same statutes to more than twenty states. *See Weber*, No. 2:25-CV-09149, Dkt. No. 37-2 at 148. Title III required DOJ to particularize "why it believed the NVRA [or HAVA] was violated." *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *9. And neither letter articulated any factual basis to believe that Maryland had violated either law. The failure to provide any basis in the demand is fatal to the government's claim.

**D.    The Attorney General provided an inadequate, and possibly pretextual, purpose for the demand.**

The Department's purpose for its database demand was, allegedly, "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." (ECF 1 ¶ 25; *see also* Exhibit C at 2.) But Title III is not a list maintenance tool and could not have been intended as a means for vetting a state's computerized voting database. Congress enacted the NVRA, imposing list maintenance standards on states, three decades after Title III. Congress likewise enacted HAVA, establishing standards for uniform and computerized registration databases, almost four decades after

23

JA109

Title III.  When Title III became law, it was set to apply to "public records which ought ordinarily to be open to legitimate reasonable inspection."  *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *10-*11 (quoting *Lynd*, 306 F.2d at 231).  Today, pursuant to federal law, voter registration databases contain driver's license numbers and, at least, partial social security numbers.  *See* 52 U.S.C. § 21083(a)(5).

This is no small concern.  Maryland's voter database contains more than demographic information.  Each voter record in Maryland's database consists of three parts: "voter data, images of transaction source documents, and an activity log."  *Judicial Watch v. Lamone*, 399 F.Supp.3d 425, 432 (D. Md. 2019).  The images are scans of any documents that cause a change in a voter's record.  *Id*.  And the activity log "tracks changes to a voter's data."  *Id*.  An electronic copy of Maryland's voter registration database would therefore not only contain driver's license numbers, COMAR 33.05.02.02A(6)(a), and social security numbers, COMAR 33.05.02.02A(6)(b), but also documents used to prove residency (such as bank statements), COMAR 33.05.04.05B(4) & 33.01.01.01B(26), and identifying information for voters shielded by address confidentiality programs, State Gov't. § 7-303; *see also* Cts. & Jud. Proc., §§ 3-2303, 3-2406.  And it would reveal how a voter changed their party affiliation or moved to a series of new addresses within the State.

A modern system for tracking and organizing a multi-million-voter roster necessarily contains a trove of sensitive data.  *See* 52 U.S.C. § 21083(a)(3) (requiring that the computerized voter registration database be protected by "adequate technological security measures to prevent unauthorized access").  And Maryland's database contains

JA110

that information going back further than 22 months. *See* Elec. Law § 3-101(b)(6) (requiring the voter database to contain "voting history information" for a period covering "at least" the five preceding years); *cf. Lynd*, 306 F.2d at 228 ("one of the clearest purposes of the Title III proceeding is to enable the Attorney General to assemble all of the voter record information *within the time-reach* of the statute ") (emphasis added). Reviewing Maryland's "list maintenance" through its computerized voter registration database could not have been, and is not now, a purpose contemplated by a 40-year-old civil rights statute designed to mechanically provide the Attorney General with access to otherwise "public" election records. *Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *10-*11.

Nor does the Department's "list maintenance" purpose fit within the subject matter of the statute, which it must. *See United Steelworkers of America, AFL-CIO-CLC v. Weber*, 443 U.S. 193, 201-02 (1979) (literal construction of a statute is insufficient because "a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers"). The Department's curiosity with Maryland's general list maintenance is unrelated to racial discrimination in voting administration. And more to the point, the removal of ineligible voters from a voter registration list is "a matter which does not bear any particular importance" to a Title III inquiry. *Kennedy v. Bruce*, 298 F.2d 860, 863 n. 3 (5th Cir. 1962).

The Department's alleged purpose is also not "limited in scope to reasonably relate to and further its purpose." *2025 Subpoena*, 2026 WL 160792 at *7 (quoting *In re Subpoena Duces Tecum*, 228 F.3d 341, 349 (4th Cir. 2000)). The requested "electronic

25

JA111

copy" (ECF 1 ¶¶ 22, 25 (quoting Exhibits A, C)) of a voter registration database cannot meaningfully provide insight into a state's compliance with its list maintenance obligations. Nor do materials that explain "how a voter record is coded into the statewide voter registration list and reported in the electronic copy," such as a "database user manual" or "coding list." (Exhibit A at 1-2.) The former would give the Department a snapshot in time of who was in Maryland's database, but not whether the State was routinely and timely removing ineligible voters in accordance with the NVRA mandate against removing certain voters until they failed to participate in two consecutive general elections. *See* 52 U.S.C. § 20507(c)(1). And the latter would provide the Department nothing relating to list maintenance. It would provide the Department unprecedented access to manipulate the computerized database files, which could assist in transferring data from the State's voter database into other federal databases.

The Department's alleged purpose is therefore insufficient for its Title III demand. But it is also possibly not the Department's actual purpose for making the demand. *See Department of Commerce v. New York*, 588 U.S. 752, 784 (2019) (noting that courts are not bound to defer to a "contrived" rationale and are instead free to "ignore the disconnect between the decision made and the explanation given"). Outside of its letters, the Department has given every indication that it seeks states' voter registration databases "for use in a centralized federal database," likely for immigration enforcement purposes. *See Weber*, ___ F.Supp.3d ___, 2026 WL 118807 at *10-*11 (compiling press reports and statements by Department officials). This Court may therefore accept the "truth" of the allegation in paragraph 25 of the Department's complaint—that the August 18, 2025

26
JA112

letter contained the language, "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA."  But it should not assume the truth of the underlying assertion—that list maintenance was, in fact, the Department's purpose. *Chambers v. King Buick GMC*, LLC, 43 F.Supp.3d 575, 586 (D. Md. 2014) (reasoning that this Court does not need to credit "conclusory factual allegations devoid of any reference to actual events").

## CONCLUSION

The motion to dismiss should be granted with prejudice.

Respectfully submitted,

ANTHONY G. BROWN
Attorney General of Maryland

/s/ Daniel M. Kobrin

DANIEL M. KOBRIN
Federal Bar No.
Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland  21202
dkobrin@oag.state.md.us
(410) 576-6472
(410) 576-6955 (facsimile)

January 30, 2026                    Attorneys for Defendant

27

JA113

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State Maryland, <br><br> Defendant. | Case No. 1:25-cv-03934 <br> (Hon. Stephanie A. Gallagher) |

**MOTION TO DISMISS, AND BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
TO COMPEL, OF INTERVENOR-DEFENDANTS COMMON CAUSE,
OUT FOR JUSTICE, INC., CARL SNOWDEN, MYRIAM PAUL, AND LUIS SIMS**

JA114

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 3

LEGAL STANDARD............................................................................................................ 11

ARGUMENT ......................................................................................................................... 11

   I.    THE UNITED STATES' CASE SHOULD BE DISMISSED BECAUSE ITS DEMANDS
EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO
LAW. ......................................................................................................................... 11

      A.   Plaintiff's Demand for Records Fails to Meet the Requisite Statutory Requirements of
the CRA. ................................................................................................................ 12

      B.   The United States' Demand is Invalid Because it Does Not Allow for Redactions and
Modifications to Protect the Privacy and Constitutional Rights of Voters. ........................... 19

   II.    THE UNITED STATES' MOTION TO COMPEL SHOULD BE DENIED BECAUSE
IT IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM. ................... 23

CONCLUSION....................................................................................................................... 27

**TABLE OF AUTHORITIES**

**Cases**

*American Federation of State, County & Municipal Employees, AFL-CIO v. Social Security Administration*,
    No. 1:25-cv-596-ELH (D. Md. Jan. 16, 2026) .......................................................... 9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................. 11

*Becker v. United States*,
    451 U.S. 1306 (1981) .............................................................................................. 25

*Burdick v. Takushi*,
    504 U.S. 428 (1992) .................................................................................................. 1

*Coleman v. Kennedy*,
    313 F.2d 867 (5th Cir. 1963) .................................................................................. 13

*Corner Post, Inc. v. Board of Governors of the Federal Reserve System*,
    603 U.S. 799 (2024) ................................................................................................ 17

*Equity Investment Associates, LLC v. United States*,
    40 F.4th 156 (4th Cir. 2022) ................................................................................... 13

*Federal Deposit Insurance Co. v. Wentz*,
    55 F.3d 905 (3d Cir. 1995) ...................................................................................... 14

*In re Coleman*,
    208 F. Supp. 199 (S.D. Miss. 1962) ....................................................... 13, 21, 22, 24

*Just Puppies, Inc. v. Brown*,
    123 F.4th 652 (4th Cir. 2024) ................................................................................. 11

*Kennedy v. Lynd*,
    306 F.2d 222 (5th Cir. 1962) ............................................................................ passim

*Navigators Insurance Co. v. Under Armour, Inc.*,
    No. 25-1068, --- F.4th ----, 2026 WL 137123 (4th Cir. Jan. 20, 2026) ................... 18

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) .................................................................................. 11

*Niz-Chavez v. Garland*,
    593 U.S. 155 (2021) ................................................................................................ 17

*Pennsylvania Fair Elections v. Pennsylvania Department of State*,
    337 A.3d 598 (Pa. Commw. Ct. 2025) ...................................................................... 7

*Project Vote/Voting for America, Inc. v. Long*,
    682 F.3d 331 (4th Cir. 2012) ....................................................................... 20, 21, 22

*Pubic Interest Legal Foundation v. Boockvar*,
  431 F. Supp. 3d 553 (M.D. Pa. 2019) ........................................................................ 21

*Public Interest Legal Foundation v. Benson*,
  136 F.4th 613 (6th Cir. 2025) ................................................................................... 16

*Public Interest Legal Foundation, Inc. v. Bellows*,
  92 F.4th 36 (1st Cir. 2024) ................................................................................. 20, 22

*Public Interest Legal Foundation, Inc. v. Dahlstrom*,
  673 F. Supp. 3d 1004 (D. Alaska 2023) .................................................................... 21

*Public Interest Legal Foundation, Inc. v. Matthews*,
  589 F. Supp. 3d 932 (C.D. Ill. 2022) ........................................................................ 21

*Public Interest Legal Foundation, Inc. v. Matthews*,
  No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) .................................. 21

*Public Interest Legal Foundation, Inc. v. North Carolina State Board of Elections*,
  996 F.3d 257 (4th Cir. 2021) .................................................................................... 20

*Republican National Commission v. North Carolina State Board of Elections*,
  120 F.4th 390 (4th Cir. 2024) ..................................................................................... 1

*Sheetz v. County of El Dorado*,
  601 U.S. 267 (2024) ................................................................................................. 22

*Shore v. Charlotte-Mecklenburg Hospital Authorities*,
  412 F. Supp. 3d 568 (M.D.N.C. 2019) ...................................................................... 18

*State of Ala. ex rel. Gallion v. Rogers*,
  187 F. Supp. 848 (M.D. Ala. 1960) ............................................................................ 2

*Tincher v. Noem*,
  No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026) ........................................ 10

*United States v. Oregon*,
  No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026) ......................................................... 1

*United States v. Powell*,
  379 U.S. 48 (1964) .............................................................................................. 14, 25

*United States v. Rosinsky*,
  547 F.2d 249 (4th Cir. 1977) .................................................................................... 14

*United States v. Simms*,
  914 F.3d 229 (4th Cir. 2019) .................................................................................... 20

*United States v. Weber*,
  No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ......... passim

*Yick Wo v. Hopkins*,
  118 U.S. 356 (1886) ................................................................................................... 1

**Statutes**

5 U.S.C. § 552a ................................................................................................................ 17

18 U.S.C. § 2721 .............................................................................................................. 26

26 U.S.C. § 7604 .............................................................................................................. 25

44 U.S.C. § 3351 .............................................................................................................. 26

52 U.S.C. § 20501 .............................................................................................................. 1

52 U.S.C. § 20507 ..................................................................................................... passim

52 U.S.C. § 20701 ......................................................................................................... 1, 12

52 U.S.C. § 20703 ..................................................................................................... passim

52 U.S.C. § 20704 .............................................................................................................. 5

52 U.S.C. § 20705 ...................................................................................................... 25, 26

52 U.S.C. § 20901 .............................................................................................................. 1

52 U.S.C. § 21083 ............................................................................................................ 15

52 U.S.C. § 21085 ............................................................................................................ 15

E-Government Act of 2002,
   Pub. L. No. 107-347, 116 Stat. 2899 (2002) ............................................................. 26

Md. Code Ann.,
   Election Law § 3-506(a)(1) ......................................................................................... 4

Privacy Act of 1974,
   Pub. L. No. 93-579, 88 Stat. 1896 (1974) ................................................................. 26

**Other Authorities**

"Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER (last visited Dec. 9, 2025)
   ..................................................................................................................................... 23

Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020
   Grievances*, N.Y. TIMES, Oct. 22, 2025 ...................................................................... 7

Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying
   to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024 .............. 7

*Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026 ............................ 10

Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-
   1809 (4th Cir. Oct. 18, 2011) .................................................................................... 21

Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d
   Cir. Nov. 6, 2023) ...................................................................................................... 21

iv

Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows*, No. 23-1361 (1st Cir. July 25, 2024) .................................................................................................................. 21

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025 ..................................................................................................... 6

Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025 ..................................................... 7

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025 ...................................................................................... 6

H.R. Rep. No. 86-956 (1959) ........................................................................................................ 2

Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NATIONAL PUBLIC RADIO, Nov. 5, 2024 .................................................................. 8

Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025 ....................................................................... 7

Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024 ...................................................................................................................................... 8

Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025 ............................................................................................................................... 6

Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NATIONAL PUBLIC RADIO, June 29, 2025 ................................................................ 7

Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NATIONAL PUBLIC RADIO, Dec. 10, 2025 ............................................................... 9

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (updated Jan. 23, 2026) ................ 3

Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026 ..................................................................................................... 9

Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025 .......................................................................................... 7

Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NATIONAL PUBLIC RADIO, May 22, 2025 ................................................................. 9

Press Release, United States Department of Justice, *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026) ................................................. 5

Press Release, United States Department of Justice, *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025) .. 5

Press Release, United States Department of Justice, *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025) ......................................................................... 5

v

Press Release, United States Department of Justice, *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025)................................................. 5

Press Release, United States Department of Justice, *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025)........................................ 5

Press Release, United States Department of Justice, *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025) ...................................... 5

Press Release, United States Department of Justice, *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018)........................................................................................................... 16

Press Release, United States. Department of Justice, *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026).......................................................... 5

Sarah Lynch, *US Justice Dept Considers Handing over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025 ................................................................. 6

Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976)........................ 23

United States Department of Justice, Civil Rights Division, *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021)........................................ 2

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................. 11

## INTRODUCTION

In this action, the United States seeks to compel the disclosure of sensitive personal voter data to which it is not entitled, using the civil rights laws as a pretext. But the information requests propounded on the State by the U.S. Department of Justice ("DOJ"), as set forth in the Complaint, do not satisfy the core statutory requirement that any federal demand for information under the Civil Rights Act of 1960 ("CRA") include a disclosure of "the basis and the purpose" for the federal data request. 52 U.S.C. § 20703. Because the United States fails to properly disclose any sufficient basis and purpose for its request for the data, and because its request is unlawful, it has failed to state a claim. Indeed, a district court in California reached those same conclusions just three weeks ago with respect to a materially identical complaint, dismissing the United States' claims without leave to replead and denying its materially identical Motion to Compel. *See United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026); *see also* Minutes of Proceedings, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), Dkt. No. 68 (also granting dismissal of the United States's claims with written opinion to follow). This Court should do the same.

The right to vote "'is of the most fundamental significance under our constitutional structure.'" *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 404 (4th Cir. 2024) (quoting *Burdick v. Takushi*, 504 U.S. 428, 433 (1992)). It is "preservative of all other rights" because it serves as a check against tyrannical rule while simultaneously ensuring the competition of ideas among our elected officials. *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Congress has repeatedly legislated to protect the franchise, including through Title III of the CRA, 52 U.S.C. § 20701 *et seq.*, as well as the National Voter Registration Act ("NVRA"), 52 U.S.C. § 20501 *et seq.*, and the Help America Vote Act ("HAVA"), 52 U.S.C. § 20901 *et seq.* These statutes were enacted for the purpose of ensuring that all eligible Americans—especially

1

JA121

racial minorities and voters with disabilities—have the opportunity to participate in free, fair, and secure elections. As the United States Department of Justice itself explains, Title III of the CRA, the election records provision invoked in the Complaint here, was designed to "secure a more effective protection of the right to vote." U.S. Dep't of Just., Civ. Rts. Div., *Federal Law Constraints on Post-Election "Audits"* (Jul. 28, 2021), https://perma.cc/74CP-58EH (citing *State of Ala. ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960) and H.R. Rep. No. 86-956 (1959)).

The United States' demand for Maryland's unredacted voter file—which contains sensitive personal information such as full birth dates, driver's license numbers, and Social Security numbers from every voter in the state—undermines these statutes' core purposes and is contrary to law. To be sure, the public disclosure of state voting records is important to ensure transparency and the accuracy of the voter rolls, especially by ensuring that citizens are not erroneously removed from the voter rolls. But releasing the State's voter records *without redaction* and for purposes far afield from protecting voter access would only deter voter participation and undermine the right to vote. That is especially so here, where the United States' *actual* reason for the data demand—which it never disclosed in its request but has been widely reported—is to create an unauthorized and unlawful national voter database, and to use this illicit tool to illegally target voters.

For good reason, there is no statutory right to demand the type of sensitive voter information at issue here without fully and accurately setting forth "the basis and the purpose" for the data request. 52 U.S.C. § 20703. Because the United States has failed to establish its entitlement to a complete, unredacted Maryland voter file— much less its entitlement to obtain this sensitive data at the very beginning of the case, without any discovery process or any of the other protections

2

JA122

and procedures required by the Federal Rules—this Court should deny Plaintiff's Motion to Compel and dismiss this action.

**BACKGROUND**

Beginning in May 2025, Plaintiff the United States, through its Department of Justice ("DOJ"), began sending letters to election officials in at least forty states, making escalating demands for the production of statewide voter registration databases, with plans to gather data from all 50 states. *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (updated Jan. 23, 2026), https://perma.cc/R824-QG68.

On July 14, 2025, DOJ sent a letter to Defendant DeMarinis, Maryland's State Administrator of Elections, demanding, among other things, "[t]he current electronic copy of Maryland's computerized statewide voter registration list," and directing the State to "include all fields contained within the list." *See* Ex. 1, Letter of Michael E. Gates to the Hon. Jared DeMarinis dated July 14, 2025, Dkt. No. 2-2, ("July 14 Letter"), at 2–3. Defendant DeMarinis responded on July 30, 2025, setting out the process under Maryland law for procuring the statewide voter registration list and referring the DOJ to the state's website for doing so. *See* Ex. 2, Letter of the Hon. Jared DeMarinis to Maureen Riordan and Michael E. Gates dated July 30, 2025, Dkt. No. 2-2, at 7–9. Defendant DeMarinis directed DOJ to "follow these instructions" at the state website "to obtain a copy of the portions of the statewide voter registration list that are subject to disclosure." *Id.* at 9.

On August 13, 2025, Defendant DeMarinis sent another letter to DOJ, seemingly in response to DOJ's "request for Maryland's voter registration list." *See* Ex. 3, Letter of the Hon. Jared DeMarinis to Maureen Riordan and Michael E. Gates dated Aug. 13, 2025, Dkt. No. 2-2,

3
JA123

("Aug. 13 Letter"), at 13. Defendant DeMarinis raised several issues with DOJ's request. First, he noted that "Maryland law requires that the voter registration list not be used for 'commercial solicitation,' and, more importantly, may not be used for 'any other purpose not related to the electoral process." *Id.* at 13 (quoting Md. Code Ann., Election Law § 3-506(a)(1)). Yet Defendant DeMarinis stated that based on DOJ's request, "it is not clear what you intend to do with Maryland's voter registration list." *Id.* Further, Defendant DeMarinis noted that the Federal Privacy Act requires DOJ to "share the Department's purpose in creating [a system of records of Maryland voters] . . . and how the public voter registration list requested is necessary and relevant to that purpose." *Id.* Finally, Defendant DeMarinis warned that "[t]he voter registration list may not be used in a manner that intimidates a voter from going to the polls, results in or has the intent to result in the denial or abridgement of the right of a Maryland citizen to vote . . . ." *Id.* at 14.

On August 18, 2025, DOJ responded to Defendant DeMarinis, demanding that Maryland provide to the DOJ its complete, non-public voter database. *See* Ex. 4, Letter of Harmeet K. Dhillon to the Hon. Jared DeMarinis dated Aug. 18, 2025, Dkt. No. 2-2 ("Aug. 18 Letter"), at 16–18. DOJ specified that it was seeking an unredacted electronic copy of the statewide voter registration list that "contains *all fields*," including registrants' full name, date of birth, address, driver's license number and the last four digits of the registrant's social security number ("SSN4"). *Id.* at 16. DOJ cited the NVRA, HAVA, and Title III of the CRA as authority for its records request, and stated that "[t]he purpose of the request is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," but did not elaborate further in this regard or refer to any compliance deficiencies by Maryland with respect to those statutes' voter list maintenance requirements. *Id.* at 17. It waved away any privacy issues, claiming that the federal prohibition on sharing voter information obtained under the Civil Rights Act of 1960 with the

4

JA124

public was sufficient to assuage concerns. *See id.* (citing 52 U.S.C. § 20704). DOJ's August 18 Letter never addressed Defendant DeMarinis's questions raised in his August 13 Letter.

Defendant DeMarinis responded on August 25, 2025. *See* Ex. 5, Letter of the Hon. Jared DeMarinis to Harmeet K. Dhillon and Maureen Riordan dated Aug. 25, 2025, Dkt. No. 2-2, ("Aug. 25 Letter"), at 20–22. His letter noted that DOJ's August 18 Letter "did not answer the questions posed in [Maryland's] August 13, 2025 letter"—*i.e.* DOJ's purpose for procuring a list of Maryland's voters and why the list was necessary and relevant for that purpose. *Id.* at 20. Defendant DeMarinis reiterated that DOJ's answers to these questions were important for compliance with state and federal law. *Id.* at 20–22.

According to documents in the public record, DOJ never responded to Defendant DeMarinis's August 25 Letter, and never provided additional legal arguments to support its position or address Defendant DeMarinis's objections and concerns. Instead, months later on December 1, 2025, the United States filed this lawsuit—one of at least 25 nearly identical lawsuits that DOJ has initiated against states and election officials across the country—seeking to compel the production of this sensitive Maryland voter data.[1]

---

[1] *See* Press Release, U.S. Dep't of Just., *Justice Department Sues Virginia for Failure to Produce Voter Rolls* (Jan. 16, 2026), https://perma.cc/3L8Q-SJM5; Press Release, U.S. Dep't of Just., *Justice Department Sues Arizona and Connecticut for Failure to Produce Voter Rolls* (Jan. 6, 2026), https://perma.cc/YCM2-QQKM; Press Release, U.S. Dep't of Just., *Justice Department Sues Four States for Failure to Produce Voter Rolls* (Dec. 18, 2025), https://perma.cc/RZL3-4E4B; Press Release, U.S. Dep't of Just., *Justice Department Sues Four Additional States and One Locality for Failure to Comply with Federal Elections Laws* (Dec. 12, 2025), https://perma.cc/8V9V-SRPJ; Press Release, U.S. Dep't of Just., *Justice Department Sues Six Additional States for Failure to Provide Voter Registration Rolls* (Dec. 2, 2025), https://perma.cc/F5MD-NWHD; Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls* (Sept. 25, 2025), https://perma.cc/7J99-WGBA; Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls* (Sept. 16, 2025), https://perma.cc/M69P-YCVC.

5

Notably, according to extensive public reporting, DOJ's requests for private, sensitive voter data from Maryland and other states do not appear to relate to list maintenance under the NVRA and HAVA. Rather, they appear to be in connection with unprecedented efforts by the United States to construct a national voter database, and to otherwise use untested forms of database matching in order to scrutinize state voter rolls. According to this reporting, DOJ employees "have been clear that they are interested in a central, federal database of voter information." Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. TIMES, Sept. 9, 2025, https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html. DOJ is coordinating these efforts with the federal Department of Homeland Security ("DHS"), according to reported statements from DOJ and DHS. *Id.*[2] One article extensively quoted a recently departed lawyer from DOJ's Civil Rights Division describing DOJ's aims in this case and others like it:

> We were tasked with obtaining states' voter rolls, by suing them if necessary. Leadership said they had a DOGE person who could go through all the data and compare it to the Department of Homeland Security data and Social Security data. . . . I had never before told an opposing party, Hey, I want this information and I'm saying I want it for this reason, but I actually know it's going to be used for these other reasons. That was dishonest. It felt like a perversion of the role of the Civil Rights Division.

Emily Bazelon & Rachel Poser, *The Unraveling of the Justice Department*, N.Y. TIMES MAGAZINE, Nov. 16, 2025, https://www.nytimes.com/interactive/2025/11/16/magazine/trump-justice-department-staff-attorneys.html.

---

[2] *See also, e.g.*, Jonathan Shorman, *DOJ is Sharing State Voter Roll Lists with Homeland Security*, STATELINE, Sept. 12, 2025, https://stateline.org/2025/09/12/doj-is-sharing-state-voter-roll-lists-with-homeland-security; Sarah Lynch, *US Justice Dept Considers Handing Over Voter Roll Data for Criminal Probes, Documents Show*, REUTERS, Sept. 9, 2025, https://www.reuters.com/legal/government/us-justice-dept-considers-handing-over-voter-roll-data-criminal-probes-documents-2025-09-09.

6

JA126

According to additional public reporting, these efforts are being conducted with the involvement of election deniers within and outside the government who have previously sought to disenfranchise voters and overturn elections. Those advocates include Heather Honey, who sought to overturn the result of the 2020 presidential election in multiple states and now serves as DHS's "deputy assistant secretary for election integrity."[3] Also involved is Cleta Mitchell, a private attorney and leader of a national group called the "Election Integrity Network," who has, among other things, promoted the use of artificial intelligence to challenge registered voters.[4] These actors and their associates have previously sought to compel states to engage in aggressive purges of registered voters, and have abused voter data to make mass challenges to disenfranchise voters in other states. *See, e.g.*, *PA Fair Elections v. Pa. Dep't of State*, 337 A.3d 598, 600 n.1 (Pa. Commw. Ct. 2025) (dismissing as meritless complaint brought by "PA Fair Elections," a group affiliated

---

[3] *See* Alexandra Berzon & Nick Corasaniti, *Trump Empowers Election Deniers, Still Fixated on 2020 Grievances*, N.Y. TIMES, Oct. 22, 2025, https://www.nytimes.com/2025/10/22/us/politics/trump-election-deniers-voting-security.html (documenting "ascent" of election denier Honey); Jen Fifield, *Pa.'s Heather Honey, Who Questioned the 2020 Election, Is Appointed to Federal Election Post*, PA. CAPITAL-STAR, Aug. 27, 2025, https://penncapital-star.com/election-2025/pa-s-heather-honey-who-questioned-the-2020-election-is-appointed-to-federal-election-post; Doug Bock Clark, *She Pushed to Overturn Trump's Loss in the 2020 Election. Now She'll Help Oversee U.S. Election Security*, PROPUBLICA, Aug. 26, 2025, https://www.propublica.org/article/heather-honey-dhs-election-security.

[4] *See, e.g.*, Matt Cohen, *DHS Said to Brief Cleta Mitchell's Group on Citizenship Checks for Voting*, DEMOCRACY DOCKET, June 12, 2025, https://www.democracydocket.com/news-alerts/dhs-said-to-brief-cleta-mitchells-anti-voting-group-on-checking-citizenship-for-voters; *see also* Jude Joffe-Block & Miles Parks, *The Trump Administration Is Building a National Citizenship Data System*, NPR, June 29, 2025, https://www.npr.org/2025/06/29/nx-s1-5409608/citizenship-trump-privacy-voting-database (reporting that Mitchell had received a "full briefing" from federal officials); *see also* Andy Kroll & Nick Surgey, *Inside Ziklag, the Secret Organization of Wealthy Christians Trying to Sway the Election and Change the Country*, PROPUBLICA, July 13, 2024, https://www.propublica.org/article/inside-ziklag-secret-christian-charity-2024-election ("Mitchell is promoting a tool called EagleAI, which has claimed to use artificial intelligence to automate and speed up the process of challenging ineligible voters.").

with current DHS official Honey, challenging Pennsylvania's voter roll maintenance practices pursuant to HAVA).[5]

Here, DOJ's actions indicate that it may focus on or target specific groups of voters in its use of the requested data. In its letters to Maryland and other States requesting the same private voter data, DOJ also requested information about how elections officials, among other things, process applications to vote by mail; identify and remove duplicate registrations; and verify that registered voters are not ineligible to vote, such as due to a felony conviction or citizenship status.[6] *See* July 14 Letter.

According to public reporting, as another part of its efforts to use novel and unspecified forms of data analysis to scrutinize state voter data and target voters for potential disenfranchisement, DOJ last year asked staffers from the new "Department of Governmental Efficiency" ("DOGE") to identify noncitizens in state voter rolls by matching voter data with data

---

[5] *See* Carter Walker, *Efforts to Challenge Pennsylvania Voters' Mail Ballot Applications Fizzle*, SPOTLIGHT PA, Nov. 8, 2024, https://www.spotlightpa.org/news/2024/11/mail-ballot-application-challenges-pennsylvania-fair-elections/ (describing mass-challenges and noting connection to Honey and her organization "PA Fair Elections"); *see also* Jeremy Roebuck and Katie Bernard, *'I Can't Think of Anything Less American': Right-Wing Activists' Effort to Nullify Hundreds of Pa. Votes Met with Skepticism*, PHILA. INQUIRER, Nov. 1, 2024, https://www.inquirer.com/politics/election/heather-honey-pa-fair-elections-vote-challenges-pennsylvania-20241101.html (noting sworn testimony regarding PA Fair Elections' involvement in the challenges); Hansi Lo Wang, *Thousands of Pennsylvania Voters Have Had Their Mail Ballot Applications Challenged*, NPR, Nov. 5, 2024, https://www.npr.org/2024/11/04/nx-s1-5178714/pennsylvania-mail-ballot-voter-challenges-trump (same).

[6] *See, e.g.*, Letter from Maureen Riordan to Sec'y of State Al Schmidt (June 23, 2025), Dkt. No. 37-1, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Oct. 9, 2025) (Pennsylvania); Letter from Michael E. Gates to Sec'y of State Jocelyn Benson, Dkt. No. 34-3, *United States v. Benson*, No. 1:25-cv-01148 (W.D. Mich. Nov. 25, 2025) (Michigan); Letter from Michael E. Gates to Sec'y of State Tobias Read (July 16, 2025), Dkt. No. 33-1, *United States v. Oregon*, No. 6:25-cv-01666 (D. Ore. Nov. 17, 2025) (Oregon); Letter from Michael E. Gates to Sec'y of State Shirley Weber (July 10, 2025), Dkt. No. 37-2, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Nov. 7, 2025) (California).

from the Social Security Administration.[7] DOJ officials have since claimed that "we've checked 47.5 million voter records" and found "several thousand non-citizens who are enrolled to vote in Federal elections," although public reporting indicates that these efforts are producing false positives—*i.e.*, that they are flagging U.S. citizens as being non-citizens who are ineligible to vote.[8]

A recent federal court filing by DOJ correcting misrepresentations in a case in this district before Judge Hollander further corroborates how United States officials have been seeking to use voter data in conjunction with DOGE-inspired data-matching and aggregation techniques, and have been working with outside groups seeking to deny election results in those efforts. As detailed in the corrected filing, which was made on behalf of the U.S. Social Security Administration ("SSA"):

> [I]n March 2025, a political advocacy group contacted two members of SSA's DOGE Team with a request to analyze state voter rolls that the advocacy group had acquired. The advocacy group's stated aim was to find evidence of voter fraud and to overturn election results in certain States. In connection with these communications, one of the DOGE team members signed a "Voter Data Agreement," in his capacity as an SSA employee, with the advocacy group. He sent the executed agreement to the advocacy group on March 24, 2025.

Notice of Corrections to the Record at 5, *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, No. 1:25-cv-596-ELH, Dkt. No. 197 (D. Md. Jan. 16, 2026); *see also* Kyle Cheney, *Trump Administration Concedes DOGE Team May Have Misused Social Security Data*, POLITICO, Jan. 20, 2026, https://www.politico.com/news/2026/01/20/trump-musk-doge-social-

---

[7] *E.g.*, Miles Parks & Jude Joffe-Block, *Trump's DOJ focuses in on voter fraud, with a murky assist from DOGE*, NPR, May 22, 2025, https://www.npr.org/2025/05/17/nx-s1-5383277/trump-doj-doge-noncitizenvoting.

[8] December 5, 2025 Post by @AAGDhillon https://x.com/AAGDhillon/status/1997003629442519114; *see* Jude Joffe-Block, *Trump's SAVE Tool Is Looking for Noncitizen Voters. But It's Flagging U.S. Citizens Too*, NPR, Dec. 10, 2025, https://www.npr.org/2025/12/10/nx-s1-5588384/savevoting-data-us-citizens.

JA129

security-00737245. The filings, which do not specify the terms of the "Voter Data Agreement" or the activities these DOGE actors or others undertook pursuant to it, also indicated that, around the same period, DOGE actors also improperly shared unknown amounts of social security data on an unapproved third-party server, in a "manner [that] is outside SSA's security protocols." Notice of Corrections to the Record, *supra*, at 6.

Extensive public reporting, including government documents created by the DOJ and DOJ officials' own statements and admissions, thus indicate that the United States's aim in seeking sensitive voter data on millions of Americans is to turn states' own voter rolls into a tool for unlawfully and improperly mass-challenging voters and interfering with the democratic process in the states. Recent events have further highlighted the pretextual, and extremely abnormal, nature of the United States' request.  On  January 24, 2026, Attorney General Pamela Bondi wrote a letter to Minnesota Governor Tim Walz, purporting to discuss DHS's "Operation Metro Surge" activities in the Twin Cities amidst ongoing violence against the civilian population there.[9] The letter purports to set out three actions that Minnesota—which is one of the states DOJ has sued to try to obtain sensitive voter data—should take to "restore the rule of law, support ICE officers, and bring an end to the chaos in Minnesota," one of which is to "allow the Civil Rights Division of the Department of Justice to access voter rolls to confirm that Minnesota's voter registration practices comply with federal law as authorized by the Civil Rights Act of 1960."[10]

---

[9] *Read Bondi's Letter to Minnesota's Governor*, N.Y. TIMES, Jan. 24, 2026, https://perma.cc/H5GY-ZKBS ("Bondi Letter"); *see also* Order, *Tincher v. Noem*, No. 0:25-cv-04669-KMM-DTS (D. Minn. Jan. 16, 2026), Dkt. No. 85 (granting injunction against certain DHS practices towards the civilian population of Minneapolis-St. Paul in connection with purported immigration enforcement operations there).

[10] Bondi Letter at 2, 3.

## LEGAL STANDARD

A court must dismiss a complaint if, accepting all well-pleaded factual allegations as true, it does not "state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, a court need not accept the complaint's legal conclusions. *Iqbal*, 556 U.S. at 678. A complaint must state a "plausible claim for relief" and contain more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* at 678–79.

Thus, in practice, while courts "accept[] all well-pled facts as true and construe[] these facts in the light most favorable to the plaintiff," they ignore "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). This "context-specific" inquiry requires courts, using "judicial experience and common sense," to determine whether the factual allegations "nudge claims across the line from conceivable to plausible." *Id.* at 256 (internal quotation marks omitted). To perform this review, courts can also "consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," as well as "documents attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Just Puppies, Inc. v. Brown*, 123 F.4th 652, 660 (4th Cir. 2024) (internal quotation marks omitted).

## ARGUMENT

I.    **THE UNITED STATES' CASE SHOULD BE DISMISSED BECAUSE ITS DEMANDS EXCEED THE STATUTORY AUTHORITY OF THE CRA AND ARE CONTRARY TO LAW.**

The United States' demand for Maryland's full and unredacted electronic voter file exceeds its statutory authority under the CRA. Against the backdrop of the turmoil of the Jim Crow era, Congress enacted the CRA, including the public records provisions in Title III, to facilitate

11

investigations of civil rights violations preventing eligible citizens from voting due to discrimination. H.R. Rep. No. 86-956 at 7 (1959) (indicating the purpose of Title III "is to provide a more effective protection of the right of all qualified citizens to vote without discrimination on account of race"). But the Attorney General's access to these records is not unbounded. If the Attorney General makes a demand for records, she must provide "a statement of the basis and the purpose therefor." 52 U.S.C. § 20703.

The United States' records request here is contrary to the CRA for at least two distinct reasons. *First*, in making this sweeping demand for Maryland's full and unredacted state voter registration list, the United States fails to offer a statutorily sufficient statement of "the basis and the purpose" in support of its records requests. *Second*, to the extent the United States might be entitled to any records under the CRA, those records would need to be redacted to protect the privacy and constitutional rights of Maryland voters. State and federal law would require such redaction, and nothing in the CRA prevents the appropriate redaction of the sensitive personal information of voters. Plaintiff's case should thus be dismissed.

### A. Plaintiff's Demand for Records Fails to Meet the Requisite Statutory Requirements of the CRA.

Title III of the CRA sets out requirements regarding federal election records, including a requirement in Section 301 for officers of elections to "retain and preserve, for a period of twenty-two months from the date of any" federal election, "all records and papers which come into [their] possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election," with certain exceptions regarding delivery and designation of custodians. 52 U.S.C. § 20701. Section 303 requires that "[a]ny record or paper" retained and preserved under Section 301 "shall, upon demand in writing by the Attorney General or [her] representative directed to the person having custody, possession, or control of such record or paper, be made

12

JA132

available for inspection, reproduction, and copying at the principal office of such custodian by the Attorney General or [her] representative." *Id*. § 20703. "This demand *shall* contain a statement of *the basis <u>and</u> the purpose* therefor." *Id.* (emphasis added).

Contemporaneous case law immediately following the enactment of Title III of the CRA shows that the "basis" is the statement for why the Attorney General believes there is a violation of federal civil rights law and the "purpose" explains how the requested records would help determine if there is a violation of the law. *Kennedy v. Lynd*, 306 F.2d 222, 229 n.6 (5th Cir. 1962); *accord Weber*, 2026 WL 118807, at *9 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law."). Indeed, "basis" and "purpose" under Title III of the CRA have consistently been treated as distinct concepts. *See id.*; *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963).

The basis-and-purpose requirement under the CRA is a "critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at *9. It prevents the statute from being used as a fishing expedition to obtain records for reasons that are speculative, unrelated to the CRA's aims, or otherwise impermissible or contrary to law. *See id.* The statutory basis and purpose requirements are therefore not perfunctory but require a specific statement as to the reason for requesting the information and how that information will aid in the investigatory analysis. This is consistent with other federal statutes allowing federal agencies to obtain records in service of investigations, where courts have found that the test of judicial enforcement of such subpoenas includes an evaluation of whether the investigation is "conducted pursuant to a legitimate purpose," *Equity Inv. Assocs., LLC v. United States*, 40 F.4th 156, 161–62 (4th Cir. 2022) (quoting *United States v. Powell*, 379 U.S. 48,

13

JA133

57 (1964)), and that such subpoenas are not in service of "unnecessary examination or investigations," *United States v. Rosinsky*, 547 F.2d 249, 253 (4th Cir. 1977) (internal quotation marks omitted). Indeed, courts have explained that such a purpose requirement ensures that the information sought is relevant to the inquiry and not unduly burdensome. *See, e.g.*, *F.D.I.C. v. Wentz*, 55 F.3d 905, 908 (3d Cir. 1995) (reciting requirements for investigation pursuant to an administrative subpoena).

As set forth below, the United States failed to articulate in its demand and in the Complaint "the basis and the purpose" for its request for Maryland voters' sensitive voter information. The United States' demand fails to meet this requirement of the CRA for at least three distinct reasons. These failures warrant dismissal of the case.

*First*, the United States has not stated a proper "basis" for its demand. The United States alleges that the "purpose" of its request seeking "an electronic copy of Maryland's complete and current [voter registration list]" was "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 25; Aug. 18 Letter at 17. But neither the Complaint nor the DOJ's August 18 Letter that invoked the CRA supply a "basis" for why the United States believes Maryland's list maintenance procedures might violate the NVRA or HAVA in the first place. The United States claims it is investigating Maryland's compliance with the NVRA and HAVA based on its review of the Election Administration and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission ("2024 EAVS Report"), which includes states' "reported data on their efforts to keep voter registration lists current and accurate, known as list maintenance." Compl. ¶¶ 19–20. Yet in its August 18 Letter, DOJ included no reference at all to the 2024 EAVS Report. *See* Aug. 18 Letter. While DOJ mentioned the 2024 EAVS Report in its earlier July 14 Letter, it did so in connection to other requests for data and did

not make any connection between the report and its request for the statewide voter file. *See* July 14 Letter at 3–4. Moreover, neither the Complaint nor either of DOJ's two letters addressed to Defendant DeMarinis alleges any evidence of anomalies or anything inconsistent with reasonable list maintenance efforts in the data Maryland reported to EAVS. *See* Compl. ¶¶ 19–20; July 14 Letter; Aug. 18 Letter.

*Second*, even if the United States had provided a proper "basis" for its demand—and it did not—it fails to explain any connection between its purported "purpose" and the vast scope of its records request here, seeking the full and unredacted Maryland statewide voter file. It does not attempt to explain why unredacted voter files are necessary to determine whether Maryland has "conduct[ed] a general program that makes a reasonable effort to remove the names of ineligible voters" by virtue of "death" or "a change in the residence of the registrant," 52 U.S.C. § 20507; Compl. ¶ 12. And in fact, such unredacted files are not necessary: A single snapshot of a state's voter list does not and could not provide enough information to determine if the state has made a "reasonable effort" to remove ineligible voters under Section 8 of the NVRA. Compl. ¶ 12; 52 U.S.C. § 20507(a)(4)(A)–(B). The NVRA and HAVA both leave the mechanisms for conducting list maintenance within the discretion of the State. *See* 52 U.S.C. § 20507(a) (4); (c)(1); § 21083(a)(2)(A); § 21085. The *procedures* carried out by a state or locality establish its compliance; the unredacted voter file does not. Even were the United States to use voter file data to identify voters who had moved or died on Maryland's voter list at a single point in time, that would not amount to Maryland failing to comply with the "reasonable effort" required by the NVRA or HAVA. *See, e.g.*, *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 624–27 (6th Cir.

2025) (describing a "reasonable effort" as "a serious attempt that is rational and sensible" and rejecting any "quantifiable, objective standard" in this context).[11]

Even if some portion of the voter file were necessary to investigate "Maryland's compliance with the list maintenance requirements of the NVRA and HAVA," Compl. ¶ 25; Aug. 18 Letter at 17, the United States has not provided any justification for why the full unredacted voter file is necessary to carry out this purported purpose. It is telling that, for decades, DOJ has neither sought nor required a full and unredacted voter file in its investigations regarding NVRA compliance. *See, e.g.*, Press Release, U.S. Dep't of Just., *United States Announces Settlement with Kentucky Ensuring Compliance with Voter Registration List Maintenance Requirements* (July 5, 2018) https://perma.cc/G2EZUUA5 (describing letters to all 44 states covered by the NVRA with requests for list maintenance information, but without demanding voter files).

*Third*, even if the United States had plausibly set forth some facially sufficient statement of the basis and the purpose for its request related to compliance with the NVRA and HAVA, the CRA claim would also be subject to dismissal because DOJ's stated reason for requesting the sensitive personal data of millions of Maryland voters is pretextual.

DOJ's failure to fully and accurately provide this information is fatal to its Complaint. Section 303 of the CRA requires a statement of "*the* basis and *the* purpose" of a records request, and by twice using the definite article here, the statute requires not just *a* basis or purpose among many, but *the* complete basis and purpose underlying the request. *See Niz-Chavez v. Garland*, 593

---

[11] Indeed, the inclusion at any particular point in time on Maryland's voter registration list of some voters who may have potentially moved out of state is to be expected, since Section 8(d) of the NVRA explicitly sets out a specific set of rules and requirements for removals from the voter rolls based on changes of residence, whereby states "shall not remove" voters on these grounds unless these voters directly confirm their change of residence in writing, or unless states first provide notice and then abide by a statutory waiting period until the second general federal election after providing notice. 52 U.S.C. § 20507(d).

16

U.S. 155, 165–66 (2021); *see also, e.g.*, *Corner Post, Inc. v. Bd. of Governors of the Fed. Rsrv. Sys.*, 603 U.S. 799, 817 (2024) (emphasizing distinction between the definite and the indefinite article). But the United States has not disclosed the actual purpose for its requests, and this Court "is not obliged to accept a contrived statement and purpose" in place of an accurate one. *Weber*, 2026 WL 118807, at *10.

Title III's basis and purpose requirement is especially important here, where massive amounts of public reporting and public, judicially noticeable documents confirm that the United States' *actual* purpose is not to ensure compliance with the NVRA and HAVA, but to build an unprecedented national voter file through novel, error-prone, DOGE-inspired forms of data-matching and then to use this tool to identify ostensibly ineligible voters and challenge their right to vote. *See supra* 6–10 & nn.2–10 (describing this evidence). As the *Weber* court characterized it, considering the same robust set of public reporting and documents, "[i]t appears that the DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." 2026 WL 118807, at *10. The creation of such a database has never been authorized by Congress and violates the federal Privacy Act. *See* 5 U.S.C. § 552a(e)(7) (provision of the federal Privacy Act prohibiting the creation or maintenance of any database "describing how any individual exercises rights guaranteed by the First Amendment," which necessarily includes exercising the right to vote).

Now, consider that the United States has recently sought states to sign a memorandum of understanding ("MOU") in connection with its requests for statewide voter files. *See* Ex. 1, U.S. Dep't of Just., Civ. Div., Confidential Mem. of Understanding ("MOU").[12] Far from indicating a

---

[12] This Court can take judicial notice of the MOU as a government document produced by DOJ. *See, e.g., Shore v. Charlotte-Mecklenburg Hosp. Auth.*, 412 F. Supp. 3d 568, 573 (M.D.N.C.

purpose of ensuring compliance with the NVRA and HAVA, this MOU runs afoul of those statutes. For one, the United States seeks to place authority to identify supposed ineligible voters in the hands of the federal government, directly contrary to statute's requirement that procedures for complying with HAVA be "left to the discretion of the State." 52 U.S.C. § 21085; MOU at 2, 5. In addition, the MOU's substantive terms would allow DOJ to compel states to remove supposedly ineligible voters "within forty-five (45) days," MOU at 5, in a manner that would violate multiple protections of the NVRA, including the requirement to provide voters with notice prior to their removal from the rolls, and the firm bar against systematic voter removals within 90 days of an election. 52 U.S.C. § 20507. This MOU confirms that Plaintiff's stated purpose of ensuring compliance with the NVRA and HAVA is not accurate or plausible, and that its actual purpose is to ingest the sensitive personal information of millions of Maryland voters in defiance of those statutes and the procedural protections they provide to voters.[13]

And now consider the Attorney General's recent letter to Minnesota Governor Tim Walz, demanding that Minnesota turn over voters' private data in order to help "support ICE officers" and "bring an end to the chaos" being inflicted on the civilian population there by DHS agents ostensibly tasked with enforcing the immigration laws. The Bondi Letter, purporting to connect DOJ's request for state voter data with the Administration's draconian immigration-enforcement efforts, further highlights DOJ's failure to disclose the true purpose of the request here.

Plaintiff's failure to honestly disclose what it is doing and will do with voters' sensitive personal information—to state the true purpose for the demand for Marylanders' protected

---

2019); *see also, e.g.*, *Navigators Ins. Co. v. Under Armour, Inc.*, No. 25-1068, --- F.4th ----, 2026 WL 137123, at *6 n.9 (4th Cir. Jan. 20, 2026).

[13] Dismissal on the grounds set forth above would also be proper under Rule 12(c) or after discovery regarding the United States' purported basis and purpose for its requests pursuant to Rule 56.

JA138

personal data—is independently fatal to the CRA claim. "Congress passed the NVRA, Civil Rights Act, and HAVA to protect voting rights. If the DOJ wants to instead use these statutes for more than their stated purpose, circumventing the authority granted to them by Congress, it cannot do so under the guise of a pretextual investigative purpose." *Weber*, 2026 WL 118807, at \*12.

**B. The United States' Demand is Invalid Because it Does Not Allow for Redactions and Modifications to Protect the Privacy and Constitutional Rights of Voters.**

Even had the United States provided a valid basis and purpose sufficient to support its demands—which it did not—any sensitive personal voter information would still be subject to redaction. The text of Title III of the CRA does not prohibit redactions to protect voter privacy and ensure compliance with federal and state law and the Constitution. Indeed, courts have found that redaction may be required to prevent the disclosure of sensitive personal information that would create an intolerable burden on the constitutional right to vote. The United States' CRA is thus defective and should be dismissed on this ground, as well.

As noted *supra*, to justify its demand for data under Title III of the CRA, the United States claims it is investigating Maryland's compliance with federal election laws, including the NVRA and HAVA, purportedly based on its review of data from the 2024 EAVS Report. Compl. ¶¶ 21–22. The United States also discusses additional requirements of the NVRA and HAVA, including the NVRA's requirement in Section 8(i) to maintain "all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters" upon request. 52 U.S.C. § 20507(i); Compl. ¶¶ 10–15. Anyone—including individual voters, groups that protect the right to vote, and government officials—has the same right to records under the NVRA. Voting rights advocates have consistently relied on the NVRA to investigate infringements on the right to vote, including whether election officials have improperly denied or cancelled voter registrations. *See, e.g., Project Vote/Voting for Am., Inc. v.*

19

JA139

*Long*, 682 F.3d 331, 333 (4th Cir. 2012) (nonprofit investigating improper rejection of voter registrations submitted by students at a historically Black university).

While the United States does not rely on Section 8(i) of the NVRA for its demand for data in this lawsuit, the cases interpreting this provision are instructive, as courts have consistently found that the information required to be disclosed under the NVRA has limits. These courts, including the Fourth Circuit, have consistently permitted—and in some instances required—states to redact sensitive personal data of voters when disclosing information under the NVRA. Failure to do so can violate the fundamental right to vote protected by the Constitution.

Like the CRA, the NVRA is silent as to how sensitive personal information should be treated during disclosure. *See* 52 U.S.C. § 20703; 52 U.S.C. § 20507(i)(1). Courts must interpret the disclosure provisions in these statutes in a manner that does not unconstitutionally burden the right to vote. *See United States v. Simms*, 914 F.3d 229, 251 (4th Cir. 2019) ("We are obligated to construe a statute to avoid constitutional problems" where "such a reading is fairly possible") (internal quotation marks and alterations omitted). Federal courts throughout the country have consistently struck this balance, interpreting the "all records concerning" language in Section 8(i) to permit—and even in some cases require—redaction and the protection of confidential materials. As the First Circuit has noted, "nothing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File," and as such, "the proper redaction of certain personal information in the Voter File can further assuage the potential privacy risks implicated by the public release of the Voter File." *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 56 (1st Cir. 2024); *see also Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 266–68 (4th Cir. 2021) (holding that the potential connection to ongoing criminal investigations and the possibility of erroneously labeling a voter as a noncitizen and subjecting

20

JA140

them to public harassment warrants maintaining confidentiality of records). Other courts have consistently recognized that the NVRA disclosure provisions do not compel the release of sensitive information that is otherwise protected by federal or state laws. *See, e.g.*, *N.C. State Bd. of Elections*, 996 F.3d at 264; *Pub. Int. Legal Found., Inc. v. Dahlstrom*, 673 F. Supp. 3d 1004, 1015–16 (D. Alaska 2023); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022); *Pub. Int. Legal Found. v. Boockvar*, 431 F. Supp. 3d 553, 561–63 (M.D. Pa. 2019).

Redaction may also be affirmatively required to the extent the disclosure of such sensitive material would "create[] an intolerable burden on [the constitutional right to vote] as protected by the First and Fourteenth Amendments." *Long*, 682 F.3d at 339 (quotation marks and citation omitted). The Fourth Circuit in *Long*, even while granting access to a state's voter registration applications for inspection and photocopying, ensured the redaction of Social Security numbers, which are "uniquely sensitive and vulnerable to abuse."[14] *Id.* In coming to this conclusion, the court emphasized that the NVRA reflected Congress's view that the right to vote was "fundamental," and that the unredacted release of records risked deterring citizens from registering to vote and thus created an "intolerable burden" on this fundamental right. *Id.* at 334, 339; *cf. In re Coleman*, 208 F. Supp. 199, 200 (S.D. Miss. 1962) (noting, in the context of a records request under Title III of the CRA, multiple considerations not at issue in that case but which could be

---

[14] Plaintiff itself has stated—on multiple occasions—that the NVRA does not prohibit the States from redacting "uniquely sensitive information" when disclosing voting records. *See, e.g.*, Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found., Inc. v. Bellows* ("United States Amicus Brief"), No. 23-1361 (1st Cir. July 25, 2024), 2023 WL 4882397 at *27–28; Br. for the United States as Amicus Curiae, *Pub. Int. Legal Found. v. Schmidt*, No. 23-1590 (3d Cir. Nov. 6, 2023), https://perma.cc/3BQ9-36UJ ("States may redact certain information before disclosing Section 8(i) records."); Br. for the United States as Amicus Curiae, *Project Vote/Voting for Am., Inc. v. Long*, No. 11-1809 (4th Cir. Oct. 18, 2011), 2011 WL 4947283, at *11, 25–26.

21

"[s]ignificant," including that "[i]t is not claimed that these official records are privileged, or exempt from discovery for any sound reason of public policy," or "that an inspection of these records would be oppressive, or any unlawful invasion of any personal constitutional right"). As such, public disclosure provisions such as those in the NVRA and Title III of the CRA must be interpreted to avoid this unconstitutional burden. *See id.*; *Bellows*, 92 F.4th at 56. The danger of imposing those burdens on Maryland voters like Mr. Snowden, Ms. Paul, and Mr. Sims, and non-partisan, non-profit organizations like Common Cause and Out for Justice, is present here. *See* Dkt. No. 8-4, Decl. of Carl Snowden, ¶¶ 9–10; Dkt. No. 8-5, Decl. of Myriam Paul, ¶¶ 5–6; Dkt. No. 8-6, Decl. of Luis Sims, ¶¶ 6–8.

The same privacy and constitutional concerns that federal courts have found warrant redactions under NVRA records requests apply equally to requests for the same records under the CRA. *Cf. Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 281–282 (2024) (Gorsuch, J., concurring) ("[O]ur Constitution deals in substance, not form. However the government chooses to act, . . . it must follow the same constitutional rules."). Indeed, the limited case law considering records requests under the CRA expressly acknowledged that courts retain the "power and duty to issue protective orders," *Lynd*, 306 F.2d at 230, such as the redaction of sensitive fields that courts have consistently determined are entitled to protection from disclosure.

Thus, even were the United States entitled to records under Title III after having provided a valid statement of the basis and the purpose therefor (which it failed to do here), sensitive personal identifying information, including Social Security numbers and driver's license numbers, should similarly be redacted. No matter the statutory mechanism, conditioning the right to vote on the release of voters' sensitive private information "creates an intolerable burden on that right." *Long*, 682 F.3d at 339 (citation omitted).

22

JA142

## II.    THE UNITED STATES' MOTION TO COMPEL SHOULD BE DENIED BECAUSE IT IS NOT ENTITLED TO SUMMARY DISPOSITION OF ITS CRA CLAIM.

In its Motion to Compel, the United States makes expansive claims that Title III of the CRA universally "displaces the Federal Rules of Civil Procedure by creating a 'special statutory proceeding'" where "'[a]ll that is required is a simple statement by the Attorney General'" that "a written demand for Federal election records and papers covered by the statute" was made, "explaining that the person against whom an order is sought has failed or refused to make the requested records" available. Mem. of Law in Supp. of the Request for Order to Compel Prod. of Records ("Mot. to Compel"), Dkt. No. 2-1 at 5; *see also* Compl. ¶¶ 1–4. This argument rests entirely on a single set of non-binding cases decided more than 60 years ago, in the early 1960's, in a different circuit and a drastically different historical context, including primarily *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). *See* Mot. to Compel; *see also* Compl. ¶¶ 1–4.

The United States briefly acknowledges that "[c]aselaw addressing the CRA in any depth is confined to courts within the Fifth Circuit in the early years following the CRA's enactment. Since then, courts have not had occasion to revisit the issue." Mot. to Compel at 4 n.1. But the United States does not provide key historical context that could help explain why this provision of the CRA would have been addressed primarily in the Fifth Circuit—which at the time those cases were decided, during the Jim Crow era, included the southern states of Alabama, Florida, Georgia, Louisiana, Mississippi, and Texas.[15] In these states, it was widely known that many election officials were recalcitrant in their refusal to register Black voters.[16] It was against this particular

---

[15] "Federal Judicial Circuits: Fifth Circuit," FEDERAL JUDICIAL CENTER, https://perma.cc/9MSD-EFRB (last visited Dec. 9, 2025).

[16] *See generally, e.g.*, Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944-1969* (1976).

JA143

backdrop that the Fifth Circuit in *Kennedy v. Lynd* fashioned an expedited, summary procedure for enforcing CRA records requests in those early 1960's cases. In the face of Jim Crow regimes that were using every possible means to block Black Americans from registering to vote, including resistance from judges, the Fifth Circuit in *Lynd* noted that "the factual foundation for, or the sufficiency of, the Attorney General's 'statement of the basis and the purpose' contained in the written demand is not open to judicial review or ascertainment." *Lynd*, 306 F.2d at 226. In that context, "the factual foundation for" the basis and purpose of the Attorney General's request was utterly self-evident, and thus plenary consideration was not required. *See id.* The Fifth Circuit's treatment of Section 303 of the CRA cannot be divorced from that context.[17]

By contrast, here, more than 60 years later, the context of *this* records request could not be more different. The United States has invoked the CRA for unprecedented purposes, to make sweeping demands for extensive voter data with no showing or claim of legal deficiencies or violations of rights, while making unprecedented demands for sensitive, non-public personal identifying information. Even more alarming, as noted *supra*, there is extensive reporting and publicly available, judicially noticeable documents showing that the purported basis and purpose of DOJ's request are pretextual, and that the data at issue is in fact being sought for unlawful ends. *See supra* 6–10 & nn.2–10; *Weber*, 2026 WL 118807, at *10 (federal court holding DOJ's invocation of the CRA in a near-identical case seeking California's unredacted voter file is "contrived" and "pretextual").

Nothing in the text of Title III of the CRA insulates the sufficiency of the requirement for a "statement of the basis and the purpose" of a demand from standard judicial review—especially

---

[17] *See also In re Coleman*, 208 F. Supp. 199, 201 (S.D. Miss. 1962) (acknowledging in the context of Title III of the CRA that while "[t]he right of free examination of official records is the rule," there could be "exception[s]" where "the purpose is speculative, or from idle curiosity").

not in the circumstances presented here. *See* 52 U.S.C. § 20703. Indeed, in the more than 60 years since *Lynd*, the Supreme Court has reaffirmed that "the Federal Rules apply to proceedings to compel the giving of testimony or production of documents in accordance with a subpoena issued by an officer or agency of the United States under any statute of the United States except as otherwise provided by statute or by rules of the district court or by order of the court in the proceedings." *Becker v. United States*, 451 U.S. 1306, 1307–08 (1981) (internal citation and quotation marks omitted); *see also, e.g.*, *Powell*, 379 U.S. at 57–58  (holding that IRS Commissioner bears the burden to establish statutory requirements before enforcement of a tax subpoena); *Sugarloaf Funding, LLC v. U.S. Dep't of Treasury*, 584 F.3d 340, 347–50 (1st Cir. 2009) (allowing summons recipient opportunity to rebut government's prima facie case). *Powell* is especially on point. There, just two years after *Lynd*, the Court held that proceedings to enforce a statute providing the United States with the power to request records in terms that are materially identical to the CRA were governed by the Federal Rules. *Powell*, 379 U.S. at 57–58 & n.18 (citing 26 U.S.C. § 7604(a)); *compare* 26 U.S.C. § 7604(a) ("[T]he United States district court for the district in which such person resides or is found *shall have jurisdiction by appropriate process* to compel such attendance, testimony, or production of books, papers, records, or other data[.]" (emphasis added)) *with* 52 U.S.C. § 20705 ("The United States district court for the district in which a demand is made . . .or in which a record or paper so demanded is located, *shall have jurisdiction by appropriate process* to compel the production of such record or paper." (emphasis added)). The United States' demand for a summary resolution to this case, with no discovery into whether it has a proper statutory basis for its demand, flies in the face of a half-century of precedent as well as the Federal Rules.

25
JA145

Furthermore, even in *Lynd*, the court in explaining its findings noted that "we are not discussing confidential, private papers and effects. We are, rather, dealing with public records which ought ordinarily to be open to legitimate reasonable inspection and which by nature relate directly to the most vital of all public functions—the franchise of the citizen." 306 F.2d at 231. The court also noted that what is now Section 305 of the CRA authorizes only jurisdiction by "appropriate process" to compel document production, which the court had "no doubt" would "include the power and duty to issue protective orders"—such as orders protecting and redacting sensitive information such as that at issue in this case. 52 U.S.C. § 20705; *Lynd*, 306 F.2d at 230. Thus, even in the 1960's, before sensitive personal identifying information such as Social Security Numbers or driver's license numbers were widely collected as part of the voter registration record, and before any federal laws had been passed to protect and constrain access to personal information,[18] the court recognized the distinction between the disclosure of "confidential, private" information and "public records" that would already "ordinarily [] be open to legitimate reasonable inspection," *Lynd*, 306 F.2d at 231, and anticipated the possibility that the "duty to issue protective orders" would arise for certain records requests under the CRA, *id.* at 230.

To argue that the United States is entitled to summary relief and the forced provision of an unprecedented trove of "confidential, private" information, without *any* review of its statutorily required statement of the basis and the purpose for its demand, would go even further than *Lynd* did in the context of the 1960's Jim Crow South, where, very much unlike here, the federal basis and purpose for the requested voter data were inarguably clear and not apparently pretextual or

---

[18] *E.g.*, Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896 (1974); Driver's Privacy Protection Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (1994), codified at 18 U.S.C. § 2721 *et seq.*; E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899 (2002); Federal Information Security Modernization Act of 2014, Pub. L. No. 113-283, 128 Stat. 3073 (2014), codified at 44 U.S.C. §§ 3351 *et seq.* (2014).

26

unlawful. The United States' attempt to end-run the Federal Rules and the CRA's requirements

must be rejected, and its Motion to Compel should accordingly be denied.

## CONCLUSION

The United States' Motion to Compel should be denied and the Complaint dismissed.

Dated: February 5, 2026                          Respectfully submitted,

<u>/s/ Jonathan Topaz</u>            .
  Jonathan Topaz*                              Deborah A. Jeon (Bar No. 06905)
  Theresa J. Lee*                              Dara Johnson (Bar No. 31478)
  Sophia Lin Lakin*                            AMERICAN CIVIL LIBERTIES UNION OF MARYLAND
  AMERICAN CIVIL LIBERTIES UNION FOUNDATION    3600 Clipper Mill Road
  125 Broad Street, 18th Floor                 Suite 200
  New York, NY 10004                           Baltimore, MD 21211
  Tel.: (212) 549-2500                         Tel. 410-889-8555
  jtopaz@aclu.org                              jeon@aclu-md.org
  tlee@aclu.org                                djohnson@aclu-md.org
  slakin@aclu.org

  *admitted pro hac vice*

27

JA147

## CERTIFICATE OF SERVICE

I hereby certify that on February 5, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system on all counsel of record and by email on counsel for the United States and Defendant DeMarinis.

/s/ Jonathan Topaz
Jonathan Topaz

28

# Exhibit 1

JA149



**U.S. Department of Justice**

Civil Rights Division

## CONFIDENTIAL MEMORANDUM OF UNDERSTANDING

### I.    PARTIES & POINTS OF CONTACT.

Requester
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice
VRL/Data User:
Title:
Address:
Phone:

VRL/Data Provider
State Agency Name:
Custodian:
Title:
Address:
Phone:

The parties to this Memorandum of Understanding ("MOU" or "Agreement") are the Department of Justice, Civil Rights Division ("Justice Department" or "Department"), and the State of Colorado ("You" or "your state").

### II.    AUTHORITY.

By this Agreement, the State of Colorado ("You" or "your state") has agreed to, and will, provide an electronic copy of your state's complete statewide Voter Registration List ("VRL" or "VRL/Data") to the Civil Rights Division of the U.S. Department of Justice (at times referred to as the "Department").  The VRL/Data must include, among other fields of data, the voter registrant's full name, date of birth, residential address, his or her state driver's license number or

1

JA150

the last four digits of the registrant's social security number as required under the HAVA to register individuals for federal elections. *See* 52 U.S.C. § 21083(a)(5)(A).

The authorities by which this information is requested by the Department of Justice are:

- National Voter Registration Act of 1993, 52 U.S.C. § 20501, *et seq.*

- Attorney General's authority under Section 11 of the NVRA to bring enforcement actions. See 52 U.S.C. § 20501(a).

- Help America Vote Act of 2002, 52 U.S.C. § 20901, *et seq.*

- Attorney General's authority to enforce the Help America Vote Act under 53 U.S.C. § 21111.

- Attorney General authority to request records pursuant to Title III of the Civil Rights Act of 1960 ("CRA"), codified at 52 U.S.C. § 20701, *et seq*.

- The Privacy Act of 1974, 5 U.S.C. § 552a, as amended.

## III.    PURPOSE.

A VRL is a Voter Registration List pursuant to the NVRA and HAVA, commonly referred to as "voter roll," compiled by a state – often from information submitted by counties – containing a list of all the state's *eligible* voters. Regardless of the basis for ineligibility, ineligible voters do not appear on a state's VRL when proper list maintenance is performed by states. The Justice Department is requesting your state's VRL to test, analyze, and assess states' VRLs for proper list maintenance and compliance with federal law. In the event the Justice Department's analysis of a VRL results in list maintenance issues, insufficiency, inadequacy, anomalies, or concerns, the Justice Department will notify your state's point of contact   of the issues to assist your state with curing.

2

JA151

The purpose of this MOU is to establish the parties' understanding as to the security protections for data transfer and data access by the Department of Justice of the electronic copy of the statewide voter registration list, including all fields requested by the Department of Justice.

## IV.    TIMING OF AGREEMENT – TIME IS OF ESSENCE.

Although the Justice Department is under no such obligation as a matter of law, because this Agreement is proposed, made, and to be entered into at your state's request as part of your state's transmission of its VRL to the Justice Department, this Agreement is to be fully executed within seven (7) days of the Justice Department presenting this Agreement to you.  Both parties agree that no part of this Agreement or execution is intended to, or will, cause delay of the transmission of your state's VRL to the Justice Department for analysis.

## V.    TIMING OF VRL/DATA TRANSFER.

You agree to transfer an electronic copy of your state's complete statewide VRL/Data to the Civil Rights Division of the U.S. Department of Justice as described in Section III of this Agreement no later than five (5) business days from the execution of this Agreement, which is counted from the last day of the last signatory.

## VI.    METHOD OF VRL/DATA ACCESS OR TRANSFER.

The VRL will be submitted by your state via the Department of Justice's secure file-sharing system, i.e., Justice Enterprise File Sharing (JEFS"). A separate application to use JEFS must be completed and submitted by your state through the Civil Rights Help Desk.  JEFS implements strict access controls to ensure that each user can only access their own files.  All files and folders are tied to a specific user, and each user has defined permissions that govern how they may interact with those files (e.g., read, write, or read-only).

3

JA152

Whenever a user attempts to access a file or folder, JEFS validates the request against the assigned permissions to confirm that the user is explicitly authorized. This process guarantees that users can only access files and folders only where they have permission. Users are also limited to the authorized type of interaction with each file or folder. Within the Department of Justice, access to JEFS is restricted to specific roles: Litigation Support, IT staff, and Civil Rights Division staff.

## VII.    LOCATION OF DATA AND CUSTODIAL RESPONSIBILITY.

The parties mutually agree that the Civil Rights Division (also "Department") will be designated as "Custodian" of the file(s) and will be responsible for the observance of all conditions for use and for establishment and maintenance of security agreements as specified in this agreement to prevent unauthorized use. The information that the Department is collecting will be maintained consistent with the Privacy Act of 1974, 5 U.S.C. § 552a. The full list of routine uses for this collection of information can be found in the Systems of Record Notice ("SORN") titled, JUSTICE/CRT – 001, "Central Civil Rights Division Index File and Associated Records," 68 Fed. Reg. 47610-01, 611 (August 11, 2003); 70 Fed. Reg. 43904-01 (July 29, 2005); and 82 Fed. Reg. 24147-01 (May 25, 2017). It should be noted that the statutes cited for routine use include NVRA, HAVA, and the Civil Rights Act of 1960, and the Justice Department is making our request pursuant to those statutes. The records in the system of records are kept under the authority of 44 U.S.C. § 3101 and in the ordinary course of fulfilling the responsibility assigned to the Civil Rights Division under the provisions of 28 C.F.R. §§ 0.50, 0.51.

VRL/Data storage is similar to the restricted access provided on JEFS and complies with the SORN: Information in computer form is safeguarded and protected in accordance with applicable Department security regulations for systems of records. Only a limited number of staff members who are assigned a specific identification code will be able to use the computer to access

4

JA153

the stored information. However, a section may decide to allow its employees access to the system in order to perform their official duties.

All systems storing the VRL data will comply with all security requirements applicable to Justice Department systems, including but not limited to all Executive Branch system security requirements (e.g., requirements imposed by the Office of Management and Budget [OMB] and National Institute of Standards and Technology [NIST]), Department of Justice IT Security Standards, and Department of Justice Order 2640.2F.

## VIII.    NVRA/HAVA COMPLIANT VOTER REGISTRATION LIST.

After analysis and assessment of your state's VRL, the Justice Department will securely notify you or your state of any voter list maintenance issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, the Justice Department found when testing, assessing, and analyzing your state's VRL for NVRA and HAVA compliance, i.e., that your state's VRL only includes eligible voters.

You agree therefore that within forty-five (45) days of receiving that notice from the Justice Department of any issues, insufficiencies, inadequacies, deficiencies, anomalies, or concerns, your state will clean its VRL/Data by removing ineligible voters and resubmit the updated VRL/Data to the Civil Rights Division of the Justice Department to verify proper list maintenance has occurred by your state pursuant to the NVRA and HAVA.

## IX.    CONFIDENTIALITY & DEPARTMENT SAFEGUARDS.

Any member of the Justice Department in possession of a VRL/Data will employ reasonable administrative, technical, and physical safeguards designed to protect the security and confidentiality of such data. Compliance with these safeguards will include secure user authentication protocols deploying either: (i) Two-Factor Authentication ("2FA"), which requires users to go through two layers of security before access is granted to the system; or (ii) the

5

JA154

assignment of unique user identifications to each person with computer access plus unique complex passwords, which are not vendor supplied default passwords.

The Department will activate audit logging for the records, files, and data containing the state's VRL/Data in order to identify abnormal use, as well as to track access control, on computers, servers and/or Devices containing the VRL/Data.

For all devices storing records, files, and data containing the VRL/Data: there is (i) up-to-date versions of system security agent software that includes endpoint protection and malware protection and reasonably up-to-date patches and virus definitions, or a version of such software that can still be supported with up-to-date patches and virus definitions, and is set to receive the most current security updates on a regular basis; and (ii) up-to-date operating system security patches designed to maintain the integrity of the personal information.

For all devices storing records, files, and data containing the VRL/Data: there is (i) controlled and locked physical access for the Device; and (ii) the prohibition of the connection of the Device to public or insecure home networks.

There will be no copying of records, files, or data containing the VRL/Data to unencrypted USB drives, CDs, or external storage. In addition, the use of devices outside of moving the records, files, or data to the final stored device location shall be limited.

Any notes, lists, memoranda, indices, compilations prepared or based on an examination of VRL/Data or any other form of information (including electronic forms), that quote from, paraphrase, copy, or disclose the VRL/Data with such specificity that the VRL/Data can be identified, or by reasonable logical extension can be identified will not be shared by the Department. Any summary results, however, may be shared by the Department.

In addition to the Department's enforcement efforts, the Justice Department may use the information you provide for certain routine, or pre-litigation or litigation purposes including:

6

JA155

present VRL/Data to a court, magistrate, or administrative tribunal; a contractor with the Department of Justice who needs access to the VRL/Data information in order to perform duties related to the Department's list maintenance verification procedures. Recipients of information shall be required to comply with the requirements of the Privacy Act of 1974, as amended, pursuant to 5 U.S.C. § 552a(m).

## X.    LOSS OR BREACH OF DATA.

If a receiving party discovers any loss of VRL/Data, or a breach of security, including any actual or suspected unauthorized access, relating to VRL/Data, the receiving party shall, at its own expense immediately provide written notice to the producing party of such breach; investigate and make reasonable and timely efforts to remediate the effects of the breach, and provide the producing party with assurances reasonably satisfactory to the producing party that such breach shall not recur; and provide sufficient information about the breach that the producing party can reasonably ascertain the size and scope of the breach. The receiving party agrees to cooperate with the producing party or law enforcement in investigating any such security incident. In any event, the receiving party shall promptly take all necessary and appropriate corrective action to terminate unauthorized access.

## XI.    DESTRUCTION OF DATA.

The Department will destroy all VRL/Data associated with actual records as soon as the purposes of the list maintenance project have been accomplished and the time required for records retention pursuant to applicable law has passed. When the project is complete and such retention requirements by law expires, the Justice Department will:

1. Destroy all hard copies containing confidential data (e.g., shredding);

2. Archive and store electronic data containing confidential information offline in a secure location; and

7

JA156

3. All other data will be erased or maintained in a secured area.

**XII.    OTHER PROVISIONS.**

A. Conflicts. This MOU constitutes the full MOU on this subject between the Department and your state. Any inconsistency or conflict between or among the provisions of this MOU, will be resolved in the following order of precedence: (1) this MOU and (2) other documents incorporated by reference in this MOU (e.g., transaction charges).

B. Severability. Nothing in this MOU is intended to conflict with current law or regulation or the directives of Department, or the your state. If a term of this MOU is inconsistent with such authority, then that term shall be invalid but, to the extent allowable, the remaining terms and conditions of this MOU shall remain in full force and effect.

C. Assignment. Your state may not assign this MOU, nor may it assign any of its rights or obligations under this MOU.  To the extent allowable by law, this MOU shall inure to the benefit of, and be binding upon, any successors to the Justice Department and your state without restriction.

D. Waiver. No waiver by either party of any breach of any provision of this MOU shall constitute a waiver of any other breach. Failure of either party to enforce at any time, or from time to time, any provision of this MOU shall not be construed to be a waiver thereof.

E. Compliance with Other Laws. Nothing in this MOU is intended or should be construed to limit or affect the duties, responsibilities, and rights of the User Agency under the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., as amended; the Help America Vote Act, 52 U.S.C. § 20901 *et seq*., as amended; the Voting Rights Act, 52 U.S.C. § *10301 et seq*., as amended; and the Civil Rights Act, 52 U.S.C. § 10101 et seq., as amended.

F. Confidentiality of MOU.  To the extent allowed by applicable law, this MOU, its contents, and the drafts and communications leading up to the execution of this MOU are deemed

JA157

by the parties as "confidential."  Any disclosures therefore could be made, if at all,

pursuant to applicable laws or court orders requiring such disclosures.


**SIGNATURES**

<u>VRL/Data Provider</u>
State Agency Name:
Signature: _____ Date of Execution:_____


Authorized Signatory Name Printed:_____


Title: _____


<u>Requester</u>
Federal Agency Name:  Civil Rights Division, U.S. Department of Justice

Signature: _____ Date of Execution:_____

Authorized Signatory Name Printed:_____

Title: _____

9

JA158

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>*v.*<br><br>JARED DEMARINIS, *in his official capacity as the State Administrator of Elections for the State of Maryland*,<br><br>*Defendant*. | Case No. 1:25-cv-03934-SAG |

**MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS'
PROPOSED MOTION TO DISMISS**

Proposed Intervenor-Defendant Maryland/DC Alliance for Retired Americans moves to dismiss Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth in the supporting memorandum filed alongside this Motion, Plaintiff's Complaint fails to state a claim upon which relief may be granted.

**WHEREFORE**, Proposed Intervenor-Defendant requests that the Court dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).

JA159

Respectfully submitted,

Dated: January 30, 2026

*/s/ Uzoma N. Nkwonta*

Uzoma N. Nkwonta*
Jacob D. Shelly (D. Md. Bar No. 30972)
Tina Meng Morrison (D. Md. Bar No. 21832)
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
unkwonta@elias.law
jshelly@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law

* Admitted *pro hac vice*

*Counsel for Proposed Intervenor-Defendant
the Maryland/DC Alliance for Retired
Americans*

2

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA,

       *Plaintiff,*

       *v.*

JARED DEMARINIS, *in his official
capacity as the State Administrator of
Elections for the State of Maryland,*

       *Defendant.*

Case No. 1:25-cv-03934-SAG

**MEMORANDUM OF LAW IN SUPPORT OF THE MARYLAND/DC ALLIANCE FOR
RETIRED AMERICANS' PROPOSED MOTION TO DISMISS**

JA161

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 3

I.　Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers. ........................................................ 3

II.　The Department of Justice has embarked on an unprecedented nationwide campaign to amass personal voter data held by the states. ................................................ 4

III.　The Department of Justice filed suit to obtain Maryland's voter registration records. ................................................................................................................ 6

LEGAL STANDARD ........................................................................................................ 7

ARGUMENT ...................................................................................................................... 7

I.　DOJ failed to satisfy Title III's threshold requirements of stating a valid "basis" and "purpose" for its demand. ......................................................................... 8

　A.　DOJ did not provide any statement of the "basis" for its demand. ......................... 11

　B.　DOJ did not provide a proper "purpose" for its demand. ....................................... 13

II.　Title III does not pre-empt Maryland's privacy protections. ............................................. 14

III.　DOJ has failed to comply with the Privacy Act, which independently requires dismissal. ............................................................................................................ 18

CONCLUSION ................................................................................................................. 21

i

JA162

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alabama ex rel. Gallion v. Rogers,*
187 F. Supp. 848 (M.D. Ala. 1960) ........................................................................ 13

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.,*
778 F. Supp. 3d 685 (D. Md. 2025) ........................................................................ 21

*Arizona v. Inter Tribal Council of Ariz., Inc.,*
570 U.S. 1 (2013) ...................................................................................................... 3

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .................................................................................................. 7

*Atl. Coast Pipeline, LLC v. Nelson Co. Bd. of Supervisors,*
443 F. Supp. 3d 670 (W.D. Va. 2020) .................................................................... 15

*CFPB v. Accrediting Council for Indep. Colls. & Schs.,*
854 F.3d 683 (D.C. Cir. 2017) .............................................................................. 8, 9

CFPB v. Source for Pub. Data, L.P.,
903 F.3d 456, 458 (5th Cir. 2018) ............................................................................ 8

*Foster v. Love,*
522 U.S. 67 (1997) .................................................................................................... 3

*Gaines Motor Lines, Inc. v. Klaussner Furniture Indus., Inc.,*
734 F.3d 296 (4th Cir. 2013) .................................................................................. 10

*Giarratano v. Johnson,*
521 F.3d 298 (4th Cir. 2008) .................................................................................... 7

*Harts v. Calvert Cnty. Sheriff,*
No. 8:22-cv-03192-BAH, 2024 WL 944321 (D. Md. Mar. 5, 2024) ...................... 11

*Home Depot U.S.A., Inc. v. Jackson,*
587 U.S. 435 (2019) ................................................................................................ 10

*Husted v. A. Philip Randolph Inst.,*
584 U.S. 756 (2018) .............................................................................................. 3, 4

*In re Admin. Subpoena No. 25-1431-019,*
800 F. Supp. 3d 229 (D. Mass. 2025) .................................................................. 9, 14

JA163

*In re Coleman*,
208 F. Supp. 199 (S.D. Miss. 1962)............................................................................ 11

*In re Subpoena No. 25-1431-014*,
No. 2:25-mc-00039-MAK, 2025 WL 3252648 (E.D. Pa. Nov. 21, 2025)............................ 8, 14

*Jud. Watch, Inc. v. Lamone*,
399 F. Supp. 3d 425 (D. Md. 2019) ............................................................................ 16

*Kennedy v. Bruce*,
298 F.2d 860 (5th Cir. 1962)...................................................................................... 11

*Kennedy v. Lynd*,
306 F.2d 222 (5th Cir. 1962)................................................................... 6, 10, 11, 16

*League of Women Voters v. U.S. Dep't of Homeland Sec.*,
No. 25-cv-3501, 2025 WL 3198970 (D.D.C. Nov. 17, 2025) ...................................... 18, 19, 20

*McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*,
780 F.3d 582 (4th Cir. 2015)........................................................................................ 7

*N. Va. Hemp & Agric., LLC v. Virginia*,
125 F.4th 472 (4th Cir. 2025)...................................................................................... 15

*Phillips v. LCI Int'l, Inc.*,
190 F.3d 609 (4th Cir. 1999)...................................................................................... 11

*Pippinger v. Rubin*,
129 F.3d 519 (10th Cir. 1997)..................................................................................... 21

*Project Vote, Inc. v. Kemp*,
208 F. Supp. 3d 1320 (N.D. Ga. 2016) ...................................................................... 17

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012)...................................................................................... 16

*Project Vote/Voting For Am., Inc. v. Long*,
752 F. Supp. 2d 697 (E.D. Va. 2010).......................................................................... 17

*Pub. Int. Legal Found., Inc. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) ......................................................................................... 15

*Pub. Int. Legal Found., Inc. v. Matthews*,
589 F. Supp. 3d 932 (C.D. Ill. 2022).......................................................................... 17

*Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*,
996 F.3d 257 (4th Cir. 2021)....................................................................................... 16

JA164

*Republican Nat'l Comm. v. N.C. State Bd. of Elections*,
  120 F.4th 390 (4th Cir. 2024)........................................................................................ 3

*Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*,
  4 F.3d 244 (4th Cir. 1993) ........................................................................................... 21

*Rouse v. Moore*,
  724 F. Supp. 3d 410 (D. Md. 2024) ............................................................................ 12

*Tarrant Reg'l Water Dist. v. Herrmann*,
  656 F.3d 1222 (10th Cir. 2011)................................................................................... 15

*True the Vote v. Hosemann*,
  43 F. Supp. 3d 693 (S.D. Miss. 2014)......................................................................... 17

Minute Entry, *United States v. Oregon*,
  No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), ECF No. 68 ...................................... 2

*United States v. State of Ala.*,
  192 F. Supp. 677 (M.D. Ala. 1961) ............................................................................. 10

*United States v. Ward*,
  349 F.2d 795 (5th Cir.)................................................................................................. 10

*United States v. Wayda*,
  966 F.3d 294 (4th Cir. 2020)......................................................................................... 8

*United States v. Weber*,
  No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807 (C.D. Cal. Jan. 15, 2026) ................ *passim*

*Util. Air Regul. Grp. v. EPA*,
  573 U.S. 302, 321 (2014) ............................................................................................ 10

*Voter Reference Found., LLC v. Torrez*,
  160 F.4th 1068 (10th Cir. 2025).............................................................................. 16, 18

**Constitutional Provisions and Statutes**

U.S. Const. art. I, § 4, cl. 1............................................................................................. 2, 3

5 U.S.C. § 552a ......................................................................................................... 18, 19, 21

52 U.S.C. § 20501(b) ....................................................................................................... 3

52 U.S.C. § 20507(a) .................................................................................................. 3, 17

52 U.S.C. § 20703 ........................................................................................... 8, 12, 15, 16

52 U.S.C. § 21083(a) .................................................................................................... 4, 18

iv

52 U.S.C. § 20701 ............................................................................................ 6

52 U.S.C. § 21085 ....................................................................................... 4, 13

MD Code Ann., Gen. Provisions § 4-330 ...................................................... 1

MD Code Ann., State Gov't § 10-1301(c)(1) ............................................... 14

**Regulations and Rules**

82 Fed. Reg. 24147 (May 25, 2017) ............................................................ 20

MD Code Regs. 02.06.01.17 ..................................................................... 1, 14

MD Code Regs. 33.05.02.02(B)(5) .............................................................. 14

*Privacy Act of 1974; System of Records,*68 Fed. Reg. 47610 (Aug. 11, 2003) ............................ 20

*Privacy Act of 1974; System of Records,*70 Fed. Reg.  43904 (July 20, 2005) ........................... 20

 Fed. R. Civ. P. 12(b)(6) ............................................................................... 7

**Other Authorities**

Basis, Black's Law Dictionary (4th ed. 1968) ............................................... 9

Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html ............................................................. 5

H.R. Rep. No. 107-329 (2001) .................................................................. 2, 4

H.R. Rep. No. 86-956 (1959) ................................................................. 10, 13

Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Jan. 23, 2026), https://perma.cc/UHF4-SPUA ............................................................. 5

Purpose, Black's Law Dictionary (4th ed. 1968) ........................................... 9

Proposed Intervenor-Defendant Maryland/DC Alliance for Retired Americans (the "Alliance") hereby moves, through undersigned counsel, to dismiss the Complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. In support of this Motion, the Alliance states as follows:

**INTRODUCTION**

The United States Department of Justice ("DOJ") seeks to build a nationwide database of registered voters, a scheme not authorized by Congress and contrary to federal laws assigning states the responsibility for maintaining voter registration. To accomplish this task, DOJ has demanded that dozens of states turn over their full, unredacted voter lists, even though state laws often shield voter information on those lists—most notably driver's license numbers, social security numbers, and dates of birth—from disclosure. Maryland law is no exception: among other protections, it prohibits "inspection of the part of a public record that contains sociological information," MD Code Ann., Gen. Provisions § 4-330, which includes social security numbers, dates of birth, and driver's license numbers, *see* MD Code Regs. 02.06.01.17.

Because State Election Administrator Jared DeMarinis followed Maryland's privacy laws and refused to acquiesce to DOJ's demands, DOJ amplified its pressure campaign by filing suit, seeking to forcibly obtain the State's unredacted voter registration list. The Complaint relies on a single cause of action brought under Title III of the Civil Rights Act of 1960 ("CRA"), which Congress enacted to combat the infringement or denial of the right to vote. Not surprisingly, this landmark civil rights law does not support DOJ's attempt to compel Maryland to turn over sensitive personal data of registered voters for several reasons.

First, the CRA requires DOJ to provide a statement identifying the "purpose" of its investigation and the "basis" for its determination that a violation of federal voting rights law may have occurred. But DOJ failed to offer any valid basis for its demand, and its stated purpose—to

1

JA167

assess Maryland's compliance with administrative list maintenance activities required under the National Voter Registration Act ("NVRA") and the Help America Vote Act ("HAVA")—is beyond the reach of Title III. Second, even a lawful Title III request does not preempt Maryland's state law privacy protections, which prohibit the Administrator from furnishing certain sensitive voter data such as driver's license or social security numbers. Finally, the Privacy Act prohibits unfettered governmental possession of individuals' personal information, and bars any collection of such sensitive data until the agency has implemented requisite procedural safeguards.

Legal errors aside, DOJ's attempt to create a federal voter registration database also runs directly contrary to the decentralized structure of our federal electoral system. *See, e.g.*, U.S. Const. art. I, § 4, cl. 1 (granting states principal authority over congressional elections). When enacting HAVA after the contested 2000 election, Congress stressed that the "dispersal of responsibility for election administration has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome." H.R. Rep. No. 107-329 at 32 (2001). DOJ's effort to assert sweeping federal authority over the management of federal elections would dismantle the careful delineation of authority over American elections, as reflected by the Constitution and long-established federal laws.

For these same reasons, federal courts in California and Oregon recently dismissed DOJ's parallel lawsuits seeking the same types of sensitive data about voters in those states as DOJ demands here. In addition to thoroughly rejecting DOJ's claims on the merits, the California court warned that DOJ's efforts are "antithetical to the promise of fair and free elections our country promises and the franchise that civil rights leaders fought and died for." *United States v. Weber*, No. 2:25-CV-09149-DOC-ADS, 2026 WL 118807, at \*2 (C.D. Cal. Jan. 15, 2026); *see also* Minute Entry, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), ECF No.

68 (advising that court is granting motions to dismiss and will issue a more detailed, written opinion shortly). DOJ's attempt to assert sweeping federal authority over the management of federal elections is not only unprecedented—it would dismantle the careful delineation of authority over American elections as reflected by the Constitution and long-established federal laws. The Court should dismiss the Complaint with prejudice.

## BACKGROUND

**I.      Federal law has long made voter list maintenance a state responsibility, consistent with the constitutional separation of powers.**

The U.S. Constitution "invests the States with responsibility for the mechanics" of elections, subject to any decision by Congress to "preempt state legislative choices." *Foster v. Love*, 522 U.S. 67, 69 (1997); *see also* U.S. Const. art. I, § 4, cl. 1. Accordingly, as a default matter, the Constitution assigns states the responsibility for determining voter eligibility and maintaining lists of eligible voters. *See Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 17 (2013).

While Congress has enacted certain laws governing voter registration, these laws augment existing "state voter-registration systems," *id.* at 5, and confirm that states are the custodians of voter registration data. As relevant here, Congress enacted the NVRA in 1993 to serve "two main objectives: increasing voter registration and removing ineligible persons from the States' voter registration rolls." *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 761 (2018); *see also* 52 U.S.C. § 20501(b). The law charges states—not the federal government—with the "administration of voter registration for elections for Federal office," 52 U.S.C. § 20507(a), including maintaining voter lists (subject to strict safeguards), *id.* § 20507(c)–(g). It similarly makes *states* the custodians of voter lists. *See Husted*, 584 U.S. at 761.

In the wake of the 2000 elections, Congress enacted HAVA "to improve voting systems and voter access." *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 394 (4th

Cir. 2024). Like the NVRA, HAVA regulates how states maintain their voter rolls, requiring them to create a "computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). It also requires states to "perform list maintenance" consistent with the NVRA. *Id.* § 21083(a)(2)(A). HAVA is abundantly clear that this list is to be "defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). Further, HAVA commands that the "specific choices on the methods of complying with" HAVA "shall be left to the discretion of the State." *Id.* § 21085. Indeed, HAVA's legislative history stressed the importance of maintaining our decentralized electoral system to preserving liberty:

> Historically, elections in this country have been administered at the state and local level. **This system has many benefits that must be preserved. The dispersal of responsibility for election administration** *has made it impossible for a single centrally controlled authority to dictate how elections will be run, and thereby be able to control the outcome.* This leaves the power and responsibility for running elections where it should be, in the hands of the citizens of this country.

H.R. Rep. No. 107-329, at 31–32 (emphases added).

Consistent with that principle, neither the NVRA nor HAVA authorizes the federal government to compile a national voter database. Congress has traditionally "left it up to the States to maintain accurate lists of those eligible to vote in federal elections," *Husted*, 584 U.S. at 761, subject only to the specific requirements of the NVRA and HAVA, which purposefully operate through the states themselves.

## II.    The Department of Justice has embarked on an unprecedented nationwide campaign to amass personal voter data held by the states.

In the spring of 2025, DOJ launched a campaign to obtain broad and unprecedented access to state voter files, including sensitive and personal information about each registered voter. To date, DOJ has sent demands to 44 states and the District of Columbia, with plans to make similar

demands on all 50.[1] The vast majority of states that have received such demands—including those led by Republican officials—have responded by declining to turn over sensitive personal information that is typically protected by state law.[2]

DOJ's nationwide pressure campaign reached Maryland on July 14, 2025, when DOJ sent Administrator DeMarinis a letter demanding, among other things, Maryland's "statewide voter registration list." Compl. at 8, ECF No. 1. Administrator DeMarinis responded two weeks later with an in-depth description of the state's procedures for list maintenance and for accessing the state's publicly available voter registration list. *Id.* ¶ 24; Mot. to Compel, Ex. 2 at 7–11, ECF No. 2-2. In early August, DOJ submitted a request for the voter list using an online application, to which Administrator DeMarinis responded by requesting information from DOJ to determine whether its intended use of the data complied with Maryland law. *See* Mot. to Compel, Ex. 3 at 13–14, ECF No. 2-2. Ignoring Administrator DeMarinis's inquiry, DOJ reiterated its demand in an August 18 letter, *see* Mot. to Compel, Ex. 4 at 16–18, ECF No. 2-2, asking Maryland to produce its entire computerized statewide voter registration list with "*all fields*, which includes the registrant's full name, date of birth, residential address, and his or her state driver's license number or the last four digits of the registrant's social security number," *id.*; *see also* Compl. ¶ 22. Administrator DeMarinis responded on August 25, refusing the demand "absent particularized and

---

[1] *See* Kaylie Martinez-Ochoa, Eileen O'Connor, & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Jan. 23, 2026), https://perma.cc/UHF4-SPUA; Devlin Barrett & Nick Corasaniti, *Trump Administration Quietly Seeks to Build National Voter Roll*, N.Y. Times (Sep. 9, 2025), https://www.nytimes.com/2025/09/09/us/politics/trump-voter-registration-data.html.

[2] *See* Martinez-Ochoa, O'Connor, & Berry, *supra* note 2 (eleven states have reportedly given or intend to give DOJ the information it seeks: Arkansas, Indiana, Kansas, Louisiana, Mississippi, Tennessee, Texas, and Wyoming).

JA171

detailed" explanations of DOJ's need for, and intended use of, the sensitive information. *See* Mot.to Compel, Ex. 5 at 20–22, ECF No. 2-2.

**III.    The Department of Justice filed suit to obtain Maryland's voter registration records.**

It does not appear that DOJ ever provided Administrator DeMarinis with the information he sought. Instead, on December 1, 2025, it filed its Complaint in this action seeking to compel Maryland to provide a copy of its full, unredacted statewide voter registration database. *See generally* Compl. DOJ frames its demand as part of an effort to ensure that Maryland is complying with its list maintenance obligations under the NVRA and HAVA, *id.* ¶¶ 16–23, but fails to assert any claim under either statute. Instead, DOJ asserts a solitary claim under Title III of the Civil Rights Act of 1960: a law that permits DOJ to review certain voting "records and papers which come into [the Administrator's] possession," 52 U.S.C. §§ 20701–20703, for the purpose of enabling investigations "concerning infringement or denial of . . . constitutional voting rights." *Kennedy v. Lynd*, 306 F.2d 222, 228 (5th Cir. 1962). Notably, DOJ previously asserted claims under the NVRA and HAVA in otherwise identical complaints that it brought against multiple other states in September of last year.[3] However, in the following 17 lawsuits that it filed against states seeking the same relief (including this one against Maryland), DOJ has abandoned its NVRA and HAVA claims.[4]

---

[3] *See* Compl., *United States v. Bellows*, No. 25-cv-468 (D. Me. Sep. 16, 2025); Compl., *United States v. Oregon*, No. 25-cv-1666 (D. Or. Sep. 16, 2025); Compl., *United States v. Weber*, No. 25-cv-09149 (C.D. Cal. Sep. 25, 2025); Compl., *United States v. Bd. of Elections of N.Y.*, No. 25-cv-1338 (N.D.N.Y. Sep. 25, 2025); Compl., *United States v. Benson*, No. 25-cv-1148 (W.D. Mich. Sep. 25, 2025); Compl., *United States v. Simon*, No. 25-cv-3761 (D. Minn. Sep. 25, 2025); Compl., *United States v. Scanlan*, No. 25-cv-371 (D.N.H. Sep. 25, 2025); Compl., *United States v. Pennsylvania*, No. 25-cv-1481 (W.D. Pa. Sep. 25, 2025).

[4] *See* Compl., *United States v. Albence*, No. 25-cv-01453 (D. Del. Dec. 2, 2025); Compl., *United States v. DeMarinis*, No. 25-cv-03934 (D. Md. Dec. 1, 2025); Compl., *United States v. Amore*, No. 25-cv-00629 (D.R.I. Dec. 2, 2025); Compl., *United States v. Copeland Hanzas*, No. 25-cv-903 (D.

6

## LEGAL STANDARD

A complaint must be dismissed where it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). At the motion-to-dismiss stage, the Court "must accept as true all of the allegations contained in a complaint" but need not accept the complaint's "legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must contain more than "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 585 (4th Cir. 2015) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). And the "complaint must be dismissed if it does not allege 'enough facts to state a claim to relief that is *plausible* on its face.'" *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).

## ARGUMENT

DOJ's reliance on Title III of the CRA to justify its sweeping demand fails for three independent reasons. First, DOJ has not complied with the basic procedural requirements contained within Title III, namely that it provide Maryland with a proper "basis" and "purpose" for its demand for records. Second, Title III does not preempt Maryland's privacy protections for highly sensitive personal data. And finally, DOJ's attempted collection and maintenance of this

---

Vt. Dec. 2, 2025); Compl., *United States v. Hobbs*, No. 25-cv-6078 (W.D. Wash. Dec. 2, 2025); Compl., *United States v. Oliver,* No. 1:25-cv-01193 (D.M.N. Dec. 2, 2025); Compl., *United States v. Griswold*, No. 25-cv-03967 (D. Colo. Dec. 12, 2025); Compl., *United States v. Nago*, No. 25-cv-00522 (D. Haw. Dec. 12, 2025); Compl., *United States v. Galvin*, No. 25-cv-13816 (D. Mass. Dec. 12, 2025); Compl., *United States v. Aguilar*, No. 25-cv-00728 (D. Nev. Dec. 2, 2025); Compl., *United States v. D.C. Bd. of Elections*, No. 25-cv-04403 (D.D.C. Dec. 18, 2025); Compl., *United States v. Raffensperger*, No. 25-cv-00548 (M.D. Ga. Dec. 18, 2025); Compl., *United States v. Matthews*, No. 25-cv-03398 (C.D. Ill. Dec. 18, 2025); Compl., *United States v. Wis. Elections Comm'n*, No. 25-cv-1036 (W.D. Wis. Dec. 18, 2025); Compl., *United States v. Fontes*, No. 2:26-cv-66 (D. Ariz. Jan. 6, 2026); Compl., *United States v. Thomas*, No. 3:26-cv-21 (D. Conn. Jan. 6, 2026); Compl. *United States v. Beals*, No. 3:26-cv-00042 (E.D. Va. Jan. 16, 2026).

7

JA173

data violates the federal Privacy Act. This court should follow the lead of its sister courts and dismiss the complaint with prejudice. *See Weber*, 2026 WL 118807, at \*20; Minute Entry, *United States v. Oregon*, No. 6:25-cv-01666-MTK (D. Or. Jan. 26, 2026), ECF No. 68.

## I.    DOJ failed to satisfy Title III's threshold requirements of stating a valid "basis" and "purpose" for its demand.

Governmental agencies are "not afforded unfettered authority to cast about for potential wrongdoing." *CFPB v. Accrediting Council for Indep. Colls. & Schs.* ("*ACICS*"), 854 F.3d 683, 689 (D.C. Cir. 2017) (citation modified). Instead, an agency's authority to demand documents and information "is a creature of statute," *CFPB v. Source for Pub. Data, L.P.*, 903 F.3d 456, 458 (5th Cir. 2018), and, as such, it "must comply with statutory requirements," *id.* at 460. If an agency fails to follow the relevant statutory prerequisites for issuing a demand for information, courts will decline to order enforcement. *See, e.g.*, *ACICS*, 854 F.3d at 690 (declining to enforce civil investigative demand where agency failed to comply with statutory requirements).

Title III contains a fundamental requirement that DOJ failed to follow in demanding the data it seeks here: it requires that any request for records "shall contain a statement of the basis *and* the purpose therefor." 52 U.S.C. § 20703 (emphasis added). The use of "and" means that DOJ must provide both. *See United States v. Wayda*, 966 F.3d 294, 307 (4th Cir. 2020) ("[I]t is well-settled that courts should disfavor interpretations of statutes that render language superfluous.") (citation modified). "The requirement that the Attorney General state their purpose and basis is not merely perfunctory—it is a critical safeguard that ensures the request is legitimately related to the purpose of the statute." *Weber*, 2026 WL 118807, at \*9. Indeed, multiple district courts have, in just the past few months, quashed records demands when DOJ sought to assert statutory authority for investigations "far removed from those claimed purposes granted by Congress." *In re Subpoena No. 25-1431-014*, No. 2:25-mc-00039-MAK, 2025 WL 3252648, at \*12, 17 (E.D. Pa.

8

Nov. 21, 2025) (striking DOJ subpoena that "invoke[d] sweeping needs" for information that had "no relevance to the investigation Congress permitted or to the investigation the Department of Justice tells the world it is pursuing"); *see also In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d 229, 237 (D. Mass. 2025) (quashing subpoena when DOJ "failed to show proper purpose" under the statutory scheme, rejecting the notion that "the Government's self-proclaimed say-so" is sufficient to "preclude any form of judicial review").

Title III's "basis" requirement ensures that the federal government will not unduly interfere in the states' traditional oversight of elections unless DOJ is able to state a concrete reason to believe that a state has denied the right to vote or otherwise violated federal voting rights law. *See Basis*, *Black's Law Dictionary* (4th ed. 1968) (including definitions for "basis" such as the "groundwork," "support," or "foundation" of something). This requirement advances public accountability and guards against bad-faith investigations, imposing the very undemanding requirement that DOJ simply be able to articulate *why* it seeks the information it demands. *Cf. ACICS*, 854 F.3d at 691 (concluding that mere citation to statutory provisions in agency's statement failed to sufficiently provide "statutory basis for the Bureau's investigation," "especially considering the Bureau's failure to adequately state 'the specific conduct under investigation'").

Similarly, Title III's "purpose" requirement ensures that the federal government's intentions for the information sought, once acquired, are proper and just, and allows judicial evaluation of whether the demand does in fact comport with the government's stated purpose. *See Purpose*, *Black's Law Dictionary* (4th ed. 1968) (defining "purpose" to include "an end, intention, or aim, object, plan, project"); *cf. ACICS*, 854 F.3d at 689–90 ("Because the validity of a CID is measured by the purposes stated in the notification of purpose, the adequacy of the notification of purpose is an important statutory requirement." (citation omitted)).

9

JA175

To understand the basis and purpose requirements, the Court must "look not only to the particular statutory language, but to the statute as a whole and to its object and policy." *Gaines Motor Lines, Inc. v. Klaussner Furniture Indus., Inc.*, 734 F.3d 296, 303 (4th Cir. 2013). The Court should "account for both the specific context in which language is used and the broader context of the [entire] statute." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (citation modified); *see also Home Depot U.S.A., Inc. v. Jackson*, 587 U.S. 435, 441 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989))). Accordingly, the terms "basis" and "purpose" must be read in the specific context of the Civil Rights Act of 1960, a law that serves the critical but narrow function of ensuring that the voting rights of all citizens receive the protections due under the U.S. Constitution. *See United States v. Ward*, 349 F.2d 795, 804 (5th Cir.) (noting that the purpose of the CRA was to ensure voter laws were enforced "in accordance with constitutional demands"), *modified on reh'g*, 352 F.2d 329 (5th Cir. 1965); *United States v. State of Ala.*, 192 F. Supp. 677, 682 (M.D. Ala. 1961) (noting that the Act was "was adopted to protect the right to vote" when voters faced "discriminatory acts and practices, which acts and practices clearly violate the Constitution and laws of the United States"), *aff'd*, 304 F.2d 583 (5th Cir. 1962), *aff'd sub nom.*, *Ala. v. United States*, 371 U.S. 37 (1962); H.R. Rep. No. 86-956, at 3 (1959) (finding that while "some progress" has been made since the Civil Rights Act of 1957, there was a "need for additional legislation to implement the enforcement of civil rights").

DOJ has yet to cite a single instance in the 65 years of Title III's existence in which a court has read Title III to require the production of records in response to a demand that did not relate to "infringement or denial of . . . constitutional voting rights." *Lynd*, 306 F.2d at 228. Indeed, the

10

JA176

principal authority that DOJ cites in its Complaint confirms that DOJ has previously complied with this statutory requirement. *See id.* at 229 n.6. In *Lynd*, the court recognized that the "basis" of DOJ's demand was "information in the possession of the Attorney General tending to show that distinctions on the basis of race or color have been made with respect to registration and voting within your jurisdiction"; and the "purpose" was "to examine the aforesaid records in order to ascertain whether or not violations of Federal law in regard to registration and voting have occurred." *Id.* (citation modified). Other Title III cases from that period likewise contained an explicit statement of both a "basis" and "purpose" for DOJ's demand. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *In re Coleman*, 208 F. Supp. 199, 199–200 (S.D. Miss. 1962), *aff'd sub nom.*, *Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963). But here, DOJ's demand was deficient on both fronts. *See, e.g.*, *Source for Pub. Data*, 903 F.3d at 460 (declining to enforce a civil investigative demand because "[an agency] must comply with statutory requirements, and here it did not").

### A.    DOJ did not provide any statement of the "basis" for its demand.

Nowhere in its correspondence with Administrator DeMarinis (or in its pleadings) has DOJ provided any basis to believe that Maryland has infringed the voting rights of its citizens.[5] In its

---

[5] Consideration of DOJ's correspondence with the Administrator does not convert this Rule 12 motion to dismiss into a Rule 56 motion for summary judgment. DOJ docketed the correspondence contemporaneously with its Complaint, *see* ECF 2-2, and refers to it in the Complaint. Compl. ¶¶ 21–27. When a Plaintiff cites to a document in its complaint but fails to attach it, "a court may consider [the document] in determining whether to dismiss the complaint because it was integral to and explicitly relied on in the complaint and because the plaintiffs do not challenge its authenticity." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (*citing Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2nd Cir.1991)); *see also Harts v. Calvert Cnty. Sheriff*, No. 8:22-cv-03192-BAH, 2024 WL 944321, at *3 n.3 (D. Md. Mar. 5, 2024) ("When a plaintiff chooses not to attach to the complaint or incorporate by reference a document upon which it solely relies and which is integral to the complaint," other parties may use the document when attacking the complaint for its failure to state a claim, "because plaintiff should not so easily be allowed to escape the consequences of its own failure." (citation modified)).

11

July 14 letter, DOJ cited the NVRA and requested that Maryland provide an explanation for data that DOJ interpreted to suggest Maryland's voter file included individuals who were ineligible to vote. *See* Mot. to Compel, Ex. 1 at 2–5, ECF No. 2-2. But DOJ did not offer that data as evidence that any Marylander had been wrongfully denied the ability to register, vote, or have their vote counted. As in the parallel California suit, "there was no explanation for why unredacted voter files for millions of Californians, an unprecedented request, was necessary for the DOJ's investigation." *Weber*, 2026 WL 118807, at *9. DOJ's bare assertion in its Complaint that its "written demand 'contain[ed] a statement of the basis and the purpose therefor,'" Compl. ¶ 29 (quoting 52 U.S.C. § 20703), is a textbook example of a legal conclusion, unsupported by any factual allegation that cannot defeat a motion to dismiss. *See Rouse v. Moore*, 724 F. Supp. 3d 410, 417 (D. Md. 2024), *appeal docketed*, *Rouse v. Fader*, No. 25-1004 (4th Cir. Jan. 2, 2025).

DOJ's omission of any cognizable basis in its correspondence with the state, complaint, and motion to compel is particularly striking given that Administrator DeMarinis specifically identified this defect in his August 25 letter, noting that DOJ has provided "no basis for suspecting any shortcoming or failure in Maryland's HAVA compliance" and that the state had already "detailed its compliance with the NVRA." Mot. to Compel, Ex. 5 at 21. To date, DOJ has made what appear to be near carbon copy demands to 44 other states and has sued 24 of those states (as well as the District of Columbia) with complaints that contain nearly identical boilerplate claims and allegations as here. *See supra* Background §§ II, III. In no case does it appear that DOJ has asserted a basis for investigating any of these states for any violation of voting rights. But rather than remedy its error and explain the basis for its Maryland investigation in response to the Administrator's well-grounded objections, DOJ jumped straight to filing this lawsuit. That deficiency warrants dismissal.

B.    **DOJ did not provide a proper "purpose" for its demand.**

Separate and independent from its failure to provide any basis for its demand, DOJ's claim must also be dismissed because it failed to articulate a proper purpose. While Congress enacted the record retention provisions of Title III "to secure a more effective protection of the right to vote," *Alabama ex rel. Gallion v. Rogers*, 187 F. Supp. 848, 853 (M.D. Ala. 1960), *aff'd sub nom.*, *Dinkens v. Att'y Gen. of U.S.*, 285 F.2d 430 (5th Cir. 1961); *see also* H.R. Rep. No. 86-956, at 7 (explaining Congress enacted Title III to aid DOJ "during any investigation it may conduct on complaints of a denial to vote"), DOJ *admits* that it is *not* seeking Maryland's statewide voter registration list for that reason. Rather, DOJ seeks to "ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." Compl. ¶ 25. That purpose, however, is beyond the scope of the CRA. "Title III was not passed as a tool for NVRA compliance." *Weber*, 2026 WL 118807, at *9. And "driver's license numbers and partial social security numbers were not required for voter registration until the passage of HAVA in 2002 so Congress could not have conceived for this highly sensitive information to be at the DOJ's disposal through the passage of Title III four decades prior." *Id.*

Further, even if ascertaining Maryland's compliance with the NVRA and HAVA were permissible grounds for invoking Title III, "DOJ states no reason why an *unredacted* version of [Maryland's] voter list is necessary." *Id.* (emphasis added). Both the NVRA and HAVA grant states broad discretion in list maintenance: State efforts under the NVRA need only be "reasonable," 52 U.S.C. § 20507(a)(4), and HAVA explicitly commits "specific choices . . . to the discretion of the State," *id.* § 21085. In response to DOJ's HAVA and NVRA inquiries, Administrator DeMarinis offered pages of detailed responses with exacting descriptions of the state's voter roll maintenance procedures. Mot. to Compel, Ex. 2 at 7–11. Administrator DeMarinis also repeatedly requested that DOJ state the purpose for which the list would be used—seeking

13

JA179

nothing more than what DOJ was required to provide under Title III—but DOJ never explained why it believes it requires particularly sensitive information about voters. Mot. to Compel, Ex. 3 at 13; *id.,* Ex. 5 at 20. And even in its Complaint, DOJ still fails to advance any reasonable basis or purpose that can justify its sweeping demand. *See In re Subpoena No. 25-1431-014*, 2025 WL 3252648, at *17; *In re Admin. Subpoena No. 25-1431-019*, 800 F. Supp. 3d at 237.

**II.     Title III does not pre-empt Maryland's privacy protections.**

Administrator DeMarinis explained to DOJ the process for obtaining publicly available data in the statewide voter registration list, which is subject to strict restrictions against using the list "for a purpose that results in or has the intent to result in the denial or abridgment of the right of a Maryland citizen to vote or causes a qualified voter to be stricken from [the] voter registration list." Mot. to Compel, Ex. 5 at 21. Numerous Maryland laws and regulations prohibit the State from sharing sensitive personal information that is withheld from the publicly available voter list. By statute, the State Board of Elections that maintains the voter file "may not disclose data" in the voter file "except as provided by" the Public Information Act. MD Code Ann., Election Law § 3-101(e)(2). That Act, in turn, requires custodians to "deny inspection of the part of a public record that contains sociological information," MD Code Ann., Gen. Provisions § 4-330, which is defined to include Social Security numbers, driver's license numbers, and dates of birth, MD Code Regs. 02.06.01.17; *see also* MD Code Ann., State Gov't § 10-1301(c)(1) (defining "Personal Information" to include Social Security and driver's license numbers); *id.* § 10-1304(a) (requiring "reasonable security procedures and practices and procedures" to protect personal information). Maryland even requires a statement on the voter registration application that "voter registration records are generally available for public inspection," "*except for* an applicant's full Social Security number or [driver's license] number." MD Code Regs. 33.05.02.02(B)(5) (emphasis

added). Accordingly, for DOJ to access this information, it must show that Title III preempts Maryland's privacy protections. It does not.

Because Title III contains no *express* preemption provision, *see* 52 U.S.C. § 20703, DOJ's argument must rest on the idea that Maryland's privacy protections *impliedly* conflict with Title III, *see generally Atl. Coast Pipeline, LLC v. Nelson Co. Bd. of Supervisors*, 443 F. Supp. 3d 670 (W.D. Va. 2020) (discussing express versus implied preemption). The Fourth Circuit and the Supreme Court have made clear that "a federal statute is presumed not to preempt a state provision." *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025) (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)); *see* Antonin Scalia & Brian A. Garner, *Reading Law* 290 (2012) ("It is a reliable canon of interpretation . . . to presume that a federal statute does not preempt state law."). Although the presumption against preemption "does not hold when Congress acts under the Elections Clause, which empowers Congress to make or alter state elections regulations," *Pub. Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 51–52 (1st Cir. 2024) (citation modified), or when Congress otherwise regulates the mechanics of the voting process, Title III addresses only the retention, maintenance, and disclosure of records; it does not target any state election regulations or practices, nor does it implicate any voting requirements. Accordingly, the presumption applies here. *See Tarrant Reg'l Water Dist. v. Herrmann*, 656 F.3d 1222, 1242 (10th Cir. 2011) ("In all pre-emption cases . . . we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (quoting *Medtronic*, 518 U.S. at 485)).

Title III does not evince a "clear and manifest purpose" that Congress intended to preempt state privacy laws that protect highly sensitive information. To the contrary, in the principal case DOJ cites in its Complaint, the Fifth Circuit explained that Title III is intended to reach *only* "public

15

JA181

records which ought ordinarily to be open to legitimate reasonable inspection," but not "confidential, private papers and effects." *Lynd*, 306 F.2d at 231. The information that DOJ seeks here is not of the type ordinarily "open to legitimate reasonable inspection," *id.*; instead, DOJ seeks obviously sensitive information that enjoys strong privacy protection under both federal and state law, *see Weber*, 2026 WL 118807, at *9 (recognizing that this "sensitive and identifying information is private and not open to inspection by federal officials").

Further confirmation that Title III does not preempt Maryland's privacy protections may be found in the judicial consensus that a similar disclosure requirement in the NVRA likewise does *not* preempt state laws protecting the same highly sensitive categories of information that DOJ seeks here. *See id.* at *13 (finding that, even if the NVRA might require disclosure of records under some circumstances, "California's privacy laws would not be preempted"). Both Title III and the NVRA require disclosure of certain records relating to voter registration, and they employ similar language to do so. *Compare* 52 U.S.C. § 20703 (Title III: covered voting records held by a state election official "shall, upon demand in writing by the Attorney General . . . be made available for inspection"), *with* 52 U.S.C. § 20507(i) (NVRA: requiring that states "shall make [covered voting records] available for public inspection"). Yet multiple courts—including the Fourth Circuit—have held that the NVRA does *not* prohibit States from restricting access to precisely the information that DOJ seeks. *See Pub. Int. Legal Found., Inc. v. N.C. State Bd. of Elections*, 996 F.3d 257, 268 (4th Cir. 2021) (recognizing the NVRA permits redactions to "protect sensitive information"); *Project Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (affirming district court order to redact social security numbers before disclosure under NVRA); *Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 446 (D. Md. 2019) (ordering disclosure of records "subject to compliance with the relevant state law"); *see also Voter Reference Found., LLC*

16

JA182

*v. Torrez*, 160 F.4th 1068, 1083 n.14 (10th Cir. 2025) ("To the extent the State wishes to redact appropriate personal information before providing the voter data, the NVRA does not prohibit that limitation."); *Bellows*, 92 F.4th at 56 ("[N]othing in the text of the NVRA prohibits the appropriate redaction of uniquely or highly sensitive personal information in the Voter File."); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp. 3d 932, 942 (C.D. Ill. 2022) (holding the NVRA permits "proper redaction of highly sensitive information"); *Project Vote, Inc. v. Kemp*, 208 F. Supp. 3d 1320, 1344 (N.D. Ga. 2016) (holding the NVRA "does not require the disclosure of sensitive information that implicates special privacy concerns," including telephone numbers, partial social security numbers, partial email addresses, and birth dates); *True the Vote v. Hosemann*, 43 F. Supp. 3d 693, 739 (S.D. Miss. 2014) (holding the NVRA "does not require the disclosure of unredacted voter registration documents, including voter registrant birthdates"); *Project Vote/Voting For Am., Inc. v. Long*, 752 F. Supp. 2d 697, 711 (E.D. Va. 2010) (holding the NVRA permits redacting social security numbers).

This conclusion is reinforced by analyzing the choices Congress made when it enacted the NVRA and HAVA. Recall that DOJ's stated purpose for its demand here for personal and highly sensitive voter information is purportedly to evaluate Maryland's compliance with its list maintenance obligations under those statutes. Compl. ¶ 20. But if Congress had thought that it was necessary or desirable for DOJ to have access to a database containing highly sensitive information about every voter in a state so that it would be able to ensure that the state was complying with its list maintenance obligations, it would have done so in *the NVRA and HAVA themselves*. Congress did not. In fact, Congress created a *different* mechanism meant to ascertain states' compliance with list maintenance obligations: the NVRA inspection provision, located at 52 U.S.C. § 20507(i). Congress "envisioned" this provision to allow for "critical scrutiny and public audits of voter

data"—but nonetheless did not prevent states from redacting sensitive voter data. *Voter Reference Found.*, 160 F.4th at 1082 & 1083 n.14. Congress specified only that records subject to inspection must include the "names and addresses" of certain voters, 52 U.S.C. § 20507(i)(2), but stopped short of requiring states to go beyond that and disclose sensitive voter information. *See supra* at 16–18. As for HAVA, it contains no disclosure provision at all, and instead explicitly confirms that voter registration lists must be "maintained" and "administered at the State level"—not by the federal government. 52 U.S.C. § 21083(a)(1)(A). In short, it simply makes no sense to suggest that Congress intended Title III to preempt state privacy laws protecting highly sensitive voter data so that the federal government can assess compliance with voter list maintenance under the NVRA and HAVA—both statutes reflect a congressional judgment *not* to preempt such laws.

**III.    DOJ has failed to comply with the Privacy Act, which independently requires dismissal.**

The Privacy Act, codified at 5 U.S.C. § 552a, *et seq.*, "offers substantial protection[] regarding governmental use and retention of identifiable personal information." *League of Women Voters v. U.S. Dep't of Homeland Sec.*, No. 25-cv-3501, 2025 WL 3198970, at *1 (D.D.C. Nov. 17, 2025). It does so in part by "adopt[ing] procedural safeguards when the records maintained by a federal agency, *i.e.*, a 'system of records,' are changed or used in a new way." *Id.* at *2 (quoting 5 U.S.C. § 552a(a)(5), (e)). In its rush to sweep up the sensitive information of every registered voter in Maryland, DOJ overlooked the Privacy Act's basic procedural requirements, despite Administrator DeMarinis's express request for information about DOJ's compliance efforts. *See* Mot. to Compel, Ex. 5 at 20. As a result, the Privacy Act independently prohibits DOJ from obtaining Maryland's statewide voter registration list.

The Privacy Act imposes certain obligations on any agency that "maintains" a "system of records." *See* 5 U.S.C. § 552a(e). Both of those terms are given specific definitions by the statute.

18

JA184

A "system of records" is defined as "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual." *Id.* § 552a(a)(5); *see also id.* § 552a(a)(4) (defining "record" to include "any item, collection, or grouping of information about an individual that is maintained by an agency . . . that contains his name, or the identifying number . . . or other identifying particular assigned to the individual"). Maryland's statewide voter registration list, which contains the names of all registered voters in the state as well as their voter registration identifiers and other identifying information, plainly qualifies as a "system of records" under the Privacy Act. The term "maintain" is defined to include "maintain, collect, use, or disseminate." *Id.* § 552a(a)(3). Accordingly, if DOJ were to "collect," "use," or "maintain" Maryland's statewide voter registration list, the obligations imposed by subsection (e) are triggered. *See id.* § 552a(e)(4); *Weber*, 2026 WL 118807, at *17 (noting that DOJ's request for voting records "includes a litany of personal and sensitive information that is governed by the Privacy Act").

Most relevant here, the Privacy Act requires that "when an agency 'establish[es] or revis[es]' any 'system of records,' it must 'publish in the Federal Register . . . a notice of the existence and character of the system of records,' *i.e.*, a System of Records Notice (SORN)." *League of Women Voters*, 2025 WL 3198970, at *2 (alterations in original) (quoting 5 U.S.C. § 552a(e)(4)). A SORN must include, among other things, the name and location of the system, the categories of individuals on whom records are maintained in the system, the categories of records maintained in the system, and all "routine uses" to which the system can be put as well as the "categories of users and the purpose of such use." *Id.*

19

JA185

DOJ does not appear to dispute that the Privacy Act is applicable to its collection of voter data, nor that DOJ must publish a SORN that would apply to voter registration lists. Yet the Complaint is bereft of any allegations that an appropriate SORN has been published. DOJ has alleged in parallel litigation in other states that a SORN they identified as "JUSTICE/CRT – 001," the "Central Civil Rights Division Index File and Associated Records," supplies the requisite authority. *E.g.*, Complaint ¶ 23, *United States v. Oliver,* No. 1:25-cv-1193 (D.M.N. Dec. 2, 2025), ECF No. 1. But even if DOJ had included that allegation in Maryland, it would have been insufficient. That SORN does not extend to statewide voter registration lists. It notifies the public that the categories of individuals covered by the system may include "[s]ubjects of investigations, victims, [and] potential witnesses," in addition to other categories not relevant here. *Privacy Act of 1974; System of Records*, 68 Fed. Reg. 47610, 47611 (Aug. 11, 2003). It "does nothing to put a member of the American public on notice that specifically, their voter registration data is going to be collected on an unprecedented level." *Weber*, 2026 WL 118807, at *18.[6]

Congress enacted these privacy protections to "permit an individual to determine what records pertaining to him are collected, maintained, used, or disseminated by federal agencies" and to "ensure adequate safeguards are provided to prevent misuse of such information." *League of Women Voters*, 2025 WL 3198970, at *2 (citation modified). If DOJ wishes to compile a federal database of registered voters, the Privacy Act requires (at a minimum) that DOJ give the public adequate notice about its intention to do so, by publishing a SORN that accurately discloses the

---

[6] DOJ's complaints seeking the same information from other states have also cited two other notices in the Federal Register, but they, too, fail to "give sufficient notice to the American public as required under the Privacy Act." *Weber*, 2026 WL 118807, at *18. The first simply adds an additional, allowable "routine use" to the SORN that is not applicable here. *See Privacy Act of 1974; System of Records,* 70 Fed. Reg. 43904 (July 20, 2005). The second adds a blanket routine use to all DOJ SORNs that is relevant in the event of a data breach. *See* 82 Fed. Reg. 24147 (May 25, 2017).

20

system of records it intends to create and the uses to which it will put that information. *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 763 (D. Md. 2025); *Pippinger v. Rubin*, 129 F.3d 519, 527 (10th Cir. 1997) (noting the Privacy Act "requir[es] publication of the establishment and existence of a government-maintained 'system of records'" and that agencies "publish in the Federal Register notice of revisions in the *character* of existing systems of records" ); *see also* 5 U.S.C. § 552a(e)(4); *id.* § 552a(e)(11) (requiring a 30-day notice period "of any new use or intended use of the information in the system," to "provide an opportunity for interested persons to submit written data, views, or arguments to the agency").

Finally, there is no impediment to the Court dismissing the Complaint based on DOJ's failure to comply with the Privacy Act. Even if the Court construes this argument as an affirmative defense, "where the allegations of the complaint give rise to an affirmative defense, the defense may be raised under Rule 12(b)(6)." *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993). Here, the Complaint clearly alleges DOJ's intention to create a system of records that requires compliance with the Privacy Act. Its failure to comply with that Act independently warrants dismissal.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

21

JA187

Respectfully submitted,                    Dated: January 30, 2026

                                           /s/ Uzoma N. Nkwonta
                                           Uzoma N. Nkwonta*
                                           Jacob D. Shelly (D. Md. Bar No. 30972)
                                           Tina Meng Morrison (D. Md. Bar No. 21832)
                                           Marcos Mocine-McQueen*
                                           **ELIAS LAW GROUP LLP**
                                           250 Massachusetts Ave NW Suite 400
                                           Washington, D.C. 20001
                                           Telephone: (202) 968-4490
                                           unkwonta@elias.law
                                           jshelly@elias.law
                                           tmengmorrison@elias.law
                                           mmcqueen@elias.law

                                           * Admitted *pro hac vice*

                                           *Counsel for Proposed Intervenor-Defendant
                                           the Maryland/DC Alliance for Retired
                                           Americans*

22

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JARED DEMARINIS in his official capacity as STATE ADMINISTRATOR of Elections for the State of Maryland,<br><br>Defendant. | Case No. 1:25-cv-03934-SAG<br><br><br><br>DECLARATION OF ERIC NEFF IN SUPPORT OF THE DEMAND TO COMPEL PRODUCTION OF RECORDS PURSUANT TO 52 U.S.C. § 20701, *et seq*. |

**DECLARATION OF ERIC NEFF IN SUPPORT OF THE UNITED STATES'
MOTION TO COMPEL (DOC. 2) AND IN OPPOSITION TO DEFENDANT'S
MOTION TO DISMISS (DOC. 34)**

**<u>DECLARATION</u>**

I, Eric Neff, declare, pursuant to 28 U.S.C. § 1746, that:

1.      I am currently Acting Chief to the Voting Section within the Civil Rights Division of the United States Department of Justice. I am fully and personally familiar with the facts stated herein. I make this declaration in support of the United States' Motion to Compel the production of election records pursuant to the Civil Rights Act codified at 52 U.S.C. §§ 20701, and in opposition to Defendant's Motion to Dismiss and Response in Opposition to the Motion to Compel (ECF No. 34-35), the combined Motion to Dismiss by Intervenor-Defendants Common Cause and Out for Justice ("Common Cause Intervenors") (ECF No. 43); and (3) the Motion to Dismiss by Intervenor-Defendant Maryland/DC Alliance for Retired Americans Educational Fund ("Alliance Intervenors") (ECF No. 50), and to supplement the Riordan Declaration dated December 1, 2025 (ECF No. 2:3).

1

JA189

2.      As stated in the correspondence dated July 14, 2025 and August 18, 2025, attached to Mot. to Compel (ECF No. 2:2) as Exhibits 1 and 4 in reference to the Riordan Decl.(ECF No. 2:3), the United States has requested the federal election records that are the subject of this litigation for the limited purpose of evaluating Maryland's compliance with the list maintenance provisions of the Help America Vote Act ("HAVA") and the National Voter Registration Act ("NVRA"), and, if appropriate, to bring an enforcement action.

3.      HAVA requires that "an application for voter registration for an election for Federal office may not be accepted or processed by a State unless the application includes" the applicant's driver's license number or if that is unavailable, the last four digits of the Social Security number. 52 U.S.C. § 21083(a)(5)(A)(i). That information is necessary to identify duplicate registration records, registrants who have moved, registrants who have died, and those who are not eligible to vote in federal elections.

4.      To ascertain whether a jurisdiction engages in practices that violate federal law (whether HAVA, the NVRA, the Voting Rights Act or any other one), the Attorney General needs to examine both applications to register to vote *and* the final voting rolls, including the electronic statewide voter registration list ("SVRL"), so as to assure herself that the applications are being properly processed and that reasonable and nondiscriminatory list maintenance efforts have been practiced.

5.      Contrary to what Administrator DeMarinis and Defendant-Intervenors contend through third-party hearsay, the records the United States is seeking to compel under the CRA are not intended "to collect voter registration databases from every state [in] an effort to create 'a centralized federal database' for broader immigration enforcement purposes." Defendant's Mot., ECF 34 at 9; *see also* Common Cause's Mot., ECF 43 at 17 (same); Alliance's Mot., ECF 50 at 1. Rather, the records sought from Maryland are necessary to perform an individualized assessment of the State's efforts to comply with HAVA and the NVRA.

6.      When the Civil Rights Division performs this individualized assessment, the State's SVRL is compartmentalized and maintained by the Civil Rights Division separately from the SVRL of any other State. The maintenance, use, and destruction of those records is in full

compliance with the requirements in the CRA, Privacy Act, and all other federal laws governing the records.

7.    This is the first Administration to request the SVRL from states nationwide (except North Dakota) to verify enforcement of HAVA's driver's license and SSN4 requirement pursuant to 52 U.S.C. § 21083(a)(5)(A).

8.    The United States previously has pursued successful matters, including in litigation, to obtain statewide voter registration lists under Title III of the Civil Rights Act ("CRA"). For example, in two of those CRA matters against Georgia and Texas, the United States obtained the SVRLs, including drivers' license numbers and last four digits of the registrant's social security number, to evaluate compliance with the NVRA, including that Act's list maintenance requirements.

9.    The Texas matter was resolved by a Memorandum of Understanding ("MOU") dated May 13, 2008, which required Texas to produce its SVRL to the United States. A true and accurate copy of the Texas MOU is attached as Exhibit 7.

10.    A true and accurate copy of the Complaint filed in *United States v. Georgia*, Case No. 1:06-cv-02442-CC (N.D. Ga. filed Oct. 12, 2006), is attached as Exhibit 8.

11.    On October 27, 2006, the Court entered a Consent Decree in *Georgia* requiring the state to produce its SVRL to the United States. A true and accurate copy of the *Georgia* Consent Decree is attached as Exhibit 9.

12.    Recent enforcement efforts by the Attorney General demonstrate the need for federal scrutiny, as Congress contemplated in authorizing the Attorney General to bring enforcement actions under HAVA and the NVRA.

13.    In 2025, North Carolina election officials admitted that the state "maintained and used a HAVA List that includes records that do not comply with the requirements for Federal elections under Section 303(a)(5)." *See United States v. N. Carolina Bd. of Elections*, Case No. 5:25-cv-283-M (E.D.N.C.), Consent J. & Order at 4 (E.D.N.C. Sept. 8, 2025). Specifically, the State's HAVA List included over one hundred thousand active voter records that were missing one of the identification numbers required by HAVA: the registrant's driver's license number, the last

JA191

four numbers of the registrant's social security number, or a unique identifying number if the registrant had neither a driver's license nor a social security number. A true and accurate copy of the *North Carolina* Consent Judgment and Order is attached as Exhibit 10.

14.    As a result of the Attorney General's enforcement action, North Carolina has reduced the number of voter records missing an identification number under HAVA from 103,329 to 70,709. *See N. Carolina Bd. of Elections*, Defs.' 2d Status R. at 2 (E.D.N.C. Jan. 30, 2026). A true and accurate copy of the Second Status Report from the *North Carolina* litigation is attached as Exhibit 11.

15.    As stated in the initial Declaration, the United States has reached out to states, including Maryland, to address any reasonable privacy concerns without impeding the Attorney General's authority to enforce federal law.

16.    To that end, the United States has offered states an MOU memorializing these requirements. As of February 11, 2026, nineteen states either have provided their SVRL or indicated they will be doing so including: eleven states that have provided their SVRLs without any MOU; two states that have agreed to provide their SVRL under the terms of the MOU; and six states that have indicated their intention to provide the SVRLs in the near future.

17.    A true and accurate copy of the Order (ECF No. 73) issued in *United States v. Oregon*, Case No. 6:25-cv-01666-MTK (D. Or. Feb. 5, 2026), is attached as Exhibit 12.

18.    A true and accurate copy of the Opinion (ECF No. 68) issued in *United States v. Benson*, Case No. 1:25-cv-01148-HYJ-PJG (W.D. Mich. Feb. 10, 2026), is attached as Exhibit 13.

19.    A true and accurate copy of cited excerpts from the report by the National Commission on Federal Election Reform (the Ford-Carter Commission), entitled "To Assure Pride and Confidence in the Electoral Process (Aug. 2001)," is attached as Exhibit 14.

20.    A true and accurate copy of the Order (ECF No. 128) issued in *United States v. Weber*, Case No. 2:25-cv-09149-DOC-ADS (C.D. Cal. Jan. 15, 2026), is attached as Exhibit 15.

21.    A true and accurate copy of the Order (ECF No. 49) issued in *United States v. Raffensperger*, Case No. 5:25-cv-548-CAR (M.D. Ga. January 23, 2026), is attached as Exhibit 16.

JA192

I declare under the penalty of perjury that the above statements are true and correct. Executed on February 13, 2026.

Dated: February 13, 2026, at Washington, D.C.

_/s/Eric Neff_
Eric Neff

JA193

UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No. 1:25-cv-03934-SAG |
| Plaintiff, | |
| v. | |
| JARED DEMARINIS in his official capacity as STATE ADMINISTRATOR of Elections for the State of Maryland, | UNITED STATES' RESPONSE TO NOTICE OF SUPPLEMENTAL AUTHORITY |
| Defendant. | |

The United States respectfully submits this response to Intervenor-Defendant Maryland/DC Alliance for Retired Americans' Notice of Supplemental Authority, Dkt. 65. In *nited tate al in*, No. 25-13816, 2026 WL 972129 (D. Mass. Apr. 9, 2026) (*al in*), the District Court ruled that Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. § 20703, requires that the Attorney General's written demand for records must provide a "*fa t al* basis," not just a legal basis, to support a demand. *al in*, at \*3 (emphasis added). *al in* acknowledged that in *enned nd*, 306 F.2d 222, the stated basis for the demand was merely that there was "information in the possession of the Attorney General tending to show that" the states were violating the law. *d*. at 229 n. 6. Nevertheless, *al in* ruled that the Attorney General's written demand letters did not provide a factual basis that satisfied *nd*. *ee al in*, at \*4. The United States respectfully disagrees with *al in*'s overly formalistic interpretation of CRA procedure. Another out-of-circuit district noted in a footnote that a similar pair of demand letters "collectively put [the State] on notice of the basis and purpose of its request, which is sufficient to comply with

JA194

the CRA." *nited tate en n*, No. 25-1148, 2026 WL 362789, at *8, fn. 3 (W.D. Mich. Feb. 10, 2026), *a eal d eted* Feb. 27, 2026. If the Court is persuaded by *al in* formalistic approach, the United States requests that the Court provide leave for the United States to send the Defendants a curing elaboration letter rather than dismiss on the merits to avoid unnecessary delay in resolution of the underlying legal issues.[1]

Dated: April 13, 2026

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General
Civil Rights Division

ROBERT J. KEENAN
Acting Deputy Assistant Attorney General
Civil Rights Division

ERIC V. NEFF
Acting Chief, Voting Section

/s/ Joseph W. Voiland
BRITTANY E. BENNETT
JOSEPH W. VOILAND
Civil Rights Division
4 Constitution Square
Washington, D.C. 20002

---

[1] Judge Kari A. Dooley, United States District Judge for the District of Connecticut, suggesting the requisite cure for any alleged deficiency in the written demand, said: "If . . . I find the [written demand] letter does not meet the requisites for a court order, aren't we just back here in six months after a new letter has been sent " *nited tate a* , No. 3:26-cv-00021-KAD, Tr. of Oral Arg. 85:19-22 (D. Conn. Mar. 19, 2026) (attached as Ex. 1).

JA195

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>JARED DEMARINIS, in his official capacity as Secretary of State for the State of Maryland<br><br>Defendant(s). | Case Number: 1:25-cv-03934 |

**NOTICE OF APPEAL**

Plaintiff, United States of America, by and through the Attorney General, appeals to the United States Court of Appeals for the Fourth Circuit from this Court's Order Denying the United States' Motion to Compel and Granting Defendant's Motion to Dismiss (ECF No. 92) and Memorandum Opinion (ECF No. 91) entered in this action on June 18, 2026.

[Signatures Next Page]

JA196

Respectfully Submitted,                    July 6th, 2026


                                           HARMEET K. DHILLON
                                           Assistant Attorney General
                                           Civil Rights Division

                                           JESUS A. OSETE
                                           Principal Deputy Assistant Attorney General
                                           Civil Rights Division

                                           WILLIAM MORHMAN
                                           Senior Counsel

                                           ANDREW BRANIFF
                                           Acting Chief, Appellate Section

                                           ERIC V. NEFF
                                           Acting Chief, Voting Section

                                           /s/ *Jonathon P. Hauenschild*
                                           JONATHON P. HAUENSCHILD
                                           Trial Attorney
                                           Civil Rights Division
                                           Voting Section
                                           U.S. Department of Justice
                                           4 Constitution Square
                                           150 M St. NE, 8th Floor
                                           Washington, D.C. 20002
                                           Jonathon.Hauenschild@usdoj.gov
                                           202-215-2110

                                           *Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2026, a true and correct copy of the foregoing document was served via the Court's ECF system to all counsels of record.

/s/ Jonathon P. Hauenschild
Jonathon P. Hauenschild
Trial Attorney
Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, 8th Floor
Washington, D.C. 20002
Jonathon.Hauenschild@usdoj.gov