**No. 26-1878**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,

*Plaintiff-Appellant*,

– v. –

JARED DEMARINIS, in his official capacity as State Administrator of Elections for the State of Maryland,

*Defendant-Appellee*

MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; OUT FOR JUSTICE, INC.; CARL SNOWDEN; MYRIAM PAUL; LUIS SIMS,

*Intervenors-Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# BRIEF OF *AMICUS CURIAE* LIBERTY LEGAL FOUNDATION IN SUPPORT OF PLAINTIFF-APPELLANT AND REVERSAL

Stacey Bucci
LIBERTY LEGAL FOUNDATION
P.O. Box 443
Bennington, Vermont 05201
518-407-3020
stacey@libertylegalusa.org

Ronald D. Coleman
COLEMAN LAW FIRM, PC
50 Park Place
Newark, New Jersey 07102
973-264-9611
rcoleman@colemanlaw-pc.com

*Counsel for Amicus Curiae*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 26-1878 Caption: USA v. JARED DEMARINIS ET AL.

Pursuant to FRAP 26.1 and Local Rule 26.1,

LIBERTY LEGAL FOUNDATION
(name of party/amicus)

who is AMICUS, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity? ☐ YES ☑ NO

2. Does party/amicus have any parent corporations? ☐ YES ☑ NO
If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐ YES ☑ NO
If yes, identify all such owners:

4. Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
If yes, identify entity and nature of interest:

5. Is party a trade association? (amici curiae do not complete this question) ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6. Does this case arise out of a bankruptcy proceeding? ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7. Is this a criminal case in which there was an organizational victim? ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Ronald D. Coleman Date: August 17, 2026

Counsel for: Amicus Curiae

## TABLE OF CONTENTS

**PAGE**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES .......... i

INTEREST OF AMICUS CURIAE .......... 1

INTRODUCTION .......... 2

ARGUMENT

I. CONGRESS'S ELECTIONS CLAUSE AUTHORITY AND THE SUPREMACY CLAUSE FORBID STATES FROM USING CUSTODYOF ELECTION RECORDS TO FRUSTRATE FEDERAL ENFORCEMENT .......... 4

II. EXCLUDING THE OFFICIAL STATEWIDE VOTER REGISTRATION LIST FROM TITLE III CREATES AN ENFORCEMENT VACUUM CONGRESS ENACTED TITLE III TO PREVENT .......... 7

III. THE SVRL IS NOT MERELY AN ADMINISTRATIVE CONVENIENCE .......... 10

IV. AN ENFORCEMENT VACUUM IS A PRACTICAL GREEN LIGHT TO EVADE FEDERAL ELECTION LAW .......... 12

V. THE SVRL IS THE OFFICIAL ADMINISTRATIVE RECORD OF VOTER REGISTRATION, NOT AN EXTRA-STATUTORY STATE-CREATED ARTIFACT .......... 13

VI. TITLE III'S HISTORY CONFIRMS THAT CONGRESS INTENDED FEDERAL ACCESS TO RECORDS THROUGH WHICH ELECTION OFFICIAL ADMINISTERED REGISTRATION .......... 15

VII. EFFECTIVE ENFORCEMENT REQUIRES ACCESS TO THE STATEWIDE SYSTEM AND ITS SUPPORTING ADMINISTRATIVE RECORDS .......... 17

CONCLUSION .......... 21

## TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013)................ 4

*Cooper v. Aaron*, 358 U.S. 1 (1958).................................................6

*Ex parte Siebold*, 100 U.S. 371 (1879) .............................................. 5

*Foster v. Love,* 522 U.S. 67 (1997).................................................. 4

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ..................................... 7, 22

UNITED STATES CONSTITUTION

U.S. Const. art. I, § 4, cl. 1 ("Elections Clause") ...................... 3, 4, 5, 6, 7, 22
U.S. Const. art. VI, cl. 2 ("Supremacy Clause")......................... 3, 4, 5, 6, 22

STATUTES

Civil Rights Act of 1960
Pub. L. No. 86-449, title III, 74 Stat. 86, 88–89 (codified
at 52 U.S.C. 20701–20706)...................................... *passim*
52 U.S.C. 20701 ............................................................ 5, 13
52 U.S.C. 20703 .............................................................. 5
52 U.S.C. 20705 .............................................................. 5

Help America Vote Act
Pub. L. No. 107-252, 116 Stat. 1666 (codified
at 52 U.S.C. 20901–21145)...................................... *passim*
52 U.S.C. 21083.............................................................. 5
52 U.S.C. 21083(a)(1)(A) ............................................ 3, 10, 14
52 U.S.C. 21083(a)(2)...................................................... 17

**PAGE**

**STATUTES (cont.)**

National Voter Registration Act
Pub. L. No. 103-31, 107 Stat. 77 (codified as amended at
52 U.S.C. 20501–20511)……………………………… … *passim*
52 U.S.C. 20507 ……………………………………..……………… 5
52 U.S.C. 20507(a)(4) ……………………………………..……… 17

RULE

Fed. R. Civ. P. 37(e) ..……………………………………………………… 10

MISCELLANEOUS

U.S. Comm'n on Civil Rights, *Report of the United States Commission on Civil Rights* (1959)…………………………..……………… 15, 16

White House Government Transparency Task Force,
*Transparency Statement* (July 13, 2026),
[https://www.whitehouse.gov/wp-content/uploads/2026/07/Chinas-Acquisition-and-Exploitation-of-American-Voter-Data.zip] ….…..10, 11

## INTEREST OF AMICUS CURIAE[1]

Liberty Legal Foundation ("Liberty Legal") is a Delaware corporation exempt from income tax under 26 U.S.C. § 501(c)(3). It is a nonprofit public interest organization whose mission is to promote the rule of law, protect due process, and defend equal protection under the Constitution. This case presents legal questions central to the administration of federal election law and to Liberty Legal's ongoing election-related work. Liberty Legal works closely with organizations dedicated to election integrity and security as well as with attorneys who are engaged in the subject matter. Liberty Legal and its Maryland supporters are vitally concerned with the outcome because it affects the integrity and security of federal elections in the State.

Liberty Legal writes to encourage the First Circuit to reverse the decision by the District Court of Maryland so that the United States[2] can obtain the records necessary to enforce federal election law.

Liberty Legal therefore has a substantial institutional interest in the outcome of this case. Liberty Legal submits this brief solely to aid the Court's consideration

---

[1] No party's counsel authored the brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting this brief; and no person other than the amicus curiae, its members, or its counsel contributed money that was intended to fund preparing or submitting the brief.

[2] "Attorney General," "United States," "USA," "Department of Justice," and "DOJ" are used interchangeably throughout this brief.

of the matter. Its brief offers legal analysis and insights into the dispositive issues involved in the District Court case that are not merely duplicative of the parties' arguments. As a nonpartisan organization, it does not support or oppose any political party or candidate and participates only to advance its commitment to the rule of law.

This case concerns whether the Attorney General may inspect Maryland's official statewide voter registration list ("SVRL") under Title III of the Civil Rights Act of 1960.[3] The question is consequential not only to Maryland's administration of federal elections but also to Congress's constitutional authority to enact — and the United States' ability to enforce — uniform federal laws governing voter registration, list maintenance, records retention, and election administration.

*Amicus* submits this brief to address the constitutional structure, historical purpose, and practical enforcement consequences of the district court's categorical exclusion of the statewide registration system from Title III.

## INTRODUCTION

Congress did not enact Title III of the Civil Rights Act of 1960 so that federal election law could be enforced only when state election officials voluntarily choose to disclose the records necessary to verify compliance. Congress required election

[3] Pub. L. No. 86-449, title III, 74 Stat. 86, 88–89 (codified at 52 U.S.C. 20701–20706). "Title III" and "CRA" are used interchangeably.

officers to preserve registration-related records and gave the Attorney General authority to inspect them because federal rights require federal oversight.

Maryland's computerized SVRL is the official record used to administer voter registration for federal elections. The Help America Vote Act ("HAVA")[4] requires that list to be "single," "uniform," "official," "centralized," and "interactive," and expressly provides that it shall serve as "the official voter registration list for the conduct of all elections for Federal office in the State." 52 U.S.C. § 21083(a)(1)(A). The district court's memorandum opinion ("opinion") nevertheless held that Maryland may deny federal access to that central record because the State's election officials created and regularly update it.

That result cannot be reconciled with the text or constitutional function of Title III. The opinion makes the federally required statewide registration system uniquely resistant to federal inspection: the state may preserve individual forms, inputs, and isolated source documents while refusing access to the central system showing what the state actually did with them. The more sophisticated the State's registration system becomes, the more effectively it may shield the official record from federal review.

The Elections Clause gives Congress power to "make or alter" state election regulations for congressional elections. U.S. Const. art. I, § 4, cl. 1. The Supremacy

---

[4] Pub. L. No. 107-252, 116 Stat. 1666 (codified at 52 U.S.C. 20901–21145).

Clause makes Congress's valid enactments binding on State officials. U.S. Const. art. VI, cl. 2. Those provisions do not permit a state to convert its physical or electronic custody of election records into a practical veto over federal enforcement.

## ARGUMENT

### I. CONGRESS'S ELECTIONS CLAUSE AUTHORITY AND THE SUPREMACY CLAUSE FORBID STATES FROM USING CUSTODY OF ELECTION RECORDS TO FRUSTRATE FEDERAL ENFORCEMENT.

The Constitution assigns to states the initial responsibility to regulate the "Times, Places and Manner" of congressional elections, but it gives Congress the ultimate authority to "make or alter" those state regulations. U.S. Const. art. I, § 4, cl. 1. The Elections Clause is therefore not merely a reservation of state authority. It is an affirmative delegation of national power to Congress to prescribe binding rules governing federal elections.

The Supreme Court has consistently recognized Congress's override authority. In *Foster v. Love*, 522 U.S. 67 (1997), the court explained that the Elections Clause gives Congress power to override state regulations by adopting uniform rules for federal elections. In *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1 (2013), the court held that the NVRA preempted Arizona's demand that Federal Form registrants submit additional documentary proof of citizenship. A state's role in federal election administration, the court emphasized, exists only to the extent Congress has not exercised its superior authority.

Congress exercised that authority here. Title III requires election officers to retain and preserve records and papers relating to voter registration and other acts requisite to voting. 52 U.S.C. § 20701. It requires custodians to make covered material available to the Attorney General upon written demand. *Id*. § 20703. It authorizes district courts to compel production. *Id.* § 20705. The NVRA and HAVA add substantive federal requirements governing voter registration maintenance, statewide voter list administration, verification, and the removal of ineligible registrants. 52 U.S.C. §§ 20507, 21083.

The Supremacy Clause supplies the result. Valid federal election law is binding on state officials notwithstanding state privacy preferences, internal procedures, or preferred database architecture. *Ex parte Siebold*, 100 U.S. 371, 384 (1879), described federal election rules enacted under the Elections Clause as "paramount" to inconsistent state rules. A state cannot comply with federal election law only on the condition that it retains exclusive control over the evidence of compliance.

Maryland may administer its own voter registration system in the first instance. But it may not invoke control over that system as a reason to deny the United States access to the records that Congress authorized the Attorney General to inspect. The State's custody of election records is an administrative fact. It is not a constitutional defense to federal enforcement.

The contrary rule produces a form of practical nullification. A state need not formally declare that it will disregard federal law. It need only withhold the official records through which federal compliance can be assessed, demand that the Department of Justice ("DOJ") prove its concerns without access to those records and then rely on the resulting evidentiary gap as a reason to resist federal oversight. The Elections Clause and Supremacy Clause do not permit that result.

The Constitution does not permit a state to revive nullification by administrative means. A state cannot place a federally regulated election system behind a wall of state-controlled secrecy, deny the United States access to the records necessary to test compliance, and then invoke the absence of proven violations as a reason to avoid federal oversight. That is not cooperative federalism. It is practical nullification through opacity.

The constitutional order established after the Civil War does not allow states to treat federal law as advisory or optional. The Supremacy Clause makes valid federal law binding; the Reconstruction Amendments confirm that states are accountable to the nation for the protection of federally secured rights; and *Cooper v. Aaron* rejects the premise that state officials may disregard controlling federal authority. *Cooper v. Aaron*, 358 U.S. 1, 17, 18 (1958). In *Cooper*, the Supreme Court warned, "No state legislator or executive or judicial officer can war against the Constitution without violating his undertaking to support it."

In the federal election context, Congress's authority is express. The Elections Clause empowers Congress to make or alter state regulations governing congressional elections. Once Congress enacted Title III, the NVRA, and HAVA, Maryland retained responsibility for administration but not a veto over federal inspection and enforcement. A contrary rule under the district court's opinion allows the State's custody of the evidence to become its defense against federal law.

No constitutional system can preserve national election standards if the entities subject to those standards may unilaterally decide whether federal investigators may see the records that reveal compliance or violation. The Court should reject a construction that makes federal election law enforceable only at the discretion of the state charged with obeying it.

## II. EXCLUDING THE OFFICIAL STATEWIDE VOTER REGISTRATION LIST FROM TITLE III CREATES AN ENFORCEMENT VACUUM CONGRESS ENACTED TITLE III TO PREVENT.

Title III is an investigative statute. It does not require the Attorney General to prove an election-law violation before obtaining the records needed to determine whether a violation exists.

The Fifth Circuit recognized that feature in *Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962). It characterized Title III as a specialized statutory mechanism by which the Attorney General may inspect and copy covered election records. The purpose is to allow federal investigation before the government must decide whether

a substantive enforcement action is warranted. The Attorney General need not possess the outcome of the investigation before initiating it.

That framework reflects practical necessity. Election law violations, administrative errors, and list-maintenance failures usually cannot be diagnosed from a public-facing voter list. A public extract might reveal that a registrant disappeared, that a voter status changed, that a record was merged, or that an entry was cancelled. But it does not identify:

- the reason for the change;
- the government official, process, or computer system responsible;
- the timing of the change;
- the data sources used for matching or verification;
- whether required notices were sent;
- whether a duplicate-record determination was accurate;
- whether a cancellation complied with federal and state law;
- whether similarly situated voters were treated consistently; nor
- whether the action reflected a lawful correction, a routine update, negligence, or deliberate misconduct.

The official SVRL is therefore not merely helpful to federal investigation. It is practically indispensable.

The DOJ did not seek Maryland's voter registration system on a bare of abstract assertion of generalized authority. Its July 14, 2025 letter identified concrete, Maryland-specific anomalies drawn from Maryland's own EAVS submissions and a State audit: a 95.9% active-registration rate relative to citizen voting-age population, only 430 reported duplicate-registration removals, and audit findings of potentially

thousands of deceased persons with active registrations, delayed removals of deceased registrants, and unaddressed duplicate registrations. JA36–37.

Those indicators do not themselves adjudicate liability. However, they demonstrate why the DOJ needs access to the official SVRL to determine whether Maryland's federally required list maintenance program operates lawfully in practice. Instead, Maryland refused to produce the full SVRL and instead demanded that DOJ identify "specific cases" or "specific individuals suspected of involvement in electoral illegalities" before Maryland would cooperate. JA50–51. That demand inverts Title III. The Attorney General sought the SVRL because the cited anomalies warranted investigation; the statute does not require the DOJ to prove violations before gaining access to the official statewide record needed to determine whether violations occurred.

The district court's opinion creates an enforcement vacuum by requiring the DOJ to show concrete proof of violations in a statewide list while denying the DOJ access to the SVRL. That circular result reverses Title III's design. It permits a state to demand proof from the federal government while retaining exclusive control over the evidence necessary to provide that proof.

A state cannot create an evidentiary blackout and then benefit from the darkness. If officials control the relevant system, control its audit history, control its transaction data, and control whether federal investigators may inspect it, the

absence of proven wrongdoing may reveal only an absence of access — not an absence of violation.

The law recognizes the general principle that a party's intentional deprivation of access to relevant evidence may justify consequences adverse to that party. *See* Fed. R. Civ. P. 37(e). *Amicus* does not contend that Maryland's litigation position itself establishes concealment, spoliation, or criminal intent. But Title III should be interpreted to avoid rewarding an architecture of exclusive state control over the only evidence capable of proving or disproving compliance with federal election law.

## III. THE SVRL IS NOT MERELY AN ADMINISTRATIVE CONVENIENCE.

Maryland's SVRL is not merely an administrative convenience. HAVA requires Maryland to maintain a "single, uniform, official, centralized, interactive computerized statewide voter registration list" that serves as the official list for conducting elections for federal office. 52 U.S.C. § 21083(a)(1)(A). The integrity, accuracy, preservation, and security of that system are therefore matters of direct federal concern.

That concern is no longer abstract. On July 13, 2026, the White House Government Transparency Task Force announced the declassification of Intelligence Community records stating that voter registration rolls from at least eighteen States had been compromised by the People's Republic of China ("PRC"). The Task Force separately announced that more than 200 million voter records had been

compromised by the PRC, although the state specific affiliation of those records was not publicly identified. The memorandum expressly lists Maryland among the states identified by name in the declassified intelligence records as having election infrastructure vulnerabilities. White House Government Transparency Task Force, *Government Transparency Statement* (July 13, 2026), [https://www.whitehouse.gov/wp-content/uploads/2026/07/Chinas-Acquisition-and-Exploitation-of-American-Voter-Data.zip]

This disclosure materially reinforces the need for the Attorney General's Title III inspection authority. A foreign compromise of voter registration data may create risks that cannot be resolved from a public voter file extract. Without those records, the United States cannot determine whether the State's official list remained accurate, whether any data were altered or merely accessed, whether the State undertook appropriate remediation, or whether apparent anomalies result from ordinary maintenance, human error, system defects, unauthorized access, or foreign compromise.

*Amicus* does not contend that the White House memorandum establishes that a Maryland registration was altered, that a Maryland ballot was affected by the hack, that any Maryland official acted improperly, or that the SVRL contains a particular ineligible registration. The point is more fundamental. When declassified intelligence identifies Maryland among states facing election infrastructure

vulnerabilities associated with a foreign compromise of voter registration rolls, the federal government has a compelling need to inspect the official statewide record Congress required Maryland to maintain.

The district court's opinion places the very record most relevant to assessing the effect of a foreign compromise beyond federal inspection because the state maintains that record in an electronic, centrally administered system. That construction would convert HAVA's requirement of a centralized official statewide registration list into a barrier against federal oversight of the list's integrity.

Title III should not be read to create such a perverse result. Congress required election officials to preserve registration related records and authorized the Attorney General to inspect them precisely so the United States could assess whether federal election law is being obeyed. The ability to examine official SVRLs is particularly indispensable where there is a documented national security concern involving the integrity of those records.

## IV. AN ENFORCEMENT VACUUM IS A PRACTICAL GREEN LIGHT TO EVADE FEDERAL ELECTION LAW.

The opinion below does not formally authorize Maryland to disregard the NVRA, HAVA, or Title III. But it produces the practical equivalent of a green light. By withholding from the United States the SVRL necessary to detect, investigate, and prove violations, the opinion removes the principal means by which federal law can be enforced before the harm becomes irreversible. Federal commands without a

workable means of federal verification invite noncompliance. And where noncompliance cannot be promptly discovered, challenged, or remedied, those willing to exploit weak controls — including corrupt officials, bad-faith third parties, and persons ineligible to participate in federal elections — have every incentive to do so.

Recent events show the danger is real. The danger is no longer theoretical. In New Jersey, State officials reportedly identified roughly 6,600 noncitizens who were improperly placed on voter rolls through a motor vehicle software error. According to reported state disclosures, about 400 of those individuals voted in elections after being improperly registered.

Those facts demonstrate why Congress gave the Attorney General an investigative role and why federal authorities cannot be required to prove the violation before obtaining the records necessary to investigate it. A state may identify some error through its own internal review; but federal law cannot depend exclusively on a state's willingness, ability, or political incentive to expose its own failures.

## V. THE SVRL IS THE OFFICIAL ADMINISTRATIVE RECORD OF VOTER REGISTRATION, NOT AN EXTRA-STATUTORY STATE-CREATED ARTIFACT.

The district court regarded the SVRL as outside § 20701 because Maryland officials create and update it. That conclusion mistakes the nature of a computerized

statewide voter registration system. An individual registration application records how a person enters the registration system. The SVRL records how the state administers that registration over time. It is the official statewide administrative record and repository of voter registration.

The relationship may be compared to the relationship between a source document and a general ledger or repository. A source document may show the initial event: an invoice shows that a transaction began; a registration application shows that a voter sought registration. But a general ledger records how the organization processed, maintained, adjusted, reconciled, and reported that transaction. A meaningful audit requires examination of the ledger.

The same is true here. The SVRL reflects the election authority's official treatment of registration information. It records - or can reflect - current eligibility classifications, addresses, registration statuses, voter history information, cancellations, merges, duplicate resolutions, and other administrative decisions. It is the official system through which Maryland determines who may vote in federal elections.

The fact that Maryland created, compiled, and maintains the list does not make the list unrelated to voter registration. The point is exactly the opposite: the list is the State's official record of voter registration because State officials compile and administer the registration data they receive.

Nor does the fact that the SVRL is electronic or dynamic remove it from Title III. As stated *supra*, HAVA requires a "single, uniform, official, centralized, interactive computerized statewide voter registration list." 52 U.S.C. § 21083(a)(1)(A). Congress required an interactive system because voter registration records necessarily change as individuals register, move, die, become ineligible, correct information, or otherwise experience a status change. The system's dynamism is not a reason for exclusion. It is a feature Congress expressly required.

The contrary opinion also makes Title III turn on form rather than substance. A voter registration record might be subject to federal inspection when stored on paper but insulated from inspection when the State aggregates the same data into its official statewide database. Congress did not create such a technological safe harbor.

## VI. TITLE III'S HISTORY CONFIRMS THAT CONGRESS INTENDED FEDERAL ACCESS TO RECORDS THROUGH WHICH ELECTION OFFICIALS ADMINISTERED REGISTRATION.

Title III was enacted against the backdrop of systematic obstruction of the franchise. State and local election officials could administer voter registration systems in discriminatory ways while retaining control of the records needed to reveal those practices.

The 1959 United States Commission on Civil Rights documented voter registration barriers and the difficulty of investigating them where election authorities controlled the relevant records. The historical problem was not confined

to applications completed by prospective voters. It included official registration lists, internally administered voucher systems, registrars' records, and the governmental decisions that determined whether an applicant could become or remain registered. U.S. Comm'n on Civil Rights, *Report of the United States Commission on Civil Rights* 27–68, 75, 82, 87–89, 93, 134–42 (1959).

The United States' opening brief identifies historical examples: official voter registration lists, internally maintained voucher indices, and registrar records showing how registration requirements were applied. Those materials were often created or maintained by election authorities — not submitted by voters. Yet they were central to identifying discriminatory treatment.

The district court's external-source rule would have defeated that historical purpose. Under its logic, the DOJ could obtain a voter's application but not the internal registrar index showing that the official applied different standards by race; could obtain an applicant's form but not the official voting list showing the applicant never appeared on the rolls; and could obtain raw registration inputs but not the State-created record showing how the State processed them.

That interpretation cannot be reconciled with Congress's effort to provide the Attorney General access to the records necessary to investigate voting-rights violations. The historical lesson is straightforward: when the government actor

accused of administering a system unlawfully controls the official records documenting that administration, federal inspection is indispensable.

Modern computerized statewide lists perform the functions that official registration books, registrar lists, voucher indices, and related administrative records performed in 1960. Technology has changed the medium. It has not diminished the need for federal access to the operative record.

## VII. EFFECTIVE ENFORCEMENT REQUIRES ACCESS TO THE STATEWIDE SYSTEM AND ITS SUPPORTING ADMINISTRATIVE RECORDS.

The United States seeks the SVRL not as an abstract database project but because the SVRL is the core operational record needed to evaluate whether Maryland complies with the NVRA and HAVA.

The NVRA requires states to conduct a general program making a reasonable effort to remove names of registrants who are ineligible because of death or change of residence. 52 U.S.C. § 20507(a)(4). HAVA requires routine maintenance of the State's centralized list, including procedures to remove individuals who are not eligible to vote while protecting eligible voters from erroneous removal. 52 U.S.C. § 21083(a)(2).

Compliance with those duties cannot reliably be determined from redacted public datasets alone. Meaningful review requires the databased list with all its fields. These records allow investigators to distinguish lawful maintenance from

error or misconduct. For example, a public dataset may show that a registrant disappeared from the list between two dates. Without the unredacted records, the DOJ cannot determine whether the voter moved, died, requested cancellation, was merged with a duplicate record, was removed by mistake, was affected by a system migration, or was improperly purged.

Conversely, an apparent duplicate registration may be a lawful duplicate-resolution event, a temporary system artifact, a failure of matching procedures, or evidence of a broader data-integrity problem.

Denying access thus harms both sides of the franchise. It makes it harder to detect inaccurate or ineligible registrations that may dilute lawful ballots. And it makes it harder to detect erroneous cancellations, discriminatory practices, or other failures that may deprive qualified citizens of their ability to vote. The federal statutes protect election integrity and eligible voter access together; neither objective can be vindicated through an enforcement regime that leaves the central statewide record unavailable for federal inspection.

Inaccurate or discriminatory list maintenance can disenfranchise eligible citizens. The NVRA and HAVA require states both to maintain accurate rolls and to protect eligible voters from erroneous removal. A state's failure to document, preserve, or disclose the processes by which it cancels, merges, or changes registrations makes it materially harder to discover improper removals, inconsistent

treatment across counties, or practices that disproportionately burden protected groups. Congress's federal standards serve not merely administrative interests but the individual right of eligible citizens to cast an effective ballot.

Also, failure to maintain accurate voter rolls can permit ineligible registrations to remain undetected. HAVA specifically requires list maintenance practices under which only voters who are not registered or not eligible are removed, while duplicate names are eliminated. A SVRL that cannot be meaningfully examined leaves federal authorities unable to test whether those requirements are actually being followed.

This Court need not conclude that Maryland has committed a violation to recognize the need for access. The point of an investigation is to determine whether a violation occurred. Congress did not require the DOJ to establish the answer before allowing it to inspect the records needed to find it.

When a public official fights relentlessly to prevent inspection of records under that official's custody and control, the court need not blind itself to the obvious possibility that the resistance is designed to keep the contents of those records from public or federal scrutiny. Records custodians do not ordinarily expend extraordinary effort to conceal information that would vindicate their conduct. Where an official withholds, obscures, alters, deletes, or refuses meaningful access to the very records that would reveal whether federal election law has been obeyed, the obstruction itself

may support a reasonable inference that disclosure would expose negligence, noncompliance, or malfeasance.

That inference is especially appropriate where the records are uniquely within the State's possession and the United States has no alternative means to verify what occurred. Maryland — or any state — cannot be allowed to retain exclusive control over the SVRL, deny federal inspection of its contents and audit history, and then invoke the absence of conclusive proof as a defense. The State cannot create an evidentiary blackout and then benefit from the darkness.

The purpose of Title III is to prevent precisely that result. Congress required election officers to retain and preserve covered election records and authorized the Attorney General to inspect them because election law violations are often revealed only by the records controlled by the officials charged with administering the system.

Courts routinely recognize that the intentional suppression or destruction of relevant evidence may justify an inference that the missing evidence would have been unfavorable to the party responsible for its loss. The same common-sense principle applies here: a state official who intentionally prevents federal review of the records most capable of confirming or disproving compliance creates a powerful basis to question what that review would reveal.

The State may not lock the evidence in its own vault, deny the United States the key, and then insist that the DOJ has failed to prove what lies inside. That is not a defense to federal enforcement. It is a mechanism of evasion.

## CONCLUSION

The opinion below reflects a troubling tendency to treat state control of election records as more important than the federal government's ability to enforce federal election law. That approach elevates administrative secrecy over electoral accountability. It asks the Nation to trust that states will police themselves, while depriving the United States of the statutory tools Congress provided to verify whether that trust is warranted.

The SVRL is the official administrative record of voter registration for federal elections in Maryland. Congress required states to maintain that centralized system, required election officers to preserve registration related election records, and authorized the Attorney General to inspect those records. Maryland may not invoke its own maintenance and custody of the system as a basis for denying federal access.

The district court effectively held that even specific, State-derived warning signs were insufficient: the DOJ identified unusually high registration figures, anomalously low duplicate removals, and a State audit reporting potentially thousands of deceased registrants with active records and unremoved duplicate registrations. JA36–37. But instead of permitting the investigation those facts

warranted, Maryland demanded proof of particular unlawful votes or identified wrongdoers, and the court denied access to the one record capable of supplying that proof. Title III does not impose such a Catch-22. Congress did not require the Attorney General to solve the mystery before allowing inspection of the evidence.

Congress did not create a nationwide enforcement scheme only to permit states to make its enforcement turn on whether voter registration data is stored in a stack of paper files or in the very statewide electronic system federal law requires.

this Court should reject any construction of Title III, the NVRA, or HAVA that leaves the Attorney General unable to inspect the official SVRL necessary to assess compliance with federal law. The Elections Clause authorizes Congress to establish binding federal rules for federal elections; the Supremacy Clause requires state officials to honor those rules; and *Lynd* recognizes that Title III provides the Attorney General an investigative mechanism to obtain election records before a violation can be conclusively proved. A contrary rule would not formally repeal federal safeguards, but it would make them substantially harder to enforce — leaving eligible voters more vulnerable to wrongful removal, leaving inaccuracies and ineligible registrations harder to detect, and allowing state-controlled recordkeeping practices to frustrate Congress's paramount authority over federal election administration.

The history of federal voting rights enforcement supplies a warning. When state officials control the registration process, control the records, and control whether the Federal Government may inspect the evidence of compliance, violations can persist until after the injury to the franchise has occurred. Congress enacted Title III so that the Attorney General would not be forced to wait for that result. The Court should not construe the statute in a manner that recreates the enforcement vacuum Congress enacted Title III to prevent — an environment in which unlawful conduct is harder to detect, wrongdoing is easier to conceal, and federal election protections become enforceable only when the state charged with compliance chooses to permit enforcement.

The opinion creates an invitation to calculated evasion. It tells a bad-faith actor that the less transparent the voter registration system is, the safer unlawful conduct becomes from federal scrutiny. It tells those who would exploit administrative errors, gaps in verification, duplicate records, or ineligible registrations that the federal sovereign may be required to prove the problem without seeing the records that would reveal it. That is not a neutral procedural consequence. It is an affirmative weakening of deterrence in an area where even a small number of unlawful ballots or wrongful removals can matter.

Recent events underscore that this is not speculation. New Jersey reportedly identified a motor-vehicle software failure that improperly placed roughly 6,600

apparent noncitizens on voter rolls, with approximately 400 reportedly casting ballots. Recently declassified intelligence identified Maryland among states facing election infrastructure vulnerabilities associated with a foreign compromise of millions of voter registration rolls. These episodes demonstrate why federal investigators must be able to examine statewide data, audit histories, verification procedures, and list maintenance records: without that access, serious eligibility failures can persist unseen or be discovered only after unlawful ballots have been cast.

The opinion should be reversed, and the case remanded with instructions to compel Maryland to produce the complete, unredacted SVRL in accordance with the Attorney General's written demand.

DATE: August 17, 2026

Respectfully submitted,
/s/ Ronald D. Coleman

Ronald D. Coleman
COLEMAN LAW FIRM, PC
50 Park Place
Newark, New Jersey 07102
973-264-9611
rcoleman@colemanlaw-pc.com

Stacey Bucci
LIBERTY LEGAL FOUNDATION
P.O. Box 443
Bennington, Vermont 05201
518-407-3020
stacey@libertylegalusa.org

Counsel for *amicus curiae*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation for an *amicus* under the Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 5,066 words, excluding the parts exempted by the Federal Rule of Appellate Procedure 32(f).

This brief also complies with the typeface requirements of the Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(2)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in a 14-point Times New Roman font.

Dated: August 17, 2026

/s/ Ronald D. Coleman
RONALD D. COLEMAN
*Counsel for Amicus Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was filed on August 17, 2026 with the Clerk of the Court for the United States Court of Appeals for the Fourth Circuit by using the Court's Electronic Filing System which will send notification of that filing to all counsel of record in this litigation.

/s/ Ronald D. Coleman
RONALD D. COLEMAN
*Counsel for Amicus Curiae*