**No. 26-1878**

---

**UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

UNITED STATES OF AMERICA,
*Plaintiff-Appellant*,
v.

JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State of Maryland,

*Defendant-Appellee*,

and

MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; OUT FOR JUSTICE, INC.; CARL SNOWDEN; MYRIAM PAUL; LUIS SIMS,
*Intervenors/Defendants-Appellees*.

---

On Appeal from the U.S. District Court for the District of Maryland
Honorable Stephanie A. Gallagher
Civil Action No. 1:25-cv-03934-SAG

---

**BRIEF OF *AMICI CURIAE* CAMPAIGN LEGAL CENTER AND BRENNAN CENTER FOR JUSTICE IN SUPPORT OF DEFENDANTS-APPELLEES AND AFFIRMANCE**

---

Maura Eileen O'Connor
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th St., NW, Suite 1100
Washington, DC 20001
(202) 249-7190
oconnore@brennan.law.nyu.edu

Patrick Berry
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750

Brent Ferguson
Daniel S. Lenz
Sejal Jhaveri
Renata O'Donnell
Alexis Grady
Katherine Hamilton
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW
Suite 300
Washington, DC 20036
(202) 736-2200
khamilton@campaignlegalcenter.org

New York, NY 10271
(646) 925-8754
berryp@brennan.law.nyu.edu

*Counsel for Amici Curiae*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus curiae* Campaign Legal Center states that it is a nonprofit corporation organized under Section 501(c)(3) of the Internal Revenue Code. Campaign Legal Center has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

In addition, *amicus curiae* Brennan Center for Justice at New York University School of Law states that it is a nonprofit corporation organized under Section 501(c)(3) of the Internal Revenue Code. The Brennan Center has no parent corporation, and no publicly held corporation owns ten percent or more of its stock.

Date: October 7, 2026

*/s/ Katherine Hamilton*
Katherine Hamilton
Campaign Legal Center

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........ i

TABLE OF AUTHORITIES ........ iv

INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 1

BACKGROUND ........ 4

SUMMARY OF ARGUMENT ........ 6

ARGUMENT ........ 6

- I. Appellant did not allege a sufficient purpose under the CRA ........ 7
  - A. "Basis" and "purpose" are distinct requirements under the CRA ........ 7
  - B. Appellant's statement of purpose is pretextual. ........ 8
  - C. Oversight of a state's list maintenance procedures is not a valid purpose under the CRA. ........ 14
  - D. Appellant's stated purpose does not satisfy the requirements for a Title III demand because it does not relate to the investigation of violations of individuals' voting rights. ........ 16
- II. Appellant failed to properly state a basis for its demand ........ 18
  - A. "Basis" means a factual basis. ........ 19
  - B. Appellant's demand for Maryland's unredacted SVRL contained an insufficient statement of basis. ........ 20
- III. Appellant's demand undermines authority over elections that the Constitution reserves for Congress and the States. ........ 21

CONCLUSION ........ 25

CERTIFICATE OF COMPLIANCE ........ 26

CERTIFICATE OF SERVICE ........................................................................ 27

# TABLE OF AUTHORITIES

**Cases** **Pages**

*California v. U.S. Department of Health & Human Services*, No. 25-cv-5536, 2025 WL 3751931 (N.D. Cal. Dec. 29, 2025) ........ 12

*California v. Trump*, 786 F. Supp. 3d 359 (D. Mass. 2025) ........ 22

*California v. Trump*, No. 25-cv-10810-DJC, 2026 WL 1826535 (D. Mass. June 24, 2026) ........ 23

*Center for Taxpayer Rights v. Internal Revenue Service*, 815 F. Supp. 3d 1 (D.D.C. 2025) ........ 11

*Center for Taxpayer Rights v. Internal Revenue Service*, No. 25-0457 (CKK), 2026 WL 551105 (D.D.C. Feb. 26, 2026) ........ 11

*Coleman v. Kennedy*, 313 F.2d 867 (5th Cir. 1963) ........ 18

*Common Council of Alexandria v. Preston*, 12 U.S. (8 Cranch) 53 (1814) ........ 13

*Community Economic Development Center of Southeastern Massachusetts v. Bessent*, 818 F. Supp. 3d 228 (D. Mass. 2026) ........ 12

*David v. King*, 109 F.4th 653 (4th Cir. 2024) ........ 13

*Department of Agriculture Rural Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024) ........ 14

*Department of Commerce v. New York*, 588 U.S. 752 (2019) ........ 8

*DSCC v. Trump*, No. 26-5193, 2026 WL 2168617 (D.C. Cir. July 28, 2026) ........ 22

*DSCC v. Trump*, No. 26-CV-1114, 2026 WL 2681471 (D.D.C. Sep. 13, 2026) ........ 2

*In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962) ........ 18

*In re Gordon*, 218 F. Supp. 826 (S.D. Miss. 1963) ........ 19

*Kennedy v. Bruce*, 298 F.2d 860 (5th Cir. 1962) ........ 19, 21

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ........ 21

*League of United Latin American Citizens v. Executive Office of the President*, 808 F. Supp. 3d 29 (D.D.C. 2025) (*LULAC I*) ............................................2, 22

*League of United Latin American Citizens v. Executive Office of the President*, 818 F. Supp. 3d 34 (D.D.C. 2026) (*LULAC II*)..........................................21, 23

*League of Women Voters v. U.S. Department of Homeland Security*, 835 F. Supp. 3d 79 (D.D.C. 2026).........................................................................9

*Smiley v. Holm*, 285 U.S. 355 (1932) .......................................................................2

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988)...........................................................................17, 18

*United States Postal Service v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026).........................................................................................2

*United States v. Amore*, 831 F. Supp. 3d 149 (D.R.I. 2026) ..................8, 16, 17, 19

*United States v. Benson*, 179 F.4th 470 (6th Cir. 2026) ..........................................7

*United States v. Benson*, 187 F.4th 462 (6th Cir. 2026) ..........................................9

*United States v. Board of Elections of State of New York*, No. 25-cv-1338, 2026 WL 1999921 (N.D.N.Y. July 10, 2026) ..........................................................17

*United States v. Galvin*, 830 F. Supp. 3d 122 (D. Mass. 2026)..............................19

*United States v. Gradwell*, 243 U.S. 476 (1917) .....................................................2

*United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877 (C.D. Ill. July 31, 2026)..................................................15–17, 19, 21

*United States v. Oregon*, 828 F. Supp. 3d 1092 (D. Or. 2026)...........3, 8, 16, 17, 19

*United States v. Scanlan*, 838 F. Supp. 3d 150 (D.N.H. 2026) ..............................19

*United States v. Schmidt*, 835 F. Supp. 3d 697 (W.D. Pa. 2026) ...........8, 17, 19, 24

*United States v. Toulouse Oliver*, No. 1:25-cv-1193, 2026 WL 2031479 (D.N.M. July 14, 2026)....................................................................7, 19, 21

*United States v. Warner*, No. 26-cv-156, 2026 WL 2018877 (S.D.W. Va. July 13, 2026)...................................................................17

*United States v. Weber*,
816 F. Supp. 3d 1168 (C.D. Cal. 2026) .......................... 3, 8, 15, 16, 19, 21, 24

*Utility Air Regulatory Group v. EPA*, 573 U.S. 302 (2014) ..................................17

**Constitutional Provisions**

U.S. Const. art. I, § 2, cl. 1 ..........................................................................22

U.S. Const. art. I, § 4 .....................................................................................1

U.S. Const. art. I, § 4, cl. 1 ..........................................................................22

**Statutes**

52 U.S.C. § 20501, *et seq.* ................................................................................5

52 U.S.C. § 20507(a)(4)..........................................................................14, 15

52 U.S.C. § 20507(c)–(d)..................................................................................14

52 U.S.C. § 20509 ............................................................................................14

52 U.S.C. § 20510 ............................................................................................15

52 U.S.C. § 20701, *et seq.* ................................................................................5

52 U.S.C. § 20703 ......................................................................................6, 7, 13

52 U.S.C. § 21083(a)(1)(A) ..............................................................................15

52 U.S.C. § 21083(a)(2)....................................................................................15

52 U.S.C. § 21083(a)(2)(A)(i) ..........................................................................15

52 U.S.C. § 21083(a)(5)(A)(i) ............................................................................5

52 U.S.C. § 21085 ............................................................................................15

52 U.S.C. § 21111 ............................................................................................15

**Rules**

Fed. R. App. P. 29(a)(2)......................................................................................1

**Other Authorities**

Appendix, *United States v. Amore*, No. 26-1665 (1st Cir. July 17, 2026) ................9

Appendix, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) .............9

*Basis*, Black's Law Dictionary 161 (8th ed. 2004)................................................19

Camilo Montoya-Galvez, *Reports of airport immigration arrests come amid increased TSA-ICE collaboration, sources say*, CBS News (July 29, 2026), https://perma.cc/36MT-N7AM ..........................................................................12

Complaint, *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Dec. 18, 2025), Dkt. No. 1 ..................................................................................23

Complaint, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025), Dkt. No. 1 ..................................................................................23

Complaint, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025), Dkt. No. 1.........................................................................................23

Complaint, *United States v. Wisconsin Elections Commission*, No. 3:25-cv-01036 (W.D. Wis. Dec. 18, 2025), Dkt. No. 1 .......................................................23

Debate in Massachusetts Ratifying Convention, *in* 2 The Founders' Constitution (P. Kurland & R. Lerner eds., 1987)...........................................................22

Donald J. Trump (@realDonaldTrump), TruthSocial.com (Aug. 18, 2025), https://perma.cc/R3KM-525Z...............................................................24

Erica L. Green, Michael Gold & Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, N.Y. Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html. ............................................................................................23

Executive Order No. 14,158, 90 Fed. Reg. 8441 (Jan. 20, 2025)............................11

Executive Order No. 14,243, 90 Fed. Reg. 13681 (Mar. 20, 2025) ........................11

Executive Order No. 14,248, 90 Fed. Reg. 14006 (Mar. 25, 2025) ........................11

Executive Order No. 14,399, 91 Fed. Reg. 17125 (Mar. 31, 2026) ........................12

Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Center for Justice (Oct. 2, 2026), https://perma.cc/TAE9-9H6U ....................3, 9

Kimberly Kindy & Amanda Seitz, *Trump administration gives personal data of immigrant Medicaid enrollees to deportation officials*, AP (June 14, 2025), https://apnews.com/article/medicaid-deportation-immigrants-trump-4e0f979e4290a4d10a067da0acca8e22. ....................12

Nicholas Kerr & Elise Spenner, *System that DHS is urging states to use to assess voter rolls known to return faulty results: reports*, ABC News (July 19, 2026), https://perma.cc/5YBE-LRW6 ....................10

Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Center for American Progress (Aug. 25, 2025), https://perma.cc/LT65-TYUA. ....................13

*Public Voter File Acquisition and Handling*, SAM.gov (Aug. 25, 2026), https://perma.cc/5KN7-GVNX ....................10

## INTEREST OF *AMICI CURIAE*[1]

Campaign Legal Center (CLC) is a leading nonpartisan, nonprofit organization that has been working for more than 20 years to advance democracy through law. CLC engages in litigation, policy development, and advocacy to protect voting rights and ensure broad and equal access to the ballot.

The Brennan Center for Justice at New York University School of Law[2] is a nonprofit, nonpartisan think tank and public-interest law institute that seeks to improve systems of democracy and justice. Since its founding in 1995, the Brennan Center's work has focused extensively on protecting the right to vote using empirical, historical, and legal research. It participates in voting rights and election law cases around the country, both as counsel and *amicus curiae*.

All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

## INTRODUCTION

The Constitution delegates election administration primarily to the states, subject to regulation by Congress. *See* U.S. Const. art. I, § 4. The executive branch has a small role in elections and enjoys only the authority Congress grants it. *See*

---

[1] Counsel for *amici curiae* authored this brief in its entirety. No party or party's counsel authored any part of this brief, and no person, other than *amici* and their counsel, contributed money to fund its preparation or submission.
[2] This brief does not purport to convey the position of New York University School of Law.

*League of United Latin Am. Citizens v. Exec. Off. of the President*, 808 F. Supp. 3d 29, 41–42 (D.D.C. 2025) (*LULAC I*) (permanently enjoining parts of March 2025 executive order on elections); *see also DSCC v. Trump*, No. 26-CV-1114, 2026 WL 2681471, at *8 (D.D.C. Sep. 13, 2026) (preliminarily enjoining the use of a postal service rule on mail ballots because "[t]he key portions of the Rule exceed any conception of the outer bounds of these [statutory] authorities"); *U.S. Postal Serv. v. California*, No. 26A305, 2026 WL 2687160 (U.S. Sep. 14, 2026) (mem.) (declining to stay injunction of the same postal service rule on mail ballots). Because states' authority to administer their elections is broad, encompassing rules "not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Smiley v. Holm*, 285 U.S. 355, 366 (1932); *see also United States v. Gradwell*, 243 U.S. 476, 484 (1917) ("The policy of thus [e]ntrusting the conduct of elections to state laws, administered by state officers, which has prevailed from the foundation of the government to our day . . . was proposed by the makers of the Constitution, and was entered upon advisedly by the people who adopted it . . . .").

The U.S. Department of Justice (DOJ) is attempting to upend the constitutional framework that governs elections by demanding full voter registration lists—including sensitive data like driver's license and partial social security

numbers—from at least forty-eight states and the District of Columbia.[3] Most have refused. Appellant has sued election officials in Maryland and twenty-nine other states, plus the District of Columbia, over such refusals. Every court to decide the issue, including one court of appeals, has dismissed these complaints.

DOJ's unprecedented requests for sensitive voter data are beyond its statutory authority and represent an incursion into states' roles administering elections—a trespass that upsets our constitutional structure surrounding elections. Courts addressing this effort have concluded that DOJ's demands amount to an "overreach and misuse" of its role in election administration beyond constitutional limits. *United States v. Oregon*, 828 F. Supp. 3d 1092, 1108 (D. Or. 2026); *see also United States v. Weber*, 816 F. Supp. 3d 1168, 1195 (C.D. Cal. 2026) ("[T]he Executive may not unilaterally usurp the authority over elections . . . ."). And DOJ's desire to collect confidential voter information is not about enforcing federal voting statutes at all. Rather, those justifications are pretext for DOJ to overtake the state's role in elections and aggregate as much data about Americans as possible. Our constitutional system does not authorize DOJ to take those steps.

*Amici curiae* urge this Court to affirm the decision of the district court dismissing the complaint and denying the motion to compel.

---

[3] Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Oct. 2, 2026), https://perma.cc/TAE9-9H6U.

## BACKGROUND

On July 14, 2025, DOJ sent a letter to Maryland State Administrator of Elections Jared DeMarinis demanding various information and data about Maryland voters and elections, including how Maryland complied with certain provisions of federal election laws. JA35. Citing the National Voter Registration Act (NVRA), the letter demanded that DeMarinis "produce for inspection . . . [t]he current electronic copy of Maryland's computerized statewide voter registration list" including "all fields contained within the list." JA35. The letter also referenced the Election and Voting Survey 2024 Comprehensive Report from the U.S. Election Assistance Commission (EAVS Report) and asked eight questions about Maryland's list-maintenance practices described in that report. JA36–37.

On July 30, 2025, DeMarinis, whose responsibilities include leading the State Board of Elections (SBE), responded to DOJ's letter on behalf of the SBE. JA39. The SBE provided substantial information, answering the vast majority of DOJ's inquiries. But the SBE did not provide the unredacted statewide voter registration list (SVRL), instead directing DOJ to obtain publicly available portions of the list online, pursuant to state law. JA41. The SBE sent a second letter to DOJ on August 13, 2025, requesting information about DOJ's purpose for requesting the SVRL and how the list requested was "necessary and relevant to that purpose." JA44–45.

On August 18, 2025, DOJ sent the SBE a second letter asserting that it was entitled to a copy of Maryland's full SVRL under the Help America Vote Act (HAVA), 52 U.S.C. § 21083(a)(5)(A)(i), the NVRA, 52 U.S.C. § 20501, *et seq.*, and Title III of the Civil Rights Act of 1960 (CRA), 52 U.S.C. § 20701, *et seq.* JA46–47. DOJ contended that the purpose of the request was to "ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." JA47. On August 25, 2025, the SBE responded again, asserting that neither HAVA, nor the NVRA, nor the CRA supported DOJ's demand for Maryland's SVRL. JA50.

Appellant sued on December 1, 2025. JA26. Its complaint includes only one claim: that DOJ is entitled to Maryland's SVRL under the CRA. JA32. Appellant immediately moved to compel production of the SVRL. Dist. Ct. ECF No. 2. Administrator DeMarinis, as well as Intervenors/Defendants-Appellees (collectively, "Appellees") moved to dismiss, Dist. Ct. ECF Nos. 34, 43, 50, and responded in opposition to Appellant's motion to compel. Dist. Ct. ECF Nos. 35, 43, 51. Finding that no hearing was necessary, the district court granted Appellees' motion to dismiss and denied Appellant's motion to compel. JA1. Like multiple other courts in these cases, the district court applied the Federal Rules of Civil Procedure. JA5. It then found that the SVRL was not a "record or paper that the United States may request" under Title III of the CRA since it does not "come into

possession" of state election officials but is rather created by them. JA6–8. This appeal followed.

## SUMMARY OF ARGUMENT

This Court should look closely at Appellant's unprecedented demand for the sensitive voting data of millions of Americans; the record in this case and similar cases across the country show that justifications for these requests are pretextual. Appellant's alleged basis and purpose are plainly contrived and legally inadequate. Moreover, granting Appellant's demand would undermine the constitutional separation of powers. This Court should therefore affirm the decision below, on alternative grounds, because Appellant failed to meet the requirements of the CRA including a statement of basis and purpose.

## ARGUMENT

While the district court correctly found that Maryland's SVRL is not a "record" or "paper" that comes into the State Administrator's "possession" and therefore is not a record subject to disclosure to the Attorney General within the meaning of the CRA, Appellant's demand suffers from two other fatal flaws the district court did not address. The CRA requires that the Attorney General submit a "demand in writing" containing both the "basis" and the "purpose" of the demand. 52 U.S.C. § 20703. Appellant complied with neither requirement. Its asserted purpose is both pretextual and insufficient, and it provided an inadequate factual

basis for its demand. Instead, Appellant's demand, and similar demands it has made across the country, represent an attempted intrusion into the type of election administration determinations the Constitution reserves for the states. Dismissal of its CRA claim was therefore appropriate on these grounds as well.

## I. Appellant did not allege a sufficient purpose under the CRA.

Appellant has failed to state a sufficient purpose for its demand for Maryland's unredacted SVRL. Its stated purpose is pretextual, list-maintenance oversight is not a valid purpose under the CRA, and access to the unredacted list would not serve even that purpose.

### A. "Basis" and "purpose" are distinct requirements under the CRA.

The CRA requires that the Attorney General's "demand shall contain a statement of *the* basis and *the* purpose therefor." 52 U.S.C. § 20703 (emphasis added). The inclusion of the article "the" before each of the words "basis" and "purpose," as well as the use of the conjunctive "and" between them—the basis *and* the purpose—show that the statute requires the demand to contain a specific basis and, separately, a specific purpose. *See, e.g.*, *United States v. Benson*, 179 F.4th 470, 483 (6th Cir. 2026) ("The government cannot pinpoint a Title III demand with a statement of the basis *and* purpose. . . . [A]ny demand must contain both."); *United States v. Toulouse Oliver*, No. 1:25-cv-1193-JCH-JFR, 2026 WL 2031479, at *9 (D.N.M. July 14, 2026) ("Section 20703 requires the Attorney General outline both

the discrete factual and the legal motivations underlying the request."). To require only a generalized statement would collapse those two requirements into one, a reading that cannot be reconciled with the statutory text.

**B. Appellant's statement of purpose is pretextual.**

The record in this case, as well as statements and actions from key government officials, shows that Appellant's purported "purpose" of assessing compliance with federal law is a pretext. Accordingly, its demand does not meet the requirements of the CRA. "Accepting contrived reasons would defeat the purpose of" judicial review. *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019). When agency action is "incongruent with what the record reveals about the agency's priorities . . . [a court] cannot ignore the disconnect between the decision made and the explanation given." *Id.* Courts "are not required to exhibit a naiveté from which ordinary citizens are free." *Id.* (citation modified).

Public actions and statements from federal officials reveal that "DOJ is on a nationwide quest to gather the sensitive, private information of millions of Americans for use in a centralized federal database." *Weber*, 816 F. Supp. 3d at 1184; *see also Oregon*, 828 F. Supp. 3d at 1106 (same); *United States v. Schmidt*, 835 F. Supp. 3d 697, 699 (W.D. Pa. 2026) ("Public statements from government officials reveal its intentions: to create a nationwide voter-database, for potential weaponization in future elections."); *United States v. Amore*, 831 F. Supp. 3d 149,

158 (D.R.I. 2026) (rejecting the United States' effort to "conduct the kind of fishing expedition" it seeks with its demands).

In this expedition, DOJ has demanded unredacted SVRLs from nearly every state in the country and Washington, D.C., and has filed lawsuits against 30 of those states and Washington, D.C.[4] That breadth shows that DOJ is engaged in a sweeping effort to amass data, not in targeted assessments of list-maintenance practices.[5] Appellant's descriptions of its plans for this data have changed over time, revealing their pretextual nature. DOJ's lawyers admitted at multiple hearings that the United States plans to run voter data through the notoriously unreliable Systematic Alien Verification for Entitlements (SAVE) program.[6] App. at 165:22–23, *United States v. Amore*, No. 26-1665 (1st Cir. July 17, 2026) ("[O]ur intention is to run this against DHS's SAVE database."); App. at 123:21–23, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) ("To the extent that that data may be run against other databases, again, that's something that's been routine . . . ."); *see also United States v. Benson*, 187 F.4th 462, 477 (6th Cir. 2026) (mem.) (Thapar, J., dissenting from denial of reh'g en banc) ("The Attorney General then planned to compare the voter

---

[4] *See supra* note 3.
[5] *See supra* note 3.
[6] *See League of Women Voters v. U.S. Dep't of Homeland Sec.*, 835 F. Supp. 3d 79, 95 (D.D.C. 2026) (stayed pending appeal) (finding the SAVE program expansion had "haphazardly combined and repurposed the private information of millions of Americans, including citizenship data that they knew to be unreliable").

file to federal databases . . . . "). Thus, before even receiving any of the information it seeks, Appellant has admitted it will use the data for purposes far afield from assessing compliance with the NVRA and HAVA. *Cf.* Appellant's Br. at 45 (arguing that the CRA does not limit the purpose for which Appellant can demand records).

As recently as July 17, 2026, the Secretary of the Department Homeland Security (DHS) threatened to withhold funds and possibly prosecute state officials unless they "scrub" their voter rolls in line with DHS's demands, after apparently running several states' voter rolls through the SAVE program.[7] And DHS's investigations unit recently put out a request for information to find a contractor who can "secure delivery of publicly available voter registration files and voter history files to support Homeland Security Investigations (HSI) fraud detection and data segmentation activities."[8] All in all, Appellant's efforts to sweep up sensitive voter data, run it through federal databases, and redirect law enforcement resources to do so show the pretextual nature of Appellant's stated purpose.

The executive branch's broader quest to amass sensitive data has been revealed through a campaign of agency actions, including:

---

[7] Nicholas Kerr & Elise Spenner, *System that DHS is urging states to use to assess voter rolls known to return faulty results: reports*, ABC News (July 19, 2026), https://perma.cc/5YBE-LRW6.

[8] *See Public Voter File Acquisition and Handling*, SAM.gov (Aug. 25, 2026), https://perma.cc/5KN7-GVNX.

- Between January and March 2025, the President issued executive orders that established centralized data keeping systems and ordered agencies to give "full and prompt access to all unclassified agency records, software systems, and IT systems," Exec. Order No. 14,158, 90 Fed. Reg. 8441, 8442, §§ 1, 4(b) (Jan. 20, 2025); required federal agencies to "ensure the Federal Government has unfettered access to comprehensive data from all State programs that receive Federal funding, including, as appropriate, data generated by those programs but maintained in third-party databases," Exec. Order No. 14,243, 90 Fed. Reg. 13681, § 3(b), (c) (Mar. 20, 2025); and directed DHS to provide state and local officials access to government systems to verify citizenship and coordinate with the "DOGE Administrator" to "identify unqualified voters registered in the States," Exec. Order No. 14,248, 90 Fed. Reg. 14005, 14006-07, § 2(b), 2(b)(iii) (Mar. 25, 2025) (Elections EO).
- In April 2025, the Administration directed the Internal Revenue Service to provide confidential taxpayer information to Immigration and Customs Enforcement (ICE) until courts found it unlawful. *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, 815 F. Supp. 3d 1, 18–20 (D.D.C. 2025); *Ctr. for Taxpayer Rts. v. Internal Revenue Serv.*, No. 25-0457 (CKK), 2026 WL

551105, at *3 (D.D.C. Feb. 26, 2026); *Cmty. Econ. Dev. Ctr. of Se. Mass. v. Bessent,* 818 F. Supp. 3d 228, 234–35 (D. Mass. 2026).

- In May 2025, the Transportation Security Administration reportedly signed an agreement with ICE and has since been providing ICE with travelers' information for use in immigration enforcement.[9]
- In June 2025, it was revealed that the Centers for Medicare & Medicaid Services agreed to provide ICE extraordinary levels of detail about Medicaid recipients, including Social Security numbers, birthdays, sex, phone numbers, localities, ethnicities, and race,[10] although a court order narrowed the available information, *California v. U.S. Dep't of Health & Hum. Servs.*, No. 25-cv-5536-VC, 2025 WL 3751931, at *3 (N.D. Cal. Dec. 29, 2025).
- In March 2026, the President issued an executive order on mail voting that directed DHS to create lists of citizens eligible to vote using information from U.S. Citizenship and Immigration Services, the Social Security Administration, and "other relevant Federal databases." Exec. Order No.

---

[9] Camilo Montoya-Galvez, *Reports of airport immigration arrests come amid increased TSA-ICE collaboration, sources say*, CBS News (July 29, 2026), https://perma.cc/36MT-N7AM.

[10] Kimberly Kindy & Amanda Seitz, *Trump administration gives personal data of immigrant Medicaid enrollees to deportation officials*, AP (June 14, 2025), https://apnews.com/article/medicaid-deportation-immigrants-trump-4e0f979e4290a4d10a067da0acca8e22.

14,399, 91 Fed. Reg. 17125, 17125, § 2(a) (Mar. 31, 2026) (Mail Voting EO).

In these ways and others, over the past year and a half, the federal government has regularly reappropriated and centralized information about Americans, engaging in unauthorized "secondary use[s]" of data, "where information that an individual has given to one agency for a specific purpose is later reused by that agency or by another agency or entity for an entirely different purpose without the individual's consent."[11] The administration has only stopped this unlawful amassing of data when ordered to do so by the courts.

Further, as explained in Section I.C, *infra*, acquiring confidential voter rolls is not necessary for DOJ's claimed purpose. Appellant's claim that it is seeking unredacted SVRLs solely to pursue oversight for compliance with federal voter registration law is therefore implausible and cannot constitute "*the* purpose" of its demand under the CRA. 52 U.S.C. § 20703 (emphasis added); *Common Council of Alexandria v. Preston*, 12 U.S. (8 Cranch) 53, 55 (1814) (discussing use of the definite article "the"); *David v. King*, 109 F.4th 653, 661 (4th Cir. 2024) ("[T]he consistent use of the definite article in reference to an object normally indicates that the statute refers to only one such object.") (internal quotation marks omitted).

[11] Nicole Alvarez, *The Trump Administration Is Using Americans' Sensitive Data to Build a Digital Watchtower*, Ctr. for Am. Progress (Aug. 25, 2025), https://perma.cc/LT65-TYUA.

DOJ's efforts to acquire unredacted SVRLs are, instead, part of the executive branch's larger data consolidation project.

### C. Oversight of a state's list maintenance procedures is not a valid purpose under the CRA.

Even ignoring the obvious pretext of Appellant's request, its claimed "purpose" for its demand under the CRA—assessing Maryland's compliance with federal list maintenance requirements—is invalid because both the NVRA and HAVA assign list maintenance responsibilities to the states, not the federal government. Moreover, the unredacted SVRL would not enable Appellant to ascertain Maryland's compliance.

Through the NVRA and HAVA, Congress entrusted list maintenance to the states and provided for enforcement by DOJ in instances of noncompliance. Because it provided a limited role for DOJ in enforcing these statutes, it would flout Congress' intent to allow Appellant to use the CRA to get around those limitations. *See Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 63 (2024) ("Where two laws are merely complementary . . . our duty lies not in preferring one over another but in giving effect to both."). The NVRA establishes a comprehensive statutory scheme for voter list maintenance and delegates the administration of that scheme to the states. *See* 52 U.S.C. §§ 20507(a)(4), 20507(c)–(d), 20509. HAVA likewise requires states' chief election officials to "implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive

computerized statewide voter registration list defined, maintained, and administered at the State level"; tells "appropriate State or local election official[s] [to] perform list maintenance"; and directs that "[t]he specific choices on the methods of complying . . . shall be left to the discretion of the State[s]." *Id.* §§ 21083(a)(1)(A), 21083(a)(2), 21085. Both the NVRA and HAVA include a limited role for DOJ: to bring civil enforcement actions for instances of noncompliance. *Id.* §§ 20510, 21111.

With respect to enforcement of the list maintenance requirements, DOJ is limited to challenging a state's general program prescribed by those statutes. *See id.* §§ 20507(a)(4) (NVRA list maintenance provision), 21083(a)(2)(A)(i) (HAVA list maintenance provision); *Weber*, 816 F. Supp. 3d at 1188 ("[T]he NVRA only permits investigations into states' policies regarding reasonable voter roll maintenance."). "Congress did not confer a general auditing power to the DOJ" to conduct audits, question removal rates, or access confidential information. *United States v. Matthews*, No. 25-cv-3398, 2026 WL 2212877, at *5 (C.D. Ill. July 31, 2026). And the fact that Congress was silent about the CRA in the NVRA and HAVA—both of which postdate it—demonstrates that Congress did not intend for Appellant to use the CRA to contravene that limited role.

Even if the DOJ *could* use the CRA to demand records for NVRA and HAVA oversight, the unredacted SVRL would not enable Appellant to ascertain Maryland's compliance. The SBE's responses to DOJ's letters in 2025 provide the information

needed to ascertain Maryland's compliance with federal list maintenance requirements by explaining how Maryland conducts list maintenance as required by federal and state law. *See, e.g.*, JA40. By contrast, the SVRL provides only a snapshot of current registrations, not information about how Maryland operates either its initial registration process or its list-maintenance systems. As Administrator DeMarinis observed in his August 25, 2025, reply letter, "[t]he actual voter list is not required to assess compliance" with HAVA, nor can the NVRA "support such a request." JA50. And here, like in parallel cases, Appellant has given "no explanation for why unredacted voter files for millions of [voters], an unprecedented request, was necessary for the DOJ's investigation." *Weber*, 816 F. Supp. 3d at 1184.

DOJ must give a legally valid reason of need that connects to a legally valid result. *See Amore*, 831 F. Supp. 3d at 157; *Oregon*, 828 F. Supp. 3d at 1105; *Matthews*, 2026 WL 2212877, at *5. Exceeding the agency's authority under the NVRA and HAVA to get data that does not actually address Maryland's compliance with those statutes does not suffice.

### D. Appellant's stated purpose does not satisfy the requirements for a Title III demand because it does not relate to the investigation of violations of individuals' voting rights.

Appellant's purported desire to investigate Maryland's NVRA and HAVA compliance is also insufficient because the CRA may only be used to investigate

violations of individuals' voting rights. *Oregon*, 828 F. Supp. 3d at 1105 ("[T]he 'purpose' required in a demand for records under Title III must relate to a purpose of investigating violations of individuals' voting rights."); *Amore*, 831 F. Supp. 3d at 157–58 (same) (quoting *Oregon*); *United States v. Warner*, No. 26-cv-156, 2026 WL 2018877, at *7 (S.D.W. Va. July 13, 2026) (same) (quoting *Oregon*); *United States v. Bd. of Elections of State of N.Y.*, No. 25-cv-1338, 2026 WL 1999921, at *8 (N.D.N.Y. July 10, 2026); *Schmidt*, 835 F. Supp. 3d at 698–700. Assessing state compliance with routine election administration in the absence of potential voting rights violations is not a legally valid purpose for a Title III demand. *Matthews*, 2026 WL 2212877, at *5.

Appellant asserts that "no limitation on the scope of the basis or purpose of the demand appears in the text of Title III," including any explicit requirement that demands are limited to the protection of voting rights. Appellant's Br. at 50-51. This gets the analysis backwards. A "fundamental canon of statutory construction [is] that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (internal quotation marks omitted). "Statutory construction . . . is a holistic endeavor" and a "provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law."

*United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988). It would turn the CRA on its head to divorce the purpose requirement from the rest of the statute—which Appellant concedes exists to promote voting rights, not list maintenance, Appellant's Br. at 3—and allow for purposes that have no relation to, and perhaps even undermine, the statutory scheme.[12]

Thus, because Appellant's alleged purpose for its CRA demand of Maryland's unredacted SVRL was to assess the State's list maintenance practices—and not to investigate violations of individuals' voting rights—Appellant cannot use the CRA to obtain the SVRL.

## II. Appellant failed to properly state a basis for its demand.

Appellant failed to state a sufficient basis for its Title III demand, and this Court should affirm for that reason as well.

---

[12] Appellant cherry picks from *Coleman v. Kennedy* to claim that its Title III demand is sufficient because it "relates to 'investigating possible violations of a Federal statute.'" Appellant's Br. at 52 (quoting 313 F.2d 867, 868 (5th Cir. 1963), *aff'g sub nom. In re Coleman*, 208 F. Supp. 199 (S.D. Miss. 1962)). In context, that sentence refers to the amount of evidence the government must show to compel production, not the subject matter of the request. *Coleman*, 313 F.2d at 868 (clarifying that DOJ does not need to establish a *prima facie* case to compel production). In *Coleman*, DOJ *did* supply a purpose related to voting rights: "information in the possession of the Attorney General tending to show that discriminations on the basis of race and color have been made with respect to registration and voting" in the target counties. *In re Coleman*, 208 F. Supp. at 199. *Coleman* is in fact another example showing that DOJ knew how to write statutory compliant demands in the 1960s, even as it fails to do so now.

### A. "Basis" means a factual basis.

Title III requires the Attorney General to establish a factual basis for his demand. *See Weber*, 816 F. Supp. 3d at 1182–84 ("The basis is the reasoning provided by the DOJ regarding the evidence behind its investigation of a particular state and specific, articulable facts pointing to the violation of federal law.") Every court to consider the issue has found the same. *See, e.g.*, *Toulouse Oliver*, 2026 WL 2031479, at *9; *Amore*, 831 F. Supp. 3d at 156–57; *United States v. Galvin*, 830 F. Supp. 3d 122, 129–30 (D. Mass. 2026); *Oregon*, 828 F. Supp. 3d at 1104; *United States v. Scanlan*, 838 F. Supp. 3d 150, 162 (D.N.H. 2026); *Schmidt*, 835 F. Supp. 3d at 698; *Matthews*, 2026 WL 2212877, at *4. At a minimum, the "basis" requirement compels DOJ to describe factual information in its possession that tends to show the law has been violated. *See Kennedy v. Bruce*, 298 F.2d 860, 861 (5th Cir. 1962); *Amore*, 831 F. Supp. 3d at 156–57; *see also Basis*, Black's Law Dictionary 161 (8th ed. 2004) ("an underlying condition").

The requirement that DOJ state a factual basis for a record demand is a meaningful safeguard that Appellant may not flout. *See Weber*, 816 F. Supp. 3d at 1184; *Oregon*, 828 F. Supp. 3d at 1102–03. It ensures that the federal government uses the CRA as a tool to conduct properly predicated investigations rather than a blank check to get wide swaths of documents about voters beyond its statutory authority. *See In re Gordon*, 218 F. Supp. 826, 827 (S.D. Miss. 1963) ("[T]his Act

merely provides for a limited exploration and discovery as to the validity of the election processes employed and pursued in such Federal elections after May 6, 1960.”). Failure to meet this standard is fatal to Appellant’s CRA claim.

### B. Appellant’s demand for Maryland’s unredacted SVRL contained an insufficient statement of basis.

Appellant’s claimed basis—“to ascertain Maryland’s compliance with the list maintenance requirements of the NVRA and HAVA”—is no basis at all. Appellant’s Br. at 49. In its July and August 2025 letters, the SBE thoroughly explained Maryland’s list maintenance procedures, including how the State addresses voters who are inactive, move, die, are ineligible due to a conviction, or adjudged legally incompetent to vote, as well as how it handles duplicate and online voter registrations. JA39–41.[13]

Instead of attempting to explain why those explanations were insufficient, Appellant sued for the full SVRL, again without explanation as to how that will assist in any subsequent analysis. If the Attorney General could compel election records from states anytime he had an open-ended question about compliance and needed no factual underpinning for his demands, then the CRA’s reach would be

[13] The EAVS data to which Appellant points in its brief does not establish any likelihood that Maryland is failing to implement the procedures required by the NVRA and HAVA. In neither its initial letters to the SBE, nor in its arguments, does Appellant connect the EAVS result with any alleged deficiency in Maryland’s list maintenance procedures, despite the State Administrator’s thorough explanation of the same.

limitless, and its basis requirement would be meaningless. That would upend the limited oversight scheme Congress created. *See Matthews*, 2026 WL 2212877, at *5 ("Title III requires a factual basis for the demand which could include the evidence behind the Attorney General's investigation into the state's suspected noncompliance with federal law.").

Appellant's conclusory statements of basis contrast with the lawful demands for election records by the Attorney General in the 1960s. In *Kennedy v. Lynd*, the demand referenced information "tending to show that distinctions on the basis of race or color have been made with respect to registration and voting." 306 F.2d 222, 229 n.6 (5th Cir. 1962); *see also Kennedy v. Bruce*, 298 F.2d at 861 (same). "These cases also show that the DOJ wrote statutorily compliant demand letters sixty years ago." *Toulouse Oliver*, 2026 WL 2031479, at *8; *see also Weber*, 816 F. Supp. 3d at 1182–83 ("In the past, the DOJ has routinely stated . . . [a] basis related to alleged civil rights violations . . . ."). The Attorney General sixty years ago had to have evidence of racial discrimination to acquire election records, and Appellant must present a similarly sufficient factual basis here. It cannot.

## III. Appellant's demand undermines authority over elections that the Constitution reserves for Congress and the States.

The Constitution "assign[s] no role at all to the President" in election administration. *League of United Latin Am. Citizens v. Exec. Off. of the President*, 818 F. Supp. 3d 34, 53 (D.D.C. 2026) (*LULAC II*), *judgment entered*, No. 25-cv-

0946, 2026 WL 880056 (D.D.C. Mar. 31, 2026). The States and Congress share responsibilities for regulating election administration. *See* U.S. Const. art. I, § 2, cl. 1; U.S. Const. art. I, § 4, cl. 1. The notion that the executive would have the power to regulate federal elections "does not appear to have crossed the Framers' minds." *LULAC I*, 808 F. Supp. 3d at 45 (citing The Federalist No. 59 (Alexander Hamilton)); *see also* Debate in Massachusetts Ratifying Convention, *in* 2 The Founders' Constitution 255 (P. Kurland & R. Lerner eds., 1987) ("I know of but two bodies wherein [the power to regulate federal elections] can be lodged—the legislatures of the several states, and the general Congress." (statement of Caleb Strong)). "Congress, not the President, has the ultimate constitutional authority over elections." *California v. Trump*, 786 F. Supp. 3d 359, 381 (D. Mass. 2025); *see also* *DSCC v. Trump*, No. 26-5193, 2026 WL 2168617, at *5 (D.C. Cir. July 28, 2026) (per curiam) (finding that the Constitution vests the President with "no express authority over the conduct of elections").

Although the president has no constitutional role in elections, this administration has attempted to use the collection and analysis of data to exert authority over election administration. In the first half-dozen complaints in these thirty cases seeking unredacted voter rolls, Appellant began by identifying the President's March 2025 Elections EO as the cases' catalyst. Notably, since commencing this action, Appellant has ceased doing so. *Compare e.g.*, Compl. at 2–

3, *United States v. Weber*, No. 2:25-cv-09149 (C.D. Cal. Sep. 25, 2025), Dkt. No. 1 (quoting Elections EO); *and* Compl. at 1, *United States v. Pennsylvania*, No. 2:25-cv-01481 (W.D. Pa. Sep. 25, 2025), Dkt. No. 1, *with* JA26 (solely discussing CRA); Compl. at 1–3, *United States v. Wis. Elec. Comm'n*, No. 3:25-cv-01036 (W.D. Wis. Dec. 18, 2025), Dkt. No. 1; *and* Compl. at 1–3, *United States v. Matthews*, No. 3:25-cv-03398 (C.D. Ill. Dec. 18, 2025), Dkt. No. 1 (same). That shift is likely due to court decisions concluding that multiple provisions of the Elections EO "are inconsistent with the constitutional separation of powers and cannot lawfully be implemented." *LULAC II*, 818 F. Supp. 3d at 54 (permanently enjoining provisions purporting to impose new requirements for verifying citizenship for people registering to vote or applying for absentee ballots). Appellant's abandonment of its argument regarding the Elections EO further demonstrates the faulty premise and unconstitutionality of its actions.

Although courts had already declared the Elections EO invalid on separation-of-powers grounds, in early February 2026, the President called for a "take over" of voting procedures in many states.[14] The Mail Voting EO, issued the next month, illustrates a dogged attempt to put these words into action, which courts have continued to hold is unconstitutional. *See California v. Trump*, No. 25-cv-10810-

---

[14] *See* Erica L. Green, Michael Gold & Robert Jimison, *Trump Repeats Call to 'Nationalize' Elections, as White House Walks It Back*, N.Y. Times (Feb. 3, 2026), https://www.nytimes.com/2026/02/03/us/politics/trump-save-act-elections.html.

DJC, 2026 WL 1826535 (D. Mass. June 24, 2026) (enjoining provisions involving USPS and the creation of citizenship lists as ultra vires and a violation of the separation of powers). This is an escalation, but not a change in position for this President, who in August 2025 declared that states must do “what the Federal Government, as represented by the President of the United States, tells them” as related to elections.[15] By its own public accounts, the executive’s real purpose for collecting sensitive voter data from Maryland and other states is to disrupt and take over election processes. Specifically, Appellant seeks to supplant Maryland’s role in list maintenance by substituting its own judgment and process, which violates the constitutional and statutory assignments of election administration duties. *Weber*, 816 F. Supp. 3d at 1175–76. Appellant’s role in enforcing federal statutes does not permit it to engage in list maintenance, but only to ensure that the states comply with federal laws. But, as is clear from its repeated statements, DOJ plans to conduct its own analyses to identify voters it deems should be removed from the rolls. If granted, Appellant’s demand could make voters less likely to register and turn out to vote. *See Weber*, 816 F. Supp. 3d at 1196. “This risk threatens the right to vote which is the cornerstone of American democracy.” *Id.*; *see also Schmidt*, 835 F. Supp. 3d at 699 (“What, a reader rhetorically may ask, could possibly go wrong?”). As with its

[15] *See* Donald J. Trump (@realDonaldTrump), TruthSocial.com (Aug. 18, 2025), https://perma.cc/R3KM-525Z.

other unlawful uses of information, Appellant's goal in obtaining and consolidating massive amounts of voter data is to encroach on the constitutionally mandated role of states in election administration.

## CONCLUSION

For the reasons stated above, *amici* Campaign Legal Center and the Brennan Center for Justice respectfully request the Court affirm the district court's dismissal of the complaint and denial of Appellant's motion to compel.

Dated: October 7, 2026

Respectfully submitted,

/s/ *Katherine Hamilton*
Katherine Hamilton
Brent Ferguson
Daniel S. Lenz
Sejal Jhaveri
Renata O'Donnell
Alexis Grady
CAMPAIGN LEGAL CENTER
1333 New Hampshire Ave. NW
Suite 300
Washington, DC 20036
(202) 736-2200
khamilton@campaignlegalcenter.org

Maura Eileen O'Connor
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
777 6th St. NW, Ste. 1100
Washington, DC 20001
(202) 249-7190
oconnore@brennan.law.nyu.edu

Patrick Berry
BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW
120 Broadway, Suite 1750
New York, NY 10271
(646) 925-8754
berryp@brennan.law.nyu.edu

*Counsel for Amici Curiae*

## CERTIFICATE OF COMPLIANCE

1. The foregoing brief complies with the type-volume limitations of Fed. R. App. P. 29(a)(5) and Fed. R. App. P. 32(g)(1) because this brief contains 5,920 words, excluding the items exempted by Fed. R. App. P. 32(f).
2. The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6) as this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

Date: October 7, 2026

*/s/ Katherine Hamilton*
Katherine Hamilton
Campaign Legal Center

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2026, I electronically filed the foregoing with the Clerk of Court for the U.S. Court of Appeals for the Fourth Circuit by using the appellate CM/ECF system.

Participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

*/s/ Katherine Hamilton*
Katherine Hamilton
Campaign Legal Center