**26-1878**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT**

---

United States of America,

Appellant,

v.

Jared DeMarinis, in his official capacity as the State Administrator of Elections for the State of Maryland,

Appellee,

Maryland/DC Alliance for Retired Americans, et al.,

Intervenors.

---

On Appeal from an Appealable Order of the
United States District Court for the District of Maryland
Case No. 25-cv-3934, Hon. Stephanie A. Gallagher

---

# BRIEF OF LOCAL ELECTION OFFICIALS AND LOCAL GOVERNMENTS AS AMICI CURIAE SUPPORTING APPELLEES AND AFFIRMANCE

---

Christine Bass
Public Rights Project
490 43rd St., #115
Oakland, CA 94609
(309) 242-8511
christine.bass@publicrightsproject.org

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Counsel for Amici Curiae

October 7, 2026

## CORPORATE DISCLOSURE STATEMENT

Amici are individuals or government entities. They have no parent corporation, and no publicly held corporation owns any portion of any of them.

## TABLE OF CONTENTS

**Page(s)**

Corporate Disclosure Statement ..... i

Table of Authorities ..... iii

Interests of the Amici Curiae ..... 1

Introduction ..... 3

Argument ..... 5

I. Courts must be able to assess requests for election-related records, including demands made ostensibly pursuant to the Civil Rights Act. ..... 5

A. The District Court properly exercised its authority to evaluate the DOJ's demand. ..... 6

B. If district courts did not exercise their authority to review records requests, local election officials like *Amici* could become swamped by records demands. ..... 7

II. The Department of Justice did not provide a sufficient basis for its demand. ..... 13

A. Maryland's state and local election officials have made reasonable efforts to fulfill their obligations under the NVRA and HAVA. ..... 14

B. The data sought would not shed any light on whether Maryland officials fulfill their obligations under the NVRA and HAVA. ..... 17

Conclusion ..... 21

Certificates ..... 1a

Appendix .....

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Civ. Rts. Union v. Phila. City Comm'rs*,
872 F.3d 175 (3d Cir. 2017) .................................................................... 16
*Bellitto v. Snipes*,
935 F.3d 1192 (11th Cir. 2019) ............................................................... 15
*Figueroa v. Butterball, LLC*,
164 F.4th 312 (4th Cir. 2026)..................................................................... 13
*In re Bender*,
586 F.3d 1159 (9th Cir. 2009) ..................................................................... 6
*Nat'l Shooting Sports Found. v. Att'y Gen. New Jersey*,
__ F.4th __, 2026 WL 2639295 (3d Cir. Sept. 8, 2026) ............................................ 7
*Pub. Int. Legal Found. v. Benson*,
136 F.4th 613 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026) ................. 15, 18
*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014) ..................................................................................... 7
*United States v. Aguilar*,
No. 3:25-cv-00728, 2026 WL 2364502 (D. Nev. Aug. 14, 2026)............................... 7
*United States v. Amore*,
831 F.Supp.3d 149 (D.R.I. 2026)............................................................. 11, 21
*United States v. Benson*,
179 F.4th 470 (6th Cir. 2026)....................................................................... 7
*United States v. Koski*,
No. 3:26CV42, 2026 WL 2032532 (E.D. Va. July 14, 2026) .................................... 7
*United States v. Powell*,
379 U.S. 48 (1964) ....................................................................................... 6
*United States v. Simon*,
No. 25-cv-03761, 2026 WL 2389778 (D. Minn. Aug. 17, 2026) ............................... 3
*United States v. Weber*,
816 F.Supp.3d 1168 (C.D. Cal. 2026) ............................................................. 6

**Statutes**

52 U.S.C. § 20507(a)(4) ............................................................................ 14, 15
52 U.S.C. § 20507(c)(1) ................................................................................... 15
52 U.S.C. § 20507(c)(2) ................................................................................... 20
52 U.S.C. § 20507(d)(1) ............................................................................ 15, 19
52 U.S.C. § 20705 ............................................................................................ 6
52 U.S.C. § 21083(a)(2)(A) ............................................................................... 14
52 U.S.C. § 21083(a)(4)(A) ........................................................................ 14, 15
Md. Code Ann., Elec. Law § 3-101 ..................................................................... 16
Md. Code Ann., Elec. Law § 3-101(c)(3) ............................................................. 16
Md. Code Ann., Elec. Law § 3-504 ..................................................................... 16

## TABLE OF AUTHORITIES—continued

**Page(s)**

Md. Code Ann., Elec. Law § 3-506(a) .......... 18
Md. Code Ann., Elec. Law § 3-506(a)(2)(v) .......... 18

**Other Authorities**

Ali Swenson & Gary Fields, *The Justice Department Seeks Voter and Election Information From at Least 19 States, AP Finds*, AP News (Aug. 3, 2025) .......... 3
Andrew Garber, *Mass Voter Challenges*, Brennan Ctr. for Just. (July 21, 2026) .......... 10
Assoc. Press, *Justice Department Requests Access to Dominion Voting Equipment Used in Missouri in 2020*, CNN (Sept. 4, 2025) .......... 12
Br. for the United States as Appellant, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026) .......... 18
Brett Sholtis, *'PA Fair Elections,' tied to powerful conservative groups, pushes to remove people from voter rolls*, WESA (Sept. 28, 2024) .......... 10
Carter Walker, *Efforts to challenge Pennsylvania voters' mail ballot applications fizzle,* Spotlight PA (Nov. 8, 2024) .......... 11
Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?*, MIT Political Science Department Research Paper No. 2018-20 (2018) .......... 20
Exec. Order No. 14399, 91 Fed. Reg. 17125 § 2(b) (Mar. 31, 2026) .......... 12
Gilare Zada, *SF Officials Push Back as DOJ Seeks Data on Voters Removed Over Citizenship Rules*, KQED (July 31, 2025) .......... 12
Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings* (2025) .......... 20
Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026) .......... 3
Kyle Yoder & April Tan, *Election Officials & the Misuse of Public Records Requests*, Ctr. for Election Innov. & Rsch. (June 2024) .......... 9
Md. State Bd. of Elections, Voter Registration List Maintenance (Feb. 1, 2022) .......... 17
Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle.*, N.Y. Times (Sept. 24, 2026) .......... 19
Paul Gronke et. al., *Today's Election Administration Landscape: Findings from the 2024 Elections & Voting Information Center*, EVIC (2025) .......... 8
Samantha J. Gross, *"I Have No Idea What Any of These Even Mean": Massachusetts Clerks Are Getting Bombarded With Conspiracy-Fueled Records Requests About the 2020 Election*, Boston Globe (Sept. 18, 2022) .......... 8
Steve Mistler, *Election Deniers Are Swamping Officials With Records Requests — Including Maine's*, Me. Pub. (Sept. 7, 2022) .......... 8
U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests* (2023) .......... 9
U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report* (2025) .......... 20

## INTERESTS OF THE AMICI CURIAE

*Amici* are local election officials and local governments representing forty jurisdictions, including those from the many states that have received demands for voter rolls under the Civil Rights Act of 1960 ("CRA") from the U.S. Department of Justice ("DOJ") since 2025.[1] *Amici* have considerable experience relevant to this case because as local election officials, they administer local, state, and federal elections in their respective jurisdictions. In states that are subject to the National Voter Registration Act ("NVRA"), like Maryland here, local government officials are duty-bound to promote the exercise of the right to vote. 52 U.S.C. § 20501(a)(2). *Amici* are committed to holding free and fair elections for their residents by fulfilling the purposes of the NVRA, which include "ensur[ing] that accurate and current voter registration rolls are maintained," *id.* § 20501(b)(4), and "enhanc[ing] the participation of eligible citizens as voters," *id.* § 20501(b)(2). And *Amici* work hard to do that every day.

*Amici* have a particular interest in ensuring that the federal government does not wrongly invade the province of the states—especially in ways that impose expensive demands on already under-resourced offices. In Maryland and other states in the Fourth Circuit, elections are administered at the municipal level, and many municipalities have limited staff and resources at their disposal to fulfil those purposes. While state election officials do possess the statewide voter registration list ("SVRL") at issue in this case and others like it, local election officials in Maryland

[1] A full list of signatory *Amici* appears as an Appendix to this Brief.

and other states already perform list maintenance activities that support the list's accuracy and submit responses about those activities to the United States through the Election Administration and Voting Survey ("EAVS"). Because the DOJ is investigating those activities and is citing those survey responses in support of its investigations in Maryland and elsewhere, *Amici* write to provide context and accurate information about those processes based on their combined decades of election administration experience across the country. Their perspective is particularly relevant here because a statewide voter-registration database is the product of thousands of individual administrative decisions made by local election officials; the database itself does not show the process by which those decisions were made.

*Amici* are also interested in the outcome of this case because the DOJ has foreshadowed directly targeting officials like *Amici* for criminal prosecution. The DOJ has sought identifications and contact information for local election officials in the states it has sued to obtain voter rolls, and it has indicated in a recent court filing that it is considering filing criminal charges against election officials in connection with their list maintenance duties and the state voter rolls it is seeking to acquire, seemingly to enforce an executive order that has directed such prosecutions. Given the potential downstream consequences for *Amici*, they have a strong interest in the Court understanding the facts of election administration, proper list maintenance, and the purported basis of this lawsuit.

*Amici* file with the consent of the Parties. No person or entity other than *Amici* or their counsel have contributed resources to or otherwise worked on this brief.

## INTRODUCTION

In 2025, the DOJ began to send letters to local and state governments across the country demanding copies of voter rolls with sensitive voter data.[2] The letters to the states changed over time, but generally asked questions about state compliance with federal voter list maintenance laws, suggested that certain data points from the EAVS Comprehensive Report indicated potential noncompliance, and demanded copies of the SVRLs, including unique identifiers for voters.[3] Eventually, the government began to cite the CRA to support the DOJ's authority to demand the records. Most states refused, and the DOJ sued thirty states and Washington, D.C., because of that refusal. *See, e.g.*, JA 3. Every district court that has evaluated dueling motions to compel and to dismiss has dismissed the cases. *See id.* ("no court has ruled in favor of the United States to date"), JA 6 ("[c]onsistent with *Powell*, and every other court to have addressed this question in the recent litigation in other states . . .").[4]

---

[2] Ali Swenson & Gary Fields, *The Justice Department Seeks Voter and Election Information From at Least 19 States, AP Finds*, AP News (Aug. 3, 2025), https://perma.cc/4UEC-B3VZ (documenting initial wave of letters to states demanding voter rolls, and noting that several counties received similar requests from the DOJ).

[3] Kaylie Martinez-Ochoa, Eileen O'Connor & Patrick Berry, *Tracker of Justice Department Requests for Voter Information*, Brennan Ctr. for Just. (Aug. 17, 2026), https://perma.cc/3T7M-6SNS (storing copies of the correspondence between states and the DOJ).

[4] *See also, e.g. United States v. Simon*, No. 25-cv-03761, 2026 WL 2389778, at *2 (D. Minn. Aug. 17, 2026), *appeal filed*, No. 26-2679 (8th Cir.) (collecting cases) ("[F]ederal courts in Michigan, Oregon, California, Maryland, Colorado, Wisconsin, Maine, Arizona, Rhode Island, Massachusetts, New Mexico, Illinois, New Jersey, Kentucky, Virginia, New York, New Hampshire, Connecticut, Pennsylvania, West

*Amici* support Appellees' briefing but write separately to provide additional context and perspective that provides a separate basis upon which this Court could affirm. Courts not only may, but must evaluate records demands under the CRA, because otherwise local and state election officials in Maryland and across the country would have no recourse for burdensome demands seeking sensitive information like individual and personally-identified voter records. The District Court did not reach this issue, but investigations into list maintenance are not a valid use of the Attorney General's record request authority under the CRA. Even if they were, the data cited by the DOJ as a basis for its investigations would not provide a proper basis for such a demand. The data it seeks sheds no light on the reasonableness of Maryland election officials' efforts under the NVRA or HAVA. A voter-registration database is not itself a description of the list-maintenance process that produced it. In Maryland, local election officials continually add, change, cancel, and remove registration records, while the state Appellee aggregates those records into the statewide list. A record showing that a voter remains registered therefore does not, by itself, show what information officials received, what verification they performed, or why they determined that a registration should remain on the list. Election officials do hard, thankless work in service of American civic life; this Court should reject unlawful attempts to make that work even harder.

---

Virginia, the District of Columbia, and Nevada have dismissed Plaintiff's claims demanding production of unredacted statewide voter registration lists.").

## ARGUMENT

### I. Courts must be able to assess requests for election-related records, including demands made ostensibly pursuant to the Civil Rights Act.

Courts have a vital role to play in adjudicating novel records requests for some of our most sensitive voting data. Local election officials regularly receive records requests from both the public and government agencies. The majority of those are routine and lawful, but *Amici* and other local election officials also receive requests implicating other statutes or individual privacy rights, and they rely on courts to evaluate those requests and identify the limits of production obligations. Without courts playing that vital adjudicatory role, local election officials would struggle to fulfil their day-to-day election administration responsibilities while simultaneously responding to every single onerous or frivolous request for records. As local election officials, *Amici* appreciate more than anyone the power of transparency to build trust in elections. But frivolous or unlawful requests can do the opposite while also burdening election administration.

In this case, as in every one of the identical suits brought by the DOJ, the District Court properly exercised its authority to decide whether the DOJ could compel production of the complete, unredacted SVRL by Maryland officials. This Court reversing and disclaiming authority to review CRA demands would subject local election officials like *Amici* to sweeping demands by the federal government or others, and could leave them without recourse in the face of overbroad, unduly burdensome, or unlawful demands.

### A. The District Court properly exercised its authority to evaluate the DOJ's demand.

The District Court properly exercised its authority to evaluate the validity of the DOJ's demand for the SVRL. The statute governing Attorney General requests under the CRA confers on district courts jurisdiction to compel records demanded by the Attorney General by "appropriate process." 52 U.S.C. § 20705. Examining the term "appropriate process" in another statute, the Supreme Court observed that because the statute did not "specify[] the procedure to be followed in invoking the court's jurisdiction, the Federal Rules of Civil Procedure apply," i.e., "filing a complaint, followed by answer and hearing" under those Rules. *United States v. Powell*, 379 U.S. 48, 58 n.18 (1964). *Powell* further explained that, under that statute, federal courts may "inquire into the underlying reasons for the [investigative] examination" at issue in that statutory context. *Id.* at 58. There is no reason to depart from that here, because "[n]othing in the text of Title III requires a special statutory proceeding or any abbreviated procedures." *United States v. Weber*, 816 F.Supp.3d 1168, 1182 (C.D. Cal. 2026). So *Powell*'s reasoning should control.

The DOJ's contrary argument that courts may play only a "limited" role in assessing its demands under the CRA in these cases concerning voter rolls, U.S. Br. at 37, makes little sense. As a practical matter, it would "create an asymmetric rule permitting . . . jurisdiction" for the federal government to seek enforcement from a noncompliant target of a records request, but bar jurisdiction for such targets to seek review of potentially unlawful requests in the first instance. *In re Bender*, 586 F.3d 1159, 1166 (9th Cir. 2009). Such a result would force local election officials with good

faith objections to potentially unlawful record requests to risk criminal penalties for noncompliance if they want federal court review, a predicament that federal courts recognize across contexts as putting people in an unfair position—and thus amenable to pre-enforcement challenge. *E.g.*, *Nat'l Shooting Sports Found. v. Att'y Gen. New Jersey*, __ F.4th __, 2026 WL 2639295, at *5 (3d Cir. Sept. 8, 2026) (reinstating pre-enforcement challenge that New Jersey Attorney General had previously had dismissed in reliance on subsequently-broken promise of non-enforcement); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 152, 159 (2014) (reinstating pre-enforcement challenge because of "threatened enforcement").

Given the legal bases for judicial review, it comes as little surprise that courts have unanimously rejected the DOJ's argument in parallel cases concerning the voter roll demands. *E.g. United States v. Benson*, 179 F.4th 470, 483 n.2 (6th Cir. 2026) (observing that the law "carves out a role for the courts in reviewing civil investigative demands like the government's."); *see also, e.g. United States v. Aguilar*, No. 3:25-cv-00728, 2026 WL 2364502, at *2–3 (D. Nev. Aug. 14, 2026), *appeal filed*, No. 26-5375 (9th Cir.) (collecting cases); *United States v. Koski*, No. 3:26CV42, 2026 WL 2032532, at *1 n.2 (E.D. Va. July 14, 2026) (same).

### B. If district courts did not exercise their authority to review records requests, local election officials like *Amici* could become swamped by records demands.

*Amici* file this separate brief, however, to underscore the real stakes for local election officials in the adjudication of these requests. Of course, *Amici* willingly and ably respond to lawful records requests. They have historically provided considerable

voter information to the public through record requests, and as noted, *Amici* understand the important balance of transparency and voter privacy that fosters public confidence in the electoral process. But *Amici* have simultaneously experienced a swelling flood of requests in recent years—requests that are both more numerous and more burdensome in character. That deluge already threatens to swamp election officials across the country, and courts must exercise their role to ensure that unlawful or unwarranted requests do not crowd out *Amici*'s and other officials' important direct work on elections.

First, *Amici* and other local election officials in Maryland and around the country have seen the number of records requests expand exponentially in recent years, and those requests are more burdensome. Some of these requests are hard to parse even on their own terms because they incorporate conspiracy theories, or at least evince misunderstanding of list management.[5] This problem is not limited to Maryland, or the Fourth Circuit; national surveys of local election officials demonstrate both that the volume of records requests has increased and that the requests themselves have become more burdensome.[6]

---

[5] *See, e.g.,* Steve Mistler, *Election Deniers Are Swamping Officials With Records Requests — Including Maine's*, Me. Pub. (Sept. 7, 2022), https://perma.cc/TC7Y-XVKV (describing an increase in election record requests in Maine driven by conspiracy theories); Samantha J. Gross, *"I Have No Idea What Any of These Even Mean": Massachusetts Clerks Are Getting Bombarded With Conspiracy-Fueled Records Requests About the 2020 Election*, Boston Globe (Sept. 18, 2022), https://perma.cc/2GV8-RRG2 (same as to Massachusetts).

[6] *See* Paul Gronke et. al., *Today's Election Administration Landscape: Findings from the 2024 Elections & Voting Information Center*, at 20, EVIC (2025), https://perma.cc/EH7G-LPLD ("[O]ver 60% of requests are unduly burdensome and

Second, the increase in both number and complexity of the requests has vastly increased the time and resources required to respond to them. While some records may be produced by a simple process, others require a more complex process involving multiple teams and prolonged diversion from election administration work. Local election offices nationwide have had to devote days or weeks of staff time across multiple teams to accommodate requests, or even had to hire additional staff to accommodate the increasing demands on their time.[7] And that's for requests that can be handled solely by non-lawyer staff; requests for records for which an election office does not already have a clear public inspection or production procedure in place could require consulting legal counsel to determine whether a response is required or would violate privacy laws. (As Appellees explain, the request here, for example, violates such laws.) If records can be produced in compliance with privacy laws, lawyers and election officials' staffs might still spend considerable time painstakingly applying redactions to protect voter privacy. Even aside from legal counsel, many requests can require work from technology personnel to convert files from formats used in voting software to shareable or printable documents; from administrative staff to physically

---

impede the ability of [local election officials] to perform their duties."); U.S. Election Assistance Comm'n, *Best Practices: Public Records Requests*, at 1 (2023), https://perma.cc/V5EH-G95E ("Since the 2020 election cycle, election officials have reported an increase in public records requests, requiring time and resources added to their official duties of administering elections. Flooding elections offices with public records requests may impact key service delivery during critical periods of an election cycle when staff time and resources are already stretched thin.").

[7] *See* Kyle Yoder & April Tan, *Election Officials & the Misuse of Public Records Requests*, Ctr. for Election Innov. & Rsch. (June 2024), https://perma.cc/569H-7745.

reproduce records, like printing and copying; and from other public-facing staff to monitor public inspection sessions and respond to questions about what the documents mean.

Election officials also face increasingly time-consuming second-order work responding to public incidents caused by misinformation arising from the production of records. Regardless of the intent of requesters, election records can be complicated to interpret. When records are misunderstood by people who have obtained them, those misunderstandings can create cascading problems for both local election officials and voters. In an example relevant to list maintenance, since 2020, organizations claiming to be concerned with the accuracy of voter rolls have exploited state voter eligibility statutes to issue mass challenges against registered voters.[8] These organizations request public versions of voter rolls, compare them against various datasets, and use those comparisons to accuse certain voters of ineligibility to vote. But many of those accusations are erroneous, and even erroneous accusations made under state challenge statutes can result in hearings that take considerable resources from elections offices and create separate burdens for ordinary voters who have done nothing wrong.[9]

---

[8] Andrew Garber, *Mass Voter Challenges*, Brennan Ctr. for Just. (July 21, 2026), https://perma.cc/9LCA-QC7F.

[9] For example, groups in Pennsylvania became convinced that voter rolls were not properly maintained, and began sending datasets to local election officials. Local officials devoted time reviewing records, responding to emails, and holding meetings with organizations to try to explain that their list maintenance practices were proper and lawful. Brett Sholtis, *'PA Fair Elections,' tied to powerful conservative groups, pushes to remove people from voter rolls*, WESA (Sept. 28, 2024), https://perma.cc/2D9E-NMYM. Misunderstanding the law and voter roll information,

Novel election records requests coming from the DOJ since 2025 are yet another unjustified burden. In addition to demanding copies of state voter rolls with sensitive voter data, the demand letters issued by the DOJ beginning in 2025 sought voluminous information from state election officials, including in Maryland, with a tight deadline.[10] While the states' responses would require significant time and effort, the DOJ appears to have sent the demand letters after minimal due diligence. *See United States v. Amore*, 831 F.Supp.3d 149, 154 (D.R.I. 2026), *appeal filed*, No. 26-1665 (1st Cir. 2026) (citing, in a different case, "the United States [having] proposed that its unprecedented demands for unredacted voting rolls are the result of its 'trust but verify' approach to the states' list maintenance efforts"). For example, the letters requested some information that could have been found with basic online research, and asked questions about the implications of data without seeming to understand those data's purpose and use. One district court has characterized the demand as a "fishing expedition." *Id.*

---

those groups returned with formal challenges to voters' eligibility just before the 2024 general election, diverting local election officials from their typical duties during the busiest weeks of election administration to hold hearings and forcing eligible voters to appear at those hearings to defend their eligibility—consuming time and resources even when the challenges were spurious. Carter Walker, *Efforts to challenge Pennsylvania voters' mail ballot applications fizzle,* Spotlight PA (Nov. 8, 2024), https://perma.cc/F4SE-ZWMQ.

[10] *E.g.* JA 37 (July 14, 2025 letter to Appellee DeMarinis incorporated by reference to the complaint; that letter gave DeMarinis 14 days to describe all list maintenance activities, identify local election officials, review and respond to EAVS data questions, and provide the SVRL).

*Amici* recognize that if they have not already received such demand letters from the federal government, they likely will. The letters sent to states asked for names of all local election officials, necessarily including many or all *Amici*, responsible for list maintenance in the states. *See, e.g.*, JA 35. The DOJ is already making unprecedented requests of local election officials, including by asking for access to physical voting machines[11] and demanding years of voter roll data.[12] And requests made by the federal government come with a separate, unique, and uniquely dangerous burden: criminal prosecution. Pursuant to an executive order directing the Attorney General to prioritize the investigation and prosecution of State and local officials whom he believes have issued ballots to ineligible voters,[13] the DOJ is apparently considering filing criminal charges against election officials in connection with their list maintenance duties—which *Amici* know because the DOJ has openly asserted that on the docket in this very appeal.[14]

An opinion from this or any other court that denies review of even the mostly baldly spurious or privacy-violating CRA demands would facilitate the imposition of

---

[11] Assoc. Press, *Justice Department Requests Access to Dominion Voting Equipment Used in Missouri in 2020*, CNN (Sept. 4, 2025), https://perma.cc/XYT3-ZDH2.

[12] Gilare Zada, *SF Officials Push Back as DOJ Seeks Data on Voters Removed Over Citizenship Rules*, KQED (July 31, 2025), https://perma.cc/4JNW-E9CK.

[13] Exec. Order No. 14399, 91 Fed. Reg. 17125 § 2(b) (Mar. 31, 2026).

[14] *See, e.g.*, Doc. 24, Reply to Opp'n to Mot. to Expedite at 8 (asserting that, after it obtains SVRL data, states might "elect voluntary compliance to avoid the criminal sanctions that may be incurred by state officials that knowingly conspire with noncitizens to permit them to vote . . . or knowingly tabulate fictitious ballots.").

an unsustainable burden on local election officials. *Amici* and other local election officials should not be forced to drop day-to-day election administration duties to respond to unrestricted records requests from the DOJ, or to defend themselves from prosecution. This Court has jurisdiction to review these demands and should exercise it accordingly.

## II. The Department of Justice did not provide a sufficient basis for its demand.

Because the District Court dismissed the case solely on the ground that the SVRL is not a "record or paper that the United States may request," JA 6–7, it did not reach any of the other "several arguments supporting dismissal of the [DOJ's] claim," *id.* at 6. This Court may affirm on any basis fairly supported by the record, *e.g. Figueroa v. Butterball, LLC*, 164 F.4th 312, 319 (4th Cir. 2026), and *Amici* write separately in part to explain that the DOJ did not supply a sufficient purpose for its request. Even accepting its purported concern for NVRA and HAVA compliance, *see* U.S. Br. at 48–49 (citing JA 47 and claiming interest in assessing compliance with list maintenance requirements of NVRA and HAVA), that concern is not a proper basis for an investigative demand. First, those statutes require only reasonable efforts, not compliance with any particular standard; second, the data the DOJ sought would not provide evidence of unreasonable list management practices for numerous reasons. The government's theory rests on a basic mismatch between what the SVRL can show and what the NVRA and HAVA require.

### A. Maryland's state and local election officials have made reasonable efforts to fulfill their obligations under the NVRA and HAVA.

The DOJ's argument fails in part because of its mistaken characterization of both the NVRA and HAVA. In its Statement of the Case, the DOJ correctly characterizes the NVRA and the HAVA as "requir[ing] each state to conduct 'a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters[.]" U.S. Br. at 5–6 (citing 52 U.S.C. § 20507(a)(4), 21083(a)(2)(A)). But in its argument section, the DOJ curiously ignores the reasonable efforts language on the way to characterizing its records request as part of an effort "to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA[.]" U.S. Br. at 49 (quoting JA 47); *see also id.* at 50. In considering the purported basis for the records request here, then, it's worth considering both the purposes of the NVRA and HAVA, and what "reasonable efforts" means in this context.

First, local election officials across the country, including *Amici*, have long participated in state list maintenance programs and well know the relevant federal statutory requirements: state programs must involve reasonable efforts to remove certain categories of ineligible voters. HAVA requires "[a] system of file maintenance that makes a reasonable effort to remove registrants who are ineligible to vote from the official list of eligible voters." 52 U.S.C. § 21083(a)(4)(A). The NVRA requires states to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of" the registrant's death or change of address. *Id.* § 20507(a)(4). As to changes of address,

the NVRA carves out a safe harbor provision, outlining an option for states to meet their change-of-residence list maintenance obligations by establishing a program under which election officials send confirmation notices to voters who appear to have moved based on the information contained in the National Change of Address database maintained by the United States Postal Service. *Id.* § 20507(c)(1); *e.g. Bellitto v. Snipes*, 935 F.3d 1192, 1203 (11th Cir. 2019) (defining the provision as a "safe harbor"). Under this statutory safe harbor process, election officials may then remove voters who filed a change-of-address form only if they (1) do not respond to that notice; and (2) have not voted for two consecutive general elections for federal office following the failure to respond to a confirmation notice. 52 U.S.C. § 20507(d)(1).

Courts to have considered these laws have held that they require state list maintenance programs to undertake exactly what the plain statutory text calls for: a "reasonable effort." *Id.* §§ 21083(a)(4)(A), 20507(a)(4). The Sixth Circuit recently offered a construction of the NVRA's requirements based on dictionary definitions, given the absence of a definition in the text of the NVRA itself: A "reasonable effort" requires "a serious attempt that is rational and sensible; the attempt need not be perfect, or even optimal, so long as it remains within the bounds of rationality." *Pub. Int. Legal Found. v. Benson*, 136 F.4th 613, 625 (6th Cir. 2025), *cert. denied*, 146 S. Ct. 1772 (2026). And in the Eleventh Circuit's view, "[t]he failure to use duplicative tools or to exhaust every conceivable mechanism does not make [a local election office's list maintenance] effort unreasonable." *Snipes*, 935 F.3d at 1207 (discussing a county's process for identifying and removing deceased voters from rolls).

Circuit courts have also read list maintenance requirements to distinguish between mandatory and permissive removal programs, with death and change-of-address being the only mandatory components. The Eleventh Circuit explained that "the statutory language is plain and unambiguous and requires the states to employ a general program of list maintenance that makes a reasonable effort to remove voters based *only* on account of death or change of address," and not on other ineligibility bases. *Id.* at 1201 (emphasis added). In litigation over list maintenance associated with criminal convictions, the Third Circuit echoed the distinction between mandatory and permissive programs: "[T]he mandatory language in Section 8(a)(4) only applies to registrants who have died or moved away. Removal due to criminal conviction is not included on this list of mandatory purging, and we will not amend the statute by reading that requirement into its text when Congress obviously chose not to do so." *Am. Civ. Rts. Union v. Phila. City Comm'rs*, 872 F.3d 175, 182–83 (3d Cir. 2017) (footnote omitted). Maryland has list maintenance procedures for voters who have died or moved away that at least meet, and likely exceed, statutory requirements.

Maryland makes more than reasonable efforts at list maintenance. Its continuously-updated system is codified at Md. Code Ann., Elec. Law § 3-101 *et seq.*, and involves the State Administrator collecting information from a myriad of governmental sources, *id.* § 3-504, and coordinating with local election officials across the state to ensure that changes are reflected in the statewide database, *id.* § 3-101(c)(3). Updates to remove ineligible voters happen quite quickly, especially considering the amount of coordination required; as Maryland explains to the public,

it "receives information from other states daily on individuals who are now registered to vote in another state," which allows Maryland election officials "to cancel their Maryland registration." Md. State Bd. of Elections, Voter Registration List Maintenance, at 1 (Feb. 1, 2022).[15] In the case of deceased voters, for example, Maryland election officials coordinate with the Maryland Department of Health "on a monthly basis" to cross-reference death records with the SVRL; deceased "voters' records are cancelled immediately, with no verification process required." *Id*. Indeed, local election officials "have 5 business days to complete the cancellation process" when notified of a death. *Id*. Maryland election officials also regularly coordinate with both state and federal courts, jury commissioners, the U.S. Postal Service, and the Electronic Registration Information Center (which centralizes DMV data from participating states), as part of their ongoing efforts to maintain an accurate SVRL of eligible voters. *Id*. at 1–3. While edge cases—like a Maryland voter moving out of state and passing away there—may take longer to manifest in the SRVL, Maryland's well-established efforts are more than reasonable.

### B. The data sought would not shed any light on whether Maryland officials fulfill their obligations under the NVRA and HAVA.

Even if obligations under the NVRA and HAVA could provide a valid basis for the DOJ's request here, the limited non-public information the DOJ seeks from Maryland's SVRL could not possibly demonstrate that Maryland officials have failed to make the required reasonable efforts. As a reminder, much of the SVRL

---

[15] *Available at*: https://elections.maryland.gov/voter_registration/list_maintenance.html.

information is already public; Maryland law already provides for a requester to receive "[a] copy of a list of registered voters," Md. Code Ann., Elec. Law § 3-506(a), albeit not one that discloses (for example) certain confidential personal addresses, *id.* § 3-506(a)(2)(v); *see also* JA 41 (Appellee explaining to the DOJ the process to obtain publicly-available data). But regardless, even at this Court the DOJ offers no reason to believe that any of the information it seeks from the SVRL could shed light on the reasonability of Maryland's efforts. *See generally* U.S. Br. at 48–56.

The DOJ has not at any point connected the information it seeks from the SVRL with NVRA or HAVA compliance. Elsewhere, the DOJ has at least—if wrongly—asserted that "[t]he SVRL is perhaps the most relevant evidence as to whether [a state's] list maintenance program is reasonable." Br. for the United States as Appellant at 25, *United States v. Bellows*, No. 26-1676 (1st Cir. July 17, 2026). But DOJ has modified its tack here, half-heartedly suggesting only that the SVRL "might cast light on . . . Maryland's compliance with the NVRA and HAVA." U.S. Br. at 50. Even that couched language provides it little help, however, because even finding some unspecified number of registrants who should not be registered would not show that Maryland was failing to meet the reasonable efforts standard for statutory list maintenance. The NVRA and HAVA statutes require "serious attempt[s]" to follow list maintenance processes that are "rational and sensible," *Benson*, 136 F.4th at 625, not a particular low rate of error, or the complete elimination of every anomalous edge case. The relevant inquiry, therefore, is not simply who appears on the statewide list, but what efforts officials undertook to maintain it. By the statutory standards, the efforts that Maryland officials have undertaken are at minimum rational and

sensible attempts—indeed, they appear to exceed the NVRA's textual safe harbor process.

Regardless of Maryland's SVRL in particular, individual data points generally cannot contribute to reliable conclusions about the sufficiency of specific states' list maintenance practices. The DOJ's own brief here offers an attenuated chain, contending that "fraudulent voting" can "dilute[] the right of citizens to cast ballots that carry appropriate weight," U.S. Br. at 53 (citation omitted), and then pointing to some potential that list-maintenance practices have to prevent such ineligible voting. But even assuming that the non-public data points from the Maryland SVRL could demonstrate that some people who died or moved had not been quickly removed from voter rolls, that would not show that even a single invalid vote had been cast. In *Amici*'s experience, the most common result of someone passing away without immediate removal from the SVRL is simply that they do not vote in the next—or any subsequent—election. And even if the DOJ could show that some number of invalid votes *had* been cast—a serious question[16]—that would not demonstrate anything about the reasonability of officials' efforts to prevent that outcome.

Worse for the DOJ, the NVRA itself ensures that some people will appear on the SVRL even when no longer eligible to vote. For example, as the DOJ well knows, the NVRA *requires* a waiting period of two federal elections after it appears that a registered voter may have moved before their registration may be cancelled, a delay of at least four years. 52 U.S.C. § 20507(d)(1). Further, the NVRA prohibits

---

[16] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle.*, N.Y. Times (Sept. 24, 2026).

systematic removal of registrants during the ninety-day period before an election, which can add months to the prohibition on removal, especially if a jurisdiction has a special election scheduled between primaries and general elections. *Id.* § 20507(c)(2). The DOJ knows because the federal government regularly warns readers of EAVS reports to use "caution" in assessing those data, because "registrants who are no longer eligible to vote in that state but who have not been removed from the voter lists" are not only common, but required by "the removal process laid out by the NVRA [that] can take up to two election cycles to be completed." U.S. Election Assistance Comm'n, *Election Administration and Voting Survey 2024 Comprehensive Report*, at 131 (2025), https://perma.cc/GKD8-5FN2.[17]

The wide gap between what the requested SVRL data could even hypothetically prove and the reasonableness of Maryland officials' efforts at

---

[17] EAVS data can be helpful in identifying general trends in voting, but its individual data points cannot be used effectively to draw conclusions about the sufficiency of specific states' list maintenance practices. The 2024 EAVS Report never claims to serve that purpose, and instead points to "produc[ing] a general understanding of core aspects of the election process and the management challenges faced by election officials," helping the Commission determine how to better support election officials and voters, and informing lawmakers and the public about the impact of voting laws, among other purposes. *Election Administration and Voting Survey 2024 Comprehensive Report*, *supra* at 238. The Congressional Research Service's overview of that report reminds readers that "some data may not be straightforwardly comparable across years, states, or localities." Karen L. Shanton, Cong. Rsch. Serv., *The Election Administration and Voting Survey (EAVS): Overview and 2024 Findings*, at 2 (2025), https://perma.cc/J6UH-47DQ. And as one researcher aptly described it, the EAVS data is "close enough for social science, but not close enough for the court house." Charles Stewart III, *Is the EAVS a Reliable Guide to Voter List Maintenance?*, MIT Political Science Department Research Paper No. 2018-20, at 3 (2018), https://perma.cc/Q8LM-FXCQ.

maintaining their voter rolls doom the DOJ's arguments under the CRA. But those flawed arguments reflect the context of the DOJ's overall national strategy of CRA demands. Its demands to Maryland and to other states suggest that it neither conducted individualized research into officials' practices, nor took any steps to find out more about state list maintenance practices generally before bringing this lawsuit and others. The DOJ has issued demands to most states, often citing cherry-picked data points diverging from national averages. *See* JA 37 (describing Maryland's number of removed duplicate registrations in a recent EAVS survey as "well below the national average"). But most states will have at least some data points that diverge from averages, without such divergence implicating the reasonableness of officials' efforts. The DOJ did not identify specific problems with Maryland's list maintenance practices; DOJ is conducting, as one court observed, a "fishing expedition." *Amore*, 831 F.Supp.3d at 158. This Court should not, and need not, allow that expedition to seek the most sensitive of voter data categories, untethered to even the ostensible stated purpose.

## CONCLUSION

For the foregoing reasons, in addition to those in the Appellees' briefing, the Court should affirm both that the District Court had jurisdiction, and its dismissal on the merits.

Respectfully submitted,

/s/ Jim Davy

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125
(215) 792-3579
jimdavy@allriselaw.org

Christine Bass
Public Rights Project
490 43rd St., #115
Oakland, CA 94609
(309) 242-8511
christine.bass@publicrightsproject.org

Counsel for Amici Curiae

October 7, 2026

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 5,813 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word 16.103.1, set in Century Schoolbook 12-point type.

/s/ Jim Davy

Jim Davy

**CERTIFICATE OF SERVICE**

I certify that on October 7, 2026 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

I further certify that, after receiving notice that the brief has been accepted for filing, I will file 4 paper copies of this brief with the Clerk of Court within the required time.

I further certify that those paper copies will be identical to the electronically-filed version of the brief.

/s/ Jim Davy

Jim Davy

**APPENDIX**

List of Amici Curiae

*Local Governments*

City of Ann Arbor, Michigan

City of Boston, Massachusetts

County of Los Angeles, California

County of King, Washington

County of Milwaukee, Wisconsin

City of Minneapolis, Minnesota

City of New Haven, Connecticut

City of New Haven, Connecticut

County of Pima, Arizona

City of Rochester, New York

County of San Diego, California

City of San Diego, California

City of San Jose, California

County of Sonoma, California

*Local Elected Officials*

Sandra Balz
Administrative Clerk, Marathon County, Wisconsin

Lisa Brown
Oakland County Clerk/Register of Deeds, County of Oakland, Michigan

Bill Burgess
County Clerk, Marion County, Oregon

Juan Cervantes
County Clerk, Recorder & Registrar of Voters, County of Humboldt, California

Mary R. Clark
Clerk, Delta Charter Township, Michigan

Rich Coglianese
Member, Board of Elections, Union County, Ohio

Lisa Deeley
City Commissioner and Vice Chairperson, City and County of Philadelphia, Pennsylvania

Jilline Dobratz
Clerk, City of West Bend, Wisconsin

Justin Douglas
County Commissioner, County of Dauphin, Pennsylvania

Anjela Hamm
Town Clerk, Town of Farmington, Wisconsin

Victoria Houser
City Clerk, Battle Creek, Michigan

Nicole Hunt
Clerk, Town Of Pine Grove, Pine Grove, Wisconsin

Kristina Irwin
Clerk/Treasurer, Village of Endeavor, Wisconsin

Lisa Lawitzke
Clerk, Bellevue Township, Michigan

Nicholas Lima
Registrar / Director of Elections, City of Cranston, Rhode Island

Dean C. Logan
Registrar-Recorder/County Clerk, County of Los Angeles, California

Daniel Loomis
County Clerk, County of Douglas, Oregon

Robin Major
Elections Administrator, County of Monmouth, New Jersey

Neil Makhija
County Commissioner and Chair of the Board of Elections, County of Montgomery, Pennsylvania

John Myers
Town Clerk, Town of Buxton, Maine

Diane Nelson
Clerk, Brule, Wisconsin

Derrin E. Robinson
County Clerk, County of Harney, Oregon

James Sabatino
Chair, Luzerne County Council, County of Luzerne, Pennsylvania

David Voye
Elections Division Manager, Allegheny County, Pennsylvania

Chris Walker
County Clerk, County of Jackson, Oregon

Kenneth Warner
Elections Commissioner, Cayuga County, New York

Braxton White
Commissioner, County of Clarion, Pennsylvania

Julie Wise
Director, King County Elections, County of King, Washington