No. 26-1878

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellant

v.

JARED DEMARINIS, in his Official Capacity as State Administrator of Elections for the State of Maryland,

Defendant-Appellee

MARYLAND/DC ALLIANCE FOR RETIRED AMERICANS; COMMON CAUSE; OUT FOR JUSTICE, INC.; CARL SNOWDEN; MYRIAM PAUL; LUIS SIMS,

Intervenors/Defendants-Appellees

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# REPLY BRIEF OF THE UNITED STATES AS APPELLANT

*(See inside cover for continuation of counsel)*

*(Continuation of cover)*

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

ANDREW G. BRANIFF
AUDREY WEAVER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 890-0949

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION ........ 1

ARGUMENT

I. Courts play a limited role in assessing the Attorney General's demand under Title III. ........ 2

II. The DOJ's Title III demand contained an adequate statement of the basis and purpose of its demand. ........ 5

A. The statement of the basis contained in a Title III demand need not be a factual basis. ........ 8

B. Two letters may be read as one Title III demand. ........ 10

C. The DOJ's Title III demand contained an adequate statement of the factual basis for its request. ........ 11

D. The DOJ did not waive its argument that the Title III demand contained an adequate statement of the basis for its request. ........ 13

E. The DOJ's Title III demand contained an adequate statement of the purpose for its request. ........ 15

III. Maryland's SVRL falls within the scope of Sections 301 and 303 of Title III. ........ 19

A. The SVRL is a record that came into Administrator DeMarinis's possession. ........ 20

**TABLE OF CONTENTS (continued):** **PAGE**


B. Section 302 does not conflict with list-maintenance requirements under the NVRA or HAVA. .................................................. 28

IV. The DOJ's demand complied with the Privacy Act. ............. 30

V. If this Court reverses, it should instruct the district court to order immediate production of the SVRL. ................................................................. 31

CONCLUSION ................................................................................. 33

CERTIFICATE OF COMPLIANCE

## TABLE OF AUTHORITIES

**CASES:** **PAGE**

*American Oversight v. United States Dep't of Just.*,
45 F.4th 579 (2d Cir. 2022) .......... 30

*Bates v. United States,* 522 U.S. 23 (1997) .......... 15

*Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647 (2021) .......... 31

*Bryan v. United States*, 524 U.S. 184 (1998) .......... 29

*Coleman v. Kennedy*,
313 F.2d 867 (5th Cir. 1963) (per curiam) .......... 17

*Common Cause v. United States Dep't of Just.*,
No. 26-1352 (SLS), 2026 WL 3033772 (D.D.C. Oct. 9, 2026) .......... 1

*Dean v. United States*, 556 U.S. 568 (2009) .......... 15-16

*Donaldson v. United States*, 400 U.S. 517 (1971) .......... 5

*Equal Emp. Opportunity Comm'n v. American Nat'l Bank*,
652 F.2d 1176 (4th Cir. 1981) .......... 11

*Fischer v. United States,* 603 U.S. 480 (2024) .......... 29

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
629 F.3d 387 (4th Cir. 2011) .......... 10-11

*Garcia-Bengochea v. Carnival Corp.*,
57 F.4th 916 (11th Cir. 2023) .......... 21

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) .......... 19

*Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427 (2019) .......... 20

**CASES (continued):** **PAGE**

*High Desert Relief, Inc. v. United States*,
917 F.3d 1170 (10th Cir. 2019) .................................................. 18

*Kennedy v. Lewis*,
325 F.2d 210 (5th Cir. 1963) (per curiam) ...................................... 24

*Kennedy v. Lynd*, 306 F.2d 222 (5th Cir. 1962) ................................ 2-4, 19

*Kennedy v. Owen*, 321 F.2d 116 (5th Cir. 1963) ................................... 24

*Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709 (2018) ............. 19

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ........................... 9

*McIntyre v. Morgan*, 624 F. Supp. 658 (S.D. Ind. 1985) ......................... 19

*Molsbergen v. United States*, 757 F.2d 1016 (9th Cir.1985) ................... 15

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014) ........................................................................ 19

*Project Vote/Voting for Am., Inc. v. Long*,
682 F.3d 331 (4th Cir. 2012) ..................................................... 31-32

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012) ........................................................................ 29

*Taylor v. Freeland & Kronz*, 503 U.S. 638 (1992) ....................................... 8

*Trump v. United States*, 603 U.S. 593 (2024) .............................................. 7

*United States v. Benson*, 819 F. Supp. 3d 753 (W.D. Mich.),
*aff'd,* 179 F.4th 470, *reh'g en banc denied,*
187 F.4th 462 (6th Cir. 2026) ................................................ *passim*

**CASES (continued):** **PAGE**

*United States v. Davis*, 99 F.4th 647(4th Cir. 2024) ................................ 9

*United States Dep't of Just. v. Tax Analysts*,
492 U.S. 136 (1989) ........................................................ 23-25

*United States v. Mississippi*, 380 U.S. 128 (1965) ................................ 19

*United States v. Morton Salt Co.*, 338 U.S. 632 (1950) .......................... 17

*United States v. Powell*, 379 U.S. 48 (1964) ...................................... 3-4, 6

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*,
386 F.3d 581 (4th Cir. 2004) ........................................................ 14

*Yee v. City of Escondido, Cal.*, 503 U.S. 519 (1992) ............................... 13

*Zee Co. v. Williams, Mullen, Clark & Dobbins, P.C.*,
547 F. App'x 166 (4th Cir. 2013) ............................................ 14-15

**STATUTES:**

Civil Rights Act of 1960 (CRA)
52 U.S.C. 20701 ............................................................ *passim*
52 U.S.C. 20702 ............................................................ 28
52 U.S.C. 20703 ............................................................ 2-3, 10
52 U.S.C. 20704 ............................................................ 4, 32
52 U.S.C. 20705 ............................................................ 3
52 U.S.C. 20701-20706 ...................................................... 15
Pub. L. No. 86-449, § 601,
74 Stat. 90 (codified at 52 U.S.C. 10101(e)) ......................... 16

Civil Rights Cold Case Records Collection Act of 2018
Pub. L. No. 115-426, § 2(3)(B),
132 Stat. 5489 (2019)
(44 U.S.C. 2107 note) ........................................................ 22

**STATUTES (continued):** **PAGE**

Help America Vote Act of 2002 (HAVA)
52 U.S.C. 21083(a)(1)(A)(i) .......... 20

National Voter Registration Act of 1993 (NVRA)
52 U.S.C. 20507(i)(1) .......... 31

President John F. Kennedy Assassination
Records Collection Act of 1992
Pub. L. No. 102-526, § 3(2),
106 Stat. 3444 (44 U.S.C. 2107 note) .......... 22

5 U.S.C. 552a(e)(4) .......... 31

5 U.S.C. 552a(e)(7) .......... 30

10 U.S.C. 130c(d)(2)(C) .......... 24

13 U.S.C. 214 .......... 24

26 U.S.C. 7602(a)(1) .......... 3

26 U.S.C. 7605(b) .......... 3

30 U.S.C. 1732(b) .......... 24

44 U.S.C. 3572(f) .......... 24

**LEGISLATIVE HISTORY:**

106 Cong. Rec. 6392 (1960) .......... 9

106 Cong. Rec. 7767 (1960) .......... 9-10

H.R. Rep. No. 956, 86th Cong., 2d Sess. 6, 37, 39 (1959) .......... 24

**REGULATION:** **PAGE**

68 Fed. Reg. 47,611 (Aug. 11, 2003) ....................................................... 31

**RULE:**

Fed. R. Civ. P. 81(a)(5) ............................................................................ 5

**MISCELLANEOUS:**

*Authority to Obtain and Share Statewide Voter Roll Data*,
50 Op. O.L.C. (May 12, 2026),
https://www.justice.gov/olc/media/1440346/dl.................................. 21

Report of the United States Commission on Civil Rights (1959),
https://www.usccr.gov/files/historical/1959/59-001-U.pdf) .......25-26

*The American College Dictionary* (1959 ed.) ......................................... 21

*Webster's Third New International Dictionary* (1966 ed. unabridg.) ..... 22

*Webster's New World Dictionary of the American Language*
(8th coll. ed. 1960) ........................................................................ 8, 21

## INTRODUCTION

Accurate voter rolls are an essential precondition for verifiable and trustworthy elections. The Department of Justice (DOJ) seeks to obtain Maryland's statewide voter registration list (SVRL) to ensure that Maryland is complying with federal law governing the maintenance of that list.[1] The DOJ's request is a lawful exercise of its authority under Title III of the Civil Rights Act of 1960 (CRA), and it is made for the lawful purpose of ensuring Maryland's compliance with the list-maintenance requirements of the National Voter Registration Act of 1993 (NVRA) and the Help America Vote Act of 2002 (HAVA). None of the arguments advanced by Administrator Jared DeMarinis, the Maryland/DC Alliance for Retired Americans (Alliance), and Common

---

[1] A district court has "set[] aside and vacate[d] DOJ's" so-called "Voter List Maintenance Policy." *Common Cause v. United States Dep't of Just.*, No. 26-1352 (SLS), 2026 WL 3033772, at *36 (D.D.C. Oct. 9, 2026). The DOJ has "has appealed [this] decision" and sought "a stay of th[e] decision pending appeal." Doc. 57, at 2, in No. 26-1352. The "DOJ does not interpret [that] decision as pretermitting or requiring dismissal of ongoing" appeals, including this one, related to "obtain[ing] voter rolls." *Id.* at 13.

Cause, (collectively, defendants)[2] support the district court's contrary conclusion.

## ARGUMENT

### I. Courts play a limited role in assessing the Attorney General's demand under Title III.

Defendants claim that "Title III does not create any special exception from the Federal Rules." Common Cause Br. 4. This is incorrect. The federal court hearing on the DOJ's CRA Section 303 demand is a "special statutory proceeding" not subject to the ordinary standards of the Federal Rules of Civil Procedure. *Kennedy v. Lynd*, 306 F.2d 222, 225-226 (5th Cir. 1962) (*Lynd II*). The Attorney General need only make a "simple statement" that the state election official against whom an order of reproduction is sought has "failed or refused to make such papers 'available for inspection, reproduction, and copying.'" *Id.* at 226 (quoting 52 U.S.C. 20703). "There is no place" for a state election official to challenge, or a court to review or require discovery regarding, "the factual support for, or the sufficiency of, the Attorney General's

[2] Because defendants adopted and incorporated by reference the arguments advanced by the others, this brief refers to them collectively throughout. *See* DeMarinis Br. 14 n.8; Common Cause Br. 3; Alliance Br. 2.

'statement of the basis and the purpose therefor' as set forth in the written demand." *Ibid.* (quoting 52 U.S.C. 20703). Title III is satisfied so long as the Attorney General states in writing the basis and purpose of the demand, as happened here. U.S. Br. 36-56.

Defendants argue that *United States v. Powell*, 379 U.S. 48 (1964), requires the ordinary application of those Federal Rules and the factual scrutiny that accompanies a Federal Rule of Civil Procedure 12(b)(6) motion. Common Cause Br. 7-9. But *Powell* involved an Internal Revenue Service (IRS) summons served on a taxpayer, and it authorized judicial inquiry only because Section 7605(b) of the Internal Revenue Code (IRC) prohibited the IRS from subjecting a taxpayer "to unnecessary examination or investigations," 379 U.S. at 52-53 (quoting 26 U.S.C. 7605(b)), and limited the IRS to documents "relevant or material" to its inquiry, 26 U.S.C. 7602(a)(1). The CRA contains no comparable textual limitation on the Attorney General's authority to compel production of covered records. U.S. Br. 15-18. Common Cause responds that *Powell* controls anyway because the CRA, like the IRC, authorizes enforcement "by appropriate process," 52 U.S.C. 20705, without specifying a particular procedure. Common Cause Br. 7-8. That does not follow: the

IRC's "relevant or material" and "necessary" limitations have no CRA analogue. *Cf. Powell*, 379 U.S. at 53 (explaining what would render an investigation "unnecessary").

*Lynd II*, on the other hand, is directly on point. U.S. Br. 39-41. The district court simply may examine the factual sufficiency of the Attorney General's stated basis and purpose. *Lynd II*, 306 F.2d at 226. Nor does *Lynd II*'s further observation that the Attorney General there demanded "public records which ought ordinarily to be open to legitimate reasonable inspection," as opposed to "confidential, private papers and effects," *id.* at 231, describe the outer boundary of Title III's coverage. *Contra* DeMarinis Br. 39-40. In *Lynd II*, the court was explaining why the delay in permitting inspection was unwarranted given the nature of the records at issue. *Lynd II*, 306 F.2d at 230-231. Were Title III limited to "public records" containing no sensitive information, its own confidentiality provision, 52 U.S.C. 20704, would serve no purpose.

Defendants also argue that the Federal Rules apply by default to a proceeding to compel production via the Attorney General's written demand because the United States has filed a complaint. Common Cause Br. 8-9. But that rule yields when the procedural requirements are

"otherwise provided by statute." Fed. R. Civ. P. 81(a)(5). And in any event, the Supreme Court has held that even when the federal rules "have an application to a summons proceeding," they "are not inflexible in this application" and should not be read to "impair a summary enforcement proceeding so long as the rights of the party summoned are protected and an adversary hearing, if requested, is made available." *Donaldson v. United States*, 400 U.S. 517, 528-529 (1971).

The CRA Section 305's summary procedure, combined with the absence of any textual standard against which to judge the demand, confirms that there are no grounds for subjecting the basis and purpose of a Section 303 demand to judicial scrutiny. *See generally United States v. Benson*, 187 F.4th 462, 479-480 (6th Cir. 2026) (*Benson III*) (Thapar, J., dissenting from the denial of reh'g en banc).

## II. The DOJ's Title III demand contained an adequate statement of the basis and purpose of its demand.

Defendants allege that DOJ's written demand fails to satisfy Title III because it lacks a statement of the basis and the purpose of the demand. Common Cause Br. 10-23. But their objections ultimately amount to a disagreement over the DOJ's discretionary decision to investigate and invoke Title III for that end. *See, e.g.*, Common Cause Br.

14, 18. The United States has already methodologically refuted these arguments. *See* U.S. Br. 36-56. Defendants' briefs, however, leave nearly all of these arguments unanswered.

They have no answer to the plain language of Title III, which provides no textual limit to the Attorney General's purpose or basis—nor standard upon which such scrutiny could be applied. *See* U.S. Br. 37, 44-45. They have no answer to the extremely limited role courts play in scrutinizing Title III demands, in large part due to the special statutory proceeding contemplated in Title III. *See* U.S. Br. 38-48. And even in administrative subpoenas—which this is not—that role remains limited. *See* U.S. Br. 45-47.

They have no answer to the pre-enforcement and investigative purpose of the demand, which does not require the DOJ to show proof of a law violation or the probative value of the records. *See, e.g.*, U.S. Br. 38-41, 47; *Powell*, 379 U.S. at 53, 57, (explaining an agency "can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not" (citation omitted)). Again, "[t]he Executive Branch has 'exclusive authority and absolute discretion' to decide which crimes to investigate and prosecute, including with respect to allegations

of election crime." *Trump v. United States*, 603 U.S. 593, 620 (2024). If the DOJ were required to possess evidence establishing the likelihood of a violation before sending an investigative demand, there would be little point in Title III—the DOJ could simply file suit and obtain records through discovery.

They have no answer for the heavy burden they must carry to overcome the presumption of good faith and establish an abuse of the Court's process through an improper, pretextual purpose. *Compare* U.S. Br. 53-56, *with* Common Cause Br. 20-23. It is not the role of this court to make determinations about legitimate and pretextual purposes in a vacuum—and defendants don't point to any alternative analytical framework for evaluating their pervasive allegations of pretext. The list could go on.

Instead of addressing these arguments, defendants largely appeal to consensus and repeatedly invoke non-binding district court decisions that have disagreed with the United States. *See* Common Cause Br. 13-17, 20. Needless to say, the number of courts adopting a position is no substitute for its legal merit.

What remains are four narrow contentions: that the "basis" described in Title II must be "factual, not legal" (Common Cause Br. 11), that it be contained in "one written demand" (Common Cause Br. 13), that the Election Administration and Voting Survey (EAVS) of States data anomalies supporting the request constitute an insufficient factual basis (Common Cause Br. 14-15), and that the DOJ somehow waived or forfeited this argument (Common Cause Br. 12-13). None of these arguments withstand scrutiny.

### A. The statement of the basis contained in a Title III demand need not be a factual basis.

Nothing in the statute's text indicates that the "basis" of a Section 303 demand must be a *factual* basis. Rather, dictionary definitions of the terms "basis" and "purpose" indicate that the purpose of a Section 303 request is its reason, end, or intent, while its basis is its justificatory principle. *See Webster's New World Dictionary of the American Language* 112, 1182 (8th coll. ed. 1960) (*Webster's New World*) (defining "purpose" as the "intent, aim, or object of an act," and "basis" as the "chief supporting factor" and "the basic principle or theory"). A "basis" need not be factual—it must only be foundational.

Legal usage elsewhere bears this out. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 641 (1992) (holding that there was "no statutory basis" for a debtor's attempt to shield lawsuit proceeds from creditors (citation omitted)); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 389 (2024) (describing its review of National Labor Relation Board conduct as limited to assessing whether its determination had a "reasonable *basis in law*" (emphasis added; citation omitted)). Indeed, this Court frequently weighs in on whether a prison sentence is "based on" specific *legal* authority, *i.e.*, the Sentencing Guidelines. *See, e.g.*, *United States v. Davis*, 99 F.4th 647, 655 (4th Cir. 2024) (noting that a "defendant who has been sentenced to a term of imprisonment based on a sentencing range that has subsequently been lowered by the Sentencing Commission . . . may sometimes provide a basis for compassionate release" (internal citations omitted)).

Such an understanding tracks the legislative history: the "basis and purpose" requirement gives the recipient notice both "as to why such an inspection was being made" (*i.e.*, the "purpose" or reason), and "what law or what constitutional provision, right, or immunity might be involved" (*i.e.*, the basis, or underlying principle behind the request). 106 Cong.

Rec. 6392 (1960) (statement of Rep. Cramer); *see also* 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating) (stating that the Attorney General need only "identify in a general way" the reasons for the demand).

**B. Two letters may be read as one Title III demand.**

Defendants are similarly mistaken that the DOJ's multiple demands may not be read together. Common Cause Br. 12-13. Under 52 U.S.C. 20703, the Attorney General may issue a written demand for records or papers required to be retained under the Civil Rights Act. While the statute itself does not explicitly address whether multiple demands can be read together as one, courts should consider the context of multiple related demands to determine their collective purpose and effect.

The fundamental purpose of a demand or notice requirement is to provide the recipient with effective and timely notice that enables them to understand the basis for the complaint and take corrective action. The key consideration is whether the notice contains sufficient information to permit the recipient to identify the alleged violations and bring itself into compliance. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 400 (4th Cir. 2011). Although *Friends of the Earth*

addresses notice requirements of the Clean Water Act under 33 U.S.C. 1365, it demonstrates that the requirement of adequate notice does not require a plaintiff to "to list every specific aspect or detail of every alleged violation." *Friends of the Earth, Inc.*, 629 F.3d at 400 (citations omitted).

When multiple notice letters addressing the same underlying charges or allegations and are sent as part of a coordinated effort to provide notice and seek compliance, they should be construed together as a single demand under this established principle. *See Equal Emp. Opportunity Comm'n v. American Nat'l Bank*, 652 F.2d 1176, 1186 (4th Cir. 1981) (explaining that multiple letters and conciliation failure notices provided defendant with sufficient awareness as to the charges against the company and all of its branches). The fact that the letters may have been sent at different times does not preclude their being read together, particularly when the recipient was aware of all communications and they were intended to accomplish the same purpose—compliance under federal law.

### C. The DOJ's Title III demand contained an adequate statement of the factual basis for its request.

Even accepting defendants' factual-predicate theory, the July 14 letter listed several anomalies in Maryland's voter registration data

identified from Maryland's EAVS responses. JA36-37. These are not, as defendants suggest merely based on "normal variation in state practices." Common Cause Br. 14. For example, the letter described that Maryland reported nearly as many active registered voters as the citizen voting age population in Maryland, with a registration rate in 2024 of 95.9% of the citizen voting age population and a similar unusually high ratio of registered voters to citizens for several prior years. JA36. As another example, the letter highlighted that Maryland reported only 430 registered voters were removed for duplicate registrations during the relevant period, well below the national average. JA37. In addition, the letter described that an October 2023 audit identified potentially thousands of deceased individuals with active voter registrations, found local boards of election were not removing deceased voters promptly, and found duplicate voter registrations were not being removed from voter rolls. JA37. The letter also requested a list of the election officials responsible for implementing Maryland's general program of voter registration list maintenance for a specified time and a description of the list maintenance steps taken and when those steps were taken to assess compliance with the NVRA. JA35. The letter also requested a current

electronic copy of Maryland's computerized SVRL, as required by Section 303(a) of HAVA. JA35-36. A State's federally enforceable list-maintenance obligations under HAVA and the NVRA are themselves a "basis" for inquiry no less than a citation to statistical anomalies would be.

### D. The DOJ did not waive its argument that the Title III demand contained an adequate statement of the basis for its request.

Defendants finally argue that because the DOJ maintained that the term "basis" refers to a legal basis, the DOJ somehow conceded its argument that the demand contained a sufficient factual basis on appeal. Common Cause Br. 12. Defendants go so far as to suggest the DOJ "has all but conceded throughout this litigation that it lacks a factual basis for its demand." *Ibid.* That assertion is unfounded for at least three reasons.

First, defendants ignore the DOJ's repeated and consistent assertions before the district court that its demand complied with Title III, including the basis and purpose requirement. *See, e.g.,* JA31-32 (¶¶ 23-25, 28-29). Having "properly presented" its Title III claim, the DOJ "can make any argument in support of that claim[.]" *Yee v. City of Escondido, Cal.*, 503 U.S. 519, 534 (1992). After all, "parties are not

limited to the precise arguments they made below[,]" nor are they "limited to the manner in which the question was framed below." *Id.* at 534-535. This Court is still "obliged on appeal to consider any theory plainly encompassed by the submissions in the underlying litigation." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co., Inc.*, 386 F.3d 581, 604 (4th Cir. 2004). That the demand contained a sufficient factual basis, assuming Title III requires one, is an argument plainly encompassed in the DOJ's Title III claim.

Second, the DOJ's conditional request for an opportunity to cure the demand did not concede that its demand was legally deficient. The DOJ made its alternative request "to send the Defendants a curing elaboration letter *rather than* [the court] dismiss[ing] on the merits" "*[i]f* the Court is persuaded by *Galvin's* formalistic approach[.]" JA195 (emphases added); *see also* Common Cause Br. 12. The DOJ expressly disavowed *Galvin*'s holding: "[t]he United States respectfully disagrees with Galvin's overly formalistic interpretation of CRA procedure." JA194. Of course, plaintiffs may assert "conflicting alternative theories . . . without one constituting an admission against the other." *Zee Co. v. Williams, Mullen, Clark &*

*Dobbins, P.C.*, 547 F. App'x 166, 168 n.3 (4th Cir. 2013); *see also Molsbergen v. United States*, 757 F.2d 1016, 1019 (9th Cir.1985).

More fundamentally, advocating a particular statutory interpretation is not a factual concession. The DOJ's argument below concerned what Title III requires, not what the demand does not contain. Defendants improperly conflate the two distinct inquiries. Nor can this Court turn a blind eye to the factual basis clearly pled in the complaint and evident on the face of the letters. *See* U.S. Br. 48-50.

### E. The DOJ's Title III demand contained an adequate statement of the purpose for its request.

Defendants allege that that the statutorily required "purpose" under Title III is "an explanation of how the requested records would help determine if there is a legal violation" Common Cause Br. 16. No such limitation appears in the statute. *See* 52 U.S.C. 20701-20706. Because courts ordinarily should "resist reading words or elements into a statute that do not appear on its face[,]" *Dean v. United States*, 556 U.S. 568, 572 (2009) (quoting *Bates v. United States*, 522 U.S. 23, 29 (1997)), there is no call to impose an extratextual limit on Section 303's purpose requirement.

The United States identified HAVA and NVRA compliance as the purpose of its demand from the very first letter. The July 14 letter disclosed the DOJ sought "to ensure that the state's list maintenance program has been properly carried out in full compliance with the NVRA." JA35. The August 18 Letter also stated that "the purpose of [the Department's] request [for the unredacted SVRL] is to ascertain Maryland's compliance with the list maintenance requirements of the NVRA and HAVA." JA47.

"[N]othing" in the statutory text "limits the purposes for which the DOJ may request the records" under Title III. *Benson III*, 187 F.4th at 467 (Murphy, J., concurring). When Congress wants to limit permissible investigative purposes, it knows how. *See* U.S. Br. 42-27 (discussing administrative-subpoena statutes). And elsewhere in the CRA, Congress limited remedies to particular harms (namely, racial discrimination). *See* Pub. L. No. 86-449, § 601, 74 Stat. 90 (1960) (applying Title VI of the CRA to violations of rights "on account of race or color") (52 U.S.C. 10101(e)). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the

disparate inclusion or exclusion." *Dean*, 556 U.S. at 573 (alteration in original; citation omitted). Under Title III, it is sufficient that the Attorney General is "investigating possible violations of a Federal statute." *Coleman v. Kennedy*, 313 F.2d 867, 868 (5th Cir. 1963) (per curiam) (quoting 106 Cong. Rec. 7767 (1960) (statement of Sen. Keating)).

Even assuming Section 303 imposes some implicit outer limit on permissible purposes, this demand falls comfortably within it: federal agencies generally may investigate "merely on suspicion" of noncompliance, or "just because" they want assurance of compliance. *United States v. Morton Salt Co.*, 338 U.S. 632, 642-643 (1950).

Defendants further contend that the United States' stated purpose is pretextual—that DOJ's true aim is to assemble a national voter database, target voters for removal, or advance immigration enforcement. Common Cause Br. 20-23. That contention "go[es] to the truth of the DOJ's allegations and cannot be addressed on a motion to dismiss." *United States v. Benson*, 819 F. Supp. 3d 753, 767 (W.D. Mich.) (*Benson I*), *aff'd*, 179 F.4th 470 (*Benson II*), *reh'g en banc denied*, *Benson III,* 187 F.4th 462 (6th Cir. 2026). In any event, defendants' evidence of pretext consists of public statements by federal officials and Executive

Orders concerning voter-list initiatives generally, all of which are consistent with the demand's stated purpose of assessing Maryland's own compliance with the NVRA and HAVA. Consistent conduct is not evidence of pretext.

Much of defendants' pretext narrative, moreover, rests not on the Complaint or the demand letter but on newspaper articles, an anonymous former employee's account, and filings from unrelated litigation in other jurisdictions. Common Cause Br. 21-23. Such material is either irrelevant (such as filings in the unrelated litigation) or not properly before this Court on review of a Rule 12(b)(6) dismissal, which tests the sufficiency of the operative pleading. And once again, advocating a particular statutory interpretation of Title III's basis-and-purpose requirement is not a factual concession, much less an admission of the veracity of defendants' rank speculation and insinuation. *Compare* Common Cause Br. 22 (suggesting the DOJ "does not deny" and "has no answer for" their "evidence"), *with* pp. 14-15, *supra* (demonstrating DOJ evidence).

Defendants' outside-the-pleadings hearsay does not satisfy the "heavy burden" of showing bad faith. *High Desert Relief, Inc. v. United*

*States*, 917 F.3d 1170, 1183 (10th Cir. 2019) (citation omitted). This Court should disregard it.

## III. Maryland's SVRL falls within the scope of Sections 301 and 303 of Title III.

Title III provides that "[e]very officer of election shall retain and preserve" for 22 months after a federal election, "all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election." 52 U.S.C. 20701.

Maryland's SVRL comes within the scope of Title III's "sweeping" retention provision. *Lynd II*, 306 F.2d at 226; *see also United States v. Mississippi*, 380 U.S. 128, 134 (1965) ("Title III . . . requires that records of voting registration be kept."); *McIntyre v. Morgan*, 624 F. Supp. 658, 664 (S.D. Ind. 1985) (stating that Title III encompasses "voting registration records"). In interpreting Title III, this Court should "begin[] and end[] with the text," *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 553 (2014), with "the assumption that the ordinary meaning of that language accurately expresses the legislative purpose," *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175 (2009) (citation omitted).

Section 301 covers records "relating to any application, registration, payment of poll tax, or other act requisite to voting." 52 U.S.C. 20701. The term "relating to" should be defined "expansively." *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717-718 (2018). In Section 301, the phrase expands the type of records to be preserved beyond simply applications, registrations, or receipts for payments. 52 U.S.C. 20701. Instead, any record "relating to" one of those activities—or even relating to the catchall "other act requisite to voting"—must be preserved. *Ibid.* The SVRL is not just a record that relates to voter registration, it is the preeminent and statutorily mandated record that governs all state voter registrations. 52 U.S.C. 21083(a)(1)(A)(i) ("The computerized list shall serve as the single system for storing and managing the official list of registered voters throughout the State."). And contrary to defendants' arguments, there is no carve-out for state-created records.

### A. The SVRL is a record that came into Administrator DeMarinis's possession.

A majority of the Sixth Circuit recently expressed agreement with the United States that an SVRL is a record that "come[s] into [the] possession" of a State's chief election official. *Benson III*, 187 F.4th at 465

(Murphy, J., concurring); *id.* at 472-473 (Griffin, J., dissenting); *id.* at 478-479 (Thapar, J., dissenting).

1. When a statute does not itself define a term, courts "ask what that term's ordinary, contemporary, common meaning was" at the time of enactment. *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433-434 (2019) (citation and internal quotation marks omitted). An officer comes into possession of any record or document the moment that he "get[s]" or "acquire[s]" it and retains it within his control. *Webster's New World* 291; *see id.* at 1140 (defining "possess" and "possession"); *id.* at 13 (defining "acquire" as "1. to get or gain by one's own efforts or actions. 2. to get possession of; get as one's own"). "Come into possession" is a broad term that both focuses the inquiry on the *moment* at which possession was obtained and denotes "possession by any means." *Garcia-Bengochea v. Carnival Corp.*, 57 F.4th 916, 933 (11th Cir. 2023) (Jordan, J., concurring); *see The American College Dictionary* 11 (1959 ed.) (defining "acquire"). The term "come into his possession" is broad enough to include both voter-generated and state-generated documents. *See* Authority to Obtain and Share Statewide Voter Roll Data, 50 Op. O.L.C. (May 12, 2026) (slip op. at 8-9), https://www.justice.gov/olc/media/1440346/dl.

The word "come" cannot create a carve-out for self-generated documents. *See* DeMarinis Br. 16-17. If anything, Congress used the phrase "*come* into his possession" rather than "*are* in his possession," not to impose an unwritten carve-out for records or documents that are self-generated, but to focus on *how* and *when* the officer gains possession of the records or documents in the first instance.[3] 52 U.S.C. 20701; *see* *Webster's Third New International Dictionary* 453 (1966 ed. unabridg.) (defining "come into" as "to enter upon or into possession of: acquire esp. as an inheritance").

A majority of the en banc Sixth Circuit recently acknowledged the possibility that the phrase "come into . . . possession" had developed a meaning contrary to defendants' interpretation here. *Benson III*, 187 F.4th at 465 (Murphy, J., concurring); *see also id.* at 470-471 (Griffin, J., dissenting); *id.* at 478-479 (Thapar, J., dissenting). It "was a familiar legal expression" at the time Congress enacted Title III, "regularly used

[3] *See also* Civil Rights Cold Case Records Collection Act of 2018, Pub. L. No. 115-426, § 2(3)(B), 132 Stat. 5489 (2019) (44 U.S.C. 2107 note) (referring to a record that "was created or made available for use by, obtained by, or otherwise came into the possession of" an agency or governmental body); President John F. Kennedy Assassination Records Collection Act of 1992, Pub. L. No. 102-526, § 3(2), 106 Stat. 3444 (44 U.S.C. 2107 note) (same).

. . . to describe when a person lawfully assumed possession of property through an office, employment, or other legal authority." *Id.* at 470 (Griffin, J., dissenting). But that phrase "did not distinguish property according to its source," so "records that come into an official's possession could include self-created records." *Id.* at 470-471 (Griffin, J., dissenting). In other words, "[t]he more natural inference is that . . . 'come into possession' [was] a familiar legal formulation identifying when the statutory duty attached, not . . . creating a separate substantive limitation on the records covered." *Id.* at 471 (Griffin, J., dissenting). There is, in short, no external-source limitation to be found in the text of Title III. *Ibid.*; *Benson II*, 179 F.4th at 485 n.3, 486 n.7 (Nalbandian, J., dissenting).

The Supreme Court has demonstrated a similar understanding of the term. In cases under the Freedom of Information Act, the Supreme Court has imposed two requirements for a document to be an agency record: "First, an agency must either *create or obtain* the requested materials," and second, "the materials [must] have *come into the agency's possession* in the legitimate conduct of its official duties" and remain in the agency's possession at the time of a records request. *United States*

*Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 144-145 (1989) (citation and internal quotation marks omitted; emphasis added). Thus, the Supreme Court has made clear that an agency record created by the agency can be said to have "come into the agency's possession"—coming into possession of material refers to when and how the possession began. *See id.* at 145-146.[4]

Numerous statutes use similar phrases to regulate acquiring information or property *through improper means* or to trigger duties to act based on acquiring information or property *at a particular time*. *See, e.g.*, 10 U.S.C. 130c(d)(2)(C); 13 U.S.C. 214; 30 U.S.C. 1732(b); 44 U.S.C. 3572(f). Moreover, decisions contemporaneous to the statute's passage confirm the point. *See Kennedy v. Owen*, 321 F.2d 116, 117 (5th Cir. 1963) (per curiam) (requiring the district court "to order each appellee to make available . . . all records and papers *in the possession*, custody or control of said appellee" (emphasis added)); *Kennedy v. Lewis*, 325 F.2d 210, 212

[4] It is irrelevant that *Tax Analysts* interpreted Freedom of Information Act in lieu of the CRA. *Cf.* DeMarinis Br. 19, n.9. The Court's unremarkable use of the phrase as a matter of ordinary language "suggest[s] that the phrase naturally describes the assumption of official custody regardless of whether the records were created within or received from outside the agency." *Benson III*, 187 F.4th at 471 (Griffin, J., dissenting).

(5th Cir. 1963) (per curiam) (requiring the district court to grant the same inspection rights); *see also* H.R. Rep. No. 956, 86th Cong., 2d Sess. 6, 37, 39 (1959) (explaining that Section 301 "would include *all records and papers* in the possession of election officers" (emphasis added)).

Election officers in Maryland acquired records and information from individual voters in the course of carrying out their duties. When they aggregated those individual records into one new, single record—the SVRL—they acquired that new record and retained it within their control, thus coming into possession of the SVRL. *See Benson II*, 179 F.4th at 484 (Nalbandian, J., dissenting). The moment of the SVRL's creation is the relevant moment; after that moment, the creating officer possesses a new document that he or she previously did not possess. *See Tax Analysts*, 492 U.S. at 144-145.

2. Context further demonstrates that Congress would not have created such a distinction between documents received from outside sources and those generated by state officers. As Judge Nalbandian has pointed out, one of the practices in the Jim Crow South when Title III was enacted was "the use of 'voucher' systems, whereby municipalities required prospective voters to find registered voters who could vouch for

them." *Benson II*, 179 F.4th at 486 (Nalbandian, J., dissenting) (citing Report of the United States Commission on Civil Rights at 93 (1959) (1959 CCR Report), https://www.usccr.gov/files/historical/1959/59-001-U.pdf); *see also id.* at 475, 479 (majority opinion) (relying on the same report). "[C]ounty boards of registrars maintained internal indices that tracked the number of times each registered voter 'vouched' for an applicant." *Id.* at 486 (Nalbandian, J., dissenting) (citation omitted). These indices would be government-created records, but once an index was passed "up the ladder," the receiving "state official came into possession of the index." *Ibid.* The indices were critical evidence for the Commission because at least one state legislature had passed a bill permitting the destruction of the registration applications themselves. 1959 CCR Report at 137. These were among the records that the Commission recommended that Congress make available for federal inspection. *Id.* at 137-138.

And the Commission itself reviewed self-generated records, including overall voter registration lists for specific counties showing severe disparities in the registration rates of black and white citizens. 1959 CCR Report at 75, 82, 89. The Commission also gathered evidence

of self-generated actions by county registrars, like error corrections on white voter registration applications. *Id.* at 87-88, 93. These county tally sheets and county voter registration lists have now been replaced by the electronic SVRL as required by HAVA.

In short, documents created by state agencies historically were some of the very types of records that the United States sought to investigate to weed out discrimination. Defendants' reading would exclude from the reach of Sections 301 and 303 all the most blatant evidence of discrimination—such as internal memoranda and documents showing whether officers accepted a proper application, including the SVRL. *See Benson II*, 179 F.4th at 486 n.7 (Nalbandian, J., dissenting).

2. Even accepting an external-source limitation, though, Title III imposes an *officer-specific* duty to preserve and produce certain voting-related records coming into the officer's possession, which would encompass the SVRL. *See* 52 U.S.C. 20701. A majority of the en banc Sixth Circuit recently agreed that Title III's "language imposes a specific duty on an individual (each officer of election), not a general duty on the entire State." *Benson III*, 187 F.4th at 465 (Murphy, J., concurring); *see id.* at 473 (Griffin, J., dissenting); *id.* at 479 (Thapar, J., dissenting). That

the fines and penalties follow the individual state official having possession of those records confirms the point. *See* 52 U.S.C. 20701.

"As long as even one 'officer[] of election' . . . 'comes into . . . possession' of the voter list, Title III applies." *Benson II*, 179 F.4th at 487 (Nalbandian, J., dissenting) (second ellipsis in original; footnote omitted) (quoting 52 U.S.C. 20701). So even if *some* state officials created the SVRL—"and therefore didn't 'come into . . . possession' of the list themselves" under the district court's reading—Administrator DeMarinis "nonetheless 'c[a]me into . . . possession' of the [SVRL]" when she received it from other election officers. *Ibid.* (first brackets and ellipsis in original) (quoting 52 U.S.C. 20701).

### B. Section 302 does not conflict with list-maintenance requirements under the NVRA or HAVA.

Defendants next argue that reading Section 301 to cover an SVRL that is regularly updated would put Maryland in the position of "willfully . . . alter[ing]" a covered record every time it performs list maintenance, in violation of Section 302. 52 U.S.C. 20702; DeMarinis Br. 24; Common Cause Br. 3. A majority of the Sixth Circuit's judges found Title III of the CRA could be harmonized with the list maintenance requirements of the NVRA and HAVA to capture the SVRL in some form or another. *See*

*Benson III*, 187 F.4th at 468 (Murphy, J., concurring); *id.* at 473-474 (Griffin, J., dissenting); *id.* at 479 n.7 (Thapar, J., dissenting).

First, the surrounding verbs elucidate the meaning of "alter" in this provision, which eliminates any conflict. *See Fischer v. United States*, 603 U.S. 480, 487 (2024). Those verbs all describe actions typically taken to make a document unavailable, inaccessible, or inaccurate for evidentiary purposes. *See id.* at 489-490 (describing a similar list of verbs). The SVRL is, as required by the NVRA and HAVA, an inherently evolving and changing record. List maintenance keeps the SVRL current; it does not "alter" it as that term is used in Section 302.[5] *See Benson III*, 187 F.4th at 473-474 (Griffin, J., dissenting).

Second, Section 302's prohibition on altering "record[s] or paper[s]" is accompanied by a mens rea requirement. The requirement that any penalizable alteration must be *willful* shows beyond all doubt that list maintenance under the NVRA and HAVA could never run afoul of the CRA's ban on altering records. *See Bryan v. United States*, 524 U.S. 184,

[5] Even if the statutes were truly inconsistent, the "specific" list-maintenance requirements in the NVRA and HAVA would merely create "an exception" to the "general" prohibition in Section 302. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

191-192 (1998) (citation omitted) ("[I]n order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'").

**IV. The DOJ's demand complied with the Privacy Act.**

1. Defendants argue (Alliance Br. 2-7) that the mere disclosure of an individual's presence or absence from the SVRL implicates the Privacy Act. *See* 5 U.S.C. 552a(e)(7). They specifically allege that the United States must issue a new Statement of Records Notice (SORN) because it does not adequately describe the records sought to be collected by the DOJ. Alliance Br. 4-7.

With regard to the DOJ's applicable SORN (*see* U.S. Br. 60-62), Defendants object that the SORN's coverage of "subjects of investigations" and "victims" cannot describe ordinary registered voters. Alliance Br. 5. But a "subject" is simply a person about whom an agency gathers information in connection with an investigation, in contrast to a "target," who is a person against whom the agency has substantial evidence of a violation. *American Oversight v. United States Dep't of Just.*, 45 F.4th 579, 582 n.2 (2d Cir. 2022). And no defendant explains why an eligible voter is not a potential "victim" of NVRA or HAVA non-

compliance when that voter's vote may be diluted by an inaccurate roll. Because votes case by eligible voters may be diluted by those cast by ineligible voters, *see Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 672 (2021), eligible voters are potential "victims" of NVRA and HAVA non-compliance, 68 Fed. Reg. 47,611 (Aug. 11, 2003). The related objection that the SORN does not adequately disclose DOJ's intended use of the data (Alliance Br. 4) demands more specificity than the Act requires; it obligates the agency to disclose "each routine use of the records" and "the purpose of such use," 5 U.S.C. 552a(e)(4), and the published SORN does so.

## V. If this Court reverses, it should instruct the district court to order immediate production of the SVRL.

This Court should reverse the district court's judgment and remand with instructions to order Administrator DeMarinis to immediately produce the requested unredacted SVRL. Defendants rely predominantly on cases interpreting provisions of the NVRA to support their belief redactions are required here. Common Cause Br. 23-24. But the NVRA requires *public* inspection, allowing inspection by *any* party. *See* 52 U.S.C. 20507(i)(1). Because the CRA requires disclosure to the Attorney General, not the public, these authorities are inapposite. *See, e.g.*, *Project*

*Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) (allowing redactions in the NVRA context to cure "an intolerable burden on [the constitutional right to vote]" for a "statute that conditions voting on *public release*" (citation omitted; emphasis added)).

Precisely because such privacy concerns might be implicated with public disclosure, Title III prohibits the Attorney General from "disclos[ing] any record or paper produced pursuant to [Title III], or any reproduction or copy, except to Congress and any committee thereof, governmental agencies," and in judicial proceedings, "[u]nless otherwise ordered by a [federal] court." 52 U.S.C. 20704. None of the public disclosure concerns justifying redactions in the context of the NVRA justify redactions of the SVRL to the DOJ here. Administrator DeMarinis must produce the unredacted SVRL.

**CONCLUSION**

This Court should reverse and remand with an order requiring Administrator DeMarinis to produce the current unredacted SVRL to the Department of Justice.

Respectfully submitted,

HARMEET K. DHILLON
Assistant Attorney General

ERIC A. SELL
Deputy Assistant Attorney General

s/ Audrey Weaver
ANDREW G. BRANIFF
AUDREY WEAVER
Attorneys
Department of Justice
Civil Rights Division
Appellate Section
Ben Franklin Station
P.O. Box 14403
Washington, D.C. 20044-4403
(202) 890-0949

Date: October 21, 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limits of Federal Rule of Appellate Procedure 27(d)(2)(A) because the motion contains 6446 words, excluding the parts exempted by Federal Rules of Appellate Procedure 27(d)(2) and 32(f). This motion also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared in Century Schoolbook 14-point font using Microsoft Word for Microsoft 365.

s/ Audrey A. Weaver
AUDREY A. WEAVER
Attorney

Date: October 21, 2026